**FILED**

OCT 1 5 2018

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____ _N.V._____,DEPUTY



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

Civil Action No.:

CARTER PAGE,

Plaintiff,

v.

DEMOCRATIC NATIONAL
COMMITTEE; PERKINS COIE LLP;
MARC ELIAS; AND MICHAEL
SUSSMANN,

Defendants.

**JURY TRIAL DEMANDED**

**COMPLAINT**    CIV 18 1019

HE

False rumors – Libel, Slander and False Rumors
(Oklahoma Statutes, Title 21 §§ 771-781)

Anti-Terrorism Act (18 U.S. Code §§ 2331-2333)

Prohibitions against the financing of terrorism (18
U.S. Code § 2339C)

Tortious Interference (Restatement (Second) of Torts
§  766A; Oklahoma Statute, Title 23 §  9.1)

RICO (18 U.S.C. § 1962(c))

RICO Conspiracy (18 U.S.C. § 1962(d))

Carter Page
c/o Global Natural Gas Ventures LLC
101 Park Ave., Suite 1300
Oklahoma City, OK 73102
Phone (405) 825-0172
Fax     (405) 825-0177
cpage@globalenergycap.com

## TABLE OF CONTENTS

I.  INTRODUCTORY STATEMENT ...................................................................3

II.  PARTIES ..............................................................................................................5

III.  JURISDICTION, VENUE, AND CONDITIONS PRECEDENT ...........................7

IV.  GENERAL ALLEGATIONS ..............................................................................9

   A.  Immediate Aftermath of False Reports and Proliferation of Harms to Dr. Page .........12

   B.  BuzzFeed's Release of the Full Dodgy Dossier ....................................................17

   C.  Steps to Mitigate Life-Threatening Risks and Other Damages.............................20

   D.  Congressional Revelations: Conspiracy between Defendants and U.S. Government .........21

   E.  Corporate Policies and Procedures .....................................................................24

   F.  Perkins Coie and the DNC Should Not Profit at Dr. Page's Significant Expense ...............24

V.  Causes of Action .................................................................................................26

   COUNT 1: Defamation and Defamation Per Se Against All Defendants ........................26

   COUNT 2:  Acts of Terrorism Transcending National Boundaries Against All Defendants ........28

   COUNT 3: Financing of Terrorism Against All Defendants ....................................29

   COUNT 4: Tortious Interference Against All Defendants..........................................30

   COUNT 5: RICO against all Defendants ..............................................................32

   COUNT 6: RICO Conspiracy against All Defendants ..............................................35

VI.  PRAYER FOR RELIEF......................................................................................36

VII.  DEMAND FOR JURY TRIAL.............................................................................37

Plaintiff, Carter Page ("Dr. Page"), for his Complaint against Defendants Democratic National Committee ("DNC"), Perkins Coie LLP ("Perkins Coie"), Marc Elias ("Mr. Elias") and Michael Sussmann ("Mr. Sussmann") alleges the following:

## I.    INTRODUCTORY STATEMENT

1.    Dr. Page brings this action to hold the DNC, Perkins Coie, Mr. Elias and Mr. Sussmann (together, the "Defendants"), accountable for defaming him by funding and distributing to the media an extensive series of statements about him that they knew to be false.  Specifically, between approximately June 2016 through at least September 2016, the Defendants and their consultants each provided to multiple media organizations and U.S. Government institutions damaging, life-threatening documents or verbal allegations regarding Dr. Page that were entirely false.

2.    The slanderous statements made and libelous documents provided by the DNC, Perkins Coie, their employees including Mr. Elias and Mr. Sussmann, and their consultants led to many false and malicious unprivileged publications by writing, printing, or other fixed representation to the eye.  These offenses directly exposed Dr. Page to public hatred, contempt, ridicule and obloquy, which severely deprived him of public confidence, and injured him severely in all of his occupations, and tended to scandalize both his colleagues and friends.

3.      On September 23, 2016, Yahoo News published an article filled with false

allegations from the Defendants and their consultants, entitled: "U.S. intel officials probe

ties between Trump adviser and Kremlin"[1] (the "Yahoo Report").   This defamatory

report stemmed directly from false information provided and funded by the Defendants

and their consultants.  The Yahoo Report included an extensive array of completely false,

misrepresented and/or unverified information compiled at the request of the Defendants

by Orbis Business Intelligence Ltd., a private company in London, U.K. ("Orbis").  The

Yahoo Report made various allegations concerning, among other things, meetings

between Dr. Page and two sanctioned Russian officials.

4.      On information and belief, Bean LLC is a Delaware corporation that

conducts business under the name Fusion GPS ("Fusion"). Fusion hired a private

investigator—a former British citizen named Christopher Steele, who operated through

Orbis.  Fusion was funded by the Defendants and the political campaign they were

supporting to conduct this opposition research on their behalf.[2]

5.      Dr. Page has never met with either of the individuals alleged by the

Defendants and their consultants at any point in his life, Rosneft Oil Company

("Rosneft") Chief Executive Officer ("CEO") Mr. Igor Sechin ("Mr. Sechin") and Mr.

Igor Diveykin ("Mr. Diveykin").

---

[1]   Michael Isikoff, "U.S. intel officials probe ties between Trump adviser and Kremlin," Yahoo
News, September 23, 2016. [https://www.yahoo.com/news/u-s-intel-officials-probe-ties-
between-trump-adviser-and-kremlin-175046002.html]
[2]   Revealed as part of the proceedings of *Bean LLC d/b/a Fusion GPS v. Defendant Bank and
Permanent Select Committee on Intelligence*, 17-cv-02187 (D.D.C., Oct. 20, 2017).

6.      Although the Defendants and their paid consultants specifically knew that at least portions of the information they provided to the media were untrue, misrepresented and/or unverified, they distributed the allegations extensively to many members of the media. This defamatory and completely unverified information included allegations that falsely accused Dr. Page of participating in an alleged conspiracy to commit crimes against the U.S. Democratic Party's Leadership. The Defendants also funded and helped distribute misinformation accusing the Plaintiff of a malicious conspiracy theory, attributing to him blame for allegedly undermining American democracy and the 2016 U.S. election. With respect to Dr. Page, these allegations were wholly and completely false.

