UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CARTER PAGE,<br><br>                          Plaintiff,<br><br>-v-<br><br>DEMOCRATIC NATIONAL<br>COMMITTEE; PERKINS COIE LLP;<br>MARC ELIAS; AND MICHAEL<br>SUSSMANN,<br>                          Defendants. | Case No.:  CIV-18-1019-HE |

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

The Plaintiff,
By:  /s/ Carter Page
Carter Page, Ph.D.
c/o Global Natural Gas Ventures LLC
101 Park Ave., Suite 1300
Oklahoma City, OK 73102
Phone (405) 825-0172
Fax     (405) 825-0177
cpage@globalenergycap.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................1

    **A.**   **The Parties: Masters, Agents, Servants and Victims** ................................................4

        **1.**   **Defendants: Perfect Diversity Jurisdiction** ........................................................4

        **2.**   **Plaintiff: Intention to Become a Permanent Oklahoma Resident, After the Defendants' Terror Tactics and Other Damages Are Remedied** ........................................................6

    **B.**   **International Impact of Defendants' Defamatory Allegations on Abuse of Process and Extreme Civil Rights Abuses** ..................................................................................8

ARGUMENT ...............................................................................................................................8

**I.**    **LEGAL STANDARDS AND EQUAL JUSTICE UNDER LAW** .....................................8

**II.**   **CLEAR PERSONAL AND SUBJECT-MATTER JURISDICTION: A RETURN TO "FAIR PLAY AND SUBSTANTIAL JUSTICE"** ..............................................................10

    **A.**   **This Court Has Personal Jurisdiction Over All of The Defendants** ........................12

        **1.**   **This Court Has General Jurisdiction: "Essentially at Home" in W.D. Ok., as in FISC** ...13

        **2.**   **This Court Has Specific Jurisdiction: DNC has Purposefully Directed Their Activities Toward Oklahoma, Long Before 2016 and Ever Since** ..................................................16

    **B.**   **This Court Has Subject Matter Jurisdiction Over This Action** ...............................16

        **1.**   **The Court Has Federal Question Jurisdiction Under 28 U.S.C. § 1331** .............................17

        **2.**   **The Court Has Diversity Jurisdiction Under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1332(a)(2)** ..................................................................................................................17

**III.**   **FEDERAL CLAIMS** ..........................................................................................................18

    **A.**   **Actionable Anti-Terrorism Act ("ATA") Claims (18 U.S.C. § 2333)** .....................18

    **B.**   **Actionable Civil RICO Claims** ..............................................................................24

        **1.**   **Multiple RICO Predicate Acts** ..........................................................................25

        **2.**   **Defendants' Dodgy Dossier Operation Was a Racketeering Enterprise** ...........................27

        **3.**   **Defendants' Secret Enterprise Was Separate from the Pattern of Racketeering Activity** 28

**IV.    THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS ON SUBSTANTIVE GROUNDS** ................................................................................29

    **A.    The Discovery Rule Negates Defendants' Misleading Time-Bar Arguments**........................29

    **B.    Actionable Defamation Targeting Private Figure Dr. Page**........................................30

      **1.    Private Figure, Until Malicious Attacks of the Defendants' Political Smear Campaign** ..31

    **C.    Actionable Tortious Interference** ....................................................................34

**V.    THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS** ....................35

**VI.    CONCLUSION** ..............................................................................................35

**Exhibit 1: EXCERPT FROM JOINT S.D. FLA./QUEENS BENCH DIVISION
             (U.K.) COURT FILING REGARDING DOSSIER MANDATE
             OF DEFENDANT**

# **TABLE OF AUTHORITIES**

## **Cases**

*Am. Fid. Assur. Co. v. Bank of N.Y. Mellon*, No. CIV-11-1284-D, 2014 WL 4471606 (W.D. Okla. 2014) ................................................................................................ 14

*Am. Fid. Assurance Co. v. Bank of N.Y. Mellon*, 810 F.3d 1234 (10th Cir. 2016) ...................... 14

*Bascuñán v. Elsaca*, 874 F.3d 819 (2d Cir. 2017) ........................................................... 8

*Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 291 F.Supp.3d 34 (D.D.C. 2018) ...................................................... 27, 28, 30, 34

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 ........................................................... 22, 26

*Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) ................................................. 11

*Burger King Corp. v. Rudzewicz*, 471 U. S. 462 (1985) .................................................. 11

*Calder v. Jones*, 465 U. S. Reports 783, 788 (1984) .................................................. 12

*Capps v. Bullion Exhange, LLC* No. 18-CV-162-GKF (N.D. Okla. August 17, 2018) .............. 29

*Citizens United v. FEC*, 558 U.S. 370 (2010) .................................................................. 18

*Clark v. United States*, 289 U.S. 1, 15 (1933) .............................................................. 16

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ........................................................... 13, 14

*Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003). ................................................. 25

*Dig. Ally, Inc., v. Util. Assocs., Inc.*, No. 14-2262-CM, 2014 WL 7375530, (D. Kan. Dec. 29, 2014) ................................................................................................ 12

*Dig. Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834 (Okla. 2001). ................................... 29

*Dill v. Rader*, 533 P.2d 650 (Okla.Ct.App.1975) .................................................... 1, 2, 5

*DNC v. Russian Federation, et al*, 18-cv-3501-JGK (S.D.N.Y. 2018) ....................................... 18

*Douglas v. City of Jeannette*, 319 U.S. 157 (1943) ........................................................ 9

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) ....... 12, 25

*Duran v. Carris*, 238 F.3d 1268 (10th Cir. 2001) ........................................................ 10

*Elonis v. United States*, 135 S. Ct. 2001 (2015) .................................................................. 19

*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160 (10th Cir. 2010)................... 12

*Express Servs., Inc. v. King*, CIV-15-1181-R (W.D. Okla. June 6, 2016).................................. 25

*Fridman et al v. Bean LLC et al*, 17-cv-02041, (D.D.C., Oct. 3, 2017) ........................................ 6

*Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) ........................ 10

*Gates v. Commissioner of Internal Revenue*, 199 F.2d 291 (10th Cir. 1952)............................... 7

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 324 (1974) ................................................................ 32

*Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915 (2011)........................... 11, 14

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). .................................................................................. 19

*Hetronic Int'l Inc. v. Rempe*, 99 F. Supp. 3d 1341, 1349-50 (W.D. Okla. 2015)........................ 30

*Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987)........................................................ 31

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ........................................................................... 31

*International Shoe v. State of Washington*, 326 U.S. 310 (1945). ................................................ 12

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016) ............................................. 32

*Judicial Watch v. U.S. Department of Justice*, 17-cv-00916 (D.D.C. 2018).............................. 27

*Kennedy v. Freeman*, 919 F.2d 126 (10th Cir. 1990) ................................................................. 11

*Lawrence v. Moss*, 639 F.2d 634 (10th Cir. 1981). .................................................................... 32

*Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123 (2d Cir. 1984).......................................... 32

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 68 (2d Cir. 2012) ................ 20

*Linde v Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) ...................................................... 20

*Martin v. Griffin Television, Inc.* 549 P.2d 85 (Okla. 1976).................................................. 30, 33

*McBride v. Doe*, 71 F. App'x 788, 790 (10th Cir. 2003)............................................................... 8

*Miliken v. Meyer*, 311 U. S. Reports 457, 463 (1940) ................................................................ 12

*Mims v. Arrow Financial Services, LLC*, 565 U.S. 368 (2012).................................................... 17

*Morris v. Khadr*, 415 F. Supp. 2d 1323, 1328 (D. Utah 2006).................................................... 20

*Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) .......................................................... 10

*Rebozo v. Wash. Post Co.*, 637 F.2d 375 (5th Cir. 1981) .......................................................... 31

*Reynolds v. Pegler*, 223 F.2d 429 (2nd Cir.), *cert. denied*, 350 U.S. 846 (1955) ........................ 35

*Roring v. Hoggard*, 326 P.2d 812 (Okla. 1958)......................................................................... 2

*Sedima, S.P.R.L. v. IMREX Co.*, 473 U.S. 479 (1984) ................................................................ 24

*Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011)......................................................... 11, 16

*Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999).................. 11

*Starr v. Pearle Vision, Inc.*, 54 F.3d 1548 (10th Cir. 1995) ...................................................... 5

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) ...................................................................... 28

*Tarver v. Ford Motor Co.*, No. CIV-16-548-D, 2016 WL 7077045, at *1 (W.D. Okla. Dec. 5, 2016) ...................................................................................................................... 13

*Time, Inc. v. Firestone* (1976) 424 U.S. 448, 460.................................................................... 33

*U.S. v. Hollis*, 14-mj-00206-HBF (D. Conn., 2014)................................................................ 24

*U.S. v. Nelson*, 36 F.3d 1001, 1004 (10th Cir. 1994)............................................................ 28

*U.S. v. Turkette*, 452 U.S. 576 (1981)................................................................................ 28

*Wolston v. Reader Digest Association, Inc.*, 443 U.S. 157 (1979) ............................................ 33

*World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286 (1980). ............................................ 16

**Statutes**

18 U.S.C. § 1001 ........................................................................................................... 21

18 U.S.C. § 1341 ........................................................................................................... 26

18 U.S.C. § 1503 ........................................................................................................... 26

18 U.S.C. § 1510 ........................................................................................................... 26

18 U.S.C. § 1831 ........................................................................................................... 27

18 U.S.C. § 1961(1)(B)................................................................................................... 25

18 U.S.C. § 1961(4)....................................................................................................... 28

18 U.S.C. § 1965(a) ......................................................................................... 25

18 U.S.C. § 201 ............................................................................................... 27

18 U.S.C. § 2261A ......................................................................................... 23

18 U.S.C. § 2331(5) ................................................................................. passim

18 U.S.C. § 2331-2333 ................................................................................... 25

18 U.S.C. § 2333 ..................................................................... 18, 20, 21, 22

18 U.S.C. § 875(d) ......................................................................................... 25

18 U.S.C. § 951 ............................................................................................... 13

28 U.S.C. § 1331 ............................................................................................. 17

28 U.S.C. § 1332(a)(1) ............................................................................. 17, 18

28 U.S.C. § 1332(a)(2) ................................................................................... 17

28 U.S.C. § 1391 ............................................................................................. 15

50 U.S.C. § 1803(g) ......................................................................................... 8

Okla. Stat. Title 12 § 2004 ............................................................................. 11

