# GLOBAL NATURAL GAS VENTURES LLC

January 22, 2019

The Honorable Chief Judge Joe Heaton
United States District Court for the Western District of Oklahoma
200 NW 4th Street
Oklahoma City, OK 73102

Subject: Notice of Supplemental Authorities in *Carter Page v. DNC et al,* Case No.
          CIV-18-1019-HE

Dear Judge Heaton:

      I write in accordance with LCvR7.1(m) to provide the Court with several supplemental authorities that U.S. Congressional proceedings made available last week. The Defendants' Reply Motion on Friday (Dkt. No. 26) referred to the Plaintiff's "recycled conspiracy theories".  But as demonstrated *infra*, senior current and incoming officials on the Judiciary Committees of both chambers in Congress and the U.S. Department of Justice have continued to provide further evidence which refutes the Defendants' conclusory allegations related to their illegal activities in 2016 (*Id.*):

(A)    **U.S. Attorney General-nominee William Barr's promise to investigate Defendants' Dodgy Dossier (Exhibit 1)**[1] – In a January 15th, 2019 confirmation hearing, Mr. Barr promised to fulfill a request from U.S. Senate Judiciary Committee Chairman Lindsey Graham that the Justice Department look into the reliability of the Defendants' false evidence which led to abuse of process in the U.S. Foreign Intelligence Surveillance Court in 2016 and "hold people accountable if it was not".

(B)    **Criminal leak investigation related to Defendants' alleged misconduct and conspiracy with the FBI (Exhibit 2)**[2] – Earlier U.S. Congressional proceedings have previously revealed alleged coordination between Defendant Michael Sussmann and former FBI General Counsel James Baker.  Plaintiff's Complaint (¶ 29, 43-44) and Memorandum of Law (Dkt. No. 22, ECF p. 38) included such initial allegations from Article I Committees. As of last week, correspondence with the U.S. Attorney for the District of Connecticut has now confirmed that these media-related actions are under criminal investigation. Mr. Baker also discussed the potentially unprecedented nature of his interactions with Defendant Mr. Sussmann in his alleged Congressional testimony:

    *Congressman Jordan:* [This] is the first time and to your recollection the only time an outside counsel had information and was wanting to make sure it got to the general counsel of the FBI, and it happened to deal with the Russia investigation.

---

[1]    Matt Naham, "William Barr Made Some Big Promises to Lindsey Graham, Including a Strzok/Page Investigation," Law & Crime, January 15th, 2019. https://lawandcrime.com/high-profile/william-barr-made-some-big-promises-to-lindsey-graham-including-a-strzok-page-investigation/

[2]    Ranking Member of U.S. House Oversight Committee Jim Jordan and Congressman Mark Meadows, Letter to U.S. Attorney John H. Durham, January 15, 2019. https://republicans-oversight.house.gov/wp-content/uploads/2019/01/2019-01-15-JDJ-MM-to-Durham-re-briefing.pdf

*Mr. Baker:* I that that's correct. Sitting here today, that's the only one I can remember.[3]

(C)   **Other Elements of Defendants' In-State Relationships: Ongoing Criminal Investigations -** In the creation and distribution of their dangerous and defamatory Dodgy Dossier, each of the Defendants could easily "foresee its possible use in Oklahoma." *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 291 (1980).  Although I believe my pleadings make general and specific jurisdiction abundantly clear, additional factual material is available if the Court might have any doubt about the personal jurisdiction over each of the Defendants in this civil action.  Government sources previously leaked to the *Washington Post* that I was interviewed at length by agents of the FBI's Counterintelligence Division in March 2017 on matters stemming from the false allegations produced and distributed by the Defendants in their Dodgy Dossier.[4]  But as outlined in ¶ (A) and (B), *supra,* federal authorities who have debunked the Defendants' libel are now instead looking into numerous matters related to crimes committed against the Plaintiff.  Although my discussions with FBI Counterintelligence stemming from the tortious activities by the Defendants in this civil action were illegally disclosed, I wish to continue my support of ongoing law enforcement investigations by protecting the integrity of their operations.  See, e.g., *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 579 (4th Cir. 2004) ("[A] compelling governmental interest exists in protecting the integrity of an ongoing law enforcement investigation.")  However, several of my 2017 **interviews with FBI Counterintelligence were directly related to the damages created by the Defendants within the jurisdiction of the state of Oklahoma**.  If necessary in the case of any remaining jurisdictional uncertainties, Plaintiff can make additional Oklahoma-specific information and/or an associated supplemental brief available upon the request of the Court; preferably under seal to protect the integrity of ongoing law enforcement investigations.