## II.   PARTIES

7.      Plaintiff Carter Page, Ph.D. ("Dr. Page") is an individual who currently maintains no permanent residence or domicile anywhere due to the terror threats that have resulted from the misinformation disinformation distributed by the Defendants and their associates in 2016. Dr. Page is the Managing Partner of Global Natural Gas Ventures LLC ("GNVG"), an Oklahoma Corporation with principal offices in Oklahoma City. He is also the Managing Partner of Global Energy Capital LLC ("GEC"), a New York Corporation with principal offices in New York City and a scholar in foreign policy. GNGV and GEC are investment management and advisory firms focused on the energy sector primarily in emerging markets.

8. Defendant DNC, registered with the Federal Election Commission as DNC Services Corp./Dem. Nat'l Committee, is a national committee as that term is defined by and used in 52 U.S.C. § 30101, dedicated to electing local, state, and national candidates – including presidential candidates – of the Democratic Party to public office. To accomplish its mission, the DNC, among other things, works closely with Democratic public officials and assists state parties and candidates by contributing money, making expenditures on their behalves, and providing active support through the development of programs benefiting Democratic candidates.

9. Perkins Coie LLP is a Washington Limited Liability Partnership with offices worldwide. Perkins Coie represented Defendant DNC with respect to the 2016 elections.

10. Defendant Marc Elias, on information and belief, is chair of Defendant "Perkins Coie's Political Law Group".[10]

11. Defendant Michael Sussmann, on information and belief, is a "Partner" at Defendant Perkins Coie and "a nationally-recognized privacy, cybersecurity and national security lawyer. He is engaged on some of the most sophisticated, high-stakes matters today, such as his representation of the Democratic National Committee and Hillary Clinton's presidential campaign in their responses to Russian hacking in the 2016 presidential election."[11]

---

[10] https://www.perkinscoie.com/en/professionals/marc-e-elias.html
[11] https://www.perkinscoie.com/en/professionals/marc-e-elias.html

12.    On information and belief, both Mr. Elias and Mr. Sussmann conduct their business for Perkins Coie from an office in Washington, D.C., where their business has included activities directly related to the defamation and death threats suffered by Dr. Page since at least September 2016. On information and belief, they were principal actors involved in organizing the opposition research consultants for Defendant Perkins Coie's client, the Defendant DNC.  Both Mr. Elias and his partner Mr. Sussmann used their prior experience as, respectively, a political lawyer and an operative in the U.S. Department of Justice covering Russian matters, to give their "oppo research" activities a gloss of credibility and reliability which, in this case, was unwarranted. Allegedly, none of the Defendants has ever publicly stated that their "oppo research" activities were fulfilled in a fashion that accords with standards observed in the legal or media professions for establishing the credibility of sources and for verifying information provided by the sources. To the contrary, one of the subcontractors that they organized hiring and hosted at Defendant Perkins Coie's office in Washington, Mr. Christopher Steele has testified publicly in a U.K. court filing that he did not abide by such standards in compiling Defendant DNC's "oppo research".[12]

## III.    JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

---

[12]  "DEFENDANTS' RESPONSE TO CLAIMANTS' REQUEST FOR FURTHER INFORMATION PURSUANT TO CPR PART 18," Aleksej Gubarev and Others v. Orbis Business Intelligence Limited and Another, High Court of Justice, Queen's Bench Division, Claim No. HQ17D00413, 18 May 2017.

13.     This Court has jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1) over all claims alleged herein as the matter in controversy in the causes of action asserted herein is between citizens of different States and exceeds $75,000 in damages.

14.     This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

15.     This court has jurisdiction over Dr. Page in accordance with 28 U.S.C. § 1332.  In the time period following the 2016 malicious attacks incited by false information funded and distributed by the Defendants, Dr. Page was an individual who changed his location frequently as a protective defense to minimize the risk of repeated threats against his life meeting the definition of Domestic Terrorism [18 U.S. Code §2331(5)] which first began in the wake of defamatory new articles.  Dr. Page has remained Managing Partner of Oklahoma Limited Liability Company Global Natural Gas Ventures LLC since 2013. But as one of the aftermaths of the death threats that the Defendants helped to incite, Dr. Page currently maintains no permanent residence anywhere due to personal safety concerns.

16.     The allegations distributed by the Defendants have been unquestionably and significantly disproven.  Subcontractor to Mr. Steele and associated parties that distributed and repeated the false allegations thus fall entirely outside of any privilege as defined in Oklahoma Statutes, Title 21 §§ 771-781. On October 24, 2017, the *Washington Post* published a privilege letter[26] from Defendant Perkins Coie

---

[26] https://assets.documentcloud.org/documents/4116755/PerkinsCoie-Fusion-PrivelegeLetter-102417.pdf

acknowledging their and Defendant DNC's direct involvement in this defamatory misinformation campaign. (Attached as **Exhibit** ..)

17.    Given related revelations that have continued to flow as the truth belatedly comes out, DNC, Perkins Coie and their subcontractor Mr. Steele have been entirely discredited as the "well-placed Western intelligence source" that he was consistently misrepresented to be by the Defendants.[27]

## IV.    GENERAL ALLEGATIONS

18.    On September 23, 2016, Yahoo published the malicious Yahoo Report based on opposition political research marketed by the Defendants that subsequently led to an escalating and sustained series of death threats aimed at Dr. Page.  Nearly two months earlier, on July 26, 2016, Dr. Page received the following text messages from a reporter at the *Wall Street Journal*.  This communication first gave Dr. Page advanced warning of the potentially deadly falsehoods which the Defendants as well as their business and political associates were unsuccessfully attempting to spread throughout the news industry via loyal media outlets:

---

[27]    Adam Entous, Devlin Barrett, and Rosalind Helderman, "Clinton campaign, DNC paid for research that led to Russia dossier," *Washington Post*, October 24, 2017. https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html

- "We are told you met with Igor Sechin during your recent Moscow trip and discussed energy deals and the possibility of the U.S. Government of lifting sanctions on him and others."

- "We are also told you recently met with a senior Kremlin official - Divyekin - and he said they have solid kompromat on Clinton as well as Trump."