Okla. Stat. Title 12 § 95(4) ............................................................................. 29

Okla. Stat. Title 13 § 176.2 ............................................................................. 27

Okla. Stat. Title 21 § 771-781 ........................................................................ 19

Okla. Stat. Title 26 § 1-107 ............................................................................. 15

**Other Authorities**

Edward C. Liu, "HPSCI Memorandum Sparks Debate over FISA Application Requirements,"
   U.S. Congressional Research Service, February 14, 2018 ....................... 11

Restatement (Second) of Agency § 219 (Am. Law Inst. 1958).................... 31

Restatement (Second) of Torts § 766 (Am. Law Inst. 1979)....................... 34

**Rules**

Fed. R. Civ. P. 11(b)(1) ........................................................................................ 2

Fed. R. Civ. P. 11(b)(2) ........................................................................................ 2

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 16

Fed. R. Civ. P. 12(b)(2) ...................................................................................... 12

Fed. R. Civ. P. 8(a) ............................................................................................ 25

Rules of Procedure, U.S. Foreign Intelligence Surveillance Court ................... 3, 8

**Constitutional Provisions**

U.S. Constitution, Article I ................................................................................. 11

U.S. Constitution, Article II ............................................................................... 11

U.S. Constitution, First Amendment ............................................................. 10, 34

U.S. Constitution, Fourteenth Amendment .................................................. 11, 12

U.S. Constitution, Fourth Amendment ............................................................... 12

Plaintiff Carter Page ("Dr. Page") respectfully submits to the Court this memorandum of law, in opposition to the memorandum of law in support of the motion to dismiss ("Memo.", ECF Dkt. 21) as filed by the Defendants: the Democratic National Committee (the "DNC"), Perkins Coie LLP ("Perkins Coie"), Marc Elias ("Mr. Elias"), and Michael Sussmann ("Mr. Sussmann").

**PRELIMINARY STATEMENT**

The Plaintiff has spent much of the past two years repairing the damage inflicted by the Defendants as a result of their false U.S. District Court declarations and associated media reports against him. Dr. Page's *pro se* response to the Defendants' Memo. continues that recent tradition with his brief presented here, *infra*. Although the Plaintiff's efforts have required that he file many thousands of pages to begin setting the record straight, this brief endeavors to avoid such unnecessary encumbrances at this early stage of the current civil action by alerting the Court of several fundamental flaws in the Defendants' Motion to Dismiss pleadings.

During the months before the 2016 Presidential election, the Defendants committed torts previously unseen in the history of the United States and without precedent in the annals of American law. "Weatherford's Watergate", *Dill v. Rader*, 533 P.2d 650, 656 (Okla. Ct.App. 1975), may show some close similarities on a local level but not on such a national and international scale including nearly round-the-clock media coverage. In the wake of this man-made disaster, the November Memo. follows their familiar pattern of abuse of process in U.S. District Courts that the Co-Defendants have helped to commit since 2016. Compl. ¶ 4. Their Memo. alleges that Dr. Page's Compl. presented a "bizarre and speculative narrative". *Id.* p. 12. To the contrary, the U.S. Congress has in the years since 2016 exposed evidence that the Defendants collectively conspired to concoct a bizarre and speculative narrative about the

1

Plaintiff as part of their multimillion dollar defamation campaign. *Id*. ¶ 41-45. These same

inconsistencies follow the pattern summarized in this opposition brief, as similarly seen in the

extensive, 412-page falsified pleadings that the Defendants caused to be submitted to the U.S.

Foreign Intelligence Surveillance Court ("FISC"), based in significant part on the Defendants'

"opposition research" report regarding fabricated allegations related to the Plaintiff and other

such collateral targets who had supported then-candidate Donald J. Trump (the "Dodgy

Dossier"). Their Memo. thus blatantly defies the rule that: "factual contentions have evidentiary

support or, if specifically so identified, will likely have evidentiary support after a reasonable

opportunity for further investigation or discovery". Fed. R. Civ. P. 11(b)(1).

Their roughshod legal analysis fares no better, characteristically defying the principle that:

"defenses, and other legal contentions are warranted by existing law or by a nonfrivolous

argument for extending, modifying, or reversing existing law or for establishing new law". Fed.

R. Civ. P. 11(b)(2).  This all follows the Defendants' erstwhile attempts to secretly extend,

modify, or reverse existing law or establish new law in the FISC, where the Defendants

creatively transformed themselves into "artificial creatures responsible for the harm inflicted by

those through whom they must act so long as harm is inflicted while the agent or servant is on

duty, on the job, or fulfilling an employment-related mission". *Roring v. Hoggard*, 326 P.2d

812, 813 (Okla. 1958) quoted in *Dill v. Rader*, 533 P.2d 650, 656 (Okla. Ct. App. 1975)).

Instead of focusing on legitimate facts or relevant legal analysis, the Defendants' Memo.

accordingly reverts back to their usual standard pattern in the FISC from recent years by seeking

to discredit the Plaintiff through citations from reliable mainstream media outlets which have

often worked on their behalf in the past. For example, citing a segment from Dr. Page's

unrelated TV interview by ABC News that had nothing to do with the core defamatory allegations that the Defendants underwrote and caused to be submitted to the FISC (*Id.,* p. 39).

Having previously overstepped many FISC safeguards in a way that remains symbolic of their pattern of arrogance and audacity in U.S. Courts as once again seen in their Memo. (Rules of Procedure, U.S. Foreign Intelligence Surveillance Court), the Defendants now disrespectfully and ironically claim that the W.D. Okla. should have no jurisdiction.

For understandable reasons, the Defendants' Memo. primarily focuses its references regarding alleged defamation towards the libelous mainstream media reports which their malicious research also incited. Primarily, this includes stories that began on September 23, 2016 by Yahoo News[i] and its progeny (*Id.* p. 5-6). However, the Defendants' pleadings remain completely mute to the fraud that their libelous research project played the essential role in egregiously instigating in the FISC. As part of preliminary efforts to begin restoring the rule of law in the wake of this judicial disaster, the top leadership of many Committees in the U.S. Congress including the Senate Judiciary, House Intelligence ("HPSCI"), House Judiciary and House Oversight Committees have in 2018 disclosed significant evidence of precisely such atrocious offenses which the Defendants sponsored and helped to manage in conjunction with their paid consultants. Compl. ¶ 41-45.

Despite having help from a large team of lawyers with drafting their Memo. (p. 46), the Defendants' initial pleadings in this case are dripping with the same types of misinformation and false pleadings that plagued the allegations from their Dodgy Dossier reports that they helped to introduce in the FISC. No lawsuit by the *pro se* Plaintiff has ever been "dismissed with prejudice"[ii] (*Id.*, p. 14). Dr. Page was never "a public figure" (*Id.*, p. 12) until the Defendants and their subcontractors worked vigorously behind the scenes to maliciously communicate their

false Dodgy Dossier allegations to countless journalists.  Compl. ¶ 19.  The Defendants' long list of misinformation has thus far continued indefinitely.

The Defendants' actions against the Plaintiff that were initiated in April 2016 (Compl. Exhibit 1) and resultant illegal offenses have reflected a complete disdain for the integrity of the U.S. justice system.  While the countless incorrect factual allegations and prolix legal text in their Memo. follows this same trend that corrupted the integrity of the FISC, the preliminary details presented in this short response provides the Court with a brief summary of an alternative proposed initial framework for future proceedings in this civil action based instead on accurate facts and applicable legal principles.

## ACCURATE, RELEVANT FACTS
### A. The Parties: Masters, Agents, Servants and Victims

The extraordinary torts committed by the Defendants and the unprecedented damages that their life-threatening Dodgy Dossier attacks in turn created worldwide for the Plaintiff and other victims have brought a complex jurisdictional scenario in this civil action. But by all measures and contrary to the Defendants' latest attempts to rewrite the rules for their malicious partisan purposes, this Court has clear jurisdiction across all individual measures, bases and relevant legal tests.

### 1. Defendants: Perfect Diversity Jurisdiction

In accordance with one of their associated websites[iii] as well as their U.S. Federal Election Commission ("FEC") filings[iv], Defendant DNC is alleged to be organized in the District of Columbia ("D.C.") through the affiliated "DNC Services Corporation" and maintains its principal place of business in Washington, D.C.

Defendant Perkins Coie is a law firm organized as a Limited Liability Partnership with its principal place of business in Seattle, Washington. Defendants Mr. Elias and Mr. Sussmann are

partners at Perkins Coie, who according to their Memo. do not deny "conduct . . . business for Perkins Coie from an office in Washington, D.C.'" (*Id.* p. 5). "Mark E. Elias, an attorney with the law firm Perkins Coie—who represented both the Clinton Campaign and the DNC—was the individual who retained Fusion for the purposes of gathering opposition research on Mr. Trump." *Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 291 F.Supp.3d 34, Dkt. No. 58, p. 19-20 (D.D.C. 2018) (citation omitted).

In October 2016, Dr. Page hired Same Day Process Service, Inc. ("SDPS") in the District of Columbia to perform service of process on each of the Defendants. SDPS is a National Association of Professional Process Servers member. Despite multiple attempts at service, the Plaintiff was informed by Attorneys for Defendants Matthew S. Salerno (Memo. p. 34)[v] that "Mr. Elias and Mr. Sussmann have appointed my firm as an authorized agent…This is a common practice under FRCP 4(e)(2)(C) and allows lawyers to accept service on behalf of their clients."[vi] Despite such attempts at creating obstacles to accountability, they each have allegedly declared "Washington, DC" as their location on their respective Twitter pages.[vii]

Acting in conjunction with other agents or servants of Defendant DNC, the Co-Defendants Perkins Coie, Mr. Elias and Mr. Sussmann fulfilled services for their masters and/or principals at the Democratic Party in 2016 (Compl. ¶ 42-45; *Id*. Exhibit 1):

> "Principles of respondeat superior dictate that [Defendant] may be held liable for the tortious acts of its employees 'so long as [the] harm is inflicted while the agent or servant is on duty, on the job, or fulfilling an employment-related mission; and the complained of act is incident to or activated by such service to the master or principal.'" *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1556 (10th Cir. 1995) (quoting *Dill v. Rader*, 533 P.2d 650, 656 (Okla.Ct.App.1975)).