In other Article III Court proceedings last week, Judge Leon denied a similar Motion to Dismiss by subcontractors of this civil action's Defendants who had assisted them as servants in the creation and dissemination of their defamatory Dodgy Dossier.  *Fridman et al v. Bean LLC et al*, 17-cv-2041-RJL, Dkt. No. 48 (D.D.C., Jan. 15, 2019).  This new legal analysis and order is also included as a further supplemental authority in Exhibit 3, *infra*.


Very respectfully,

Carter Page, Ph.D.

---

[3]   Jeff Carlson, "EXCLUSIVE: Transcripts of Former Top FBI Lawyer Detail Pervasive Abnormalities in Trump Probe," Epoch Times, January 19, 2019. https://www.theepochtimes.com/transcripts-of-former-top-fbi-lawyer-detail-pervasive-abnormalities-in-trump-probe_2771370.html

[4]   Devlin Barrett, "FBI has questioned Trump campaign adviser Carter Page at length in Russia probe," *Washington Post,* June 26, 2017. https://www.washingtonpost.com/world/national-security/fbi-has-questioned-trump-campaign-adviser-carter-page-at-length-in-russia-probe/2017/06/26/1a271dcc-5aa5-11e7-a9f6-7c3296387341_story.html

EXHIBIT 1

**William Barr Made Some Big Promises to Lindsey Graham, Including a Strzok/Page Investigation**

by Matt Naham | 10:43 am, January 15th, 2019



During his confirmation hearing before the Senate Judiciary Committee on Tuesday, U.S. Attorney General nominee **William Barr** made a series of promises to committee chairman Sen. **Lindsey Graham** (R-S.C.), including investigations that may be seen as politically motivated.

Graham began by asking, "Do you know **Lisa Page** and **Peter Strzok**?"

"I've heard their names," Barr responded, smiling.

Graham then read a text message from 2016 that said, "Trump's not ever going to become president, right? Right." That one was from FBI lawyer Lisa Page. Then FBI agent Peter Strzok, who worked on the **Hillary Clinton** email investigation, responded by saying, "No, no. We'll stop it."

After that, Graham asked Barr if he would "look into what happened in 2016," and Barr simply replied, "Yes, Mr. Chairman." Barr would add that he was "shocked" when he saw these texts for the first time.

Strzok and Page have, of course, became frequent targets of President **Donald Trump**'s ire.

From there, Graham shifted to the subject of "Michael Steele" (he meant **Christopher Steele,** after whom the "Steele Dossier" was named). Graham asked Barr to look into Fusion GPS, the **Carter Page** FISA warrant, and the use of the unverified Steele Dossier to surveil Page. Graham said that the Dossier was deemed "reliable" on four occasions as a main source to monitor Page.

"Would you look into whether that was an accurate statement and hold people accountable if it was not?" Graham asked.

Again Barr answered, "Yes, Mr. Chairman."

Barr otherwise admitted that he knows Special Counsel **Robert Mueller** personally, believes he will do the best thing for the country, and is not conducting a "witch hunt."