- "Guidance? Thoughts?"

19.     Seeking to preserve his privacy as a private person, Dr. Page informed the reporter via text message: "It's such a ridiculous idea that it almost warrants a double-no-comment." As a private person until September 2016, who sought to maintain his isolation from the media by avoiding interviews with or statements to the press, Dr. Page frequently repeated "no comment" when these same false allegations originating from consultants and associates of the Defendants were repeatedly asked by reporters over the course of the next approximately 2 months until the Yahoo Report was published. The harassing requests from news agencies and journalists to verify these outrageously inconceivable accusations from the Defendants persisted from reporters associated with a diverse array of media outlets throughout this interim period.

20.     The Yahoo Report focused on two primary false allegations that originated from the Defendants and their consultants regarding meetings which Dr. Page never participated in, involving individuals he has never communicated with at any point throughout his life. The first related to Mr. Sechin:

"...U.S. officials have since received intelligence reports that during that same three-day trip, Page met with Igor Sechin, a longtime Putin associate

10

and former Russian deputy prime minister who is now the executive chairman of Rosneft, Russian's leading oil company, a well-placed Western intelligence source tells Yahoo News. That meeting, if confirmed, is viewed as especially problematic by U.S. officials because the Treasury Department in August 2014 named Sechin to a list of Russian officials and businessmen sanctioned over Russia's "illegitimate and unlawful actions in the Ukraine." (The Treasury announcement described Sechin as "utterly loyal to Vladimir Putin — a key component to his current standing." At their alleged meeting, Sechin raised the issue of the lifting of sanctions with Page, the Western intelligence source said."

21.     The second alleged meeting related to Mr. Diveykin falsely accused Dr. Page as the leading American suspect with respect to his possible collaboration with those Russian officials allegedly bearing, "Responsibility for intelligence collected by Russian agencies about the U.S. election":

> "U.S. intelligence agencies have also received reports that Page met with another top Putin aide while in Moscow — Igor Diveykin. A former Russian security official, Diveykin now serves as deputy chief for internal policy and is believed by U.S. officials to have responsibility for intelligence collected by Russian agencies about the U.S. election, the Western intelligence source said."

11

22.     With the 2016 Yahoo Report and based on the false information that originated with the Defendants, Yahoo and other media outlets thus falsely implied Dr. Page's potential direct blame for one of the most prominent world news stories and controversial alleged transnational crimes of 2016 and 2017:

> "The questions about Page come amid mounting concerns within the U.S. intelligence community about Russian cyberattacks on the Democratic National Committee and state election databases in Arizona and Illinois. In a rare public talk this week, former undersecretary of defense for intelligence Mike Vickers said that the Russian cyberattacks constituted meddling in the U.S. election and were 'beyond the pale.' Also, this week, two senior Democrats — Sen. Dianne Feinstein, ranking minority member on the Senate Intelligence Committee, and Rep. Adam Schiff, ranking minority member on the House Intelligence Committee — released a joint statement that went further then what U.S. officials had publicly said about the matter."

A.  **Immediate Aftermath of False Reports and Proliferation of Harms to Dr. Page**

23.     Following these and other extensive reports throughout the weekend in the immediate aftermath of the Yahoo Report that the Defendants had enabled, Dr. Page wrote a letter to Director of the Federal Bureau of Investigation James Comey on the evening of Sunday, September 25, 2016.  This represented a first initial effort to set the record straight regarding these malevolent defamatory falsehoods that originated from the

Defendants.  Prior to the revelation of the illegitimate source of the libelous information

that had recently been distributed worldwide by the Defendants and their consultants in

September 2016, the FBI Letter accurately assessed as a complete waste of time any

inquiry of these sensationalist stories about Dr. Page and how any resultant Federal

investigations these falsehoods might inspire represented nothing more than a witch hunt.

(the "Witch Hunt")

24.     Peter Steflox, who previously served as the Head of Investigative Practice

at the National Policing Improvement Agency in the U.K., has explained how synergistic

relationships between media outlets and government law enforcement authorities may use

public relations tactics to intersect with the agenda of legitimate criminal investigations.

This analysis helps illustrate other elements of the impact created by the defamatory

allegations overseen and enabled by the Defendants, amidst the mass hysteria that the

Witch Hunt subsequently created for Dr. Page and other individuals he had been

associated with:

> "*Most media outlets* – newspapers, radio and television – *are primarily*
> *interested in acquiring material to provide interesting stories.  Crime is*
> *high on their list of interesting stories and so they are always willing to*
> *cover it.*  This provides investigators with an opportunity to publicise
> crimes and appeal for witnesses…*Major crime investigations and high-*
> *profile incidents always attract media interest and investigators are*
> *usually able to deploy specialist resources from their force media*

*department in these cases.  Trained staff are able to advise on a media strategy that maximizes the chance of the crime being reported in ways that support the investigation.* This often includes strategies for *keeping the story in the news even when interest in it is waning.*"[38]

25.     The public controversy that the Defendants originated worldwide regarding false allegations about Dr. Page's participation in Russia's alleged involvement in cyber operations related to the 2016 election did not exist before the publication of the Yahoo Report based on the defamatory information spread by the Defendants and their consultants. The outcome of this prominent fabricated controversy had a monumental direct impact on not only Dr. Page, but individuals beyond those directly involved in the dispute.  These individuals impacted by this malicious defamation included Mr. Donald J. Trump and other supporters of his 2016 campaign, including peripheral ones such as Dr. Page (collectively, the "Trump Movement").

26.     With the exception of volunteering as an unpaid, informal member of a foreign policy advisory committee to the Donald J. Trump for President campaign, Dr. Page has never in any way been, nor aspired to become, a politician and was not a public figure prior to the defamatory articles published by the Defendants. Outside of narrow academic foreign policy circles and energy finance circles, he was not known at all.  A

---

[38]   Peter Stelfox, *Criminal Investigation: An Introduction to Principles and Practice*, Routledge, 2013, 110-111.

largely unknown figure, his Wikipedia page was first created within hours of the fictional Yahoo Article.[40]

27.     As publisher of these falsehoods distributed by the Defendants, their associates and hired consultants were so inherently improbable that only a reckless man and/or media organization would have put them in circulation. Likewise, further recklessness may be found given the inherently obvious reasons to doubt the veracity of the informants, including the private investigator Mr. Steele and the DNC consultants which Perkins Coie had hired to support this illicit operation, given the severe inaccuracy of these reports.