By their own admission, Defendant Perkins Coie engaged Fusion GPS in April 2016. (Compl. Exhibit 1). Fusion GPS subsequently hired opposition research consultants to assemble

a Dodgy Dossier that has been largely discredited.  As per the excerpt from a 2018 filings in a

U.S. District Court and Queen's Bench Division in England, (Attached as **Exhibit 1**, *infra*;

*Fridman et al v. Bean LLC et al*, 17-cv-02041, Dkt. No. 46-2, p. 4 (D.D.C., Oct. 3, 2017)):

> Is it Orbis' case that Fusion's client needed the information contained in Memorandum 112
> [*Constituent excerpt of the Dodgy Dossier*]:
>     (a) For the purposes of prospective legal proceedings?
>     (b) For the purposes of obtaining legal advice?
>     (c) For the purpose of establishing, exercising or defending legal rights.
>
> Response: (b) and (c). Fusion's immediate client was law firm Perkins Coie LLP. It engaged
> Fusion to obtain information necessary for Perkins Coie LLP to provide legal advice on the
> potential impact of Russian involvement on the legal validity of the outcome of the 2016 US
> Presidential election. Based on that advice, parties such as the Democratic National
> Committee and HFACC Inc. (also known as "Hillary for America") could consider steps
> they would be legally entitled to take to challenge the validity of the outcome of that
> election. In turn, that may have resulted in legal proceedings within the meaning of limb (a)
> above, but the immediate needs of Fusion's clients fell within limbs (b) and (c).

In accordance with the testimony by their Dodgy Dossier servants (*Id.*), this civil action

belatedly provides Defendant DNC with "prospective legal proceedings" related to their

fictional Russia story as they have allegedly sought.  Also in their professional arena, there is

zero "legal validity" to the fraudulent FISC pleadings that Defendants Perkins Coie, Mr. Elias

and Mr. Sussmann were partially responsible for having entered in another U.S. District Court.

**2.  Plaintiff: Intention to Become a Permanent Oklahoma Resident, After the
Defendants' Terror Tactics and Other Damages Are Remedied**

Plaintiff is the Founder and Managing Partner of Global Natural Gas Ventures LLC

("GNGV"), an Oklahoma Corporation with principal offices in Oklahoma City. Due to the [18

U.S.C. §2331(5)] domestic terror threats and other damages caused by the Defendants and

contrary to the false characterizations in Memo. p. 15, Dr. Page was forced to sell his only real

estate property in New York State on October 6, 2017.

The Tenth Circuit has long held that:

"In order to acquire a domicile of choice, *one must have a present intention of permanent or indefinite living in a given place* or country, not for mere temporary and special purposes, but with a present intention of making it his home unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home… The event upon which his return was dependent was one he reasonably anticipated would occur and was not an indeterminate or floating intention." *Gates v. Commissioner of Internal Revenue*, 199 F.2d 291 (10th Cir. 1952). [Emphasis added.]

The "uncertain or unexpected" events (*Id.*) that led Dr. Page to take on his fugitive lifestyle were the life-threatening torts of the Defendants in 2016. Compl. ¶ 15.  A significant percentage of these Domestic Terror threats [18 U.S.C. §2331(5)] since 2016 which stemmed from the Defendants' actions related to their defamatory Dodgy Dossier accusations were suffered in his former home state of New York.  He had previously founded another company there which had its future prospects largely destroyed by the Defendants.  Thus, Dr. Page's present intention of permanent or indefinite living is in the state of Oklahoma where he founded GNGV in 2013. Compl. ¶ 15.

Although Plaintiff Dr. Page's present intention of permanent living in Oklahoma may be "reasonably anticipated" to occur once the threats against his life are eventually resolved, he has been required to continue his legal education in a foreign jurisdiction in the interim. As part of his new quest to help reestablish some semblance of justice in America and help repair the extreme damage inflicted by the Defendants in support of their political beneficiaries in 2016, Dr. Page became an active student member of the American Bar Association and other professional legal organizations in 2017.  But in the interest of achieving greater safety, he has also enrolled in a part-time LL.M. program at a law school overseas and began this coursework in January 2018.  Despite doing the best that he can to resolve these injustices and personal security threats while learning as much as possible remotely, for the foreseeable future he will not even come close to meeting the relevant threshold standards of any Bar, thus necessitating

7

that his allegations be construed "liberally" as a *pro se* Plaintiff. *McBride v. Doe*, 71 F. App'x

788, 790 (10th Cir. 2003).

It has been held for related offenses that "the injury is domestic if the plaintiff's property was

located in the United States when it was stolen or harmed, even if the plaintiff himself resides

abroad." *Bascuñán v. Elsaca*, 874 F.3d 819, 820 (2d Cir. 2017).  Particularly since Dr. Page

maintains no corporation outside of U.S. jurisdictions and his principal place of business is in

Oklahoma, the bulk of the Defendants' extraordinary damages caused by their vicious attacks

against the Plaintiff accrued domestically in the U.S.

## B. International Impact of Defendants' Defamatory Allegations on Abuse of Process and Extreme Civil Rights Abuses

Oklahoma courts have rejected attempts by more powerful parties to pursue an "assault on

plaintiff and assassinate his character by spreading a number of vicious and false defamatory

statements", as has been committed by the Defendants against Dr. Page. *Dill v. Rader*, 533 P.2d

650 (Okla.Ct.App.1975).  Such standards should be maintained in this civil action, given the far

more extreme civil rights abuses and other associated damages caused by the Defendants.

## ARGUMENT

## I. LEGAL STANDARDS AND EQUAL JUSTICE UNDER LAW

Defendants' Memo. cites various Fed. R. Civ. P. tenets that it seeks to use as some

imaginable basis for blocking this Court's legitimate jurisdiction over this case. The facts

surrounding the conspiracy they advanced in 2016 makes the more relevant standards the Rules

of Procedure for the U.S. Foreign Intelligence Surveillance Court, as promulgated pursuant to 50

U.S.C. § 1803(g).  No element within the FISC Rules, *Id.,* conceivably authorizes a political

party, nor its legal counsel, to feed defamatory and misrepresented reports into this once-revered

U.S. District Court for purposes of "[challenging] the validity of the outcome of that election" as occurred in 2016.  Exhibit 1, *infra*.

In the landmark *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) case, the Supreme Court held that, "…to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that petitioners adopted and implemented… policies at issue not for a neutral, investigative reason but for the purpose of discriminating…"  Rather than any "neutral, investigative reason" (*Id.*), the ever-increasing amount of factual evidence that has already continued to become available through ongoing Congressional disclosures have shown a clear pattern of discrimination and related illicit activities by the Defendants in conspiracy with teh U.S. Government ("USG") based on the false 2016 reports from the Defendants, particularly against Dr. Page as an unpaid, informal supporter of the Trump campaign. (Compl. ¶ 41-45).

The Memo.'s outrageous jurisdictional analysis reflects the complete arrogance and lack of self-awareness that led to the Defendants' pivotal influence with their corruption of one of the most revered, trust-based courts in the U.S.   "Civil liberties had their origin and must find their ultimate guaranty in the faith of the people." *Douglas v. City of Jeannette*, 319 U.S. 157 (1943). U.S. District Court Judges from coast to coast including Rosemary Collyer (D.D.C.), Michael Mosman (D. Or.), Anne C. Conway (M.D. Fla.) and Raymond Dearie (E.D.N.Y.) were among the eminent jurists deceived by the fraudulent work of the Defendants.[viii]  But through the introduction of the duplicitous claims submitted to the FISC on behalf of the current Defendants in this civil action, these appointees of Chief Justice John Roberts have had their faith in the system potentially undermined.  Last month's Memo. now asks this Court to follow the same pattern of misguided blind faith in keeping with their timeworn fictional storyline.

The Defendants' pleadings make only one passing reference to the U.S. Constitution. Memo. p. 33.  This litigation strategy may be readily understandable given the historic role the Co-Defendants have collectively played in trampling many core principles of this founding document, the supreme law of the United States.  The only passing Constitutional reference they proffered to this Court is the same nebulous citation that was summarily rejected by another one of the Defendants' subcontractors in our nation's capitol earlier this year:

> "Vendors have failed to cite any law in support of the proposition that a party that vends goods or services to a political association is entitled to similar First Amendment protection." *Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 291 F.Supp.3d 34, Dkt. No. 58, p. 19-20 (D.D.C. 2018) (citation omitted).

On a motion to dismiss, a district court accepts all well-pled factual allegations in the complaint and draws all reasonable inferences in the non-moving party's favor. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).

Courts may also make allowances for *pro se* litigants who experience some, "confusion of various legal theories... unfamiliarity with pleading requirements". *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).  The confusion displayed in their Memo. notwithstanding, Defendants Perkins Coie, Mr. Elias and Mr. Sussmann do not warrant such privileges given their respective credentials as qualified attorneys. Instead, "Undisclosed ghostwriting would also likely qualify as professional misconduct under Model Rules 8.4(c) and (d), prohibiting conduct involving a misrepresentation, and conduct that is prejudicial to the administration of justice, respectively." *Duran v. Carris*, 238 F.3d 1268 (10th Cir. 2001).

## II. CLEAR PERSONAL AND SUBJECT-MATTER JURISDICTION: A RETURN TO "FAIR PLAY AND SUBSTANTIAL JUSTICE"

The Tenth Circuit has held that, "[t]he Due Process Clause allows flexibility in ensuring that commercial actors are not effectively 'judgment proof' for the consequences of obligations they

voluntarily assume in other States." *Kennedy v. Freeman*, 919 F.2d 126 (10th Cir. 1990), citing

*Burger King Corp. v. Rudzewicz*, 471 U. S. 462 (1985). "Asserting jurisdiction over Freeman is

compatible with the notions of 'fair play and substantial justice' embodied in the Due Process

Clause." *Id*.  Based on the limited information that Article II officials have surrendered to the

top leadership of Article I Judiciary Committees in each chamber of the U.S. Congress thus far[ix],

there is growing consensus that the Defendants' defamatory Dodgy Dossier reports violated

notions of "fair play and substantial justice" in U.S. Courts. See Edward C. Liu, "HPSCI

Memorandum Sparks Debate over FISA Application Requirements," U.S. Congressional

Research Service, February 14, 2018.