EXHIBIT 2



# Congress of the United States
## House of Representatives
### Washington, DC 20515

January 15, 2019

The Honorable John H. Durham
United States Attorney
U.S. Attorney's Office for the District of Connecticut
Department of Justice
157 Church Street, Floor 25
New Haven, CT 06510

Dear Mr. Durham:

In October 2017, the House Committees on Judiciary and Oversight and Government Reform began investigating decision-making and actions at the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) in the context of the 2016 Presidential Election.[1] The conduct of DOJ personnel, largely at the FBI, during this time departed from the norms of impartial justice and fairness that Americans expect from these institutions. As we uncovered more facts during our oversight, we became concerned investigative and prosecutorial decisions may have been influenced by political bias. We know the DOJ and FBI departed from traditional investigative and prosecutorial practices, and insufficiently adhered to the Foreign Intelligence Surveillance Act (FISA).[2] The Committees learned that in some instances, high-ranking DOJ and FBI officials, including the FBI General Counsel James Baker and DOJ Associate Deputy Attorney General Bruce Ohr, took the self-described "unusual" step of inserting themselves into the evidentiary chain of custody.[3]

During the course of our investigation we interviewed former FBI General Counsel James Baker and discovered your office is investigating him for unauthorized disclosures to the media:

> **Mr. Levin.**      [Daniel Levin, Counsel to Baker]. I'm sorry, I'm going to cut – not let him answer these questions right now. You may or may not know, he's been the subject of a leak investigation which is still – a

---

[1] News Release, H. Comm. on Judiciary and Oversight & Gov't Reform, Gowdy, Goodlatte Open Investigation Into Decisions Made by DOJ in 2016 (Oct. 24, 2016), https://republicans-oversight.house.gov/release/gowdy-goodlatte-open-investigation-decisions-made-doj-2016/.
[2] 50 U.S.C § 1801 *et seq.*
[3] James Baker Transcribed Interview at 53, Day 2, Oct. 18, 2018 ("It was unusual for me to be the recipient of information directly from the public or a lawyer or anyone else about an allegation of a crime."); Brue Ohr Transcribed Interview at 43, Aug. 28, 2018 ("Mr. Gowdy. And you can't think of a single case where you inserted yourself into a chain of custody other than this one? Mr. Ohr. That's right.").

The Honorable John H. Durham
January 15, 2019
Page 2

               criminal leak investigation that's still active at the Justice Department. So I am cutting off –

**Mr. Jordan.**    Can you speak more in the mike there?

**Mr. Levin.**    I'm sorry. I'm cutting off any discussion about conversations with reporters.

**Mr. Jordan.**    Based on –

**Mr. Meadows.**    You're saying he's under criminal investigation? That's why you're not letting him answer?

**Mr. Levin.**    Yes.[4]

…

**Mr. Jordan.**    Just to clarify for us, you're, counsel, advising Mr. Baker not to answer that question because of – not because of it's classified, not because of any classification concerns, but because there is an ongoing investigation by whom?

**Mr. Levin.**    The Justice Department.

**Mr. Jordan.**    I mean, is the inspector general looking at this or is this –

**Mr. Levin.**    No, it's Mr. John Durham, a prosecutor.

**Mr. Jordan.**    Mr. Huber.

**Mr. Levin.**    Durham, Durham.[5]

…

**Mr. Jordan.**    Okay. And go back again, tell me exactly what the investigation – the reason you can't answer more specific questions about the dossier is because there's an investigation, an ongoing investigation, as we speak, looking into exactly what?

**Mr. Levin.**    And I'm sorry. I didn't say he couldn't answer any questions about the dossier, and he just has answered some. I didn't want him

---

[4] James Baker Transcribed Interview at 38-39, Day 1, Oct.3, 2018.
[5] *Id.* at 39.

The Honorable John H. Durham
January 15, 2019
Page 3

|  |  |
|---|---|
| | talking about interactions with reporters because there is an ongoing leak investigation that the Department is having – |
| **Mr. Jordan.** | He just talked to me about his interactions with a reporter. |
| **Mr. Levin.** | Well, he's talked a little bit about it, but I don't want him talking about conversations he's had with reporters because I don't know what the questions are and I don't know what the answers are right now. Given that there is an ongoing investigation of him for leaks which the Department has not closed, I'm not comfortable letting him answer questions. So in terms of getting stuff from Mr. Corn, he told you what he remembers about it. |
| **Mr. Jordan.** | So he talk to me only about what Mr. Corn may have gave him via information or actual documents or recordings or anything else, but he's not allowed to talk to me about information he may have given to Mr. Corn himself? |
| **Mr. Levin.** | That's right. As a general matter, that's right. I mean, if you want to ask specific questions we can figure it out. But as a general matter I'm not comfortable having him talk about things he has said to reporters while the Department still has an ongoing investigation.[6] |