28.     Consistent with these acknowledged methodologies of smearing innocents through the deployment of private investors and spin doctors whose primary purpose was to smash and destroy those that the DNC and their political associates perceived as a threat, the Defendants created a substantial risk of serious bodily injury to Dr. Page by attempting or conspiring to destroy or damage Dr. Page's personal property within the United States, including but not limited to Dr. Page's reputation and relationships.

29.     Part of the extensive relevant evidence discovered in other court proceedings includes a May 18, 2017 statement from Mr. Steele's legal representative to the High Court of Justice Queen's Bench Division in the U.K. dated that allege the following: "The journalists initially briefed at the end of September 2016 by the Second Defendant (Steele) and Fusion at Fusion's instruction were from the New York Times,

---

[40]

https://en.wikipedia.org/w/index.php?title=Carter_Page&diff=797155868&oldid=740937003

the Washington Post, Yahoo News, the New Yorker and CNN".[51]  The Defendants, their

political associates and their consultants played key roles in spreading this false

information to the media about the Plaintiff.  According to initial allegations by the

former FBI General Counsel James Baker subsequently made public through U.S.

Congressional testimony on October 3, 2018[52], Defendant Perkins Coie allegedly

provided additional false information to the FBI.[53]

30.    Dr. Page frequently experienced life-threatening damages following

publication of the Yahoo Report which stemmed from the false information compiled,

distributed, and funded by the Defendants.  As just one example of the countless physical

threats including death threats that followed the malicious defamatory reports that

stemmed from information first distributed to the United States and to the world by the

Defendants and their associates, Dr. Page received the following voicemail based on the

Defendants' groundless allegations regarding alleged meetings with the CEO of Rosneft

and another Russian citizen that Dr. Page has never met at any point in his life

(approximate transcript below; confidential audio version of this recording is available

for the Court upon request):

---

[51]  http://www.mcclatchydc.com/news/nation-world/national/article160622854.html
[52]  Catherine Herridge, "Top FBI lawyer Baker offers 'explosive' testimony on 'abnormal' handling of Russia probe into Trump campaign: lawmakers," Fox News, October 3, 2018. https://www.foxnews.com/politics/top-fbi-lawyer-baker-offers-explosive-testimony-on-abnormal-handling-of-russia-probe-into-trump-campaign-lawmakers
[53]  John Solomon, "Collusion bombshell: DNC lawyers met with FBI on Russia allegations before surveillance warrant," The Hill, October 3, 2018. https://thehill.com/hilltv/rising/409817-russia-collusion-bombshell-dnc-lawyers-met-with-fbi-on-dossier-before

"Yo, what's up man?  Sounds like things are going pretty fucking good for you.  Go to trade out your fucking country for some fucking Russian dollars.  *We know what the fuck you've been doing, you piece of shit mother fucker.  You think you're not, you know you're not in fucking in cahoots with fucking Rosneft* and every fucking Russian oligarch over there?  You fucking half-wit, fucking piece of shit.  You deserve everything you fucking get.  Every fucking thing you get.  *If it was up to me, after we fucking tried you for treason, we'd take you out in the street and beat the fucking piss out of you with baseball bats, you cock sucking mother fucker.*  Next time you turn your back on your fucking country, you'll fucking regret it."

[Emphasis added.]

## B.  BuzzFeed's Release of the Full Dodgy Dossier

31.     On January 10, 2017, BuzzFeed Inc. ("BuzzFeed") published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia"[61] (the "BuzzFeed Article").  This included a previously-undisclosed dossier (the "Dodgy Dossier") which repeated many of the primary false allegations from the Yahoo Report that had targeted Dr. Page as the principal falsely-accused suspect more than 100 days

---

[61]  https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.aqlNzE7OG#.mavxXNL3d

earlier and led to repeated media attacks in the intervening period.   The Dodgy Dossier included various allegations concerning, among other things, the false allegations originating from the Defendants and their hired consultants regarding alleged meetings in 2016 between Dr. Page and sanctioned Russian officials which never actually occurred.

32.     The subsequent revelation of extensive evidence by the U.S. Congress, U.S. Courts and international courts since 2017 proving these facts has made clear the primary source of these false allegations were the direct responsibility of the Defendants, their political associates and their consultants.

33.     With respect to the Plaintiff, the Dodgy Dossier included extensive assertions of fact. Not a single portion of these statements (as it applies to Dr. Page) has any basis in fact whatsoever.[62]   Although BuzzFeed's decision to publish the unverified dossier flew in the face of journalistic standards and ethics, the reckless and wanton abuses by the Defendants in 2016 were significantly more egregious and malicious as they specifically decided to target Dr. Page as the primary accused party.

34.     BuzzFeed's Editor-in-Chief Mr. Ben Smith ("Mr. Smith") has admitted he knew at the time that it published the BuzzFeed Article and the Dodgy Dossier that there were "real solid reasons to distrust" the veracity of the allegations contained therein.   On information and belief, no such admissions have been made by the Defendants or any of their representatives to this date.

---

[62]   https://assets.documentcloud.org/documents/3259984/Trump-Intelligence-Allegations.pdf

35.    In addition, Mr. Smith published an Op-Ed in the *New York Times* and appeared in numerous television and radio interviews defending his decision to publish the BuzzFeed Article and the Dodgy Dossier. In his *New York Times* Op-Ed[63], Mr. Smith stated that BuzzFeed decided to publish the Dodgy Dossier "only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims." On information and belief, no such efforts were made by the Defendants prior to or after their wanton and reckless personal attacks as they originated and helped to spread false information regarding Dr. Page.

36.    Similarly, Mr. Smith stated on CNN's Reliable Sources that BuzzFeed was "running it down every way we could" and told MSNBC's Meet the Press Daily that "we, like many other organizations had had [the Dodgy Dossier] for weeks. We had reporters in Europe and the United States trying to stand up or knock down specific details." No such steps were taken by the Defendants, prior to publication of the Yahoo Report which their consultants had instigated on their behalf.