As seen in the facts preceding this civil action, the Defendants have overstepped many

fundamental principles related to general, specific as well as subject-matter jurisdiction in U.S.

Courts. Marking an apparently unprecedented series of events in the 40-year history of the secret

FISC, the Defendants made themselves "essentially at home" in a federal jurisdiction that had

once been reserved for current USG officials.  *Goodyear Dunlop Tires Operations, S.A. v.

Brown,* 564 U.S. 915, 919 (2011). Through their outrageous Memo. and contrary to Oklahoma

law, they are now seeking to reject their infinitely more legitimate jurisdiction in this Court.

> "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff
> must show that jurisdiction is legitimate under the laws of the forum state and that the
> exercise of jurisdiction does not offend the due process clause of the Fourteenth
> Amendment." *Benton v. Cameco Corp*., 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *Soma
> Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999)). "Where, as in
> Oklahoma, the state long arm statute supports personal jurisdiction to the full extent
> constitutionally permitted, due process principles govern the inquiry." *Shrader v. Biddinger*,
> 633 F.3d 1235, 1239 (10th Cir. 2011).  See Okla. Stat. Title 12 § 2004.

Any basic consideration of the abuse of process in the FISC following partial declassification

of Dr. Page's FISA warrant makes readily apparent that due process rights guaranteed by the

U.S. Constitution Fourth Amendment and Fourteenth Amendment were severely violated.

Compl. ¶ 42, et al.

> "Analyzing due process is a two-step process. First, the court must find that the defendant has 'minimum contacts' with the forum state such that the defendant should reasonably anticipate being haled into court there." *Dig. Ally, Inc., v. Util. Assocs., Inc.*, No. 14-2262-CM, 2014 WL 7375530, (D. Kan. Dec. 29, 2014) (quoting *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160 (10th Cir. 2010)). Second, the defendant's contacts must be "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Calder v. Jones*, 465 U. S. Reports 783, 788 (1984) (quoting *Miliken v. Meyer*, 311 U. S. Reports 457, 463 (1940)).

The Defendants' threadbare recitals offer no legitimate basis by which to avoid this

jurisdiction, as summarized in § II.A., *infra*.

## A. This Court Has Personal Jurisdiction Over All of The Defendants

The Memo. asserts no valid basis for an alleged personal jurisdiction defense. Fed. R. Civ. P.

12(b)(2).  The Defendants' direct role in initiating the primary basis for Abuse of Process in the

U.S. Foreign Intelligence Surveillance Court ("FISC") have so clearly offended all traditional

notions of "fair play and substantial justice", that they inherently meet the specific criteria

defined in *International Shoe v. State of Washington*, 326 U.S. 310 (1945).  Personal jurisdiction

in this case is readily self-evident.

 "[A]t this stage, plaintiffs need only make a *prima facie* showing of personal jurisdiction."

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).  Courts

have accepted as true any uncontroverted allegations in the complaint and are encouraged to

resolve all factual disputes in plaintiff's favor. *Id.*

Further adding to the inherent appropriateness of the Tenth Circuit jurisdiction, the U.S.

Attorney General has assigned U.S. Attorney for the District of Utah John W. Huber to

investigate the alleged criminal abuses of process against the Plaintiff and related offenses

which allegedly stemmed in significant part from associated defamatory allegations managed by

the Defendants.[x]   In large part stemming directly from the illegal activities by the Defendants

and their racket, U.S. Attorney Huber's specific mandate stems from prior U.S. Congressional

demands that DOJ review "whether the FISA process employed in the fall of 2016 was

appropriate and devoid of extraneous influence."[xi]

Dr. Page's Compl. established "personal jurisdiction over each defendant named in the

action." *Tarver v. Ford Motor Co.*, No. CIV-16-548-D, 2016 WL 7077045, at \*1 (W.D. Okla.

Dec. 5, 2016).  He has also presented "competent proof in the form of affidavits and other

written materials that, if true, would establish a prima facie showing that jurisdiction is proper,"

*Id.*, as seen in the initial results of extensive U.S. Congressional investigations as preliminarily

declassified in 2018 and summarized in his Compl. For example, *Id.*  ¶ 41-45.

## 1.  This Court Has General Jurisdiction: "Essentially at Home" in W.D. Ok., as in FISC

Defendants cite *Daimler AG v. Bauman*, 571 U.S. 117 (2014), which some fora may broadly

interpret as having taken steps toward divesting general jurisdiction of its utility.  The facts of

the *Daimler* decision, involving a German car manufacturer and Argentine workers filing claims

in a U.S. Court, have nothing to do with the cause of action and related facts in this case

involving all U.S. persons.  This is notwithstanding the Defendants' fraudulent claims submitted

to the FISC and subsequent related federal investigations as part of the Witch Hunt targeting the

Plaintiff (Compl. ¶ 23), based on the outrageous defamatory information as funded and

distributed by the Defendants that the U.S. military veteran Plaintiff was somehow allegedly an

"Agent of a Foreign Power". 18 U.S.C. § 951. Instead, the only factual parallel with *Daimler*

relates to the illegal acts committed by this civil action's Defendants, since that 2014 Supreme

Court precedent also involved a period of domestic terrorism known as the "Dirty War".  *Id.*

749. As seen in Defendant Sussmann's alleged collusion with state security forces in

Washington (Compl. ¶ 44-45), Justice Justice Ginsburg noted that a party in *Daimler* similarly "collaborated with state security forces". *Id.* 751.  In any event and from a strictly legal perspective, this Court and the 10th Cir. have found that waiver of the personal jurisdiction defense does preclude defendants from asserting the new *Daimler* test and have denied defendants' motion to dismiss for lack of personal jurisdiction, implying that *Daimler* did not change the standards in *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011). See *Am. Fid. Assur. Co. v. Bank of N.Y. Mellon*, No. CIV-11-1284-D, 2014 WL 4471606, at *3 (W.D. Okla. 2014). Affirmed in *Am. Fid. Assurance Co. v. Bank of N.Y. Mellon*, 810 F.3d 1234 (10th Cir. 2016).  "Put another way, the general jurisdiction standard… was the same before and after Daimler was decided". *Id.*

According to the *Goodyear* test: "jurisdiction unquestionably could be asserted where the corporation's in-state activity is 'continuous and systematic' and that activity gave rise to the episode-in-suit." *Goodyear v. Brown,* 564 U.S. 915, 923 (2011).  Working in close coordination with its Co-Defendants, the DNC clearly meets each of these respective criteria.  First and related to its primary function of assisting "state parties and candidates by contributing money, making expenditures on their behalves, and providing active support through the development of programs" (Memo. p.15-16), its Oklahoma Democratic Party affiliate announced earlier last year that beginning in October 2017, "all state parties will receive a monthly $10,000 investment from the DNC through 2018".[xii]  Through this and countless other affiliations and measures which continues a pattern seen for many decades, the DNC's in-state activity has long remained "continuous and systematic".  Compl. ¶ 41-45.

Second, the activities of the Defendants related to the Dodgy Dossier "gave rise to the episode-in-suit." *Goodyear v. Brown,* 564 U.S. 915, 923 (2011).  The life-threatening damages

suffered by the Plaintiff at his principal place of business in Oklahoma as well as impacting his other activities worldwide would never have become an episode if it weren't for the Defendants' fraudulent Dodgy Dossier activities with the FISC and the media.

Venue is also proper in:

"(1) a judicial district in which any defendant resides,... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred,... or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(1)-(3).

The claims in this action meet prong (2), or in the alternative prong (3), of § 1391(b). *Id.* A substantial part of the events and omissions giving rise to the claim occurred as Dr. Page has worked to restore his Oklahoma business venture GNGV since 2016. § 1391(b)(2).

The Plaintiff has suffered frequent death threats in New York State, where he previously maintained his domicile prior to the reign of terror brought by the Defendants. Dr. Page has also experienced other similar threats in the District of Columbia where the DNC, Mr. Elias and Mr. Sussmann maintain their principal place of business. For these and other personal safety-related reasons and with exception of W.D. Okla., it is likely that there is "no district in which an action may otherwise be brought". § 1391(b)(3).

Through its local Oklahoma affiliate organized under Okla. Stat. Title 26 § 1-107, the DNC has been essentially at home in this state for many decades. *Hunt v. Democratic Party of Oklahoma*, 439 F. Supp. 788 (N. D. Okla. 1977).  Throughout the decades including more recently, local Democrat controversies have been decided in Oklahoma courts such as in 2016 and immediately preceding the timeframe during which the initial illegal activities by the Defendants occurred. *Niemi v. City of Tulsa, Corp.* (Ok. Civ. App. 17, March 23, 2016).  The U.S. Federal Election Committee in Washington also presented recommendations in January

2016 related to the Oklahoma Democratic Party's alleged prior Misstatements of Financial Activity.[xiii]

The U.S. Supreme Court has authorized Oklahoma courts to exercise jurisdiction over nonresidents with far more tenuous connections to this state than those Defendant DNC has benefited from for decades.  For example, an automobile retailer and its wholesale distributor in a products liability action when the defendant's only connection with Oklahoma was the fact that an automobile sold in New York to New York residents happened to become involved in an accident in Oklahoma. *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286 (1980). Clearly the relationship between the Defendants and Oklahoma has long remained far more permanently established related to the facts in this current civil action.

## 2.  This Court Has Specific Jurisdiction: DNC has Purposefully Directed Their Activities Toward Oklahoma, Long Before 2016 and Ever Since

Defendant DNC's connections to Oklahoma have long remained vast and extensive.

While many well-known public figures were eventually revealed as targets, the Defendants and their servants made Dr. Page and in turn this Courts' jurisdiction the "focal point of the tort" beginning in September 2016. *Shrader v. Biddinger*, 633 F.3d 1235, 1245-46 (10th Cir. 2011).