...

|  |  |
|---|---|
| **Mr. Jordan.** | Did any – did Franklin Foer, the guy who wrote this article, did he ever reach out to you? |
| **Mr. Levin.** | I'm not going to have him answer any questions as asking about any interactions with the press. |
| **Mr. Jordan.** | I'm not talking about whether he reached out to reporters. I'm asking did reporters reach out to you? So it's coming this direction. |
| **Mr. Levin.** | I understand. I'm not going to have him talk about any conversations with reporters. |
| **Mr. Jordan.** | Well, I think we – last time we talked about Mr. Corn pretty in-depth. |
| **Mr. Levin.** | I don't believe we – |

---

[6] *Id.* at 42-43.

The Honorable John H. Durham
January 15, 2019
Page 4

| | |
|---|---|
| **Mr. Jordan.** | Yes, we did. |
| **Mr. Levin.** | We talked about him bringing some information in, but I don't believe we – anyway, that's – I'm not going to let him answer the questions about whether he had conversations with reporters. |
| **Mr. Jordan.** | Are you going to give me the same answer when I ask did Mr. Isikoff ever reach out to you? |
| **Mr. Levin.** | Yes. Same instruction to him.[7] |

We are writing to request additional information about your ongoing criminal investigation of James Baker, as disclosed to the Committees by Mr. Baker's attorney.[8]

On January 11, 2019, *The New York Times* published a story describing how senior FBI officials speculated about the President's motives in terminating Director James Comey.[9] The story described testimony given to the Committee in October by former FBI General Counsel James Baker. As the DOJ Office of Inspector General (OIG) has documented, other senior FBI officials also disclosed classified information to the media—most notably, former FBI Deputy Director Andrew McCabe.[10] McCabe was fired for lying to the FBI's inspections division, lying to OIG investigators, and for lying to former Director James Comey about unauthorized communications with a news organization.[11]

As we continue our oversight and investigative work, we felt it prudent to write to you seeking an update. Without being apprised of the contours of your leak investigation and Baker's role, we run the risk of inadvertently interfering with your prosecutorial plans. We have interviewed a multitude of current and former DOJ and FBI officials during our investigation and intend to continue our work in this Congress, hopefully with the support of Chairman Elijah Cummings.[12] Separately, we understand the Senate committees with jurisdictional authority are evaluating their next fact-finding steps.

To this end, we look forward to receiving your briefing sometime this month. Please contact Committee staff at (202) 225-5074 to make arrangements about this request. Thank you for your attention to this matter.

---

[7] James Baker Transcribed Interview at 131-132, Day 2, Oct. 18, 2018.

[8] *See also A top FBI lawyer is allegedly under an investigation for leaking classified information to the media,* CIRCA, (July 27, 2017). https://www.circa.com/story/2017/07/27/politics/a-top-fbi-lawyer-is-allegedly-under-an-investigation-for-leaking-classified-information-to-the-media.

[9] Adam Goldman, Michael S. Schmidt and Nicholas Fandos, *F.B.I. Opened Inquiry Into Whether Trump Was Secretly Working on Behalf of Russia,* N.Y. TIMES (Jan. 11, 2018).

[10] INSPECTOR GEN., DEP'T OF JUSTICE, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe,* 2, (2018).

[11] *Id.* at 22-23; *Statement by Attorney General on firing of FBI's McCabe,* REUTERS, March 17, 2018.

[12] Letter from Jim Jordan and Mark Meadows to Chairman Elijah E. Cummings, H. Comm. on Oversight & Reform (Jan. 9, 2019).