37.    Dr. Page was never given any advanced warning that these extremely malicious and destructive falsehoods would be published on September 23, 2016 in support of the DNC and the political candidates they supported at the time. Dr. Page had consistently tried to avoid media exposure prior to the initial publication of the Yahoo Report to the greatest extent possible in an attempt to protect his privacy and avoid any

---

[63]   https://www.nytimes.com/2017/01/23/opinion/why-buzzfeed-news-published-the-dossier.html

actions which would inadvertently thrust himself to the forefront of the national debate

regarding the alleged cyberattacks or any other public controversy.

38.     Although BuzzFeed displayed a far higher level of professionalism than the

Defendants in the civil action, an array of closely related Dodgy Dossier[66] cases have

been subsequently filed since 2017 including in many U.S. District Courts as well as

other jurisdictions (the "Dodgy Dossier Cases").[67]  Albeit related to less egregious torts

than those committed by the Defendants in this civil action, these other comparable

Dodgy Dossier Cases continue to bear evidentiary fruit and have generally been

proceeding well in federal courts including the U.S. District Courts for the Southern

District of New York ("S.D.N.Y."), the District of Columbia ("D.D.C.") and the Southern

District of Florida (S.D. Fla.").


## C. <u>Steps to Mitigate Life-Threatening Risks and Other Damages</u>


39.     Amidst unrelenting malicious attacks by the Defendants and since the

Plaintiff did not qualify for U.S. Secret Service protection, Dr. Page agreed to interviews

with various media outlets in the interest of setting the record straight regarding the

---

[66]   Ken Bensinger, Miriam Elder and Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," BuzzFeed News, January 10, 2017.
https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia
[67]   Among others, see: *Gubarev et al v. Buzzfeed, Inc. et al*, 17-cv-60426 (S.D. Fla., Feb. 28, 2017); *Fridman et al v. Bean LLC et al*, 17-cv-02041 (D.D.C., Oct. 3, 2017); *Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 17-cv-02187 (D.D.C., Oct. 20, 2017). In addition, one case has been withdrawn due to personal circumstance related to the Plaintiff in that civil action: *Cohen v Bean LLC et al*, 18-cv-00183 (S.D.N.Y., Jan. 9, 2018).

defamatory statements by the Defendants and in an attempt to limit further damages from the Yahoo Report and other malicious false stories that stemmed from the misinformation provided by the Defendants.  In addition to the severe harm to the Plaintiff, as a patriotic American veteran Dr. Page was also motivated in the interest of helping to repair some of the severe damage to the U.S. that the Defendants helped facilitate including the Witch Hunt against Dr. Page.  His related media appearances included interviews with PBS[99], CNN[100], MSNBC[101], Fox News[102], ABC News[103], and others.  Due to severe damage for the Plaintiff created by the Defendants' reckless disregard for the truth in their attempt to spread false information that directly led to the Yahoo Report, the resulting death threats and associated damage suffered by Dr. Page continued following these appearances.

### D. Congressional Revelations: Conspiracy between Defendants and U.S. Government

40.     On September 14, 2017, Dr. Page filed a pro se defamation civil action in the U.S. District Court for the Southern District of New York against the publisher of the defamatory reports.[115]  Approximately 40 days later, the *Washington Post* reported the underlying source of these false allegations:

> "The Hillary Clinton campaign and the Democratic National Committee helped
> fund research that resulted in a now-famous dossier containing allegations about

---

[99]    https://www.youtube.com/watch?v=bsgSl8s2GeM
[100]   https://www.youtube.com/watch?v=82ZcZ7s-3O8
[101]   http://www.msnbc.com/all-in/watch/carter-page-i-don-t-deny-meeting-with-russian-ambassador-889043011736
[102]   http://video.foxnews.com/v/5379272731001/
[103]   http://abcnews.go.com/Politics/trump-associate-denies-middle-man-russia/story
[115]   Carter Page v. Oath Inc. and Broadcasting Board of Governors, September 14, 2017.  17-cv-6990-LGS.

President Trump's connections to Russia and possible coordination between his campaign and the Kremlin… Marc E. Elias, a lawyer representing the Clinton campaign and the DNC, retained Fusion GPS, a Washington firm, to conduct the research."[116]

41.     In February 2018, the U.S. House Permanent Select Committee on

Intelligence ("HPSCI") released a memorandum[117] ["HPSCI Memo"] disclosed

information that further exposed alleged illicit activities by the Defendants including Mr.

Elias.  In particular, the abuse of process in another federal court was included in the

introductory summary of the implications of HPSCI's findings: "1) raise concerns with

the legitimacy and legality of certain DOJ and FBI interactions with the Foreign

Intelligence Surveillance Court (FISC), and (2) represent a troubling breakdown of legal

processes established to protect the American people from abuses related to the FISA

process."

42.     Relevant conclusions of the HPSCI Memo are briefly summarized below:

"The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow. This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News*. The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. Steele has admitted in British court filings that he met with *Yahoo News* – and several other outlets – in September 2016 at the direction of Fusion GPS. **Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed…"**

---

[116]   Adam Entous, Devlin Barrett, and Rosalind S. Helderman, "Clinton campaign, DNC paid for research that led to Russia dossier," *Washington Post*, October 25, 2017. p. A1. https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html

[117]   https://intelligence.house.gov/uploadedfiles/memo_and_white_house_letter.pdf

[Emphasis added.]

43.     Former FBI general counsel James Baker has allegedly "admitted to Congress in an unclassified setting — repeat, in an unclassified setting — that he had met with a top lawyer at the firm representing the Democratic National Committee (DNC) [Perkins Coie] and received allegations from that lawyer about Russia, Trump and possible hacking."[118]

44.     Further media outlets have recently alleged in early October 2018 that:

> "**James Baker, who served as FBI's general counsel** until he resigned in May, **testified** to Congress on Wednesday **that Michael Sussmann, a lawyer for the firm Perkins Coie, provided documents and electronic media related to Russian meddling in the election.** Perkins Coie is the firm that hired opposition researcher Fusion GPS to investigate Trump. The result of the contract was the infamous but unverified Steele dossier alleging collusion between the Trump campaign and Russian government. Sources familiar with **Baker's testimony to the House Judiciary and House Oversight & Government Reform Committees tell The Daily Caller News Foundation that he said Sussmann approached him for the meeting, which occurred in late summer or early fall 2016.**"[119]

[Emphasis added.]