The U.S. Supreme Court has long held that, "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933).

## B.  This Court Has Subject Matter Jurisdiction Over This Action

The Defendants' assertion of a subject-matter jurisdiction defense fails as well. Fed. R. Civ. P. 12(b)(1).

### 1.  The Court Has Federal Question Jurisdiction Under 28 U.S.C. § 1331

Federal question jurisdiction is self-evident. "Federal courts have § 1331 jurisdiction over claims that arise under federal law." *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368 (2012). In addition: "We determine the constitutionality of an investigatory stop by balancing 'the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" *U.S. v. Moran*, 503 F.3d 1135 (10th Cir. 2007). The extreme nature of the surveillance intrusions caused by the Defendants disrupted the normal balance set by the U.S. Constitution, common law and many statutes.

### 2.  The Court Has Diversity Jurisdiction Under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1332(a)(2)

The late, great Oklahoman Will Rogers has been famously quoted as once saying: "I am not a member of an organized political party. I am a Democrat."  In contrast, the far more recent activities of each Defendant in support of their clients, political patrons and indeed the Co-Defendant DNC itself have sought to reap the benefits of significant organizational functions and deep financial relationships that have been clearly established within Oklahoma over the many decades since.  The Defendants' subcontractors including Fusion GPS have often attempted to conceal their wrongdoing and related identifying information in U.S. Courts.  As one example, see their failed battles in opposition to lawful U.S. Congressional subpoenas in: *Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 291 F.Supp.3d 34 (D.D.C. 2018).  For these reasons and in contrast to the sustained pattern of false pleadings that the Defendants caused to be introduced to the FISC beginning in 2016 (Compl. ¶ 41-45), the allegations presented *infra* are the Plaintiff's best estimate and remain subject to final confirmation in future proceedings before this Court.  Nonetheless and whereas the criteria for 28 U.S.C. § 1332(a)(1) diversity have unquestionably been met, these

granular specifics of whether the individual attorney Co-Defendants may have their primary home in the District of Columbia, Maryland, Virginia or some other jurisdiction near their principal place of business in our nation's capital as raised in Memo. p. 16 is a moot point. Putting such distraction techniques aside and for the immediate purposes of the Defendants' Motion to Dismiss, there is no question that the Plaintiff and the Defendants are "citizens of different States".  28 U.S.C. § 1332(a)(1).

Although the Defendants seem to take issue with the Plaintiff's characterization of Co-Defendant DNC (Memo. p. 15-16), the jurisdictional description in Dr. Page's original Compl. (¶ 8) closely parallels their own self-description in another civil action. See *DNC v. Russian Federation, et al*, 18-cv-3501-JGK, Dkt. No. 1 (S.D.N.Y., 2018).

## III. FEDERAL CLAIMS

*Citizens United v. FEC*, 558 U.S. 310, 370 (2010) has helped ensure that U.S. citizens: "see whether elected officials are 'in the pocket' of so-called moneyed interests".  In 2016, the moneyed interests of the Defendants caused great damage to the Plaintiff by their successful corruption of the U.S. federal court system.  Based on subsequent Congressional disclosures in 2018 (Compl. ¶ 41-44), the FISC was illicitly influenced by the Defendants' deep pockets as a result of their defamatory Dodgy Dossier allegations.  Multiple federal claims arise as a result.

## A. Actionable Anti-Terrorism Act ("ATA") Claims (18 U.S.C. § 2333)

In addition to the injustices of the associated unconstitutional civil rights abuses from simply a legal and civil rights perspective that have directly resulted from the Defendants' defamatory reports, Dr. Page was the target of terrorist threats stemming from these torts by the Defendants. But due to the *ex parte* standards of the FISC and despite having previously served as a distinguished U.S. military veteran (Compl. ¶ 74-75), he was not even afforded equivalent due process standards approved by that *ex parte* forum – a secret federal court that has traditionally

focused its docket on far more legitimate national security threats such as alleged terrorists. *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004): "due process demands that a citizen held in the United States as an enemy combatant be given a meaningful opportunity to contest the factual basis for that detention before a neutral decision maker."

Based on the defamatory information distributed and paid for by the Defendants, the USG waged an unprecedented, targeted, state-sponsored surveillance operation against Dr. Page. Given subsequent death threats (Compl. ¶ 29-30) and the intent of the Defendants (Exhibit 1, *infra*), the outcome of the libel committed against Dr. Page clearly displays the requisite elements of the statutory definition of domestic terrorism: "activities that involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State" and "appear to be intended…to intimidate or coerce a civilian population… to influence the policy of a government by intimidation or coercion; or… to affect the conduct of a government by… assassination… and… occur primarily within the territorial jurisdiction of the United States." See 18 U.S.C. § 2331(5). Whereas the Defendants were responsible for distributing the defamatory allegations in the Dodgy Dossier and caused the false information to be broadcast nationwide to all fifty states since the last U.S. Presidential election, these actions also further violate the criminal laws of many states including Oklahoma. Okla. Stat. title 21 §§ 771-781.

"There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct… Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway." *Elonis v. United States*, 135 S. Ct. 2001 (2015).

Section 2333 of the ATA creates a civil cause of action for "[a]ny national of the United States [who is] injured in his or her person, property, or business by reason of an act of international terrorism..." Section 2331 defines "international terrorism" as activities that:

> (A) involve violent acts or ***acts dangerous to human life*** that are a ***violation of the criminal laws of the United States or of any State***, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) ***appear to be intended*** --
>    (i) ***to intimidate or coerce a civilian population***;
>    (ii) ***to influence the policy of a government by intimidation or coercion***; or
>    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States, or ***transcend national boundaries in terms of the means by which they are accomplished***, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum... (Emphasis added.)

The ATA thus has "four separate requirements" for an act to constitute international terrorism -- "that the act at issue (1) involve violence or endanger human life; (2) violate federal or state criminal law if committed in the United States; (3) appear intended to intimidate or coerce civilian population, influence government policy, or affect government conduct by specified means; and (4) occur primarily outside the United States or transcend national boundaries." *Linde v Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 68 (2d Cir. 2012)); see also *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1328 (D. Utah 2006) (identifying the same elements).

In accordance with these statutory and common law frameworks, Dr. Page's Complaint provided sufficient factual allegations to state a claim under the ATA. The alleged acts of international terrorism committed against him stem directly from the worldwide smear campaign paid for and recklessly mismanaged by the Defendants. Compl. ¶ 29-30, 40-45.

The Defendants' Motion thus erred as a matter of law, by mistakenly holding that § 2333's elements were not met by Plaintiff's Compl. (Memo. p. 29-31).  Prior to any initial related discovery in this or any other civil action, the top leadership of the U.S. Senate Judiciary Committee have alleged precisely the opposite based on extensive ongoing investigations by their Committee members and staff related to the abuse of process in the FISC.  In December 2017, their Chairman of the U.S. Senate Judiciary Subcommittee on Crime and Terrorism Lindsey Graham provided the following assessment of the Abuse of Process in the FISC which stemmed from the Defendants' Dodgy Dossier:

> "I've spent some time in the last couple of days, after a lot of fighting with the Department of Justice, to get the background on the dossier, and here's what I can tell your viewers: I'm very disturbed about what the Department of Justice did with this dossier, and we need a special counsel to look into that, because that's not in Mueller's charter. And what I saw, and what I've gathered in the last couple of days, bothers me a lot, and I'd like somebody outside DOJ to look into how this dossier was handled and what they did with it…I've been a lawyer most of my life, a prosecutor, and a defense attorney… And the one thing I can say, every prosecutor has a duty to the court to disclose things that are relevant to the request. So any time a document is used to go to court, for legal reasons, I think the Department of Justice owes it to the court to be up-and-up about exactly what this document is about, who paid for it, who's involved, what their motives might be. And I can just say this: After having looked at the history of the dossier, and how it was used by the Department of Justice, I'm really very concerned, and this cannot be the new normal."[1]

The Plaintiff's Compl. provided credible factual allegations from the U.S. Congress related to § 2333's second element, that a federal or state criminal law has been violated in the United States.  The U.S. Senate Judiciary Committee Chairman has also referred Defendants' consultant Mr. Steele to DOJ "for investigation of potential violations of 18 U.S.C. § 1001 for false statements investigators have reason to believe Steele made about the distribution of claims

---

[1]   Byron York, "Lindsey Graham: We need new special counsel — just for Trump dossier," *Washington* Examiner, December 30, 2017. https://www.washingtonexaminer.com/lindsey-graham-we-need-new-special-counsel-mdash-just-for-trump-dossier

contained in the dossier." (*Id.*).  Although these claims submitted by both the senior leadership of the U.S. Congress and the *pro se* Plaintiff's related allegations in this civil action were entirely disregarded by the Defendants' Memo., DOJ's Inspector General has not completed this investigation related to the illegal activities in the FISC as has been examined throughout much of 2018.[xiv]  Contrary to the Memo.'s characterizations of the Dodgy Dossier initiative that misled a U.S. District Court, these investigations have continued to uncover wrongdoing.

Similarly, the Plaintiff's Compl. has presented significant facts to this District Court indicating that § 2333's third element has been met as well.  Mr. Steele's intention to "intimidate or coerce civilian population, influence government policy or affect government policy…" have remained a primary initial factual conclusion from many ongoing Congressional investigations. Exhibit 1 *infra*. These findings "raise [plaintiff's] right to relief above the speculative level, on assumption that all of the allegations in the complaint are true." *Bell Atlantic v. Twombly*, 550 U.S. at 555-56.  Plaintiff's Complaint has already risen well above that threshold level.