The Honorable John H. Durham
January 15, 2019
Page 5

Sincerely,

Jim Jordan
Ranking Member

Mark Meadows

cc:     The Honorable Elijah E. Cummings, Committee on Oversight and Reform

EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**JAN 15 2019**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

|  |  |  |
|---|---|---|
| MIKHAIL FRIDMAN, PETR AVEN, and GERMAN KHAN | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 17-2041 (RJL) |
| | ) | |
| BEAN LLC (a/k/a FUSION GPS) and GLENN SIMPSON | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**
(January 14, 2019) [Dkt. ## 19, 20]

This is a defamation action for monetary damages brought by three Russian
businessmen—Mikhail Fridman, Petr Aven, and German Khan ("plaintiffs")—against
political opposition research firm Fusion GPS and its principal Glenn Simpson
("defendants"). Pending before me are defendants' motions to dismiss under the D.C.
Anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP") Act of 2010, D.C.
Code §§ 16–5501–5505, and Federal Rule of Civil Procedure 12(b)(6). [Dkt. ## 19, 20].
On September 26, 2018, the parties presented oral argument on these motions, and on
November 7, 2018, the parties submitted supplemental briefing. [Dkt. ## 43, 44]. Upon
consideration of the pleadings and the relevant law, and for the reasons set forth below,
defendants' motions to dismiss are **DENIED**.

1

# BACKGROUND

Plaintiffs claim that defendants falsely accused them and their business consortium, Alfa, of engaging in criminal and other misconduct in conjunction with the Russian government and its president, Vladimir Putin. *See generally* Am. Compl. [Dkt. # 17]. Plaintiffs allege that defendants are liable for defamatory statements contained in one of the seventeen written Company Intelligence Reports 2016 ("CIRs") that collectively comprise what is now known publicly as the "Trump Dossier" or simply the "Dossier." *Id.* at ¶¶ 1–2. According to the Amended Complaint, defendants were hired first by the Washington Free Beacon and later by a law firm representing the Democratic National Committee and the Hillary Clinton presidential campaign to conduct political opposition research against then-candidate Donald Trump. *Id.* at ¶ 15. To perform this research, defendants engaged former British intelligence officer turned private investigator Christopher Steele and his company Orbis Business Intelligence Limited. *Id.* at ¶ 3. Steele allegedly used his sources in Russia to create the CIRs and compile the Dossier. *Id.*

At issue in this case is CIR 112. CIR 112 is titled "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION," which, according to plaintiffs, implies that they, through Alfa, "cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election." *Id.* at ¶ 19 (alleging that nearly all of the CIRs bear headings related to alleged Russian interference in the 2016 United States presidential election and/or ties between the Russian government and the 2016 campaign of now-President Donald Trump). CIR 112, which defendants attached to their motion to dismiss, describes plaintiffs' and Alfa's purported relationship with Putin,

2

including (1) "[s]ignificant" political favors done by plaintiffs for Putin in exchange for business and legal favors done by Putin for Alfa; (2) an "illicit cash" delivery by an "Alpha executive" to Putin while Putin was the Deputy Mayor of St. Petersburg; (3) "informal advice" given by two of plaintiffs to Putin regarding Russian foreign policy toward the United States; and (4) compromising information held by Alfa about Putin as a source of leverage. *See* [Dkt. # 20-2]. Plaintiffs claim that the foregoing statements are false and defamatory because they accuse plaintiffs and their business of "maintain[ing] a highly inappropriate, and even criminal, relationship with Putin" and, by implication, involvement in the Russian government's campaign to interfere with the 2016 United States presidential election. Am. Compl. ¶ 23.

The Amended Complaint asserts that defendants knew that the CIRs contained "unverified" and potentially inaccurate information gathered from sources and "subsources" unknown to them. *Id.* at ¶¶ 3–4, 13, 16, 18. In 2016, defendants allegedly arranged for Steele to brief select members of the media about the contents of the then-incomplete Dossier, including CIR 112, to "generate interest in the Dossier and secure eventual public dissemination of its content." *Id.* at ¶¶ 6, 18. These briefings were followed soon after by media articles describing the Dossier's contents. *Id.* In addition, defendants allegedly published the Dossier and CIR 112 to multiple other third parties. *Id.* at ¶ 18. Ultimately, on January 10, 2017, media organization BuzzFeed, Inc. published the entire Dossier online, including CIR 112. *Id.* at ¶ 8.