45.     The former Acting Chair of Defendant DNC has also alleged that a meeting occurred at FBI headquarters on August 11, 2016 involving a representative of Defendant Perkins Coie, the Defendant Michael Sussmann, and staff of Defendant DNC: "When

---

[118]   John Solomon, "FBI's smoking gun: Redactions protected political embarrassment, not 'national security'," *The Hill*, October 7, 2018. https://thehill.com/opinion/white-house/410287-fbis-smoking-gun-redactions-protected-political-embarrassment-not

[119]   Chuck Ross, "Top FBI Official Met with DNC Lawyer on Russia Prior to 2016 Election," Daily Caller, October 4, 2018. https://dailycaller.com/2018/10/04/fbi-dnc-lawyer-russia-2016-election/

Michael Sussmann arrived, he took out his security clearance badge, likely left over from his time at the Department of Justice. I was impressed…"[120]

## E. Corporate Policies and Procedures

46.     Dr. Page is the sole shareholder of GNGV.  Given GNGV's businesses focus on working with corporations and financial institutions as a trusted advisor and partner, their Oklahoma Limited Liability Company's reputation for providing services has been carefully cultivated and is paramount to the success of the business.

47.     Similarly, prior to the Defendants' distribution of life-threatening defamatory allegations and related misinformation, Dr. Page's own professional reputation had remained untarnished and key to his ability to building GEC as an international financial institution.  As a direct result of the false information spread by the Defendants, Dr. Page's business interests at GNGV and GEC suffered, and will continue to suffer, actual injury as a result of injury to its corporate reputation. At least three banks and diversified financial services companies have declined to do business with GEC and GNVG based on the defamatory statements published by the Defendants and, on information and belief, the defamatory statements have also cost GNGV clients.

## F. Perkins Coie and the DNC Should Not Profit at Dr. Page's Significant Expense

---

[120]    Donna Brazile, *Hacks: The Inside Story of the Break-ins and Breakdowns That Put Donald Trump in the White House*, New York: Hachette, 2017, p. 66.

48.     The DNC and Perkins Coie are the primary responsible actors that must be held to account and should accept full economic responsibility for the falsehoods spread to the media in the Yahoo Report and countless others defamatory articles that targeted the Plaintiff. Both financially and politically, the Defendants benefited from their false allegations while simultaneously creating or perpetuating terrorist threats aimed at Dr. Page.

49.     The DNC, Perkins Coie and its contractors knew that the defamatory statements they distributed about Dr. Page would eventually be viewed by millions of people. The Defendants and their consultants also knew that their defamatory allegations would be forwarded or republished by political operatives it was supporting including their political candidate's campaign, U.S. Government actors, numerous other news outlets and websites. This was readily apparent because of the horrific conduct that the Defendants ascribed to Dr. Page, in connection with one of the most prominent news stories in the U.S. over recent years.

50.     As a direct and proximate result of the Defendants' malicious misconduct, Dr. Page suffered anguish, humiliation, embarrassment and severe damage to his reputation – all of which are continuing in nature and will be suffered in the future.

51.     As a direct and proximate result of the Defendants' intentional and malicious misconduct, Perkins Coie reaped ill-gotten gains from the fees paid to them by DNC. According to filings reported by the *New York Times,* Perkins Coie was paid $12.4 million to represent the DNC and the Presidential campaign they were supporting during

the 2016 election.[122] Under the unique and special circumstances of this case, those profits should be disgorged.

52.     Perkins Coie should not be permitted to profit from the vast portfolio of defamatory articles printed about Dr. Page with malice and with the knowledge that the falsehoods first originating from the Defendants in 2016 through their defamatory and life-threatening misstatements to a wide array of media outlets.

## V.   Causes of Action

### COUNT 1: Defamation and Defamation Per Se Against All Defendants
### (Oklahoma Statutes, Title 21 §§ 771-781)

53.     Plaintiff re-alleges and re-asserts by reference the allegations set forth in all prior paragraphs of this Complaint as if fully set forth herein.

54.     Defendants DNC and Perkins Coie, by and through their representatives, published or caused to be published false and defamatory statements concerning the Plaintiff without privilege to do so.

55.     The false and defamatory statements included, but are not limited to, allegations that Dr. Page may have committed crimes, and/or supported cyberattacks that preceded the 2016 U.S. Presidential election.

---

[122]   Kenneth P. Vogel, "Clinton Campaign and Democratic Party Helped Pay for Russia Trump Dossier," *New York Times*, October 24, 2017.
https://www.nytimes.com/2017/10/24/us/politics/clinton-dnc-russia-dossier.html

56.     The defamatory information was distributed by the Defendants and eventually published by third-party media organization without privilege to the general public, including millions of people.

57.     The defamatory statements were made negligently; without reasonable care as to their truth or falsity; with knowledge of their falsity; and/or with reckless disregard for the truth.

58.     The completely unverified and highly suspect statements are of the kind that the Defendants knew would tend to prejudice the Plaintiff in the eyes of a substantial and respectable minority of his community.

59.     The statements have caused, and will continue to cause, the Plaintiff injury in his personal, social, and business relations.

60.     Dr. Page has suffered, and will continue to suffer, actual injury as a result of the injury to his personal reputation.

61.     The defamatory statements tend to injure the Plaintiff in his business trade as the allegations call into question the trustworthiness of the Plaintiff. Additionally, the above statements subject Plaintiff to distrust, scorn, ridicule, hatred, contempt and death threats. As such, the defamatory statements constitute defamation per se.

62.     In addition, as a direct and proximate result of the defamatory statements made by Defendants, Plaintiff has suffered, and continue to suffer, substantial damages.

63.     It is clear from the information distributed by the Defendants' and their consultants, that they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result. Despite that

knowledge, the Defendants intentionally pursued their course of conduct, resulting in enormous injury and damage to the Plaintiff.