Far more modest, local and small-scale social media pranks have led to affirmative decisions in otherwise equivalent domestic terrorism cases, perhaps most notably and similarly in the practice of "swatting" – the false reporting of serious law enforcement events (e.g., Compl. ¶ 40-42). Swatting tactics may consist of a diverse and creative range of false identity pranks related to law enforcement operations that meet each requisite element of the definition of domestic terrorism. 18 U.S.C. § 2331(5).  In these more benign and little-known swatting cases, defendants have been held accountable by courts when they, for example:

> "…fraudulently obtain the personal identifiers of certain telecommunication employees and impersonate the customer of the targeted telephone number, impersonate the telecommunications employee capable of initiating changes to the targeted telephone number..."[xv]

In a swatting case announced two days after BuzzFeed's release of the Defendants' full Dodgy Dossier in January 2017 (Compl. ¶ 31-38), then-U.S. Attorney Rod Rosenstein said: "We are working with officials in the United Kingdom to insure that Robert Walker McDaid is held accountable for his alleged actions because the alleged criminal activity represents a grave threat to public safety."[xvi] The relatively negligible law enforcement costs associated with this swatting incident involving "40 officers" who remained at the scene of the incident "for over 2.5 hours" and cost a local police department "over $10,000"[xvii] are clearly miniscule when compared to the baseless, politically-motivated investigation of Dr. Page that was instigated by the Defendants in accordance with their enterprises' strategic objectives. Exhibit 1, *infra*.

The offenses by each Defendant in this claim also clearly meet the terms of 18 U.S.C. § 2261A, whereas the defamatory reports displayed "the intent to… harass… or place under surveillance with intent to harass, or intimidate another person, uses… any interactive computer service or electronic communication service or electronic communication system of interstate commerce…that (A) places that person in reasonable fear of the death of or serious bodily injury to a person…"  Dr. Page understandably has had a reasonable fear of death or serious bodily injury since September 23, 2016, given the threats that have resulted from the Defendants' pranks (e.g., Compl. ¶ 30). Swatting tactics may consist of a diverse and creative range of false identity pranks related to law enforcement operations meeting each requisite element of the definition of domestic terrorism.  See 18 U.S.C. § 2331(5): "acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; appear to be intended— to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination, or kidnapping; and occur primarily within the territorial jurisdiction of the United

States." (internal letters and numbers omitted).  In these more benign and little-known swatting cases, federal courts have held defendants accountable when they, for example: "…fraudulently obtain the personal identifiers of certain telecommunication employees and impersonate the customer of the targeted telephone number, impersonate the telecommunications employee capable of initiating changes to the targeted telephone number..."[2]

Prior analyses released by the FBI have warned of the danger of such hoaxes as those managed by the Defendants: "The individuals who engage in this activity use technology to make it appear that the emergency call is coming from the victim's phone. Sometimes swatting is done for revenge, sometimes as a prank. Either way, it is a serious crime, and one that has potentially dangerous consequences."[xviii] Dr. Page's letter to Mr. James Comey first made the FBI aware of the Defendants' fraudulent scheme on September 25, 2016:

> "In bothering the Bureau with such repeated appeals, the parties who have requested my investigation clearly fail to appreciate the risks they create for America with these shenanigans.  Instead of allowing the staff of the FBI to focus the nation's limited resources on real threats, these desperate and unfounded calls for my investigation as a private citizen to advance political interests based on nothing more than preposterous mainstream media reports is a true disgrace." (As per the correspondence cited in Compl. ¶ 23).

## B. Actionable Civil RICO Claims

The courts have long recognized, and the Supreme Court has accepted, the use of private civil RICO actions. *Sedima, S.P.R.L. v. IMREX Co.*, 473 U.S. 479 (1984).  The initial Compl. alleged sufficient detail (*Id*. ¶ 23-30, 40-45, *et al*) to state a civil RICO claim: "a plaintiff must allege that the defendant violated the substantive RICO statute . . . by setting forth 'four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"

---

[2]   See for example, "Individual Pleads Guilty in Swatting Conspiracy Case: Defendant Faces 13 Years in Federal Prison," U.S. Attorney's Office, Northern District of Texas, January 29, 2009. https://archives.fbi.gov/archives/dallas/press-releases/2009/dl012909.htm
See also: *U.S. v. Hollis*, 14-mj-00206-HBF (D. Conn., 2014).

*Deck v. Engineered Laminates*, 349 F.3d 1253, 1256-57 (10th Cir. 2003).  Racketeering activity is defined as "any act which is indictable" under any number of the enumerated federal laws. 18 U.S.C. § 1961(1)(B).

Federal RICO provides for nationwide service of process and thus serves as another statutory basis for personal jurisdiction.  18 U.S.C. § 1965(a): "Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."

"The threshold issue for personal jurisdiction is whether any applicable statute confers jurisdiction by authorizing nationwide service of process on the defendant." *Express Servs., Inc. v. King*, CIV-15-1181-R (W.D. Okla. June 6, 2016). Citing *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070. (10th Cir. 2008).

Plaintiff carefully stated a claim in strict compliance with Fed. R. Civ. P. 8(a) by accordingly filing his "short and plain" Compl.  In contrast and throughout the past year, the U.S. Congress has begun disclosing a veritable avalanche of directly relevant facts that have demonstrated clear evidence of RICO violations by the Defendants and associated parties as sampled in Compl. ¶ 41-45.

## 1.  Multiple RICO Predicate Acts
Racketeering activity is defined as "any act which is indictable" under a number of enumerated federal laws. 18 U.S.C. § 1961(1)(B).  Each Defendant in this civil action conducted and/or participated in the affairs of the Dodgy Dossier operation or the Association-In-Fact Enterprise through a pattern of racketeering activity, including alleged acts indictable under multiple federal statutes. These include 18 U.S.C. § 1623 (False declarations before a court); 18 U.S.C. § 2331-2333 (anti-terrorism act); 18 U.S.C. § 875(d) (threat to injure the reputation of

another person over interstate lines); 18 U.S.C. § 1503 (Influencing or injuring officer or juror

generally). Other alleged violations include 18 U.S.C. § 1510 (obstruction of criminal

investigations); and 18 U.S.C. § 1341 (frauds and swindles).

Under the standards of this jurisdiction and based on recent testimony by one of the

Defendants' servants (Exhibit 1, *infra*), there can be no question of their intent to influence

proceedings in U.S. Courts:

> In an effort to "place metes and bounds on the very broad language" of § 1503, the Court
> held that to be convicted under that section a defendant must act with the intent that his
> actions will influence a proceeding. Accordingly, the Court determined that § 1503 requires
> that a defendant's obstructive conduct have a nexus in time, causation, or logic with the
> proceeding the defendant is charged with obstructing... In other words, interference with the
> proceeding must be the natural and probable effect of the defendant's conduct under § 1503.
> Id. In this way, we have explained that "[t]he nexus limitation is best understood as an
> articulation of the proof of wrongful intent that will satisfy the mens rea requirement of
> 'corruptly' obstructing." *U.S. v. Phillips*. 583 F.3d 1261, 1264 (10th Cir. 2009); internal
> citations omitted.

Given the long-standing impact of their defamatory Dodgy Dossier reports on the FISC that

first began in 2016, the impact of the Defendants' interference extended far beyond any

"probable effect". *Id.* Instead, widespread U.S. Congressional investigations throughout 2018

(Compl. ¶ 41-45) have brought these claims far beyond the requisite "plausible on its face"

standard for this stage of proceedings. *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555. The

initial short summary of related 2018 U.S. Congressional proceedings cited in Plaintiff's Compl.

demonstrate a clear "nexus in time, causation, [and] logic with the proceeding[s]" in the FISC

and the Defendant's role in concocting, sponsoring and distributing the Dodgy Dossier.

Despite their pattern of creative U.S. Court submissions, a fair-minded comparison of the

text of the 18 U.S.C. § 1341 statute (frauds and swindles) and the facts in this case also make it

hard to imagine any specific conceivable defense that the Defendants could potentially suggest now.  Following initial declassification, the evidence speaks for itself.

Related to the alleged predicate crime of economic espionage that requires acts of a party which "benefit any… foreign agent" (18 U.S.C. § 1831), the vicariously liable Defendants' consultant Fusion GPS has been credibly "accused of acting as an unregistered agent of the Russian government, in violation of the Foreign Agent Registration Act" in 2016. *Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 291 F.Supp.3d 40 (D.D.C. 2018).

Among other predicate acts, the statute on bribery of public officials and witnesses defines the term "public official" to include an "employee or person acting for or on behalf of the United States". 18 U.S.C. § 201. Prior to and after time when the Defendants began bribing public official Mr. Steele as part of their contractual engagement with him that led to their joint defamation and obstruction activities which began in April 2016 (Compl. Exhibit 1), public official Mr. Steele allegedly received 11 FBI payments throughout much of 2016. *Judicial Watch v. U.S. Department of Justice*, 17-cv-00916 (D.D.C. 2018).

These sample offenses overlap with a range of illegal activities committed against the Plaintiff on the state level under Oklahoma law, given efforts by the Defendants to cause other government parties to: "Willfully intercepts, endeavors to intercept or procures any other person to intercept or endeavor to intercept any wire, oral or electronic communication". Okla. Stat. Title 13 § 176.2.

## 2.  Defendants' Dodgy Dossier Operation Was a Racketeering Enterprise

The Defendants' Dodgy Dossier operation constituted a Racketeering Enterprise, formed in approximately April 2016 with the hiring of its opposition research team[xix] (Compl. ¶ 4, 41-45),

meeting core statutory criteria for that term: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Alternatively, and at the very least, the Defendants were part of an Association-In-Fact enterprise.

The Tenth Circuit and Oklahoma jurisdictions use a "One-Book" Rule for analysis of related offenses, thus joining the guidelines of the 2nd Circuit and other jurisdictions. *U.S. v. Nelson*, 36 F.3d 1001, 1004 (10th Cir. 1994).

As the U.S. Congress has helped to expose, the Defendants' enterprise had the required longevity. The Defendants also had an unlawful common purpose and their conduct in support of that common purpose was unlawful. Compl. ¶ 41-45.

Throughout 2018 proceedings in Article I, Article II and Article III institutions (*Id.*), the Defendants' enterprise has sought to falsely portray itself as "a separate element" from other constituent members of the racket which they established in 2016. *U.S. v. Turkette*, 452 U.S. 576 (1981).  Multiple subpoena fights by servants of the Defendants over recent years have strived to conceal the true identities of these perpetrators. *Bank v. HPSCI* (D.D.C. 2018).