3

## ANALYSIS

### I.   D.C. Anti-SLAPP Act

The D.C. Anti-SLAPP Act imposes a heightened pleading standard where a defendant makes "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). Upon such a showing, a plaintiff can survive dismissal only by "demonstrat[ing] that the claim is likely to succeed on the merits." *Id.* Defendants contend that they have made the required threshold showing, that plaintiffs cannot show a likelihood of success, and that, therefore, D.C.'s Anti-SLAPP law forecloses plaintiffs' defamation action. *See* Mem. in Supp. of Defs.' Special Mot. to Dismiss Under the D.C. Anti-SLAPP Act [Dkt. # 19-1]. I disagree.  How so?

As a general matter, federal courts sitting in diversity, as I am here, are called on to apply local substantive law and federal procedural rules. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Where local substantive law and a validly promulgated federal rule address the same question but differ as to the answer, the federal rule controls. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010). Applying this framework, then-Judge Kavanaugh wrote for our Circuit in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015) that a federal court sitting in diversity must apply Federal Rules of Civil Procedure 12 and 56 rather than D.C.'s Anti-SLAPP law, as the former are valid and "answer the same question" differently than the latter. *Id.* at 1334–37.

4

Defendants respond that the D.C. Court of Appeals later rejected *Abbas* in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016). *See Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006) (federal court's "duty" in resolving question of D.C. substantive law "is to achieve the same outcome" that the D.C. Court of Appeals would reach). Were that true, *Mann* would control here so long as it "clearly and unmistakably" resolves the disputed question. *See Easaw v. Newport*, 253 F.Supp.3d 22, 35 (D.D.C. 2017). Unfortunately for defendants, however, three of my colleagues on this Court recently have held that *Mann* does *not* sufficiently resolve this issue and that, therefore, *Abbas* remains the controlling law in our Circuit. *See Cockrum v. Donald J. Trump for President, Inc.*, 319 F.Supp.3d 158, 165 n.2 (D.D.C. 2018) (Huvelle, J.) ("The Court continues to adhere to its view that controlling precedent precludes the application of D.C.'s Anti–SLAPP Act in federal court."); *Fairbanks v. Roller*, 314 F.Supp.3d 85, 94–95 (D.D.C. 2018) (McFadden, J.); *Libre By Nexus v. Buzzfeed, Inc.*, 311 F.Supp.3d 149, 160–61 (D.D.C. 2018) (Mehta, J.). Indeed, for this very reason defense counsel candidly admitted at oral argument that defendants are "swimming uphill on the application of the Anti-SLAPP Act" in this case. Mot. to Dismiss Hr'g Tr. 22 (Sept. 26, 2018) [Dkt. # 41]. Given the sound reasoning employed in the foregoing decisions, the hill is steep, and the current is strong. I decline to ease either.

Accordingly, defendants' motion to dismiss under D.C.'s Anti-SLAPP Act is **DENIED**.

## II.   Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The Court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor[.]" *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). In addition to the complaint's factual allegations, the Court may consider "documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Local 689*, 825 F.Supp.2d 82, 85 (D.D.C. 2011).

To state a defamation claim under D.C. tort law, a plaintiff must adequately plead: "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Farah v. Esquire Mag.*, 736 F.3d 528, 533–34 (D.C. Cir. 2013). Here, defendants contend that the Amended Complaint fails to adequately plead the first two of these elements and that, as to the third element, a heightened standard of fault applies and has not been sufficiently pleaded. I disagree, and will address these contentions in turn.