**COUNT 2:  Acts of Terrorism Transcending National Boundaries Against All Defendants**
**(18 U.S. Code § 2332b)**

64.    Plaintiff re-alleges and re-asserts by reference the allegations set forth in all prior paragraphs of this Complaint as if fully set forth herein.

65.    The defamatory statements by the DNC and Perkins Coie's consultants created a substantial risk of serious bodily injury to Dr. Page by attempting or conspiring to destroy or damage Dr. Page's personal property within the United States, including but not limited to Dr. Page's reputation, relationships and physical belongings.

66.    The defamatory statements obstructed, delayed, or affected Dr. Page's prospective interstate or foreign commerce.

67.    The defamatory statements involve acts dangerous to human life that are a violation of the laws of the United States and Oklahoma.

68.    The statements appear to be intended to intimidate or coerce the civilian population of the United States and foreign countries.

69.    The continued publication of the defamatory statements beginning on or about January 20, 2017, appear to be intended to influence the policy of a government by intimidation or coercion.

70.     The defamatory statements occurred primarily within the territorial jurisdiction of the United States but were further distributed by the media across Europe and worldwide.

71.     The defamatory statements demonstrate a reckless disregard for the risk of causing such terror or inconvenience.

## COUNT 3: Financing of Terrorism Against All Defendants
## (18 U.S. Code § 2339C)

72.     Plaintiff re-alleges and re-asserts by reference the allegations set forth in all prior paragraphs of this Complaint as if fully set forth herein.

73.     The DNC and Perkins Coie directly or indirectly, unlawfully and willfully provided funds to their consultants with the intention that such funds be used, or with the knowledge that such funds are to in part be used in order to carry out the distribution of defamatory information, intended to create personal damages that may include the risk of death or serious bodily injury to Dr. Page.

74.     As an American military veteran who has spent much of the last twenty years of his life working to establish peace in his community and in the world through the empowerment of individuals and non-hostile commercial enterprises, Dr. Page is a person who has not taken any active part in hostilities in any situation of armed conflict at any time since his honorable discharge from the U.S. Navy in 1998.

75.     The DNC and Perkins Coie's purpose of funding activities that further enabled a plethora of false media reports, by its nature or context, was to intimidate the

population of U.S. voters and other members of their audience prior to as well as after the 2016 election with fears related to the Witch Hunt, and/or to compel the Russian Government to do or to abstain from doing alleged acts related to cyberattacks that Dr. Page no part in and had no advance knowledge of.

76.    Funds from the DNC and Perkins Coie were actually used by their consultants to create and distribute false allegations that helped inspire multiple threats to Dr. Page's life, in conjunction with other publications by non-state actors in the form of private United States media outlets including Yahoo News that concurrently distributed the false allegations further via the internet and other media forms.

## COUNT 4: Tortious Interference Against All Defendants
**(Restatement (Second) of Torts § 766A; and Oklahoma Statute, Title 23 § 9.1 (2001))**

77.    Plaintiff re-alleges and re-asserts by reference the allegations set forth in all prior paragraphs of this Complaint as if fully set forth herein.

78.    Dr. Page had existing and prospective business relationships with energy companies and financial institutions. These business relationships were well-established as Dr. Page's experience in energy finance transactions had been developed over 10 years. Dr. Page's relationships included, but were not limited to, the following energy companies: Samruk Kazyna, Chesapeake Energy, KazMunayGas, Tatneft, and Gazprom. Dr. Page's relationships included, but were not limited to, the following financial institutions: Deutsche Bank, Goldman Sachs, Citi, Mubadala Development Company,

China Investment Corporation, Canaccord Genuity, HSBC, Piper Jaffray Companies, Ladenburg Thalman, Morgan Stanley and others.

79.     The Defendants, their associates and/or their consultants knew that Dr. Page had business relationships with international energy companies and financial institutions as indicated in false statements by their consultants about his relationship with Rosneft. The Defendants via their consultants and political associates then intentionally and unjustifiably interfered with Dr. Page's existing and prospective business relationships with energy companies.

80.     First, the Defendants engaged in a disinformation campaign during its distribution of false information to news agencies before and after the Yahoo Report, with actual malice where they falsely stated and/or implied that Dr. Page may have engaged in efforts to disrupt the 2016 U.S. Presidential Election on behalf of the Russian Government. This disinformation campaign created a client, investor and financing backlash against Dr. Page, GNGV, GEC and associated business partners, and against those companies with which Dr. Page maintained relationships including Samruk Kazyna and Gazprom as well as associated subsidiaaries.  This all directly stemmed from the false, defamatory information that the Defendants continued to provide to the media for publication and broadcast.

81.     Second, the Defendants contributed to the incitement of a so-called "resistance" movement related in part to the Witch Hunt that started in September 2016 with Dr. Page as the central specific intended target, forcing Dr. Page and GEC to stop pursuing business opportunities based on consumer concern.

31

82.     Third, the Defendants held primary responsibility for false or misleading information that incited a Witch Hunt against Dr. Page and other members of the Trump Movement in an effort to achieve political objectives in the case of DNC and increase firm profits in the case of Perkins Coie.  Working on behalf of the DNC and their political candidates, representatives of Perkins Coie provided an essential linchpin in advancing that harmful process.

83.     As a direct result of the Defendants' tortious interference with Dr. Page's existing and prospective business relationships, Dr. Page has suffered actual and consequential damages in an amount that will be proven at trial.

## COUNT 5: RICO against All Defendants
## (18 U.S.C. §§ 1962(C))

84.     Plaintiff re-alleges and re-asserts by reference the allegations set forth in all prior paragraphs of this Complaint as if fully set forth herein.

85.     Defendants are all "persons" within the meaning of 18 U.S. Code § 1961(3). At all relevant times, Defendants conducted the affairs of an Enterprise – which affected interstate and foreign commerce – through a pattern of racketeering activity, in violation of 18 U.S. Code § 1962(c).

86.     The DNC was a Racketeering Enterprise, as that term is used in 18 U.S. Code § 1961(4). The Enterprise was formed in approximately April 2016 with the hiring of its opposition research team.

87.     The DNC and its candidates had an ongoing organizational framework for carrying out its objectives.

88.     Because the Defendants expended millions of dollars on the opposition research campaign that attacked Dr. Page and other members of the Trump Movement during the 2016 presidential race, it affected interstate and foreign commerce.