### 3.  Defendants' Secret Enterprise Was Separate from the Pattern of Racketeering Activity

"To determine continuity we examine both the duration of the related predicate acts and the extensiveness of the RICO enterprise's scheme." *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006). As seen in the summary of extensive related predicate acts (§ III.B.1 *supra*), the Defendants participated in many other related illegal activities as part of their extensive Dodgy Dossier scheme. As HPSCI's Congressional investigation has uncovered, associates have also sought to extend the illicit patterns of their defamatory enterprise involving media organizations with the intention of influencing federal investigations long after the 2016 election:

"In late March 2017, Jones met with FBI regarding PQG, which he described as 'exposing foreign influence in Western election,'"

"[Redacted] told FBI that PQG was being funded by 7 to 10 wealthy donors located primarily in New York and California, who provided approximately $50 million."[xx]

## IV. THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS ON SUBSTANTIVE GROUNDS

### A. The Discovery Rule Negates Defendants' Misleading Time-Bar Arguments

As noted in *Capps v. Bullion Exhange,* No. 18-CV-162-GKF (N.D. Okla. 2018):

Oklahoma's limitation of action statute, 12 Okla. STAT. § 95(4), provides that civil actions for libel or slander can only be brought within one year after the cause of action accrues. 2 "[A] [defamation] action generally accrues on the date of publication." *Dig. Design Grp., Inc. v. Info. Builders, Inc*., 24 P.3d 834, 839 (Okla. 2001). However, in *Digital Design Group*, the Oklahoma Supreme Court applied the "discovery rule" to defamation claims. *Id.* at 841. "The discovery rule allows the limitation period in certain tort cases to be tolled until the injured party knows or, in the exercise of reasonable diligence, should have known of the injury." *Id.* at 839. The discovery rule is properly applied in cases "in which the injury was concealed from the plaintiff or the injury was unlikely to come to the attention of the injured party." *Id.* at 840-41.

Accordingly and whereas Dr. Page's Compl. was filed on October 15, 2018, less than one year after Defendant Perkins Coie's October 24, 2017 disclosure of Defendant DNC's joint responsibility for hiring the subcontractors that conducted the so-called "research services" which led to the Dodgy Dossier (Compl. Exhibit 1), their Memo.'s arguments that "Page's Defamation Claim Is Time-Barred" has no merit. (Id., p. 24-26).

Although the Defendants' direct responsibility for these torts is obvious based on the revelations that Congress has been disclosed thus far (Compl. ¶ 41-45), the specific timeline of their scheme and full related details may be clarified as discovery for this civil action begins. With reference to the Dodgy Dossier which the Defendants and their servants were responsible for fabricating (Compl. Exhibit 1), information has been declassified in February 2018 alleging that Defendant Perkins Coie "hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed..." (*Id.* ¶ 41-42).

29

Former FBI general counsel James Baker has allegedly testified to the U.S. Congress that Co-Defendant Mr. Sussmann "provided documents and electronic media related to Russian meddling in the election… Sussmann approached him for the meeting, which occurred in late summer or early fall 2016." (*Id.* ¶ 44).  While the Defendants' Dodgy Dossier was concurrently used by the U.S. Government as part of the alleged fraud in the FISC (*Id.* ¶ 29), the specific dates for these meetings when defamatory materials related to the Plaintiff were given to U.S. law enforcement officials remain unknown to the general public at this time.

**B.  Actionable Defamation Targeting Private Figure Dr. Page**

In contrast to the Defendants' lack of public disclosure regarding the full details of their torts, their Memo. alleges that Plaintiff "fails to provide Defendants with 'sufficient notice of the communications complained of to allow' for an adequate defense." *Hetronic Int'l Inc. v. Rempe*, 99 F. Supp. 3d 1341, 1349-50 (W.D. Okla. 2015). Given a lack of transparency until their roles had already been uncovered in U.S. Courts (*Bank v. HPSCI* (D.D.C. 2018)), the Defendants' threadbare recitals similarly bear no merit now.

> "To sustain the charge of publishing libel it is not needful that the words complained of should have been read by any person; it is enough and sufficient evidence that the accused knowingly parted with the immediate custody of the libel under circumstances which exposed it to be read by any person other than himself." Okla. Stat. Title 21 §776.

Following the Defendants primary role in organizing the Dodgy Dossier defamation campaign against the Plaintiff (Compl. Exhibit 1), subsequent revelations regarding the provenance of the allegations in the media make clear that the Defendants bear primary responsibility for the violation of §776.  In the analysis of vicarious liability, Oklahoma courts have also analogized far less egregious defamation actions to medical malpractice, stating that "ordinary care under the circumstances is the same degree of care required of physicians and surgeons in Oklahoma". *Martin v. Griffin Television, Inc.*, 549 P.2d 85, 92 (Okla.1976).

The Tenth Circuit has traditionally used Restatement (Second) of Agency § 219 in its assessment of vicarious liability. For example, *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987).  "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Restatement (Second) of Agency § 219.  The Defendants' servants including Fusion GPS played key roles in the production and dissemination of the defamatory Dodgy Dossier. Compl. Exhibit 1.

## 1. Private Figure, Until Malicious Attacks of the Defendants' Political Smear Campaign

By falsely describing Plaintiff as a "public figure", the faulty analysis in the Defendants' Memo. choses an incorrect legal standard. (*Id.* p. 40-41). Dr. Page's Wikipedia presence began within hours of the Dodgy Dossier-based 2016 Yahoo Article. Compl. ¶ 26. Accordingly:

> "His access, such as it was, came after the alleged libel, and was limited to responding to the announcement of the award. Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111 (1979).

Dr. Page never sought attention and instead tried to limit his media presence to the greatest extent possible throughout his life except in instances when malicious allegations required comment to prevent severe damage to himself and his company (Compl. ¶ 19), until the defamatory reports of September 23, 2016 sourced to the Defendants' servants made the continuation of the peaceful and safe life he once enjoyed impossible.  In response to the terrorist and other threats that the Defendants verifiably played a key role in helping to inspire against the Plaintiff, Dr. Page has since been forced to incessantly conduct crisis communications.  He also never met Mr. Trump, so represents the polar opposite of "President Nixon's closest friend" in *Rebozo v. Wash. Post Co.*, 637 F.2d 375 (5th Cir. 1981).  In contrast to the millions of dollars channeled by the Defendants in their defamation initiative, the Plaintiff has not donated money to any political campaign for over a decade including the Trump

31

Campaign.  Unlike the Defendants, Dr. Page was never an "outspoken supporter, financial backer, and advisor of" any top government official and has never "paid over $100,000 to a lobbyist to support" any politician, as found in other inapplicable cases cited by the Defendants such as *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016). Memo. p. 40.

Furthermore, the Plaintiff never previously fulfilled any element of the specific criteria for "limited purpose" public figure status as set by the Tenth Circuit.  Prior to the 2016 Yahoo Report based on defamatory allegations sourced to the Defendants and their consultants (Compl. ¶ 18-22), Dr. Page never met the requisite standards found in this jurisdiction's precedent : "Plaintiff's activities were in the background and concerned with administrative organization. He did not thrust himself into public prominence" related to the political campaign he supported. *Lawrence v. Moss*, 639 F.2d 634 (10th Cir. 1981).  The only "thrust" came as a direct result of the Defendants' Dodgy Dossier and their associated malicious media operations. Compl. ¶ 18-19.

"Absent clear evidence of general fame or notoriety in the community and pervasive involvement in ordering the affairs of society, an individual should not be deemed a public figure for all aspects of his life."  *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 324 (1974).  Not only did Dr. Page demonstrate clear evidence of not meeting those relevant criteria, the only "reference to the individual's participation in the particular controversy", *Id.*, was that cruelly initiated by the Defendants beginning with the media reports they incited in 2016.  Even in other instances when wrongdoing related to a controversy has occurred, which is clearly not the case here contrary to the outrageous allegations by the Defendants and their Dodgy Dossier consultants (Compl. ¶ 25-29), courts have rejected, "the further contention of respondents that any person who engages in criminal conduct automatically becomes a public figure for purposes

of comment on a limited range of issues relating to his conviction". *Wolston v. Reader Digest Association, Inc.*, 443 U.S. 157 (1979).

A defamation suit plaintiff need not even introduce any evidence of a compensable injury to their reputation, and may proceed "without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation," but instead only as to "'personal humiliation, and mental anguish and suffering' as examples of injuries which might be compensated consistently with the Constitution upon a showing of fault." *Time, Inc. v. Firestone* (1976) 424 U.S. 448, 460. The death threats inspired by the Defendants' so-called "legal research" clearly exceed these criteria. Compl. ¶ 30; Exhibit 1, *infra*.

The Defendants have obviously failed Oklahoma's appropriate defamation test for private figures since Dr. Page: "had not become a public figure for a particular issue by voluntarily injecting himself into a particular public controversy; he had not thrust himself into the vortex of a public issue nor attempted to engage the public's attention to influence the outcome of a public issue." *Martin v. Griffin Television, Inc.* 549 P.2d 85 (Okla. 1976). To the contrary, the Defendants played that role themselves as they maliciously invested significant time and resources to advance their multimillion dollar smear campaign, in conjunction with their paid servants for whom they are vicariously liable.

The *New York Times* ("NYT"), the *Washington Post*, the *Wall Street Journal*, and CNN are just a few of the media parties that contacted Dr. Page to ask about the disgraceful fictional information from the Dodgy Dossier that the Defendants were responsible for concocting in conjunction with their consultants. Compl. ¶ 18-29.  Despite factual dissimilarities (Compl. ¶ 30-37), evidence produced by other Dodgy Dossier Cases in U.S. District Courts and foreign jurisdictions (*Id*. ¶ 38) already represents a veritable arsenal of proverbial smoking guns

regarding the Defendants' most egregious defamation and other torts. This directly stemmed

from the discredited Dodgy Dossier document that they promoted in U.S. Courts, as well as on

the world stage via cooperative, credulous media contacts. For example: Exhibit 1, *infra*.