6

D.C. law defines a defamatory statement as "one 'that tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'" *Kendrick v. Fox Television*, 659 A.2d 814, 819 (D.C. 1995) (alterations omitted) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1993)). To be actionable, the statement "must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001) (internal quotation marks omitted). At this stage, however, my task is only to "determine as a threshold matter whether" the statements identified by plaintiffs are "capable of being construed as defamatory." *Ning Ye v. Holder*, 644 F.Supp.2d 112, 118 (D.D.C. 2009) (internal quotation marks omitted)). My inquiry, therefore, is limited; I may only find as a matter of law that the statements are not actionable if "the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)). I am also mindful of my obligations to evaluate the allegedly defamatory statements "within the context of the entire" publication and to consider the publication "as a whole, in the sense in which it would be understood by the readers to whom it was addressed." *Klayman*, 783 A.2d at 613–14 (internal quotation marks omitted); *Carpenter v. King*, 792 F.Supp.2d 29, 34 (D.D.C. 2011) (statement should not be "considered in isolation but rather must be examined in the context in which it appeared" (citing *Moldea v. New York Times Co.*, 22 F.3d 310, 313–15 (D.C. Cir. 1994)).

Taking CIR 112 as a whole, I find that a reasonable reader could interpret its contents as defamatory to plaintiffs such that this element of the tort is adequately pleaded. Defendants concede that at least the "illicit cash" statement "could be potentially defamatory." Mem. in Supp. of Defs.' 12(b)(6) Mot. to Dismiss ("12(b)(6) Mot. to Dismiss") 22 [Dkt. # 20-1]. That admission is warranted—plainly, an allegation that one has bribed a public official can be understood to make one appear "odious" or "infamous" in the community. *See Klayman*, 783 A.2d at 613. Moreover, this specific charge of corruption might also be reasonably understood as supplying context to the purported political and business "favors" back and forth between plaintiffs and Putin, suggesting a series of improper *quid pro quo* arrangements. *See Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (while "[m]erely associating somebody with a foreign government would not ordinarily be defamatory," statements suggesting plaintiff "was actively in alliance" with and providing "mutual support" to Serbia's Milosevic regime were prima facie defamatory due to "intense antipathy" in America toward that government (quoting *Southern Air Transport, Inc. v. ABC, Inc.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989)). And, given that CIR 112 is titled "Russia/US Presidential Election: Kremlin-Alpha Group Co-Operation," a reasonable reader could further construe the allegations of a corrupt relationship between plaintiffs and Putin's government against the backdrop of the latter's attempt to interfere in the 2016 presidential election, conduct that I infer from the Amended Complaint has generated substantial antipathy in this country. Thus, I find that plaintiffs have sufficiently pleaded that the allegedly false statements in CIR 112 are defamatory.

8

Plaintiffs also plausibly allege non-privileged publication to a third party. *See Farah*, 736 F.3d at 533–34. The Amended Complaint claims that defendants published CIR 112 to "clients, news media, journalists and others," the identities of whom are specifically alleged. Am. Compl. ¶¶ 6, 18, 31. To survive a motion to dismiss, a plaintiff "need only allege enough information to apprise [defendants] of the persons or category of persons to whom" CIR 112 was published. *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F.Supp.2d 128, 137 (D.D.C. 2009) (internal quotation marks omitted). Plaintiffs have done so here. Moreover, taking all reasonable inferences in plaintiffs' favor, I cannot conclude at this stage that the alleged publications were, indeed, privileged. *See* 12(b)(6) Mot. to Dismiss 34–39.

Finally, the Amended Complaint plausibly alleges that defendants acted with "at least negligence." *See Farah*, 736 F.3d at 533–34. According to plaintiffs, defendants published the CIRs despite knowing that Steele had obtained the information contained therein from sources unknown to defendants and that the information had *not* been verified. Am. Compl. ¶¶ 3–4, 13, 16, 18. Defendants apparently concede that these allegations amount to at least negligence. Nevertheless, defendants seek dismissal on the ground that plaintiffs are limited purpose public figures under the First Amendment and thus were required to plead the heightened actual malice standard of culpability. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1995). To support application of this heightened standard here, defendants cite dozens of news articles concerning the relationship between so-called Russian "oligarchs," including plaintiffs, and the Russian state.