89.     Each Defendant conducted and/or participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S. Code § 1831 (economic espionage), 18 U.S. Code § 1832 (theft of trade secrets), and 18 U.S. Code § 1503 (relating to obstruction of justice [involving the U.S. Foreign Intelligence Surveillance Court]). The DNC allegedly directed, induced, urged and/or encouraged the FBI and other elements of the U.S. Government to engage in this conduct and/or provide the media with defamatory information, with the expectation that the U.S. Government and the media would disseminate this false information and thereby increase the DNC's chance of winning the U.S. Presidential election.

90.     Alternatively, and at the very least, the DNC was part of an Association-in-Fact Enterprise comprising element of the U.S. Intelligence Community including the FBI, their employees and agents, and additional entities and individuals known and heretofore unknown. The Association-In-Fact Enterprise was formed by at least April 2016. From that time until at least November 2016, the members of the Association-In-Fact Enterprise worked together to further their mutual goals of improving the DNC's electoral prospects and damaging Dr. Page as a primary opposition research target who supported the Trump Movement.

91.     The Association-In-Fact Enterprise had an ongoing organizational framework for carrying out its objectives. In fact, the Association-In-Fact Enterprise could not have carried out its intricate task of sharing defamatory information at the moments when it would be most

beneficial to DNC interests unless it had some structure for making and communicating group decision as Members of Congress have continued to investigate in 2018.

92.     As described above, each Defendant participated in the operation or management of the Association-In-Fact Enterprise, and benefited from the enterprise.

93.     Because the Association-In-Fact Enterprise's activities affected electoral spending in 2016, as well as the media response to the 2016 presidential race and the related Witch Hunt, it affected interstate and foreign commerce.

94.     Each Defendant conducted and/or participated in the affairs of the DNC, its associated campaigns and the Association-In-Fact Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S. Code § 1831 (economic espionage), 18 U.S. Code § 1832 (theft of trade secrets), and 18 U.S. Code § 1503 (relating to obstruction of justice [involving the U.S. Foreign Intelligence Surveillance Court]). The DNC allegedly directed, induced, urged and/or encouraged the FBI and other elements of the U.S. Government to engage in this conduct and/or provide the media with defamatory information, with the expectation that the U.S. Government and the media would disseminate this false information and thereby increase the DNC's chance of winning the U.S. Presidential election.

95.     Beginning on or after October 21, 2016, the United States took trade secrets from Dr. Page at the request of the Defendants, their political associates and consultants without Dr. Page's authorization, intending or knowing that doing so would benefit the DNC, DNC candidates, the Defendants and/or associates.

96.     The United States also allegedly copied, duplicated, downloaded, uploaded, altered, replicated, transmitted, delivered, sent, communicated, or conveyed Plaintiff's trade secrets, intending or knowing that doing so would benefit the DNC, Perkins Coie, their political

allies or consultants, in furtherance of the illegal scheme. Based in part upon the requests of and false information provided by the Defendants, their political allies, and consultants, unauthorized acts of economic espionage continued from approximately October 2016 through September 2017.

97.     Representatives of the Defendants also communicated false information to the U.S. Government and the media regarding Dr. Page intending or knowing that doing so would benefit the DNC, Perkins Coie or their associates, in furtherance of the illegal scheme.

98.     The DNC, Perkins Coie, their political associates and consultants furthered the common goals of the Enterprise by proffering false information that would enable the predicate acts and further the scheme and by remaining in frequent contact with U.S. Government officials and advising, instructing and providing the other Defendant and their employees with false information; encouraging continued illegal hacking which their misinformation campaign enabled; actively encouraging illegal disclosure to bolster DNC interests; and actively working to allegedly conceal and cover up the scheme through false statements to U.S. Government officials and the media.

99.     Plaintiff has been injured in his business and property by Defendants' violation of 18 U.S.Code § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above. Most of these primary injuries occurred within the United States.

### COUNT 6: RICO Conspiracy against All Defendants
### (18 U.S.C. §§ 1962(D))

100.     Plaintiff re-alleges and re-asserts by reference the allegations set forth in all prior paragraphs of this Complaint as if fully set forth herein.

101.   Defendants conspired with each other and members of the media to violate

18 U.S.C. §1962(c). Defendants knowingly agreed, combined, and conspired to conduct

the affairs of the Enterprise of the Association-in-Fact Enterprise to inflict a cyber-

espionage operation on the Plaintiff as illegitimately authorized by the U.S. Foreign

Intelligence Surveillance Court based on the defamatory information proffered by the

Defendants. Each Defendant agreed that the operation would involve repeated violations

of 18 U.S.C. §1831 (economic espionage); and 18 U.S.C. §1832 (theft of trade secrets).

102.   The Defendants' conspiracy to violate 18 U.S.C. §1962(c) violated

§1962(d).

103.   Plaintiff has been injured in his business or property by the Defendants'

violation of 18 U.S.C. §1962(c). Defendants caused enormous harm to Plaintiff's

business, as described above. Most of these injuries occurred within the United States.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Carter Page, demands judgment against Defendants DNC,

Perkins Coie LLP, Mr. Elias and Mr. Sussmann, as follows:


i.   For an award of compensatory, special and punitive damages in amounts to be

established at trial and in excess of seventy-five thousand dollars ($75,000.00) in

accordance with proof at trial together with interest thereon at the maximum

legal rate; and Plaintiff reserve the right to seek leave of court to seek punitive

damages against Defendants in accordance with the facts and claims stated

herein and established through discovery;

ii.  For costs of suit incurred herein; and

iii. For such other and further relief as to this Court may deem just and proper to

protect Plaintiff's rights and interests.

## VII.  **DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all issues so triable. Respectfully submitted this

15th day of October, 2018 by:

                                            The Plaintiff,
                                            By:  /s/ Carter Page
                                            Carter Page

                                            c/o Global Natural Gas Ventures LLC
                                            101 Park Ave., Suite 1300
                                            Oklahoma City, OK 73102
                                            Phone (405) 825-0172
                                            Fax    (405) 825-0177
                                            cpage@globalenergycap.com