### C. Actionable Tortious Interference

As correctly noted in *Wilspec Tech., Inc. v. Dunan Holding Group Co.*, 204 P.3d 69, 71

(Okla. 2009):

> "The Restatement (Second) of Torts § 766B states: One who intentionally and improperly
> interferes with another's prospective contractual relation (except a contract to marry) is
> subject to liability to the other for the pecuniary harm resulting from loss of the benefits of
> the relation, whether the interference consists of (a) inducing or otherwise causing a third
> person not to enter into or continue the prospective relation or (b) preventing the other from
> acquiring or continuing the prospective relation."

The extraordinary harm suffered by the Plaintiff discouraged all parties from continuing

relationships that Dr. Page had built over the course of decades. The nearly constant threats to

his life that have stemmed from the Defendants' multimillion-dollar Dodgy Dossier directly

represented additional relevant interference factors.  Compl. ¶ 15, 23, 25, 28.  During the period

of the illegal surveillance of the Plaintiff that stemmed from this "opposition research" funded,

enabled and managed by the Defendants, several prospective business transactions of his

company GNGV, of which Dr. Page is the sole shareholder, were entirely interrupted.   Compl.

¶ 78-79.

Defendants also cite the First Amendment as a potential defense for their conduct.  As the

U.S. District Court for the District of Columbia has held in an associated case involving

consultants to the vicariously liable Defendants which assisted in the production of the Dodgy

Dossier: "commercial transactions do not give rise to associational rights, even where the

subjects of those transactions are protected by the First Amendment." *Bean LLC d/b/a Fusion*

*GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 291 F.Supp.3d 34,

Dkt. No. 58, p. 19 (D.D.C. 2018).

## V.  THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS

The Defendants unluckily gambled in 2016 with high hopes that some of the defamatory dirt

spread with their defamatory Dodgy Dossier deck might fertilize (see "prospective legal

proceedings" allegations in Exhibit 1, *infra*).  Now, the Memo. doubles down on their imprudent

bets. The outrageousness of the Defendants' motion thus may have even more important

implications, particularly given ongoing revelations that have continued to flow from pending

investigations into their Dodgy Dossier:

> "…under proper instructions the jury may infer malice from the fact that a defendant repeats
> the defamatory matter, which is later found to be false. But here answers were served on
> behalf of each defendant, which not only repeated but elaborated upon the matters set forth
> in the original defamatory publication; even the tone and characteristics of the pleading are
> reminiscent of the style of the column in suit, although the answer is said to have been
> composed by one or more of the lawyers. It will not do to beg off on the plea that there is no
> proof that any of the corporate officers read this pleading before it was filed in court and that
> it is unverified and bears only the subscription of counsel. Despite all this, the fact remains
> that those who composed this answer and caused it to be filed were acting within the scope
> of their authority and what they did is binding upon defendants." *Reynolds v. Pegler*, 223
> F.2d 429 (2nd Cir.), *cert. denied*, 350 U.S. 846 (1955).

## VI. CONCLUSION

Based on the foregoing, Plaintiff Dr. Page respectfully requests that this Court deny

Defendant's Motion to Dismiss Plaintiff's Complaint. In the alternative, Plaintiff requests that

the Court grant him leave to amend his complaint to address any deficiencies identified by the

Court, and any other relief this Court deems just and proper.

Dated: Oklahoma City, Oklahoma
        December 26, 2018

                                    Very respectfully,
                                    By:  /s/ Carter Page
                                    Carter Page
                                    c/o Global Natural Gas Ventures LLC

101 Park Ave., Suite 1300
Oklahoma City, OK 73102
Phone (405) 825-0172
Fax     (405) 825-0177
cpage@globalenergycap.com

SUPPORTING REFERENCES / SECONDARY SOURCES:

[i]   Just last week, the same journalist who first published excerpts from the Dodgy Dossier in support of the Defendants' defamation has now begun to admit that it is a hoax. See: William Cummings, "Reporter who broke Steele dossier story says ex-British agent's claims 'likely false'," *USA Today*, December 18, 2018. https://www.usatoday.com/story/news/politics/2018/12/18/steele-dossier-michael-isikoff/2347833002/

[ii]   Dr. Page is currently litigating this civil action in the U.S. Court of Appeals for the Second Circuit: Carter Page v. Oath Inc. and Broadcasting Board of Governors. See Dkt. No. 3 of the current case, filed with this Court on October 15, 2018.  The issues presented in the 2nd Cir. case relate in significant part to the continuation of false pleadings by DOJ in 2018, as they have heretofore been slow in disclosing details of the DNC-funded and Perkins Coie-enabled defamation strategies against the Plaintiff in the FISC.  These details and related documents are eventually expected to be revealed. See: Marisa Schultz and Nikki Schwab, "Trump threatens to declassify 'devastating' docs about Democrats," *New York Post,* November 28, 2018. https://nypost.com/2018/11/28/trump-threatens-to-declassify-devastating-docs-about-democrats/

[iii]   https://democrats.org

[iv]   http://docquery.fec.gov/pdf/307/201706019055178307/201706019055178307.pdf

[v]   Page number citation of Defendants' Memo. refer to ECF pagination.

[vi]   Email from Matthew Salerno, Latham & Watkins LLP, October 19, 2018.

[vii]   Marc Elias (@marceelias):  https://twitter.com/marceelias
Michael Sussmann (@michaelsuss): https://twitter.com/michaelsuss

[viii]   https://int.nyt.com/data/documenthelper/95-carter-page-fisa-documents-foia-release/full/optimized.pdf

[ix]   Manu Raju, Laura Jarrett and Jeremy Herb, "Ryan expects Justice Department 'compliance,' doesn't rule out contempt of Rosenstein," CNN, June 21, 2018. https://www.cnn.com/2018/06/21/politics/paul-ryan-justice-department-rosenstein-contempt/index.html

[x]   https://assets.documentcloud.org/documents/4426772/Jeff-Sessions-Letter-Rejecting-Second-Special.pdf

[xi]   "Press Release: Goodlatte & Gowdy Call for Special Counsel to Investigate Crimes Involving Bias and FISA Abuse at DOJ," U.S. House Judiciary Committee, March 6, 2018. https://judiciary.house.gov/press-release/goodlatte-gowdy-call-special-counsel-investigate-crimes-involving-bias-fisa-abuse-doj/

[xii]   "DNC Announces Unprecedented Investments in State Democratic Parties," Oklahoma Democratic Party, Press Releases, July 10, 2017. https://okdemocrats.org/release-dnc-announces-unprecedented-investments-in-state-democratic-parties/

[xiii]   Agenda Item for January 28, 2016 Meeting: "Audit Division Recommendation Memorandum on the Oklahoma Democratic Party (ODP) (A 12-06)," Federal Election Commission. https://www.fec.gov/resources/updates/agendas/2016/mtgdoc_16-05-a.pdf

xiv    Laura Jarrett and Jeremy Herb, "Justice Dept. IG looking at allegations of FBI surveillance abuses," CNN, March 28, 2018.
https://www.cnn.com/2018/03/28/politics/doj-inspector-general-fbi-surveillance-abuses

xv    See for example, "Individual Pleads Guilty in Swatting Conspiracy Case: Defendant Faces 13 Years in Federal Prison," U.S. Attorney's Office, Northern District of Texas, January 29, 2009. https://archives.fbi.gov/archives/dallas/press-releases/2009/dl012909.htm

xvi    "British and American Men Indicted for 'Swatting'," U.S. Department of Justice, January 12, 2017.  https://www.justice.gov/usao-md/pr/british-and-american-men-indicted-swatting

xvii    "Catonsville Man Pleads Guilty To Conspiracy In 'Swatting' Incident," U.S. Department of Justice, November 7, 2017. https://www.justice.gov/usao-md/pr/catonsville-man-pleads-guilty-conspiracy-swatting-incident

xviii    "The Crime of 'Swatting': Fake 9-1-1 Calls Have Real Consequences," FBI website, September 3, 2013. https://www.fbi.gov/news/stories/the-crime-of-swatting-fake-9-1-1-calls-have-real-consequences1

xix    Consistent with the illicit funding schemes associated with the current Defendants' enterprise, Congress's original intention with the RICO statute was focused on the "economic base" of such illicit activities. S.REP. No. 617, 91st Cong., 1st Sess. 79-80 (1969).

xx    Chuck Ross, "Exclusive: Cabal of Wealthy Donors Financing $50 million Trump-Russia Investigation," Daily Caller, April 27, 2018.
https://dailycaller.com/2018/04/27/donors-50-million-steele-fusion-gps/

EXHIBIT 1

2.   If made orally, state when, where and between whom it was made, setting out the full substance of the words which constituted the agreement.

Response: Fusion engaged the Defendant pursuant to an agreement made orally between Mr Glenn Simpson of Fusion and Mr Christopher Steele of the Defendant in June 2016. Fusion instructed the Defendant to investigate and report, by way of preparing confidential intelligence memoranda, on Russian efforts to influence the US Presidential election process in 2016 and on links between Russia and the then Republican candidate and now President Donald Trump.

3.   If made in writing, supply a copy of the agreement.

Response: not applicable.

4.   Is it Orbis' case that Fusion's client needed the information contained in Memorandum 112:
     (a) For the purposes of prospective legal proceedings?
     (b) For the purposes of obtaining legal advice?
     (c) For the purpose of establishing, exercising or defending legal rights.

Response:  (b) and (c). Fusion's immediate client was law firm Perkins Coie LLP. It engaged Fusion to obtain information necessary for Perkins Coie LLP to provide legal advice on the potential impact of Russian involvement on the legal validity of the outcome of the 2016 US Presidential election. Based on that advice, parties such as the Democratic National Committee and HFACC Inc. (also known as "Hillary for America") could consider steps they would be legally entitled to take to challenge the validity of the outcome of that election. In turn, that may have resulted in legal proceedings within the meaning of limb (a) above, but the immediate needs of Fusion's clients fell within limbs (b) and (c).

2

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel registered for ECF.


Dated: Oklahoma City, Oklahoma
              December 26, 2018

                                              Very respectfully,

                                              By:  /s/ Carter Page
                                              Carter Page
                                              c/o Global Natural Gas Ventures LLC
                                              101 Park Ave., Suite 1300
                                              Oklahoma City, OK 73102
                                              Phone (405) 825-0172
                                              Fax     (405) 825-0177
                                              cpage@globalenergycap.com