9

Resolution of this issue turns on the application of our Circuit's three-part test in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980), which requires me to (1) "isolate" the alleged public controversy, determine whether it genuinely exists, and "define its contours"; (2) analyze plaintiffs' role in the controversy to determine whether they achieved a "special prominence"; and (3) decide whether the alleged defamation was "germane to [plaintiffs'] participation in the controversy." *Id.* at 1296–98. This is a case-specific inquiry, and I "must exercise care" in determining whether each of the *Waldbaum* factors is met on these facts. *Id.* at 1296.

With the foregoing framework in mind, I unfortunately cannot resolve the public figure issue at this stage on the limited record before me. Plaintiffs vigorously dispute the facts and circumstances relevant to *Waldbaum*'s application in this case. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss for Failure to State a Claim 16–25 [Dkt. # 25]. Moreover, defendants have put plaintiffs' public figure status—and the attendant actual malice standard—in issue as an affirmative defense to defeat plaintiffs' defamation claim. A plaintiff, however, is "not required to negate an affirmative defense in [the] complaint," and resolution of an affirmative defense is proper on a motion to dismiss only if the facts required to establish the defense are apparent on the face of the complaint (or if the plaintiff concedes public figure status or the facts that establish it). *See, e.g.*, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 607–08 (D.C. Cir. 2013) (internal quotation marks omitted) ("as long as a plaintiff's potential rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint, dismissal at the Rule 12(b)(6) stage is improper"); *see also Parisi v. Sinclair*, 845 F.Supp.2d 215, 218 n.2 (D.D.C. 2012) ("Plaintiffs concede for the

10

purpose of this motion [to dismiss] that plaintiffs are limited public figures and subject to the actual malice standard."). Thus, where a plaintiff has not alleged facts establishing public figure status and "may be able to produce a factual basis for a finding that [the plaintiff] should be considered a private figure with regard to the" allegedly defamatory statements, "there is no basis for imposing on [the plaintiff] an obligation to anticipate in [the] complaint the need to plead facts to defend against defendants' assertion that [the plaintiff] is a public figure." *MiMedx Grp., Inc. v. DBWPartners, LLC*, No. 17-1925, 2018 WL 4681005, at \*6 (D.D.C. Sept. 28, 2018).

Here, defendants' public figure defense is predicated not on the Amended Complaint allegations but on news articles and other documents that defendants have cited in their motion to dismiss. As such, defendants' affirmative defense "requires consideration of facts outside of the complaint" and is "inappropriate to resolve on a motion to dismiss." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). "These issues are properly addressed at summary judgment or trial." *de Csepel*, 714 F.3d at 608.[1]

---

[1] This conclusion is further bolstered by the fact that applying *Waldbaum* now would require me to take judicial notice of the substantive content of defendants' news articles. While some courts have taken judicial notice of news articles, in most such cases the courts have been careful to take notice only of the existence or nature of the articles. *See, e.g.*, *Sandza v. Barclays Bank PLC*, 151 F.Supp.3d 94, 113 (D.D.C. 2015) (court may take judicial notice of newspaper articles for the fact that they contain certain information but may not accept the articles for the truth of their assertions); *Hourani v. Psybersolutions, LLC*, 164 F.Supp.3d 128, 136 (D.D.C. 2016) ("the Court takes judicial notice of the fact that the news articles cited above concerned Plaintiff"); *In re Domestic Airline Travel Antitrust Litigation*, 221 F.Supp.3d 46, 71–72 (D.D.C. 2016) (refusing to take judicial notice of news articles prior to summary judgment because defendants provided them to present new factual allegations to counter the complaint allegations). I see no reason to stretch the limits of judicial notice here before the parties have had a chance to develop a record.

Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) is therefore **DENIED**.

**CONCLUSION**

For the reasons stated above, defendants' motions to dismiss under the D.C. Anti-SLAPP Act and Rule 12(b)(6) are **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued herewith.


RICHARD J. LEON
United States District Judge