UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CARTER PAGE,<br><br>                              Plaintiff,<br><br>-v-<br><br>DEMOCRATIC NATIONAL<br>COMMITTEE; PERKINS COIE LLP;<br>MARC ELIAS; AND MICHAEL<br>SUSSMANN,<br>                              Defendants. | Case No.:  CIV-18-1019-HE |

**NOTICE OF SUPPLEMENTAL AUTHORITY AND
MOTION FOR RECONSIDERATION IN LIGHT OF NEW
EVIDENCE OF DEFENDANTS' ILLEGAL ACTIVITIES**

A motion to amend based on Rule 59(e) "should be granted only to correct manifest errors of law or to present newly discovered evidence." <u>Phelps v. Hamilton</u>, 122 F.3d 1309, 1324 (10th Cir. 1997).

In light of extensive newly discovered jurisdiction-related evidence as presented in this notice of supplemental authority, Plaintiff Carter Page respectfully moves to amend the Court's April 4, 2019 order [Doc. #36] in accordance with Rule 59(e) or other relevant bases for reconsideration at the Court's discretion.[1]

---

[1]   A "motion for reconsideration, not recognized by the Federal Rules of Civil Procedure, <u>Clough v. Rush</u>, 959 F.2d 182, 186 n. 4 (10th Cir.1992), may be construed in one of two ways: if filed within 10 days of the district court's entry of judgment, it is treated as a motion to alter or amend the judgment under Rule 59(e); if filed more than 10 days after entry of judgment, it is treated as a motion for relief from judgment under Rule

On February 4, 2019, Dr. Page previously submitted to the Court an interim preliminary filing including associated supplemental authorities which began to partially demonstrate how each of the five criteria of personal jurisdiction set in Dudnikov v. Chalk & Vemillion Fine Arts have been met in this civil action [Doc. # 31].  In Doc. # 36 yesterday, the Court concluded that the Plaintiff's abbreviated pleadings had not as of yet sufficiently shown that "the defendants purposefully directed their activities at Oklahoma. See Anzures v. Flagship Rest. Grp., 819 F.3d 1277, 1280 (10th Cir. 2016) (citing Dudnikov v. Chalk & Vemillion Fine Arts, Inc., 514 F.3d 1063, 1072 (10th Cir. 2008))."

In the Dudnikov decision, then-Circuit Court Judge Gorsuch concluded that the jurisdiction-related pleadings of the Defendants, "does not tell the whole story". Id., 1075. As seen in recently revealed evidence from Article I Congressional Committees and another Article III Court, infra, it has similarly been proven that the Defendants' Opening Memorandum of Law [Doc. #21] and Reply Brief [Doc. #26] do not tell the whole story with respect to the purposeful direction of their illegal activities at Oklahoma.  LCvR 7.1(m) allows a party to "identify the proposition in filed briefs to which the [supplemental] authority is relevant".  These new supplemental authorities from the past month as included in this current filing directly address the prior

---

60(b)." Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n. 3 (10th Cir. 2002). In addition, "every order short of a final decree is subject to reopening at the discretion of the district judge." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U. S. Reports 1, 12, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); see also Fed.R.Civ.P. 54(b).  Applied in Price v. Philpot, 420 F.3d 1158, 1167 n. 9 (10th Cir. 2005).

evidentiary deficiencies related to the purposeful direction of the Defendants activities toward Oklahoma as well as other associated jurisdiction-related considerations as highlighted by the Court:

I. <u>**Telling the Whole Oklahoma Jurisdiction Story: Information Recently Discovered**</u>

Exhibit 1. **Congressional Testimony by DNC and Perkins Coie subcontractor Nellie Ohr of Fusion GPS**. In October of 2017, Defendants DNC and Perkins Coie disclosed that they had, "engaged Fusion GPS in April of 2017, to perform a variety of research services during the 2016 election cycle." [Complaint, Exhibit 1]. Last week on March 28, 2019, the Ranking Member of the U.S. House Judiciary Committee Congressman Doug Collins released the transcript of Congressional testimony by Nellie Ohr (the "Nellie Ohr Transcript").[2] Ms. Ohr worked for the Defendant DNC- and Perkins Coie- subcontractor Fusion GPS from, "Approximately, October of 2015, give or take a couple weeks, and into the end of September, 2016."[3] The research that this consultant did on behalf of the Defendants provides further initial evidence in support of the allegation that the Defendants would have reason to know that the Plaintiff has a business in Oklahoma and that the brunt of their devastating injuries against Dr. Page would be primarily felt in this forum state. The Nellie Ohr Testimony established that her research included: "research using Russian

---

[2]  Available at: https://dougcollins.house.gov/nellieohr
[3]  Nellie Ohr Transcript, p. 8.

sources, media, social media, government, you know, business registers, legal databases, all kinds of things."[4]  If such research were completed with any competence whatsoever, this would have inevitably alerted the Defendants and their consultant that the brunt of their injury would be felt in Oklahoma.  "As the 'express aiming' test focuses more on a defendant's intentions—where was the 'focal point' of its purposive efforts—while the latter requirement concentrates on the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff." Dudnikov v. Chalk & Vemillion Fine Arts, Inc., 514 F.3d 1063, 1075 (10th Cir. 2008).  Rather than provide opposition research focused directly on the public figures that the DNC and Perkins Coie was ostensibly targeting for political reasons such as then-candidate Donald J. Trump, the purposeful direction of the Defendants and their hired consultants towards the reputation of Dr. Page instead had a devastating direct impact on the Plaintiff in Oklahoma: "Their 'express aim' thus can be said to have reached into [the forum state] in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket." Dudnikov v. Chalk & Vemillion Fine Arts, Inc., 514 F.3d 1063, 1075 (10th Cir. 2008).  In accordance with Local Rule LCvR7.1(n): "A filer should submit as an exhibit or attachment only excerpts of documents that are relevant to the matter under

---

[4]   Nellie Ohr Transcript, p. 9.

consideration."  But unfortunately, the deeply incestuous nature of the business and personal relationships amongst Christopher Steele, Nellie Ohr and her husband U.S. Associate Deputy Attorney General Bruce Ohr were so extensive that the full breadth of these dealings are discussed throughout these relatively voluminous transcripts which are included as Exhibit 1 and Exhibit 3.

Exhibit 2.    **Deposition of DNC and Perkins Coie subcontractor Christopher Steele** – As the Plaintiff informed this Court on March 1, 2019, another federal court in Florida had ordered the unsealing of a June 2018 deposition by the prominent subcontractor of Defendants DNC and Perkins Coie, Mr. Christopher Steele.  Much of his testimony and the scope of his alleged criminal wrongdoing on behalf of the Defendants[5] remains temporarily undisclosed, but the preliminary excerpt of his transcript is available in Exhibit 2. Acting on the Defendants' behalf and under their command in support of their full-scale assault on the Plaintiff's reputation via their false statements to the media and law enforcement, the reckless disregard for the truth in Mr. Steele's methodology on behalf of the Defendants is reflected in the deposition exchange regarding the nature of his sources.  For example, the Defendants' subcontractor Mr. Steele acknowledged that these inherently implausible sources included CNN's iReports postings, which amount to: "nothing more

---

[5]   "Senators Grassley, Graham Refer Christopher Steele for Criminal Investigation," website of Senator Chuck Grassley, January 5, 2018.  https://www.grassley.senate.gov/news/news-releases/senators-grassley-graham-refer-christopher-steele-criminal-investigation

than any random individuals' assertions on the Internet." (Deposition, p. 48).
The extensive information sharing demonstrated in this and the other two
testimonies included in this filing led to an alleged conspiracy between Mrs.
Ohr, Mr. Steele and Mr. Ohr in conjunction with other associates of the
Defendants. As some of the top leaders in the U.S. Congress have correctly
acknowledged, this alleged conspiracy directly led to the surveillance of Dr.
Page [Doc. #22, p. 19-21]. Benefitting from over a year of access to the
Plaintiff's documents and phone communications, this in turn would allegedly
provide the Defendants and their conspirators jointly with clear "knowledge
that the brunt of the injury would be felt in the forum state" of Oklahoma.
Dudnikov v. Chalk & Vemillion Fine Arts, Inc., 514 F.3d 1063, 1072 (10th
Cir. 2008).

Exhibit 3.   **Congressional Testimony by Bruce Ohr** – With respect to the
Husband of DNC and Perkins Coie subcontractor Nellie Ohr, the transcript of
the Congressional testimony by Mr. Bruce Ohr was disclosed by the Ranking
Member of the U.S. House Judiciary Committee, Congressman Doug Collins
on March 8, 2019. Describing the extraordinary depth and historic implications
of this relationship between the then-U.S. Associate Deputy Attorney General
Bruce Ohr and the public official Christopher Steele who at the time served as
a subcontractor in support of the Defendants, this document is included as

Exhibit 3.[6]  Discussion of the insidious nature of DNC consultant Mr. Steele's dealings with Mr. Ohr throughout much of 2016 may be found on p. 7-49 and 62-265 of this document.  At the time that the Defendants were allegedly bribing public official Christopher Steele (18 U.S.C. § 201) via their intermediary consultant Fusion GPS, this testimony confirms that this husband of the Defendants' consultant Nellie Ohr served as an illicit backchannel for the defamatory false claims against the Plaintiff.  Contrary to the false or severely misrepresentative pleadings by the Defendants about the causal links that led Dr. Page to have had previously become of, "significant interest to… law enforcement"[7], Mr. Ohr instead also testified that: "I think this name came from Chris Steele originally, was Carter Page." (p. 19).  All of this offers further proof that the conspiracy between this illicit family business involving the DNC and Perkins Coie's consultant Mrs. Ohr and senior U.S. Department of Justice official Mr. Ohr led directly to the even more wide-scale surveillance of the Plaintiff by law enforcement.  In turn, this illicit information-sharing between the Defendants and law enforcement which would exacerbate the horrendous damages of the Defendants' false reports gave them means to know that the "'expressly aiming' standard" of <u>Dudnikov</u> (514 F.3d 1063, 1075) had been met with respect to the Plaintiff and his activities in Oklahoma.

---

[6]  https://dougcollins.house.gov/ohr
[7]  "That these ties to Russia were also of significant interest to media publications and law enforcement due to the allegations (and conclusions) of Russian hacking does not—of themselves—make them defamatory." [Doc. #21, p. 39]

II. **Telling the Whole Oklahoma Jurisdiction Story: Information Expected**

**Imminently and Background on Current Delay**

Within the coming weeks, more supplementary information is expected to be released by federal authorities in Washington which is expected to further support the Plaintiff's Oklahoma jurisdictional pleadings in the form of additional "newly discovered evidence." Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).  This will likely include the following:

Exhibit 4.   **The forthcoming results of ongoing investigations into the Defendant-sponsored conspiracy with the U.S. Department of Justice and associated injuries against the Plaintiff.**  Exhibit 4 provides an update on the expected disclosure of two ongoing investigations into the alleged criminal activities by the Defendants and their intermediaries.

Exhibit 5.   **Related criminal referrals surrounding the unconscionable alleged illegal activities by the Defendants against the Plaintiff.**   Dr. Page has provided extensive testimony to the U.S. House Permanent Select Committee on Intelligence regarding the breadth of damages he has suffered from the Defendants acts in Oklahoma. Earlier today and as seen in Exhibit 5, the Ranking Member of that Committee stated: "Having extensively investigated this abuse, House Intelligence Committee Republicans will soon be submitting criminal referrals on numerous individuals involved in these matters."

Exhibit 6.   **Letter from U.S. Senate Judiciary Chairman to U.S. Attorney General regarding alleged FISA abuse against Plaintiff.**  On March 7, 2019, U.S. Senate Judiciary Chairman Lindsey Graham sent the letter in Exhibit 6 to U.S. Attorney General regarding alleged FISA abuse against Plaintiff Dr. Page. Whereas the brunt of the injury caused by the Defendants and their consultants had occurred in Oklahoma and Dr. Page had previously provided extensive evidence regarding these damages to both the FBI and DOJ throughout much of 2017, the response to this inquiry will also be expected to provide additional relevant information that further confirms that the defendants purposefully directed their activities at Oklahoma.  Anzures v. Flagship Rest. Grp., 819 F.3d 1277, 1280 (10th Cir. 2016) [internal citations omitted].

With respect to future timing of additional discovery, House Judiciary Committee Chairman Jerrold Nadler and his colleagues had originally demanded that Attorney General Barr and DOJ produce the full report of the first Special Counsel Russia investigation which the Plaintiff Dr. Page had provided support to as a witness in 2017 by April 2, 2019.  The Defendants and DOJ's alleged conspiracy which led to criminal abuse of process against Dr. Page in the U.S. Foreign Intelligence Surveillance Court ("FISC") stemming from the Defendants' defamatory reports in question in this civil action is alluded to at the bottom of p. 2 and footnote 5 of this correspondence.[8]  As widely reported in the national headlines last week, Attorney General Barr has informed

---

[8]   https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/2019-03-25%20Letter%20to%20AG%20Barr%20Re%20Special%20Counsel.pdf

Congress that some additional time will be required beyond this week's original deadline as previously set by Chairman Nadler's Article I body: "Our progress is such that I anticipate we will be in a position to release the report by mid-April, if not sooner."[9]

In summary, the basis upon which the Defendants initially persuaded the Court to assume that the brunt of the injuries had not been felt in Oklahoma has now been largely disproven. The reality about the damages caused by the Defendants purposeful direction of their activities toward Oklahoma is expected to be further confirmed within the coming weeks.  Given the newly discovered information which has already been revealed, the Plaintiff respectfully submits this motion to amend the Court's decision with regards to jurisdiction.  In the alternative, the Plaintiff requests a temporary stay until these additional pending investigations into the Defendants' wrongdoing is completed.


April 5, 2019

Very respectfully,
By: _/s/ Carter Page_____
Carter Page
c/o Global Natural Gas Ventures LLC
101 Park Ave., Suite 1300
Oklahoma City, OK 73102
Phone (405) 825-0172
Fax    (405) 825-0177
cpage@globalenergycap.com

---

[9] https://www.judiciary.senate.gov/imo/media/doc/Letter%20re.32919.pdf

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2019, I authorized the electronic filing of the

foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel registered for ECF.


Dated: April 5, 2019

Very respectfully,

By: _/s/ Carter Page_____
Carter Page
c/o Global Natural Gas Ventures LLC
101 Park Ave., Suite 1300
Oklahoma City, OK 73102
Phone (405) 825-0172
Fax     (405) 825-0177
cpage@globalenergycap.com

EXHIBIT 1

COMMITTEE SENSITIVE

EXECUTIVE SESSION

COMMITTEE ON THE JUDICIARY,

JOINT WITH THE

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.


INTERVIEW OF:  NELLIE OHR


Friday, October 19, 2018


Washington, D.C.


The interview in the above matter was held in 2141 Rayburn
House Office Building, commencing at 10:10 a.m.

Present:  Representatives Meadows, Jordan, Ratcliffe, Gaetz,
Raskin, and Krishnamoorthi.

COMMITTEE SENSITIVE

Mr. Somers.  Good morning.

This is a transcribed interview of Nellie Ohr.  Chairman Goodlatte and Chairman Gowdy requested this interview as part of a joint investigation by the House Committee on the Judiciary and the House Committee on Oversight and Government Reform into decisions made and not made by the Department of Justice and the Federal Bureau of Investigation regarding the 2016 Presidential election.

Would the witness please state her name and the name of her current employer for the record.

Ms. Ohr.  Nellie Ohr.  I work for Accensure iDefense.

Mr. Somers.  On behalf of the chairman, I want to thank you for appearing today, and we appreciate your willingness to appear voluntarily.  My name is Zack Somers, I'm the majority general counsel for the House Judiciary Committee.  I will now ask everyone else who is here in the room to introduce themselves for the record, starting with Mr. Jordan.

Mr. Jordan.  Jim Jordan.

Mr. Meadows.  Mark Meadows, North Carolina.

Mr. Ratcliffe.  John Ratcliffe, Texas.

Mr. Gaetz.  Matt Gaetz, Florida.

Mr. Breitenbach.  Ryan Breitenbach, senior counsel, House Judiciary, majority.

Mr. Baker.  Arthur Baker, investigative counsel, House Judiciary Committee, majority staff.

Mr. <u>Krishnamoorthi.</u>  Raja Krishnamoorthi.

Mr. <u>Castor.</u>  Steve Castor with the House Committee on Oversight and Government Reform, majority.

Ms. <u>Doocy.</u>  Mary Doocy.

Mr. <u>Buddharaju.</u>  Deep Buddharaju, House Oversight, Mr. Gowdy's staff.

Ms. <u>Greene.</u>  Emily Greene, with Mr. Jordan's staff.

Mr. <u>Hiller.</u>  Aaron Miller, House Judiciary.

Ms. <u>Hariharan.</u>  Arya Hariharan, House Judiciary, counsel, minority.

Ms. <u>Sachsman Grooms.</u>  Susanne Sachsman Grooms, House Oversight Democrats.

Mr. <u>Somers.</u>  The Federal Rules of Civil Procedure do not apply in this setting, but there are some guidelines that we follow that I'd like to go over.  Our questioning will proceed in rounds.  The majority will ask questions for -- first for an hour, and the minority will have an opportunity to ask questions for an equal period of time.  We'll go back and forth in this manner until there are no more questions and the interview is over.

Typically we a take a short break at the end of each hour of questioning, but if you need to take a break apart from that, just let us know.  We may also take a break for lunch at the appropriate point.  As I noted earlier, you are appearing today voluntarily.  Accordingly, we anticipate that you will answer -- that our questions will receive complete responses.  To

COMMITTEE SENSITIVE

the extent that you decline to answer our questions or if counsel instructs you not to answer, we will consider whether a subpoena is necessary.

As you can see, there is an official reporter taking down everything that is said to make a written record.  So we ask that you give verbal responses to all questions.  Do you understand that?

Ms. <u>Ohr.</u>  Yes.

Mr. <u>Somers.</u>  So that the reporter can take down a clear, it is important that we don't talk over one another or interrupt each other, if we can help it.  Both committees encourage witnesses who appear for transcribed interviews to freely consult with counsel, if they so choose.  And you are appearing today with counsel.

If counsel would please state their names for the record.

Mr. <u>Berman.</u>  Joshua Berman for Ms. Ohr, from the Clifford Chance law firm.

Mr. <u>Hekman.</u>  Rebecca Hekman from Ms. Ohr from Clifford Chance.

Mr. <u>Somers.</u>  We want you to answer our questions in the most complete and truthful manner possible, so we will take our time. If you have any questions or if you do not understand one of our questions, please let us know.  If you honestly don't know the answer to a question or do not remember it, it is best not to guess.  Please give us your best recollection, and it is okay to tell us if you learned the information from someone else.  If

there are things that you don't know or can't remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

You should also understand that although this interview is not under oath, you are required by law to answer questions from Congress truthfully.

Do you understand that?

Ms. Ohr.  Yes.

Mr. Somers.  This also applies to questions posed by congressional staff in an interview.  Do you understand this?

Ms. Ohr.  Yes.

Mr. Somers.  Witnesses who knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements.  Do you understand this?

Ms. Ohr.  Yes.

Mr. Somers.  Is there any reason you're unable to provide truthful answers to today's questions?

Ms. Ohr.  No.

Mr. Somers.  Finally, we ask that you not speak about what we discuss in this interview with anyone outside of who is here in the room today in order to preserve the integrity of our investigation.  That is the end of my preamble.  Do you have any questions before we begin?

Mr. Berman.  Could I take a moment.  So the last part, you just mentioned a confidentiality.  Does that agreement govern

everybody in this room?

Mr. <u>Somers.</u>  It does.

Mr. <u>Gaetz.</u>  This is Matt Gaetz, Judiciary member from Florida.  I'm unaware of any House rule that requires confidentiality in these proceedings, and I do not consider myself bound by it at all.

Mr. <u>Hiller.</u>  And, Zack, I think we'd like to point out that information has routinely been leaking from these proceedings, sometimes while the interview is ongoing, I'd note that for the record, it's important to know that.

Mr. <u>Somers.</u>  I will just say if there's something you feel you need to respond to that came out of the interview, I think you would not be bound by that.  But I think if --

Mr. <u>Meadows.</u>  And since, counselor, since you asked, I think that it was a bipartisan initiative in a public hearing with Mr. Strzok that both Democrats and Republicans suggested that these transcripts be made available publicly after individual personal items are scrubbed so that there's no personal embarrassment.  And so in answering that, I think consistent with that theme, I fully anticipate all transcripts will be released after scrubbing the personal information because there's many on the Democrat and Republican side that wants -- wants that to happen.  And if that's a mischaracterization -- mischaracterization from my Democrat colleagues, you correct the record, but I believe that's where we were.  Is that correct?

COMMITTEE SENSITIVE

Mr. Hiller.  Yes, sir.

Mr. Meadows.  All right.  And so with that in mind, obviously, speaking to it in generic terms is something that happens on a regular basis, but obviously there's been a few more specifics that have come out of these hearings.  But from a personal standpoint, if there are personal confidences that, relationship-wise, we want to be sensitive to that to make sure that those are protected.

Mr. Berman.  Thank you, sir.  Thank you.  I've let Mrs. Ohr know that if she needs a break, a nature break, I appreciate you reiterating that.  She will just tap me on the shoulder or let one of you know.  I'd like to just put on the record, thank you, Mr. Baker, for being patient with us as we found time, a date for this hearing or this interview, I know we went back and forth, but I appreciated the courtesy on the various scheduling.

And thank you for pointing out, she's here voluntarily, unlike others who have needed to be subpoenaed, haven't showed.  She from the absolute get-go has been willing to come in and answer questions.  And that's why she's here voluntarily.  There was no need and there will be no need for a subpoena at any point with her.

And, finally, as Mr. Baker and I have discussed many times over the weeks, and we talked the last time I was here with another client, she wants to answer every single possible question.  She's not going to be waiving any privileges.  So

doctor/patient, attorney/client, marital or things along those lines, so I recommend -- the House may have a different view of privileges.  So to the extent questions can be asked, she wants to answer them.  That's the goal.

Mr. Meadows.  Well for the record, I just want to say thank you, and Ms. Ohr, thank you.  One of the things that -- we may see things differently, and I don't know that we do because I'm not -- this is my first time meeting you.  But I can tell you that I've seen things differently with some of the other witnesses, and yet I've found that their transparency has actually made a difference with me, and so I thank you for voluntarily showing up today, Ms. Ohr.

Mr. Somers.  All right.  The time is now 10:19.  We'll begin our first round of questioning.  Mr. Jordan.

Mr. Jordan.  Thank you, Zack.  Ms. Ohr, thank you again for being here.  I want to ask you -- start by asking some of the some things about how you came to work for Fusion GPS, and then get into certain people that you may or may not have had contact with and what took place in those meetings or conversations.

So what were the dates that you worked for Fusion GPS?

Ms. Ohr.  Approximately, October of 2015, give or take a couple weeks, and into the end of September, 2016.

Mr. Jordan.  And do you recall how much money you were -- your compensation for that, it looks like almost a year, working for Fusion?

Ms. <u>Ohr.</u>  Yeah, I was paid $55 an hour, and I worked variable amounts, somewhere around 30 hours a week.  And I don't recall the exact total.

Mr. <u>Jordan.</u>  Do you work from your home or do you work from an office space or where did you work?

Ms. <u>Ohr.</u>  From home.  From home.

Mr. <u>Jordan.</u>  From home.

Ms. <u>Ohr.</u>  Can you hear me all right?

Mr. <u>Jordan.</u>  I can.

Ms. <u>Ohr.</u>  Okay.

Mr. <u>Jordan.</u>  Can you hear me?

Ms. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Okay.  And what did you do?

Ms. <u>Ohr.</u>  I did online open source research using Russian sources, media, social media, government, you know, business registers, legal databases, all kinds of things.

Mr. <u>Jordan.</u>  To what end?  What was the objective?

Ms. <u>Ohr.</u>  Uh-huh.  At what time period are you talking?

Mr. <u>Jordan.</u>  That year you worked for Fusion.

Ms. <u>Ohr.</u>  Uh-huh.  I mean, I did a couple of different projects for them.

Mr. <u>Jordan.</u>  Can you tell me what those projects were?

Ms. <u>Ohr.</u>  Yeah.  The first project, the initial project had to do with looking into a particular Russian firm that was suspected of being involved in sex trafficking.

Mr. Jordan.  Can you tell me the name of that firm?

Ms. Ohr.  Vlad Models.

Mr. Jordan.  Okay.  And what else did you work on?

Ms. Ohr.  I worked on a project looking into the relationship of Donald Trump with organized crime, a Russian organized crime.

Mr. Jordan.  Okay.  And was that work at all related to the now famous dossier?

Ms. Ohr.  No.

Mr. Jordan.  What was it related to then -- walk me through what that work entailed?

Ms. Ohr.  What it entailed in what sense?

Mr. Jordan.  Describe what you were doing and what the objective was?

Ms. Ohr.  Yeah, I would write occasional reports based on the open source research that I described about Donald Trump's relationships with various people in Russia.

Mr. Jordan.  Okay.  I want to come back to that.  So, who approached you?

Ms. Ohr.  Nobody approached me.

Mr. Jordan.  You approached Fusion?

Ms. Ohr.  Yes.

Mr. Jordan.  And how did that happen?

Ms. Ohr.  I believe it was in September of 2015 that I read an article in the paper that mentioned Glenn Simpson.  And I remembered because he had been a Wall Street Journal reporter

working on things like Russian crime and corruption, so I recognized the name.  I was underemployed at that time and I was looking for opportunities.

Mr. Jordan.  So you called him up?

Ms. Ohr.  I sent an email.

Mr. Jordan.  All right, and then what happened?

Ms. Ohr.  He said, come in and we'll meet.

Mr. Jordan.  Okay.  And you met and --

Ms. Ohr.  Then they agreed to have me do some project for them.

Mr. Jordan.  Okay.  So it was all on your initiative?

Ms. Ohr.  Yes.

Mr. Jordan.  Okay.  And tell me about what transpired in that first meeting then with you and Mr. Simpson.

Ms. Ohr.  I met with --

Mr. Jordan.  Well, first of all, did you know Glenn Simpson prior to that?  You said you read his name in the press and you knew he worked for the Wall Street Journal, so had you met with him prior?

Ms. Ohr.  I had been at a conference that he was at.  I don't recall directly talking with him at that conference, and I don't know whether he knew who, you know, who I was other than the fact that I attended that conference.

Mr. Jordan.  Okay.  And did he know at the time that he hired you that your husband worked for the Department of Justice?

Ms. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Was Glenn Simpson acquainted with your husband, Bruce?  Did they have a friendship or relationship prior to you going to work for Fusion?

Ms. <u>Ohr.</u>  They were acquainted, yes.

Mr. <u>Jordan.</u>  Okay.  And what did he specifically tell you he wanted you to do?

Ms. <u>Ohr.</u>  Initially, the project that I first described regarding the company that was suspected of involvement in sex trafficking.

Mr. <u>Jordan.</u>  And who was the client that wanted that information, do you know?

Ms. <u>Ohr.</u>  I don't know.

Mr. <u>Jordan.</u>  So you were asked to get information on this trafficking issue by Mr. Simpson, and you didn't know who you were working for?

Ms. <u>Ohr.</u>  Right.

Mr. <u>Jordan.</u>  Okay.  On the second project, the second -- refresh my memory on the second project again.  The second project was what?

Ms. <u>Ohr.</u>  Looking into the relationship of Donald Trump with Russian organized crime figures.

Mr. <u>Jordan.</u>  Okay.  And who was financing that operation?

Ms. <u>Ohr.</u>  I didn't know.

Mr. <u>Jordan.</u>  You didn't know?

Ms. Ohr.  No.

Mr. Jordan.  All right.  Talk to me about your interactions that you may have had with Christopher Steele.

Ms. Ohr.  I met with him -- I mean, Bruce brought me along to meals on, I believe, as I recall, three occasions with Christopher Steele.

Mr. Jordan.  So you had three in-person meetings with Mr. Steele?

Ms. Ohr.  Correct.

Mr. Jordan.  Do you recall those dates?  I mean, I know of one, but do you recall the dates of all those meetings?

Ms. Ohr.  One of them was shortly after his first wife died. I don't recall what -- exactly what date that was.

Mr. Jordan.  Let me back up.  Were they all here in D.C. or where were the meetings?

Ms. Ohr.  All in D.C.

Mr. Jordan.  All right.  And the first one was, you said, after Mr. Steele's wife had passed?

Ms. Ohr.  Correct.

Mr. Jordan.  And you met here in D.C.?

Ms. Ohr.  D.C.

Mr. Jordan.  Were all these meetings between the -- did all these meetings take place at the time you were working for Fusion?

Ms. Ohr.  No.

Mr. Jordan.  Okay.  So how many of them took place between

October 2015 and September 2016?

Ms. Ohr.  Just the final -- yeah, I think just the final one.
I don't remember the date of the second one.

Mr. Jordan.  Okay.  And the final one is what date, do you
know?

Ms. Ohr.  The final one, July 30, 2016.

Mr. Jordan.  And that's the one at the Mayflower Hotel?

Ms. Ohr.  I'm sorry, I didn't hear you.

Mr. Jordan.  And that's the one at the Mayflower Hotel?

Ms. Ohr.  That made what?

Mr. Jordan.  I'm sorry.  That's the one that took place at
the Mayflower Hotel?  I'll speak into the mike.  Is that right?

Ms. Ohr.  Uh-huh.  Yes.

Mr. Jordan.  Okay.  And who was at that meeting?

Ms. Ohr.  Myself, Bruce, Chris Steele, and an associate of
Chris Steele.

Mr. Jordan.  Do you know that individual's name?

Ms. Ohr.  No, I'm sorry, I don't remember it.

Mr. Jordan.  So four people at the meeting.

Ms. Ohr.  Right.

Mr. Jordan.  What did you talk about?

Ms. Ohr.  His suspicions that Russian Government figures were
supporting the candidacy of Donald Trump.

Mr. Jordan.  Did you get any information at that meeting?

Ms. Ohr.  Mainly that.

Mr. Jordan.  No, I mean, did they actually physically give you any documents, any electronic communications, anything at that meeting --

Ms. Ohr.  I don't recall receiving anything, no.

Mr. Jordan.  And what did Mr. Steele say about Mr. -- then candidate Donald Trump and involvement in Russia and what Russia may be doing?  Do you recall what was said?

Ms. Ohr.  He was very concerned that his research had led him to the conclusion that Russian government figures had for a number of years been promoting the potential -- a potential presidency of Donald Trump.

Mr. Jordan.  Okay.  So was the information given at that meeting, would you say that was what became part of, again, the now well-known document called the dossier.

Ms. Ohr.  When I eventually read the dossier, I recognized that argument in there.

Mr. Jordan.  Okay.  So you did read the dossier?

Ms. Ohr.  When it became public.

Mr. Jordan.  Not before?

Ms. Ohr.  No.

Mr. Jordan.  Did you know why Mr. Steele was in town?  Why he was in D.C. that particular weekend?

Ms. Ohr.  I don't.

Mr. Jordan.  Did you talk with -- did you have conversations with your employer, Mr. Simpson, about Christopher Steele in the

course of your work for Fusion GPS?

Ms. Ohr.  After meeting Christopher Steele, we mentioned it
to each other that I had had breakfast with him.

Mr. Jordan.  You say you mentioned it to Glenn Simpson?

Ms. Ohr.  Glenn Simpson.  Or there was some chitchat about
the fact that we had had breakfast.

Mr. Jordan.  Okay how often did you talk with Mr. Simpson?
You're working from home --

Ms. Ohr.  Right.

Mr. Jordan.  You got these two projects you're working on.
You said that they weren't directly involved in the dossier.  Did
you talk to him on a daily basis, weekly basis?  Did you send
information to him?  How did the work relationship operate?

Ms. Ohr.  Uh-huh.  I didn't meet directly with him.  I would
go in every few weeks, and I would -- I only met with him, not
every one of those meetings, and I would in between send my
reports in.  So every few weeks.

Mr. Jordan.  Okay.  Tell me your background prior to working
for Fusion?  Tell me your employment background?

Ms. Ohr.  Uh-huh.  I started out in academia.  I taught
Russian history at Vassar College, and then when we came to
Washington, I did -- I was an independent contractor doing
contract work for various -- in support of U.S. Government clients
in general, and --

Mr. Jordan.  Walk me through --

Ms. Ohr.  Sorry?

Mr. Jordan.  Walk me through the clients you did contract work for.  Was this U.S. Government?

Ms. Ohr.  U.S. Government.

Mr. Jordan.  Various agencies in the United States Government.

Ms. Ohr.  Yes.

Mr. Jordan.  Tell me the agencies?

Mr. Berman.  I'm not sure how to address this.  I'm not sure what the U.S. Government agencies' positions are, given various agreements she signed as parts of her independent contracting relationships.  So she's willing to answer questions, I just don't know -- don't want to put her at risk of violating employment agreements she had at the time, especially with U.S. Government agencies.

Mr. Jordan.  Is it fair to say you worked with some of the intelligence-based agencies in the United States Government.

Ms. Ohr.  Yes.

Mr. Jordan.  Did you work for the CIA?

Mr. Berman.  Again, I would raise the same concerns, sir, if we're going to get into specifics.

Mr. Jordan.  Okay.  And for how long did you do that and how many different contracts did you have?

Ms. Ohr.  Starting in 2000, I did some part-time contracting for Mitre, which is a contract --

Mr. Jordan.  I'm sorry, I didn't hear you.

Ms. Ohr.  Mitre.  Mitre Corporation, which in turn had contracts with U.S. Government clients.

Mr. Jordan.  Got it.

Ms. Ohr.  Through most of 2008.  And then starting in 2008, I worked for Open Source Works.

Mr. Jordan.  Okay.

Mr. Berman.  Sir, can I just consult with my client?

Mr. Jordan.  Sure.

Mr. Berman.  Sir, may I ask a question, just as a follow-up?

Mr. Jordan.  Yes.

Mr. Berman.  Mrs. Ohr, have you ever worked for a U.S. Government agency?

Ms. Ohr.  Not directly.

Mr. Jordan.  Not directly, but --

Ms. Ohr.  As an independent contractor.

Mr. Jordan.  As and independent contractor -- so you were basically a subcontractor for entities who did have contracts with the United States Government?

Ms. Ohr.  Yes.

Mr. Jordan.  Yes.  But you know that the folks you were contracted to provide work for, that you had a working relationship for, you know that they were working for various intelligence-based agencies in the United States Government?

Ms. Ohr.  Yes.

Mr. Jordan.  Got it.  All right.

Mr. Meadows.  So I have one follow-up.  Have you ever submitted a resume that would list any of those agencies on that resume?

Ms. Ohr.  No.

Mr. Meadows.  So no resume that would indicate that you did work for those agencies on a resume?

Ms. Ohr.  My resume stated that I was an independent contractor doing work in support of U.S. Government.

Mr. Meadows.  But normally there is a sentence or two right after it on what they did.  And so what I'm saying is, did -- in those resumes, and for example, like with Mitre, we do work with the CIA, NSA whoever --

Ms. Ohr.  I do not explicitly name those agencies in a resume.

Mr. Meadows.  All right.

Mr. Jordan.  Earlier you mentioned that had -- that you communicated your work with emails to Fusion, your employer.  Do you still have those emails if we needed to get access to those and see those?  Do you still have those records?

Ms. Ohr.  I have them.

Mr. Jordan.  Okay.  I am going to go back a second.  You saw Glenn Simpson's name.  You remembered that you had seen him at some kind of conference.  You knew your husband had a relationship with him.  You sought him out because you were looking for work.

At that meeting, did he say -- was it like, well, you know, we're looking for someone who's an expert on Russia?

Tell me exactly when you approach him, and he says, as a matter of fact, we actually need someone just like, with your skills.  How did that first meeting where you're trying to get employment, how did that go?

Ms. <u>Ohr.</u>  I should mention that on a very important aspect of my recollection of him was that he was very -- he had done some very important work as a Wall Street Journal journalist on exactly Russian corruption, and organized crime, and oligarchs and things like that.  So I knew we had a shared interest in that topic.  So that was kind of the context for our discussion.

And in terms of, you know, we need someone, whether he said something like that, you know, it's my -- my sense is that he was saying, you know, we can always use someone who has those kinds of skills?

Mr. <u>Berman.</u>  I think that Mr. Jordan is asking you what you remember actually from the conversation.

Ms. <u>Ohr.</u>  Uh-huh.  And I don't remember the specifics of the conversation.

Mr. <u>Jordan.</u>  Okay.  What did your husband know about your work?  Particularly --

Ms. <u>Ohr.</u>  He knew that I was --

Mr. <u>Jordan.</u>  Again, I'm focused on your work from 2015 to 2016 at Fusion.

Ms. Ohr.  What did he know about it?  He knew that I was working there.

Mr. Jordan.  I mean, did you talk about the work you were doing?

Mr. Berman.  Again, Ms. Ohr is not going to talk about her communication with Mr. Ohr, given that it's protected under the marital privilege.

Mr. Meadows.  So, counselor, so in the spirit of transparency where you started out with this, a big part, as you surely anticipated, is what communication happened between Glenn Simpson, Nellie Ohr, and ultimately, her husband, Bruce Ohr.  And what you're telling me is that any communication she's had with her husband she's going to claim privilege, marital spouse privilege, to not answer that.  Is that correct?  Because that's not consistent with what you told me at the beginning.

Mr. Berman.  Ms. Ohr is more than willing to answer questions about her communications with Glenn Simpson.  This committee certainly can bring Mr. Simpson in here and answer similar questions.  They have had Mr. Ohr in here.  She like, hopefully, no U.S. citizen, is going to be compelled to discuss her private conversations with her husband.

Mr. Meadows.  I would not ever ask for private conversations, nor would I share mine.  However, there is a much different venue when you look at a July 30th meeting where Mr. Ohr brings his wife to a meeting with Christopher Steele, and obviously she was part

of a conversation there.  Those kinds of things have to be -- and it would certainly include communication with her husband.  I'm not asking for bedroom talk.  Okay?

     Mr. Berman.  Mr. Meadows, totally fair.  At any conversation in which anybody else is present, Glenn Simpson, Chris Steele, a third party associate, a person on the subway, she will answer those questions, there is no privilege if it is not exclusively between her and her husband, at least for today's conversation.

     Mr. Meadows.  So, but let me be clear because I want to make sure we are clear.  Those conversations that she may have had with her husband that then were communicated with a third party are no longer just private conversations between her and her husband.  For example, if she has a conversation with her husband and then ends up talking to Glenn Simpson or Christopher Steele, even at a later date, they are no longer private conversations, as much as they are shared with a third party.  Would you agree?

     Mr. Berman.  Sir, so if she's asked the question:  Did you ever share with Mr. Simpson a conversation you had with your husband?  Obviously, there's a yes/no answer to that.  And if the answer is yes, then I recognize there isn't a privilege.  What did you tell Mr. Simpson about your conversation with your husband?  I think that's squarely, sir, in what you're asking, and I would not -- I would instruct my client to answer that question because she's talking about what she told Mr. Simpson.  Different than, what did you and Mr. Ohr -- what did you and Bruce talk about

over --

Mr. <u>Meadows.</u>  So we just need to be a little more specific with some of our questions?

Mr. <u>Gaetz.</u>  And, counselor, let me ask this question, it is your view of the privilege that it covers the existence of the conversation beyond just the substance of it?

Mr. <u>Berman.</u>  Yes, sir.

Mr. <u>Gaetz.</u>  For the purpose of this discussion?

Mr. <u>Berman.</u>  Yes, sir.

Mr. <u>Gaetz.</u>  All right.  Thanks.

Mr. <u>Meadows.</u>  While he's looking at his notes, let me go back to that July 30th meeting at the Mayflower Hotel at approximately 10 a.m.  It was in the morning.  Is that correct?

Ms. <u>Ohr.</u>  It was in the morning.

Mr. <u>Meadows.</u>  Okay.  Why were you included in that meeting?

Ms. <u>Ohr.</u>  Because I'm interested in Russia.

Mr. <u>Meadows.</u>  So it was totally an academic exercise for you to go and be with a DOJ official?  I mean, I'm interested in a lot of things, too, but I don't normally get to go in and sit in on a meeting between an informant and a DOJ official just because I have an interest.  So you're saying it was totally academic?  You were just interested in Russia?

Ms. <u>Ohr.</u>  Could you rephrase the question?

Mr. <u>Meadows.</u>  Okay.  You took no role, and you had no anticipated role, and that you just asked to attend the meeting

just for curiosity?

Ms. Ohr.  Well, I mean, I know that I view myself as part of a community of people who are interested in Russia, and Chris Steele was part of that community.  And we had interesting discussions about Russia before, and so I viewed --

Mr. Meadows.  So why didn't you set up the meeting with Christopher Steele?  Why was it a meeting that your husband sets up and you up and then you come along?  You obviously -- you're a very learned and intelligent individual, your know where I'm going with this.  How do you get to be in a room with a DOJ official and a potential informant, and you happen to work for someone who has hired that same informant?

Ms. Ohr.  I didn't know that.

Mr. Meadows.  When did you learn that?

Ms. Ohr.  At the breakfast.

Mr. Meadows.  So at the breakfast you learned that you and Mr. Steele are working for the same company?

Ms. Ohr.  Yes.

Mr. Meadows.  And so, again, you went because you thought he could tell you things about Russia?

Ms. Ohr.  As I said, my view is of being part of a community of people who are interested in Russia, that we have a back and forth discussion, we try to mutually understand what is going on, and it's by no means clear what is going on in the minds of some elite --

Mr. Meadows.  But Mr. Steele is not the most learned when it comes to matters of the Russia community.  He may be an informant.  He may have obviously connections.  But I wouldn't say that when you look at all the academics that are out there on Russia, that Christopher Steele's name is even in the top 20.  So why all of a sudden was there this interest in meeting with Christopher Steele on that particular day?

Ms. Ohr.  I mean, all I can do is repeat what I've said.  I --

Mr. Meadows.  So did you take part in the conversation letting him know about the open source work that you were doing with Fusion?

Ms. Ohr.  I don't recall specifically what I said to him --

Mr. Meadows.  I didn't ask specifically, I said generally, did you talk about your work with Fusion GPS?

Ms. Ohr.  I don't recall telling him the content of what I was researching, but I'm not sure about that.  The fact that I was doing work for GPS, clearly, he was aware of that.

Mr. Jordan.  So he knew that before the meeting?  You said you didn't know he was working for your employer when you got to the meeting, but did Christopher Steele --

Ms. Ohr.  I don't know if he knew before or not, I'm not sure.

Mr. Jordan.  Your husband knew that you worked for Fusion and your husband knew that Chris Steele worked for Fusion?

Ms. <u>Ohr.</u>  I don't know whether he knew that he worked for Fusion.

Mr. <u>Jordan.</u>  You don't know whether your husband knew?

Ms. <u>Ohr.</u>  I don't.  I don't.

Mr. <u>Jordan.</u>  Okay.  I'm sorry Mark.  Go ahead and question.

Mr. <u>Ratcliffe.</u>  Ms. Ohr, you're saying that at that early July, 2016, meeting with Christopher Steele is when you learned that you and Mr. Steele were both doing work for Fusion GPS?

Ms. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  Okay.  In that moment when you realized that at the breakfast, did it cross your mind that maybe the work that you were doing for Fusion GPS, as it pertained to Donald Trump in your reports, had been communicated to Christopher Steele?

Ms. <u>Ohr.</u>  I probably didn't think that through.  I mean, I didn't think about it.

Mr. <u>Ratcliffe.</u>  At some point in time, based on your husband's prior testimony, did it dawn on you that the work that you had been doing maybe had been part of the information upon which Mr. Steele was relying or using in preparation of the dossier?

Ms. <u>Ohr.</u>  Judging from the content of the dossier, it seems to be quite separate, but I don't know for sure.

Mr. <u>Ratcliffe.</u>  But at some point didn't you come to the conclusion that the research that you had been doing should be made known to the FBI because it had a connection to Christopher

Steele?

Ms. <u>Ohr.</u>  There's kind of two questions there, could you separate them out?

Mr. <u>Ratcliffe.</u>  Did you request that the research that you had been doing on behalf of Fusion GPS be provided to the FBI?

Ms. <u>Ohr.</u>  Request --

Mr. <u>Ratcliffe.</u>  Did Bruce Ohr take your research and provide it to the FBI?

Mr. <u>Berman.</u>  I'm not sure -- I'm not sure.  Are you asking about a communication between her and Mr. Ohr?

Mr. <u>Ratcliffe.</u>  I'm asking about an action between her and Mr. Ohr.  I want to know whether in the chain of custodial evidence her research on behalf of Fusion GPS was taken through Mr. Ohr to the FBI or to the Department of Justice?

Mr. <u>Berman.</u>  But that's communication between --

Mr. <u>Ratcliffe.</u>  It's not communication, it's an action.

Mr. <u>Berman.</u>  An action is viewed as communication, sir.

Mr. <u>Somers.</u>  No, no.  He's asking if Bruce Ohr gave information to the FBI, a third party, that came from Ms. Ohr.  I don't understand how there's a spousal communication problem there.

Mr. <u>Ratcliffe.</u>  There isn't.

Mr. <u>Berman.</u>  Well if you're asking about a link in the chain between, hypothetically, Ms. Ohr giving something to Mr. Ohr, which you are, then that is communication.

Mr. <u>Ratcliffe.</u>  I'm ask about her role in connection with the custodial chain of evidence for the Steele dossier that went from Christopher Steele to the FBI.  I'm asking if she played a role in that with her husband.

Mr. <u>Berman.</u>  Did you play any role with regards to the dossier and Christopher Steele?

Ms. <u>Ohr.</u>  No.

Mr. <u>Berman.</u>  Or Mr. Ohr?  Anything with the dossier?

Ms. <u>Ohr.</u>  I first saw the dossier when it became public.

Mr. <u>Ratcliffe.</u>  So did your research go from you to the FBI?  Was the FBI provided with your research for Fusion GPS?

Mr. <u>Berman.</u>  Did you give the FBI your research?

Ms. <u>Ohr.</u>  I did not directly give the FBI my research.

Mr. <u>Somers.</u>  Did you ask anyone else to give the FBI your research?

Mr. <u>Berman.</u>  Again, hypothetically, if that engaged a conversation between her and her husband, she can't answer that.

Mr. <u>Somers.</u>  I'm not asking her who she asked, that might be a follow-up question where there would be an objection, but the basic question, did you ask anyone to give the FBI your research doesn't necessarily call for a spousal communication.  I asked a follow-up, it may.

Mr. <u>Berman.</u>  Fair enough.  I'm going to instruct her not to answer that question.

Mr. <u>Breitenbach.</u>  So let me ask it a different way.  Are you

aware that your research was provided to the FBI?

Ms. Ohr.  I'm not aware of whether it was provided to the FBI.

Mr. Meadows.  All right.  So let me go back to July 30th, because there's something that's just not connecting, and maybe help me understand this a little bit.  Because you said that you were unaware that he was working for Fusion GPS, and you were unaware -- you had no knowledge whether your husband knew he was working for GPS.  Is that correct?

Ms. Ohr.  Correct.

Mr. Meadows.  So when he mentioned he was working for Fusion GPS, did you have this unbelievable "aha" moment.  Oh my goodness, you're working for the same firm I am.  Help me understand that.

Ms. Ohr.  Yeah, more or less.

Mr. Meadows.  Okay.  Did your husband have an "aha" moment?

Ms. Ohr.  I don't recall.

Mr. Meadows.  What do you mean you don't recall?

Ms. Ohr.  I was having my own "aha" moment, so I wasn't watching his --

Mr. Meadows.  Well, here is the whole thing, Ms. Ohr.  And, again, I appreciate you being here voluntarily, but there are key questions, and the premise of how you're characterizing the conversation with other testimony that we have is a little inconsistent, and so I want to give you a chance to really clarify where you are because, I'm not trying to trap you.  I'm honestly

just trying to get to the truth.

Ms. Ohr.  Uh-huh.

Mr. Meadows.  It is our understanding that your husband knew of both connections, yours and Mr. Steele's, to Fusion GPS.  And there would be an "aha" moment where your husband would say, hold on, just a minute, you're working for the same firm as my wife.  I believe you would have recalled that.  Did that happen?

Ms. Ohr.  Not in my recollection, but as I said, I was having my own "aha" moment.

Mr. Meadows.  All right.  So the context of that conversation.  You said it was basically more about your interest in Russia.  Obviously, the conversation didn't stay there because the conversation focused a great deal on Carter Page at that point.  Is that correct?

Ms. Ohr.  I don't recall.  I mean, I don't recall whether it was or not.

Mr. Meadows.  Do you recall Carter Page's name coming up?

Ms. Ohr.  There's a lot about that that I don't recall.  I mean, I had been doing research on my own, and so if there was something he said --

Mr. Meadows.  So as an academic -- here is my concern.  As an academic, you're paid for your ability to recall.

Ms. Ohr.  Uh-huh.

Mr. Meadows.  I mean, that's what a professor gets paid for.

Ms. Ohr.  Uh-huh.

Mr. <u>Meadows.</u>  And what you're saying is is that here in this particular situation you can't recall whether Carter Page's name was brought up?

Ms. <u>Ohr.</u>  As I was saying, there were, you know, a number of things discussed, but I had been doing things in my own research. And so if something chimed with what I had been independently finding through my own open source research, then I kind of -- it didn't stick in my memory, it didn't jump out.

Mr. <u>Berman.</u>  Were you present for the entire breakfast?

Ms. <u>Ohr.</u>  No.

Mr. <u>Berman.</u>  Was there a time where you walked away from the table to go to the bathroom?

Ms. <u>Ohr.</u>  Yes.

Mr. <u>Meadows.</u>  Counselor, I would ask you -- if you're going to coach her -- here is the problem.  We've got sworn -- well, it's not sworn, we have transcribed interviews that would indicate that Carter Page and many of his associates met with different people, that that was the topic, a main topic of the conversation at your breakfast meeting, and we got that from your husband, so would that surprise you to know that there were multiple conversations that morning about Carter Page that you cannot recall?

Ms. <u>Ohr.</u>  It would not surprise me if he was discussed.

Mr. <u>Meadows.</u>  Okay.

Mr. <u>Ratcliffe.</u>  I want to try to clarify one point that I had

asked you earlier.  Your husband testified under oath that you, quote, provided me with a memory stick that included research, she, meaning you, had done for Fusion GPS on various Russian figures.  And the reason she provided that information to me is, my understanding was, it related to some of the same, it related to the FBI's Russia investigation, and she gave me that stick to give to the FBI.  End quote.

Do you have any reason to question the veracity of your husband's testimony under oath?

Ms. Ohr.  I do not.

Mr. Ratcliffe.  Thank you.

Mr. Jordan.  That was the same thing I was going to go to -- let me go back 1 second.  Who did you give your information to at Fusion?  Did you report directly to Glenn Simpson or someone else.

Ms. Ohr.  I reported to someone else.

Mr. Jordan.  Who was that individual?

Ms. Ohr.  Jake Berkowitz.

Mr. Jordan.  Excuse me.

Ms. Ohr.  Jake Berkowitz.

Mr. Jordan.  Okay.  Thank you.  Did you in the course of your work at Fusion, did you ever interact or talk with anyone in the press about your work?

Ms. Ohr.  No.

Mr. Jordan.  Did you ever communicate with anyone at the

Perkins Coie law firm.

Ms. Ohr.  No.

Mr. Jordan.  Anyone associated with the Clinton campaign or the Democrat National Committee?

Ms. Ohr.  No.

Mr. Jordan.  All right.  I'm going to switch here.  If you want to stay on the July 30th meeting, I have a few more there but -- go ahead.

Mr. Meadows.  So going back, and since it's the only meeting that you recall having with Mr. Steele, and that's why we keep coming back to that date, and obviously, you're aware from reports that the investigation was opened up on Mr. Trump the following day?

Ms. Ohr.  Subsequently.  More recently I learned of this.

Mr. Meadows.  Right.  So you're characterizing this conversation as being a Russian intellectual conversation, and yet, your husband's notes would indicate that you, and Mr. Steele, and I guess this fourth person -- who was the fourth person?

Ms. Ohr.  I don't recall the person's --

Mr. Meadows.  Male or female?

Ms. Ohr.  Male.

Mr. Meadows.  Male.  Where were they from?

Ms. Ohr.  If I recall correctly, he had a British accent, so I'm guessing he was from the UK.

Mr. Meadows.  But you didn't mind him being part of a meeting

and you didn't know where he was from?  I mean, you were discussing personal work-related stuff, and you're doing that with somebody that came with Christopher Steele, and you didn't know who they were?

 Ms. <u>Ohr.</u>  Well, he introduced them as an associate.

 Mr. <u>Meadows.</u>  I understand that, but, I mean, wouldn't you want to know whether the information you're sharing while you're under contract with Fusion GPS is being shared in an appropriate manner?

 Ms. <u>Ohr.</u>  As I understood, I mean, I would take appropriate precautions with anybody, but to -- you know -- but to adhere to my NDA to the extent that I viewed it as necessary, and in this case once I learned, I guess, that he was working for Fusion GPS, I didn't -- I mean, I didn't provide that much information.  I didn't talk that much.

 Mr. <u>Meadows.</u>  So this gentleman was an associate with Mr. Steele at Fusion GPS?

 Ms. <u>Ohr.</u>  No, I'm sorry -- I --

 Mr. <u>Meadows.</u>  I knew the answer to that, but go ahead.  I mean, I guess what I'm saying is.

 Ms. <u>Ohr.</u>  Yeah.

 Mr. <u>Meadows.</u>  Where was any associate of Mr. Steele's?

 Ms. <u>Ohr.</u>  As I recall, he was, he worked for Mr. Steele's company?

 Mr. <u>Meadows.</u>  So he worked for which company?

Ms. <u>Ohr.</u>  Well, subsequently, I recall that the name was Orbis at the time, I did not remember.

Mr. <u>Meadows.</u>  And so he worked for Orbis, and he didn't say anything about his background?

Ms. <u>Ohr.</u>  The associate?

Mr. <u>Meadows.</u>  Yeah.  Who he used to work for?

Ms. <u>Ohr.</u>  No.  Nope.

Mr. <u>Meadows.</u>  So you lacked curiosity there.  You didn't really care who -- did he talk much, the associate?

Ms. <u>Ohr.</u>  Not that I recall.

Mr. <u>Meadows.</u>  Did he say anything of significance?

Ms. <u>Ohr.</u>  Not that I recall.

Mr. <u>Meadows.</u>  All right.  In your husband's notes it talked that you had extensive conversations about Donald Trump, candidate Donald Trump at that point.  Did you recall that?

Ms. <u>Ohr.</u>  We had conversations about him.  As I said, as I said, I left partway through the conversation.

Mr. <u>Meadows.</u>  Well, just for a bathroom break, is what your counselor said.  So you left through the conversation and you came back.  How long was the total conversation?

Ms. <u>Ohr.</u>  I don't recall how long it was.

Mr. <u>Meadows.</u>  How long were you absent?  How long did you go to the -- well, I don't want to ask that.  How long were you absent from the conversation?

Ms. <u>Ohr.</u>  Well, I then went elsewhere.

Mr. Meadows.  So you're saying the meeting went on after you --

Ms. Ohr.  Yes.

Mr. Meadows.  -- after you left.  Why did you excuse yourself?

Ms. Ohr.  I understood that they wanted to talk.

Mr. Meadows.  Talk about what?

Ms. Ohr.  I don't know.

Mr. Meadows.  So you excuse yourself and you're not sure what they wanted to talk about?

Ms. Ohr.  I assumed it was a continuation of the conversation, that it was not my place to be there.

Mr. Meadows.  So do you recall when they talked about having Trump over the barrel?

Ms. Ohr.  No.  Huh-uh.

Mr. Meadows.  So did you say anything derogatory about Mr. Trump in that meeting?

Ms. Ohr.  I don't recall.

Mr. Jordan.  Ms. Ohr, have you ever met or had conversations with personnel in the FBI, specifically Andy McCabe?

Ms. Ohr.  I'm sorry, what was the second half of your question?

Mr. Jordan.  Have you ever had any conversations or meetings with Andy McCabe, former deputy director of the FBI?

Ms. Ohr.  No.

Mr. Jordan.  Lisa Page, former FBI counselor?

Ms. Ohr.  I met her but before she was at the FBI.

Mr. Jordan.  Okay.  And did you have conversations with her during the time period you worked at Fusion regarding the work you were doing or any work that is Fusion was doing?

Ms. Ohr.  No.

Mr. Jordan.  How about Peter Strzok?

Ms. Ohr.  No.

Mr. Jordan.  Did you know about some of the other -- were you kept abreast of other work that Fusion may have been engaged in, like the other clients they had, other work they were doing?

Ms. Ohr.  What do you mean by kept abreast of?

Mr. Jordan.  Did you know some of the other projects that Fusion GPS and Mr. Simpson were working on?

Ms. Ohr.  I was aware of another project.

Mr. Jordan.  Can you tell me what that project was?

Ms. Ohr.  It had to do with -- now the name of the company escapes me.  But it was Veselnitskaya, the lawyer who was involved in a case.

Mr. Jordan.  Did you say Veselnitskaya?

Ms. Ohr.  That was the name of the lawyer.

Mr. Jordan.  Yeah.  I'm familiar with her, but talk to me more.

Ms. Ohr.  I just knew that he was working on it.

Mr. Jordan.  Okay.  Are you aware of any efforts by Fusion

GPS to uncover negative facts about Members of Congress?

    Ms. <u>Ohr.</u>  I don't recall.

    Mr. <u>Meadows.</u>  I'd ask you to think about that more.  You don't recall any work with Fusion GPS about doing negative work on Members of Congress?

    Ms. <u>Ohr.</u>  I don't recall being asked to do work on --

    Mr. <u>Jordan.</u>  We're not asking you that.

    Mr. <u>Meadows.</u>  Not that you were asked, that were you aware of it.

    Ms. <u>Ohr.</u>  I'm sorry.  That I was aware of independent projects that they were doing on Members of Congress?

    Mr. <u>Jordan.</u>  Yes.

    Ms. <u>Ohr.</u>  I'm not aware of any project -- I was not informed of any such projects.

    Mr. <u>Meadows.</u>  Were you -- excuse me, Jim.

    Mr. <u>Jordan.</u>  Okay.

    Mr. <u>Meadows.</u>  It's critical, and if you want to confer with your counselor, you need to do that.

    Mr. <u>Berman.</u>  You're encouraging a moment.  I understand the question, I believe.

    Ms. <u>Ohr.</u>  Uh-huh.

    [Discussion off the record.]

    Mr. <u>Berman.</u>  Thank you, sir.

    Ms. <u>Ohr.</u>  Can you repeat the question?

    Mr. <u>Berman.</u>  I think the question is, and if I rephrase it

inappropriately, please tell me.  Are you aware of any work that Fusion GPS was doing, whether or not you worked on it, whether or not you were asked about it, having to do with Members of Congress?

    Mr. Jordan.  Yes.

    Ms. Ohr.  No, I'm not.

    Mr. Jordan.  What about congressional staff?

    Ms. Ohr.  No, I don't think so.

    Mr. Jordan.  Specific the name Jason Foster?

    Ms. Ohr.  What was the last part?

    Mr. Jordan.  Jason Foster.

    Ms. Ohr.  Jason Foster.  No, I'm not aware of --

    Mr. Jordan.  Mr. Ratcliffe.

    Mr. Ratcliffe.  So, Ms. Ohr, one of the concerns had to do with the connection between, obviously, you being seen as the go-between between Fusion GPS and your husband, Mr. Ohr, Bruce Ohr, and by go-between, either directly or indirectly communicating information or transferring information.  How many times did a communication, either directly or indirectly, either from your husband to Mr. Simpson or from Mr. Simpson through you to your husband occur?

    Ms. Ohr.  Wouldn't that involve my communications with my husband?

    Mr. Berman.  Did Mr. Simpson ever ask you to pass anything along to your husband?

Mr. Berman.  Is that --

Mr. Meadows.  That's part of it, sure.

Mr. Berman.  Break it down so we avoid the marital thing.

Ms. Ohr.  Okay.  He sent an email saying, call me, and I assumed it was for --

Mr. Meadows.  We have a copy of that.  Obviously, we're talking about something more substantial than that.

Mr. Berman.  Did Mr. Simpson ever ask you to pass along anything to your husband?

Ms. Ohr.  No.

Mr. Meadows.  Did Mr. Simpson ever expect you to do that?

Ms. Ohr.  Not that I'm aware, no.

Mr. Meadows.  In your communication, did Mr. Simpson ask you about your meeting with Mr. Steele on July 30th?

Ms. Ohr.  I don't recall that he asked about it.

Mr. Meadows.  Did you report on it?

Ms. Ohr.  If I recall correctly, I simply mentioned that we had had this breakfast together and --

Mr. Meadows.  And there was no written document that was included with that?

Ms. Ohr.  No.

Mr. Meadows.  Were you aware that your husband was having multiple conversations with your boss?

Ms. Ohr.  What time period are you talking about?

Mr. Meadows.  From November of 2016 -- it would actually be

prior to that -- prior to that prior -- to the November election, that he had conversations with your boss.  Were you aware of that?

Mr. Berman.  Other than whether or not your husband shared that with you?  You're not asking did she learn it from her husband.  Outside of any conversations with your husband, were you aware that -- you're talking about Mr. Simpson when you say her boss?

Mr. Meadows.  Mr. Simpson or associates of Mr. Simpson at a high level, yes.

Ms. Ohr.  Who was no longer my boss after September.

Mr. Meadows.  Right.

Ms. Ohr.  As I said, there was that one email where Glenn said --

Mr. Meadows.  So you're saying only one time?

Ms. Ohr.  That's the only time that I specifically am aware from Glenn Simpson --

Mr. Meadows.  Well, you prepped for this hearing, so obviously you saw that email.  But are you saying that there was only one time that that happened because that is not consistent with some of the other information that we have?

Ms. Ohr.  Well, anything that my husband directly told me about I would not --

Mr. Berman.  She's not answering questions about that.

Ms. Ohr.  Yeah.

Mr. Ratcliffe.  Even the existence of a meeting?

Mr. <u>Meadows.</u>  Again, counselor, we're not asking for bedroom talk here.  What we're asking for is -- obviously, the whole reason for this -- and I'm going to turn it over to my -- to a lawyer.

Mr. <u>Ratcliffe.</u>  So, Ms. Ohr, you said that after you and your husband met with Mr. Steele at the Mayflower Hotel that you had a conversation with Glenn Simpson who was still your boss.  Correct?

Ms. <u>Ohr.</u>  At that time, yes.

Mr. <u>Ratcliffe.</u>  You said you had chitchat about it?

Ms. <u>Ohr.</u>  Yeah.

Mr. <u>Ratcliffe.</u>  What do you mean by chitchat?

Ms. <u>Ohr.</u>  With Glenn, what I recall is simply, yes, I had breakfast with them or, you know, something like that.

Mr. <u>Ratcliffe.</u>  Did he fill in the details there that you had previously been unaware of about Mr. Christopher Steele being a client of GPS and doing work relating to Russia?

Ms. <u>Ohr.</u>  It was understood by that point because I hadn't learned it.

Mr. <u>Ratcliffe.</u>  Did Mr. Simpson indicate to you that he was going to or wanted to meet with your husband, Bruce Ohr, subsequent to that breakfast?

Ms. <u>Ohr.</u>  At that time I don't recall him saying that, but I'm not 100 percent sure.

Mr. <u>Ratcliffe.</u>  Do you know in the fall of 2016 before the election whether or not your husband did in fact meet with Glenn

Simpson?

Ms. Ohr.  The only specific date, which I don't remember the specific date, is that email, so --

Mr. Ratcliffe.  Tell me about the email?

Ms. Ohr.  It just said, call me.

Mr. Ratcliffe.  How do you know about the email?

Ms. Ohr.  Because we share an email address.  My husband and I do, that is.

Mr. Ratcliffe.  So I want to ask you about this.  Let me give this to your lawyer and I want you to follow along with me.

Mr. Berman.  Thank you, sir.

Mr. Ratcliffe.  Glenn Simpson testified under oath before the House Intelligence Committee.

Mr. Berman.  Sir, that's what we're looking at, Mr. Simpson's testimony?

Mr. Ratcliffe.  It is an excerpt from Glenn Simpson's publicly available testimony before the House Intelligence Committee.  On page 78, he was asked a question:  You never heard from anyone in the U.S. Government in relation to these matters, either the FBI or the Department of Justice.  His answer:  After the election.  I mean, during the election, no.  Read along with me, if you would.

Ms. Ohr.  Uh-huh.

Mr. Ratcliffe.  What did you hear after and from whom and when?  His answer:  I was asked to provide some information to the

Justice Department.  Question:  By whom and when?  Answer:  It was a prosecutor named Bruce Ohr who was following up.  You know, I can't remember when, it was some time after Thanksgiving, I think.

And then on the following page, again, halfway down, the top of the paragraph, Mr. Simpson again clarifies under oath.  The context of this was that it was after the election.  All right.

Have you able to review that testimony?

Ms. Ohr.  I'm sorry.  What was the question?

Mr. Ratcliffe.  Were you able to review that testimony?

Ms. Ohr.  Yes.  Thank you.

Mr. Ratcliffe.  Does testimony appear to be accurate to you?  Are you aware of facts which indicate that Glenn Simpson did hear from members of either the FBI or the Justice Department before the election of 2016?

Ms. Ohr.  Whatever meetings he had with my husband, I don't recall the dates.

Mr. Ratcliffe.  Didn't you just tell me you had an email?

Ms. Ohr.  Yes, and I don't recall the date of it.

Mr. Ratcliffe.  You don't know the timing of that?  Whether it was before or after the election?

Ms. Ohr.  Not right now, I don't have a recollection of that.

Mr. Ratcliffe.  Do we have a copy of that email?  Well, I was going -- what I want to ask you is, Ms. Ohr, was -- this testimony from Mr. Simpson is very much at odds with your husband's sworn testimony before this Joint Task Force.  Your husband testified

that he spoke with and met with Mr. Simpson to discuss a
Russia-related investigation, including the dossier in August
of 2016.

    Do you have any reason to doubt that?

    Ms. Ohr.  To doubt my husband?

    Mr. Ratcliffe.  Yes.

    Ms. Ohr.  I have no reason to doubt that.

    Mr. Ratcliffe.  Do you have any reason to doubt your
husband's testimony under oath that during that meeting in August
of 2016 that Glenn Simpson gave a memory stick of information to
be given to the FBI that your husband believed included the
dossier?

    Ms. Ohr.  I don't know anything about --

    Mr. Ratcliffe.  Any reason to question your husband's
testimony under oath?

    Ms. Ohr.  If you have that testimony to show me, I would look
at it.

    Mr. Ratcliffe.  I do.  Your husband's testimony -- let me
read it to you.

    Mr. Berman.  Could we see a copy -- we're working with one
copy, sorry.

    Mr. Ratcliffe.  The only copy, I assumed -- actually, let me
read it to you and I'll show it to you.

    Mr. Berman.  Thank you, sir.

    Mr. Ratcliffe.  Quote:  The rest of the conversation had to

do with additional information that he had gathered about the possible connections between the Russian Government and the Trump campaign, and he gives me a thumb drive.  I think the natural assumption at that point, I had not seen the dossier, I had heard there was such a thing as the dossier, but I hadn't seen it, so he gives me a thumb drive.  I assume that this was the dossier.  End quote.

Ms. Ohr.  Who is that referring to?  He?

Mr. Ratcliffe.  That's your husband referring to Glenn Simpson.

Mr. Berman.  What is the timeframe?  I don't have the transcript so I don't know when Mr. Ohr -- I don't have my notes either.

Mr. Ratcliffe.  It was his testimony that you and I were both present for before the subcommittee.

Mr. Berman.  Oh, no, no, I understood when he said that, and you keep saying he was under oath, I can't remember that part.  But putting that aside for a moment, what was the time period that he allegedly got this flash drive?

Mr. Ratcliffe.  August of 2016.

Mr. Berman.  That's what the testimony was?  You obviously have transcripts of prior testimony.  I would love to see the transcripts.  But what is your question for Ms. Ohr?  And that is not a transcript, those are your notes, sir.

Mr. Ratcliffe.  I'll represent that this is an excerpt of the

transcript.

Mr. Berman.  And I will say I have no reason to doubt you on that, I just don't have the transcript in front of me.

Mr. Ratcliffe.  I guess my point -- if you take me at my word, counselor and Ms. Ohr, there seems to be a clear contradiction in testimony under oath between what your husband said under oath and what Glenn Simpson said under oath before congressional investigators.  I'm trying to find out who is telling the truth.  Can you shed any light on who is telling the truth?

Ms. Ohr.  I can't.

Mr. Ratcliffe.  Okay.

Mr. Jordan.  I want to go back where Mr. Meadows was just a few minutes ago and go in the other direction.  Did Glenn Simpson ever talk to you, encourage you to talk to your husband about certain information, or ask you about conversations you had had with your husband about projects you were working on and things Fusion was working on?

Ms. Ohr.  Did he -- can you repeat the question, please?

Mr. Jordan.  Did Glenn Simpson ever ask you or talk to you about the work that your husband was doing?

Ms. Ohr.  No.

Mr. Jordan.  How about Mr. Steele, did he ever talk to you about work that your husband was doing at DOJ?

Ms. Ohr.  Did Mr. Steele talk -- no, I never spoke

independently with Mr. Steele except at that breakfast.

[11:10 a.m.]

Mr. Jordan.  Are you aware of the fact that after each and every conversation or meeting that your husband Bruce had with Mr. Steele, that he would then go to the FBI and talk to the FBI about those conversations?  Were you aware of that fact?

Ms. Ohr.  I subsequently learned that.

Mr. Jordan.  And when did you learn that?

Ms. Ohr.  I don't recall when.

Mr. Jordan.  Did Glenn --

Mr. Meadows.  So you were unaware of that when it was happening?

Ms. Ohr.  I mean, I knew that he was close to the FBI, so I would not be surprised.

Mr. Jordan.  Did Mr. Simpson ever ask you to talk with anyone at the FBI?

Ms. Ohr.  I'm sorry.  Could you repeat the question?

Mr. Jordan.  Did Glenn Simpson ever ask you to meet with anyone at the FBI?

Ms. Ohr.  No.

Mr. Jordan.  Did anyone accompany your husband when he met with the FBI to convey Fusion information?

Ms. Ohr.  I don't know.  And I'm not -- the two parts of your question are assuming that he did, and I would say that I do not know that.

Mr. Jordan.  Well, we know that he did.

Ms. <u>Ohr.</u>  Okay.

Mr. <u>Jordan.</u>  He's testified to that.  And just to be clear, you never went with your husband when he spoke with anyone at the FBI?

Ms. <u>Ohr.</u>  No.

Mr. <u>Jordan.</u>  And you've never attended any meetings at the FBI?

Ms. <u>Ohr.</u>  No.

Mr. <u>Jordan.</u>  Or with the FBI, I should say.  Okay.

Ms. <u>Ohr.</u>  No.

Mr. <u>Meadows.</u>  Let me do one real quick follow-up.  The email that you've obviously reviewed or you recall -- so I don't know if you've reviewed it.  We're getting you a copy of this -- where actually Glenn Simpson calls in, you respond and you share an email, and you say, Glenn wants you to call, and you basically say, This is for you.  You send it to your husband, and it says, This is for you, as I recall it.  How would you know that Glenn Simpson calling in was for your husband and not for you?

Ms. <u>Ohr.</u>  That's a good question.  I guess because I was having regular meetings with -- I mean, actually the time period -- I'm not sure what time period it was, so if it was after I ended work with him, there would be no reason.  So --

Mr. <u>Meadows.</u>  But even after -- so assuming that you had ended your official response --

Ms. <u>Ohr.</u>  Yeah.

Mr. Meadows.  -- why -- previous employer sends you an email, says give me a call, and you automatically assume it's your husband?  Why would you do that?

Ms. Ohr.  Because I was very busy on a new job.

Mr. Meadows.  No.  No.  No.  No.  Oh, so that's the reason you were -- you were very busy on other jobs, and so you told your husband that I assume it's for you, because you're so busy because you couldn't call him back because -- that doesn't seem to line up, Ms. Ohr.

Ms. Ohr.  Uh-huh.  Well, my work for them was done and so --

Mr. Meadows.  But you get an email that says --

Ms. Ohr.  Yeah.

Mr. Meadows.  -- please call me, and you say, This must be for you, referring to your husband.  How would you know?

Ms. Ohr.  Because I couldn't think of a reason that he would need me to talk to him because I had finished working for him.

Mr. Meadows.  So you do recall the email?

Ms. Ohr.  Excuse me?  What was that question?

Mr. Meadows.  You do recall the email?

Ms. Ohr.  I do recall the email.

Mr. Meadows.  When was that email?

Ms. Ohr.  I don't recall the date.

Mr. Meadows.  But it was after you were terminated?

Ms. Ohr.  If I recall correctly.

Mr. Meadows.  All right.  And so --

Mr. <u>Berman.</u>  Just to be clear, I mean, she wasn't terminated. She left work, yeah.

Mr. <u>Meadows.</u>  Your relationship was terminated, yeah.  We don't want a bad resume report here, I get it.  So but here is the curious part:  For you to act like you have no knowledge of a relationship between Glenn Simpson and Bruce Ohr, and then to make the assumption in an email that when he calls in it is for your husband, those two are incompatible.

Ms. <u>Ohr.</u>  I didn't say no knowledge that a relationship existed, because when we met with Chris Steele, he said Glenn knows that I'm here.  So clearly, they --

Mr. <u>Meadows.</u>  Well --

Mr. <u>Berman.</u>  Can I speak with the witness for a second, sir?

Mr. <u>Meadows.</u>  Yeah.

[Discussion off the record.]

Mr. <u>Berman.</u>  Sorry about that, sir.

Mr. <u>Meadows.</u>  So those are inconsistent.  So how do you make -- how do you reconcile those for me?

Ms. <u>Ohr.</u>  Can you repeat what --

Mr. <u>Meadows.</u>  What I'm saying is, is that you've testified this morning that you were unaware of ongoing communication between Glenn Simpson and your husband, and yet, you get an email that says, please ring me.  I have got a copy.  I'll give you a copy of it.  Please ring me.  And your response is, I assume Glenn means you, not me.

COMMITTEE SENSITIVE

Ms. Ohr.  Oh, thank you.

Mr. Berman.  We now have in front of us a copy of what we think is this email.  Can she look at this for a moment, sir?

Mr. Meadows.  Sure.

Mr. Berman.  Thank you.

Ms. Ohr.  Yeah.  So, I mean, I knew that they had spoken off and on, so -- and since I was no longer working for him --

Mr. Meadows.  So characterize off and on for me.  I mean, because that's different than what you've testified earlier today, so let's get it clear.  What is off and on?

Ms. Ohr.  I mean, over the years.  I mean, they had spoken many years before, so my understanding --

Mr. Meadows.  But, again, I want to caution you, I mean, there -- if they've spoken over the years, Ms. Ohr, and you get an email and you were the one that was -- had just previously worked for Mr. Simpson, and for you to suggest that, oh, it must be for you, that those two are not consistent.  That line of reasoning is not consistent.

If they're having regular conversation, it would -- it would be consistent, and that's what I'm trying to get at.  Were you aware that they were having regular communication, yes or no?

Ms. Ohr.  Glenn had just, as you can see from this email, had just forwarded an article --

Mr. Meadows.  From Think Progress?

Ms. Ohr.  Yeah.

Mr. <u>Meadows.</u>  But it was Russia related, so how -- and you're a Russian scholar, so how would you know that it is not for you and instead for him?

Ms. <u>Ohr.</u>  I just remember that, you know, when this article arrived, Bruce showed it to me, so I just sort of assumed that it was -- that he had taken note of it.  So I filed it away as a --

Mr. <u>Meadows.</u>  So let me get this straight.  Bruce shows you the article that Glenn Simpson gave him about NRA connections with the Trump campaign from Think Progress, and that on the same thread, you see that and you automatically assume that he is calling for that?

Mr. <u>Berman.</u>  Can I ask -- can I -- in the second email from the bottom, Sunday, December 11, 2016, at 1:08 p.m., the words are written "thank you."  They come from the Nellie Ohr email account.  Do you know who wrote that, you or Bruce, on this shared account?

Ms. <u>Ohr.</u>  I don't know.  I don't know which one of us.

Mr. <u>Meadows.</u>  So it could have been you?

Ms. <u>Ohr.</u>  I'm sorry.  What was that question?

Mr. <u>Meadows.</u>  So it could have been you?

Ms. <u>Ohr.</u>  It could have been me.

Mr. <u>Meadows.</u>  So you could have been exchanging back and forth with the Think Progress article?

Ms. <u>Ohr.</u>  It could have been.

Mr. <u>Meadows.</u>  Okay.  So then it really makes my question a lot more relevant.  If this -- you and him going back and forth,

then why when he said please ring me would you refer to it your husband?

Ms. Ohr.  It could have been Bruce, yeah.  I don't know which one of us wrote it.  It was -- he was clearly writing -- letting both of us know.

Mr. Meadows.  But that is your communication to your husband. I mean, that is your communication to your husband saying, I think -- I mean, we know that.  So what I'm saying is, how did you know?  Obviously, you knew about an ongoing relationship between your husband and Glenn Simpson that was occurring.  Is that correct?

We have time because of the -- I've been keeping track because of the referrals.  I get it.

So is that correct?

Ms. Ohr.  As I understand, any communications between my husband and myself are privileged.

Mr. Meadows.  As I understand, this was a third party.  There was a third party involved.  Counselor, let me just tell you, we're going to keep going down this.  We will subpoena you if we have to.  I'm all about protecting your privacy, but this is not about privacy.  This is about a relationship between Bruce Ohr, Glenn Simpson, and the knowledge that Ms. Ohr had of that when, indeed, there was a third party involved in that communication.

Mr. Berman.  Mr. Meadows, she's answering your questions about these communications with a third party.  She's answering

questions.  She has -- I believe you've asked her why did she flip the December 12, 2016, 10:05 a.m. email to her husband's, what appears to be, Department of Justice account.  And I believe she said she doesn't recall exactly why she did it.

Mr. <u>Meadows.</u>  No.  No.  That's not what she said.  I asked a specific question that she did not answer just a few minutes ago, and that question is, was she aware of ongoing communication between Mr. Simpson and her husband because of the type of communication that was -- actually involved three people?  Was she aware of that, yes or no?

Mr. <u>Berman.</u>  So outside of any communications you may have had with your husband.

Mr. <u>Meadows.</u>  I'm not asking you to rephrase my question, Counselor.  I'm getting frustrated because I think both of us know where I'm going with this, and at this point she needs to answer the question.  And if she's not, then we'll come back in a different purview and make sure that she does answer it.

Mr. <u>Berman.</u>  Well, I would say, we understand the subpoena power that this committee has, and we don't want to get there.

Mr. <u>Meadows.</u>  I don't want you to get there either.  So just answer the -- I mean, obvious --

Mr. <u>Berman.</u>  She can't answer a question if it's based on communications with her husband.  So if I know, sir, that -- if you know your wife or -- your wife knows you went to a particular grocery store, and I am asking questions about the grocery store

COMMITTEE SENSITIVE

based on that information, that's intruding on the marital communications.

So that's all -- I wasn't trying to rephrase your question, sir.  I was simply saying outside of any communications you may have had with Ms. Ohr, because you're clearly not asking for her communications between them.  As you said, you wouldn't want people doing that to you.  Outside of that, are you aware there was an ongoing relationship?  But if you're asking her based on communications she had with Ms. Ohr, she can't answer that.

Mr. Meadows.  So, again, I'll come back and we'll close with this, and hopefully we can get a better answer.  What in your mind triggered the fact that when "please ring me" came across, that it had to be for your husband and not for you?  I mean, what -- I mean, obviously, if he didn't have an ongoing relationship, why would you refer it to him?  Is there any reason you would refer a phone call from your previous boss to your husband if he didn't have an ongoing relationship without him explicitly asking for it?

Ms. Ohr.  Since I had finished working for him, it seemed logical that it would be for --

Mr. Meadows.  So you have had no communication with Mr. Simpson since you terminated your relationship?

Ms. Ohr.  I think I sent a couple of emails with --

Mr. Meadows.  So that didn't hold up, then?

Ms. Ohr.  I'm sorry?

Mr. Meadows.  I mean, why would it hold up?  Why would that

COMMITTEE SENSITIVE

stand a reason?  If you continued to have communication after you terminated your relationship, why would that assumption be accurate then?

Ms. <u>Ohr.</u>  I just didn't see a reason why he would want to talk to me on the phone.

Mr. <u>Meadows.</u>  I think we're out of time.

[Discussion off the record.]

Ms. <u>Hariharan.</u>  All right.  So we are back on the record.  It is 11:43.  My name is Arya Hariharan.  I represent Mr. Nadler from the Judiciary Committee, and I'm going to ask questions on behalf of the minority.

I just want to quickly state for the record, the transcript for Bruce Ohr does not represent that the memory stick was submitted in August.  In fact -- this is on page 85, or whenever you have the chance to review it.  In fact, it represents that Bruce Ohr's meetings with the FBI started in around November of 2016, according to the 302s.  And that's generally speaking when he started submitting that information in terms of the various memory sticks, so just for the record to reflect that based on what was said in the previous hour.

Mr. <u>Berman.</u>  And this is responsive to Mr. Ratcliffe's representations based on his notes --

Ms. <u>Hariharan.</u>  Exactly.

Mr. <u>Berman.</u>  -- from 40 minutes ago or so?

Ms. <u>Hariharan.</u>  Exactly.

Mr. Berman.  Thank you.

Ms. Hariharan.  I believe Mr. Raskin has a question he'd like to ask.

Mr. Raskin.  I do.  I actually have just a couple questions. One is, would you kindly review for me what your academic background and general professional trajectory has been.  Forgive me, I missed the earlier questioning.

Ms. Ohr.  Yes.  I have a degree in Russian history and literature from Harvard, and I have a Ph.D. in Russian history from Stanford.  And I was in academia for a number of years, and then moved to D.C. and was an independent contractor doing work mostly in support of various U.S. Government clients.

Mr. Raskin.  Okay.  So in the course of your academic and professional pursuits, did you have occasion to find out information about the relationship between Donald Trump and Russian organized crime?

Ms. Ohr.  In my academic pursuits, you mean, when I was in academia in the 1990s?

Mr. Raskin.  Yeah.  Either -- yeah.

Ms. Ohr.  Well, at some point he sold a mansion to Dmitri Rybolovlev, who is -- in mysterious circumstances, so that certainly piqued my interest.  But I don't recall the exact date of that.

Mr. Raskin.  Okay.  And then in your professional work since arriving in Washington, what did you find out about the

relationship between Donald Trump and the Russian mob?

Ms. <u>Ohr.</u>  What time period are you talking about?

Ms. <u>Hariharan.</u>  When you worked for Fusion or anytime?

Ms. <u>Ohr.</u>  Yeah.  Yeah.  When I worked for Fusion was when I started paying attention to it, and I learned a lot about contacts that were questionable with people who have been suspected of various relationships with Russian organized crime, some of it from my own research, some from reading that I did in pursuit of that project in terms of crime figures who bought apartments in Trump Towers or other properties, and a gambling ring in Trump Tower and things like that.

Mr. <u>Raskin.</u>  So it was -- you found at a number of different points that there were contacts between Donald Trump and various Russian organized crime figures?

Ms. <u>Ohr.</u>  From my reading, people who U.S. law enforcement has identified as Russian organized figures, such as Vyacheslav Ivankov, had either spent time in Trump properties, or people of that -- type of people bought properties.  I'm not saying that Donald Trump, you know, personally knew every single one of them. I don't know about that.

Mr. <u>Raskin.</u>  But it created the possibility that there might have been money laundering going on through Trump real estate properties?

Ms. <u>Ohr.</u>  Certainly the types of transactions raised that suspicion.

Mr. Raskin.  Yeah.  Can you just characterize generally the relationship between Russian organized crime and Vladimir Putin and the Russian Government?

Ms. Ohr.  Yeah.  Certainly, Vladimir Putin and members of the Russian government are not wholeheartedly seeking to prosecute organized crime, we'll put it that way.  Instead, there are personal relationships that might involve bribery, that might involve people doing favors in return for being able to operate, people being caught and having a little talking-to at the police station and being let go with the implication being that the police were -- either received a bribe or were encouraging the person to cooperate in some way, to help out, do favors.

Mr. Raskin.  How deep does the relationship go?  Would it be inaccurate to say that the organized crime syndicates in Russia operate under the protection of Vladimir Putin?

Ms. Ohr.  Protection is a good word because it does imply not necessarily, you know, that they were a boss, or that Putin was a boss, but rather they had to make some kind of deals or understandings.

And there's certainly a very well-documented argument, for example, made by Karen Dawisha in her book "Putin's Kleptocracy." For -- in the 1990s, some pretty well-documented evidence of Putin being sort of a go-between with a local St. Petersburg organized crime group, and then involvement with various dealings that appeared to be sort of robbing the Russian treasury in various

jobs that Putin held, and that people around him held.

Mr. <u>Krishnamoorthi.</u>  Good morning.

Mr. <u>Raskin.</u>  Thank you very much, Ms. Ohr.

Ms. <u>Ohr.</u>  Thank you.

Mr. <u>Krishnamoorthi.</u>  Good morning.  I'm Congressman Raja Krishnamoorthi.

Let me back up for a second.  I apologize if this was already asked, but what was the genesis of the work that you originally did with regard to the relationship between Trump and organized crime, like what actually prompted that line of research?

Ms. <u>Ohr.</u>  I had started working for Glenn Simpson and Fusion GPS, and I had already done one project for them.  And they gave me a choice of a couple -- you know, they gave me a choice of what to do next, and there was one that was non-Russia related, and I said I really want to study -- I want to, you know, do Russia-related research, and so they said, Well, how about this one?

Mr. <u>Krishnamoorthi.</u>  And did they tell you who the client was for that particular issue?

Ms. <u>Ohr.</u>  No.

Mr. <u>Krishnamoorthi.</u>  And how did you go about doing that research?

Ms. <u>Ohr.</u>  I did open source online research, you know, all kinds of media, social media, government -- Russian government documents, legal documents, society pages, all kinds of different

things.

Mr. Krishnamoorthi.  Okay.  And did Fusion GPS give you suggestions on different queries to make, or did they just say, Go ahead and, you know, have at it?

Ms. Ohr.  Yeah, they gave me suggestions, uh-huh.

Mr. Krishnamoorthi.  Okay.  Okay.  And I know that you answered a couple of questions related to this for Congressman Raskin, but, I guess, what about that research surprised you, if anything?

Ms. Ohr.  I suppose the depth -- it was the fact that, as I said, there was some already suspicion due to Trump's transaction with Rybolovlev some years ago, and so, I received very strong confirmation that there were deep and widespread ties with apparently unscrupulous people.

Mr. Krishnamoorthi.  And how far back did that go and time, I should say?

Ms. Ohr.  Did the ties, I mean, he was seeking to do business in the Soviet Union back into the '80s.  And along the way, he -- some of his deals were with people who have been suspected of organized crime.

Mr. Krishnamoorthi.  Go ahead.

Ms. Hariharan.  Can you share what some of the names of those unscrupulous organized you crime folks were or who they were?

Ms. Ohr.  Yeah.  There was a hotel deal that he thought about that was -- the hotel deal ended up involved with Umar

Jabregulov,(ph) who's a Chechen and is suspected in the murder of an American businessman whose name slips my mind right now.  Yep.

Mr. <u>Krishnamoorthi.</u>  Anybody else?

Ms. <u>Ohr.</u>  Anybody else, there were numerous people -- in terms of hotel deal -- in terms of deals in Moscow, or do you mean anybody else?  How --

Mr. <u>Krishnamoorthi.</u>  Any organized crime figures is what I'm referring to.  Anybody that was, you know -- I can't pronounce that name exactly.  I should be, given my own name, but like who are some of the other organized crime figures that, you know, you researched and found ties to Donald Trump?

Ms. <u>Ohr.</u>  Uh-huh.  Tokhtakhounov, who has been suspected of -- I can't remember if he was convicted or tried for -- or suspected of trying to fix the Olympics a long time ago.  And certainly, Trump's campaign chair, Manafort had close -- had ties with Oleg Derepaska.

Rinat Akhmetov is someone who also was associated with Manafort.  Now, he's Ukrainian, and right now, I can't remember whether people explicitly, you know, pointed to particular organized crime activity that he's suspected of.

Mr. <u>Krishnamoorthi.</u>  So going back to Donald Trump, setting aside Paul Manafort for a moment or any of the other members of the Trump Organization, when you found these ties to exist, or through open source research to exist, did that -- was there anything remarkable about those ties?  Did you find that they

continued into today, or into the time period -- I think you worked for GPS through September 2016.  Did you find that those ties were longstanding, and did they continue into the present time at the time that you were researching those ties?

Ms. Ohr.  Let's see.  I mean, certainly the -- for example, the Miss Universe Pageant, that was a few years before that.  I think Mr. Tokhtakhounov attended, you know, was in the VIP gallery, if I remember correctly, suggesting that there was some acquaintance or tie.  And in terms of more recently than that, I mean, there -- yeah, I can't name any specific transactions or anything like that that come to my mind right now.

Mr. Krishnamoorthi.  Okay.  Okay.  And these particular ties that Donald Trump had to these groups, or these individuals, have you done similar research before about any other Americans with ties to organized crime in Russia?  What I'm trying to get at is, did you develop kind of an expertise in this particular area that you would be able to tell like, you know, what are -- what's just a photo opportunity between two people versus, you know, looking at something bigger than that?

Ms. Ohr.  Yeah.  Good question, yes.  I certainly followed Russian organized crime figures for a number of years.  In terms of Americans' associations with them probably would be limited to what's in the press.  I'm not -- at the moment, my recollection -- I don't recall doing deep research on any of those, but I'm a -- yeah, I'm -- I may misremember.

Mr. Krishnamoorthi.  Got it.  Now, the research that you
ended up doing on these ties between Donald Trump and these
organized crime figures, what did you do with that?

Ms. Ohr.  What did I do with my research?

Mr. Krishnamoorthi.  Yeah.

Ms. Ohr.  I wrote it up in reports and emailed them to Fusion
GPS.

Mr. Krishnamoorthi.  Okay.  And do you know what happened
with them after that?

Ms. Ohr.  Some of the material appeared in the press.  I
don't know what their relationship is with the press.

Mr. Krishnamoorthi.  Okay.  Do you want to take the next
line?

EXAMINATION

BY MS. HARIHARAN:

Q   Quickly, just going back to the scope of your research,
you mentioned it was mostly open source, and it was what you found
online.  So you were not involved in reviewing classified or
highly sensitive materials?

A   No.

Q   And to go back to the Congressman's point with regards
to your reports, were you, at any point, told that your research
was going to support anti-Trump clients?

A   I don't know if I was told that.  I suppose along the
way I assumed that it was somebody who didn't want Trump

to -- yeah.

Q   So you were never told this is for the DNC?

A   No, as I recall.

Q   Okay.  At any point prior to the 2016 election, were you asked to provide research on Russian election interference?

A   At any point prior to what?

Q   To November 2016.

A   Was I asked to provide information, I believe I was and I just didn't have time to really get in depth in it, so I relied mainly on what's in the press.

Sorry, was your question election interference?

Q   Yeah.

A   In general?  Oh, okay, I'm sorry.  I thought you were talking about the DNC hack.

Q   Oh, no, I'm sorry.  Just Russian involvement in general.

A   In general.

Q   Yeah.

A   I certainly did research on social media themes that were supportive of Trump and that also echoed Russian messaging, so -- and that seemed to indicate Russian support for extreme groups, both on the far right and far left, that were divisive. So in that sense, yes.  Yeah.

Q   And that was included in the reports you provided to Fusion?

A   I wrote a report that had to do with that subject,

uh-huh.

Q    So I apologize if some of these are repetitive to earlier, but it's just to be clear for the record.

The report you just mentioned on Russian election interference, did that -- that occurred before the election or after?

A    All my reports are before the election.

Q    Before the election, okay.

So I want to walk through what has come up before, and that is the Steele dossier.  So on Tuesday, the President tweeted -- this Tuesday:  "Is it really possible that Bruce Ohr, whose wife Nellie was paid by Simpson and Fusion GPS for work" -- excuse me, he wrote GPS Fusion, "for work done on the fake dossier and who was used as a pawn in this whole scam witch hunt, is still working for the Department of Justice?  Can this really be so?"  There's a lot of question marks in there.

Did you work with Christopher Steele at all as part of your contract for Fusion GPS?

A    No.

Q    Did you work with Christopher Steele to develop what is now called the Steele dossier?

A    No.

Q    And did any aspect of your work for Fusion GPS involve firsthand gathering of facts for this -- for the dossier?

A    No.

Q   Outside of the three meetings you mentioned with Christopher Steele and your husband, the more social gatherings it sounds like, did you attend meetings with Christopher Steele and sources of his?

A   No.

Q   Did you communicate with confidential sources or source networks as part of your own work?

A   No.

Q   And were you ever a source for Christopher Steele?

A   No.

Q   So you have no reason to believe that the research or work product that you provided to Fusion GPS became part of the series of reports known as the Steele dossier?

A   I have no reason to believe that.

[Ohr Exhibit No. 1

Was marked for identification.]

BY MS. HARIHARAN:

Q   So I'm going to introduce as, I guess, exhibit 1, because I don't know if they introduced theirs as exhibits, this is the Steele dossier as published by BuzzFeed.  I'm going to read a couple different sections from it, just really quickly, to get a sense if, you know, you were the source for that information.

So this is from the Steele dossier, and it is on what is labeled as page 17, but isn't actually a page 17.  The page number is on the bottom right.  It says August 10, 2016, on the bottom.

A    Okay.

Q    Got it, okay.  So, quote:  "Speaking in confidence on 9th August, 2016, an ethnic Russian associate of Republican U.S. presidential candidate Donald Trump discussed the reaction inside his camp and revised tactics therein resulting from negative publicity concerning Moscow's clandestine involvement in the campaign.  Trump's associate reported that the aim of leaking the DNC's emails to WikiLeaks during the Democratic Convention had been to swing supporters of Bernie Sanders away from Hillary Clinton and across to Trump.  This objective had been conceived and promoted inter alia by Trump's foreign policy adviser, Carter Page who was discussed" -- "who had discussed it directly with the ethnic Russian associate," end quote.

Is that the result of any of your research?

A    No.

Q    And turning to -- oh, there's no page number.  It would say September 14, 2016, at the bottom.

A    Uh-huh.

Q    Quote, local business -- so Steele is -- I'm sorry.  Did you need another second?

Mr. Berman.  We do have page numbers.

Ms. Ohr.  Is there a paragraph number?

BY MS. HARIHARAN:

Q    Number two.

A    Detail number two.

Q   It doesn't have a page number at the bottom.

Mr. Berman.  Here it is, 27 is the --

    BY MS. HARIHARAN:

Q   So in this, Steele is speaking to a -- he's quoting a trusted compatriot.  I'll just read it.

A   Okay.

Q   It says, quote:  "The local business slash political elite figure reported that Trump had paid bribes further there to interests" -- "to further his interests but very discreetly, and only through affiliated companies making it very hard to prove. The local service industry source reported that Trump had participated in sex parties in the city, too, but that all direct witnesses to this recently had been silenced, i.e., bribed or coerced to disappear."

Is that the result of your research?

A   No.

Q   So this would be on page 33, October 19, 2016, quote: "According to the Kremlin insider, this had meant that direct contact between the Trump team and Russia had been farmed out by the Kremlin to trusted agents of influence working in pro-government policy institutes like the law and comparative jurisprudence.  Cohen, however, continued to lead for the Trump team."

Is that the result of your research?

A   No.

Q   Last one.  This is the second-to-last page at the bottom:  "Cohen had been accompanied to Prague by three colleagues and the timing of the visit was either in the last week of August or the first week of September.  The agenda comprised questions on how deniable cash payments were to be made to hackers who had worked in Europe and under Kremlin direction against the Clinton campaign and various contingencies for covering up these operations and Moscow's secret liaison with the Trump team more generally."

Is that the result of your research?

A   No.

Mr. Krishnamoorthi.  I have a question actually.  Ms. Ohr, between October of 2015 and September of 2016, did you have any other clients besides GPS Fusion?

Ms. Ohr.  No.

Mr. Krishnamoorthi.  Okay.  And when you would report to GPS -- or Fusion GPS with your findings, was it Jake Berkowitz all the time?

Ms. Ohr.  Yes, I think all the time, yeah.

Mr. Krishnamoorthi.  Okay.  And --

Ms. Ohr.  Except for the first unrelated project that I did. The Trump-related project was all Jake.

Mr. Krishnamoorthi.  Okay.  Okay.  Okay.

Ms. Hariharan.  The trafficking project was not?

Ms. Ohr.  Correct.

Mr. Krishnamoorthi.  Okay.  And did Jake tell you why he wanted you to do this?

Ms. Ohr.  No.

Mr. Krishnamoorthi.  Did you ask him?

Ms. Ohr.  No.

Mr. Krishnamoorthi.  Okay.  Another question, I want to just go to this Mayflower meeting, July 30, 2016.  How long did that meeting occur, if you recall?

Ms. Ohr.  How long did it last?

Mr. Krishnamoorthi.  Yeah.

Ms. Ohr.  I don't recall.  The length of a breakfast.  I don't know.

Mr. Krishnamoorthi.  Okay.  And you were gone for a substantial portion of that breakfast, right?

Ms. Ohr.  Yes.

Mr. Krishnamoorthi.  And did you excuse yourself, or how did that --

Ms. Ohr.  I excused myself, yeah.

Mr. Krishnamoorthi.  Okay.  And after that July 30, 2016 meeting, there were no other meetings that you had with your husband and Mr. Steele at the same time?

Ms. Ohr.  Correct.

Mr. Krishnamoorthi.  Okay.  You didn't have any other meetings with Mr. Steele, period?

Ms. Ohr.  Correct.

Mr. Krishnamoorthi.  Okay.  And you haven't had any meetings with Mr. Steele since your employment ended with Fusion GPS on September 2016, correct?

Ms. Ohr.  Correct.

Mr. Krishnamoorthi.  When was the first time that you learned of something called the Steele dossier?

Ms. Ohr.  That term first came out in -- when BuzzFeed published it.

Mr. Krishnamoorthi.  You don't remember when that was?

Ms. Ohr.  I thought it was January of, what would that be, 2017, I guess.

Mr. Krishnamoorthi.  And you've never seen this -- you never saw this particular document or excerpts of it during the time that you were employed?

Mr. Berman.  Referring to exhibit 1?

Mr. Krishnamoorthi.  Yes.

Mr. Berman.  Thank you, sir.

Ms. Ohr.  At the breakfast, I -- if I recall correctly, they may have shown pieces --

Mr. Berman.  The question is, have you seen this document?

Ms. Ohr.  Not as an entire document, no.

Mr. Krishnamoorthi.  Okay.  And you hadn't seen it or its portions during the time that you were employed, correct?

Ms. Ohr.  I -- if I recall correctly, I may have seen a -- maybe a page or something of it at the breakfast.

Mr. Krishnamoorthi.  That was the first time you learned of it?

Ms. Ohr.  I didn't know that there was going to be something called the dossier.  What was subsequently known was not known to me at that time.

Mr. Krishnamoorthi.  Okay.  And you had nothing to do with -- when you were at that breakfast, there was no talk about an investigation opening up into Donald Trump the next day or any other day by DOJ?

Ms. Ohr.  Not by DOJ.

Mr. Krishnamoorthi.  Okay.  Go ahead.

BY MS. HARIHARAN:

Q  So to build on -- actually, super quickly, before I move onto what the Congressman was referencing, when we were reading through the dossier, how did you know that those particular pieces of information weren't what you had provided to Fusion, like you weren't the source for them?

A  Because the subject matter was very different from the kind of -- yeah.

Q  So at this -- just both at this breakfast, and just generally speaking, did you have any personal knowledge that the -- about the FBI's investigation into whether there was any coordination between people associated with the Trump campaign and the Russian Government?

A  News of an investigation came to me subsequently through

the press, most recently.

Q   But there was no discussion of an FBI investigation at the breakfast?

A   I didn't hear the word "investigation."

Q   So before or around October 2016, were you aware of any effort by the U.S. Government to surveil persons associated with the Trump campaign?

A   Can you repeat the question?

Q   Before or around October 2016, were you aware that the U.S. Government was planning to surveil U.S. persons associated with the Trump campaign?

A   No.

Q   And at that time, were you aware that there was a FISA application for the surveillance of Trump's former foreign policy adviser Carter Page?

A   No.

Q   During his interview, your husband Bruce Ohr told us that he had no involvement with the Trump/Russia collusion investigation.  Is that consistent with your understanding?

A   Can you define the Trump/Russia collusion investigation?

Q   DOJ has, in these interviews, asked us to -- there is a broader sort of across government Russian investigation into any activity that they may be doing in the United States and then there's the very specific election interference investigation. And when I asked if Mr. Ohr had no involvement, besides turning

over information to the FBI, as he's testified?

    A   I'm not aware of his having any involvement.
It -- yeah.

    Q   You've never worked for the Department of Justice,
correct?

    A   Correct.

    Q   You don't currently work for them?

    A   Correct.

    Q   So you would not have any knowledge of what is going on
in an ongoing investigation?

    A   Correct.

    Ms. Sachsman Grooms.  Just to make that one crystal clear,
did you, at the time, that you were working for Fusion GPS have
any knowledge of the Department of Justice's investigations on
Russia?

    Ms. Ohr.  No.

      BY MS. HARIHARAN:

    Q   President Trump was quoted as saying, quote:  "They
should be looking at Bruce Ohr and his wife Nellie for dealing
with, by the way, indirectly Russians," end quote.

    To be very clear, have you or Ms. Ohr ever engaged in a
conspiracy to interfere in the U.S. election process with Russian
individuals or entities or individuals associated with the Russian
Government?

    A   No.

COMMITTEE SENSITIVE

Q   Do you know what the President is referring to when he accuses both of you of that, directly or indirectly?

A   No.

Q   On August 20, the President tweeted the following: "Will Bruce Ohr, whose family received big money for helping to create the phony, dirty, and discredited dossier, ever be fired from the Jeff Sessions' Justice Department?  A total joke," end quote.

Did your family, in fact, receive big money in exchange for your work doing open source research for Fusion GPS?

A   How does -- is big money defined?

Q   That is a very good question.

Mr. Berman.  How much were you paid by hour?

Ms. Ohr.  $55 an hour.

Mr. Berman.  And just in a roughest of ballparks, how much do you think you made over your 11 months, 10 months with Fusion GPS?

Ms. Ohr.  A few tens of thousands.

BY MS. HARIHARAN:

Q   Going back to -- and I know in the previous hour that your relationship with Mr. Simpson was sort of addressed, but I wanted to drill down a little bit more on that.  You first came to know Mr. Simpson through his work at The Wall Street Journal, correct?

A   I did not personally meet him at that time, but I became aware of him at that time.

Q   Okay.  And so is it fair to characterize your relationship with him as purely professional?

A   Yes.

Q   When testifying before this Senate Judiciary Committee earlier this year, Mr. Simpson stated that he had discussions with Mr. Steele about sharing Fusion's research with the FBI because it, quote, "represented a national security threat, a security issue about whether a presidential candidate was being blackmailed," end quote.  This is on page 159 through 161.

Mr. Simpson then stated that he believed Fusion's research revealed, quote, "law enforcement issues about whether there was an illegal conspiracy to violate the campaign laws, and then somewhere in this time, the whole issue of hacking also surfaced," end quote.

Did Mr. Simpson ever share concerns with you that laws may have been broken by the Trump campaign?

A   The fact that we were investigating Trump relationships with crime figures certainly suggest that there was that possibility that was worth investigating.

Q   Did you, at any point, recommend to him that he should share Fusion's research related to Donald Trump and organized crime with either -- with the FBI?

A   I did not make recommendations along those lines.

Q   Did you have direct knowledge that Glenn Simpson was communicating with your husband in the fall or winter of 2016?

COMMITTEE SENSITIVE

A    There's an email that we discussed, so that -- it led me to think that they might be.  I, you know, outside of our -- I have no separate knowledge except for personal conversations with my husband.

Q    Did Mr. Steele ever contact you directly in the summer or fall of 2016, not Mr. Ohr, but you directly?

A    No.

Q    At any point prior to fall of 2016, did you discuss your research on organized crime and Donald Trump with individuals outside of Fusion GPS, outside of this Mayflower breakfast meeting?

A    No.

Q    Did Mr. Steele, at any point, provide you with information related to your research with Fusion GPS, you directly?

A    No.

Q    I'm going to switch gears.

A    Okay.

Q    Public reporting indicates that since news broke of Mr. Ohr's communications with Mr. Steele, that he has been demoted twice within the Department of Justice.  Do you know if they've provided any formal explanation as to why he lost his positions?

Mr. Berman.  I'll just remind you, she's not going to answer questions about communications she's learned from her husband.  I mean, the same rules apply, from my perspective, from the majority

and the minority here.  So outside of any private communications
you have had with your husband.

        BY MS. HARIHARAN:

    Q    Is it fair to say -- let me rephrase this.

    In your view, were your husband's demotions unfair?  I'm not
asking for the conversations you have had with him, just in your
personal view.  What was the impact it has had on your family and
this whole ordeal for that matter?

    A    There's two different things, the demotions and the
ordeal.

    Q    Start with the demotions.

    A    Demotions, he is less stressed than he was before.  The
ordeal, the impact has been very negative.  We have to watch what
we do, what we say, and there's a lot of things out there in
the -- online, which are false.

    Q    Has it impacted your ability to find work?

    A    I'm currently employed, so I don't know whether it would
in the future.

    Q    While on a trip to the Hamptons on August 17, President
Trump was asked about your husband, and specifically, his security
clearance, and he said, quote, "I think Bruce Ohr is a disgrace.
I suspect it will be taken away very quickly."

    Has -- are you aware if his security clearance has been
revoked by the Department of Justice?

    A    I'm not aware.

COMMITTEE SENSITIVE

Q   Based on your understanding, generally speaking, of the work he did for the Department, specifically related to organized crime and drug enforcement cases, is it fair to say that he would need a security clearance to effectively do his job?

A   I don't really know if there's anything he could do without one or not.

Mr. Berman.  Can we take a one-minute break?

Ms. Hariharan.  Actually, I was about to say that, you know, we're good for this round.  It is 12:22.  We'll go off the record.

[Discussion off the record.]

[1:38 p.m.]

Mr. Baker.  The time is 1:38, and we are back on the record.

Mr. Berman.  Mr. Baker, it is Joshua Berman.  Do you mind if I say something briefly?

Mr. Baker.  Go ahead, counsel.

Mr. Berman.  In the morning session the issue of the marital and spousal privilege came up.  I just want to be clear that this is a privilege that has ramifications beyond today's proceedings. As one can imagine, Ms. Ohr has this privilege in future proceedings in front of other bodies.  So, hypothetically, if she were in a civil lawsuit, if she were in a criminal matter, if she was in front of the Senate, if she was in front of DOJ, if she was in front of an employment hearing, she would want to retain these same privileges.

As such the assertion today is in no way directed at the minority or the majority in this proceeding alone, it is a recognition of a privilege she holds and by asserting it, Ms. Ohr, or, as her counsel, mean no disrespect to Mr. Meadows, Mr. Ratcliffe, Mr. Jordan, or anyone, or -- or Mr. Ratcliffe or Mr. Raskin or anybody else.  And I just wanted to make sure nobody thought there was any game-playing or disrespect.

Mr. Baker.  Thank you very much.

Mr. Berman.  Thank you, sir.

Mr. Baker.  Thank you.

BY MR. BAKER:

Q   Ms. Ohr, I would like to go -- I would like to rewind a little bit and go back to just some basic questions.  You had indicated earlier in this session, I believe, that your initial employment, or awareness of employment, with Mr. Simpson, you were looking in the newspaper, maybe -- you said something, maybe underemployed; you were looking for work; that caught your eye. You went, applied, interviewed.  What would make you unique amongst maybe many other people that saw the same ad in the newspaper and went and applied or interviewed?  What skills do you --

A   And I should clarify there was no ad in the newspaper, I just saw the name.  And I was looking for -- for work.  And I have studied Russia all my life.  I am fluent in, you know -- read fluently in Russian.  I have research skills as a -- you know, trained as an academic.  So those skills come in handy for all kinds of research.  And I have an interest in the types of things that I knew Glenn Simpson was interested in, because of his work for the Wall Street Journal.  So it seemed to me a very good fit.

Q   So you indicate you have language skills in --

A   Yes.

Q   -- Russian?  Reading and writing?

A   Yeah, I mean, obviously reading is the strongest and -- yes.

Q   And speaking?  So I meant speaking, reading?

A   Yeah, yeah.  I am -- I am rusty speaking, but -- but,

COMMITTEE SENSITIVE

yeah, I read all the time in Russian.

Q   And you have academic credentials in --

A   Yes, I have a Ph.D. in Russian history and my undergraduate degree from Harvard was in Russian history and literature.

Q   Where is your Ph.D. degree from?

A   Stanford.

Q   Okay.  So in very simplistic terms for non-Ph.D. people, you are pretty conversant in things Russian?

A   Yes.

Q   So if someone similar to Mr. Simpson were looking for someone skilled to scour, research, look at public-source information regarding things Russian, your name would probably come up on a short list, if someone were looking for people with a particular set of credentials?

A   I would be competitive.

Q   Okay, thank you.  I want to jump a little forward from that point.  You indicated, I think, earlier, that your initial assignment or portfolio at Fusion GPS, I think you said there were three projects you were working on, and two of them, I think, were identified.  I don't remember the third one being elaborated on.  And maybe --

A   I didn't work on it.  They -- they offered, you know, and I said I wasn't interested in it.

Q   And what was that project?

A   I don't know if you remember, they were involved in a case involving a video made by -- that involved Planned Parenthood and --

Q   Okay.

A   Yeah, so that was a topic that wasn't related to Russia, and I figured that wasn't my area where I could be the most use.

BY MR. SOMERS:

Q   Were you at all involved -- I reviewed Glenn Simpson's transcript before Senate Judiciary and there was a lot of discussion of the Prevezon.  Is that -- am I pronouncing it --

A   Yeah, that was the one with Veselnitskaya.  I had forgotten the name of the company.

Q   Okay.  Were you involved at all in that for Fusion GPS?

A   No.

BY MR. BAKER:

Q   Would it be fair to say, just for clarity, that this product, or services, that Fusion GPS provides, it is not just, for lack of a better word, and this is my term, opposition research?  It sounds to me like, and what I have read, they do litigation support, maybe helping businesses answer a question or define a problem based on public source?

A   I am not aware of the full scope of their work, but I understand that they do, yeah, research, investigation, that sort of thing.

Q   And I think you have indicated that primarily what you

would do is public-source information?

A   Yes.

Q   Why would someone like Mr. Simpson, or a business like Fusion GPS, why would they need to hire someone to do that on behalf of a client?  Why wouldn't a client be able to Google, or whatever, public-source information themselves?

A   Well, the language would be, I think, the main thing, but also sort of general understanding of how the system works.

Q   And separate and apart from the language or the culture or the system of a particular government or country, I think it is fair to say, based on your academic credentials -- and I believe you indicated earlier, you also taught?

A   Yes, I taught.

Q   You probably have better than the average person's research skills?

A   I would like to think so.

Q   And you could compile and synthesize a large amount of information to a -- to a manageable issue or paper or summary?

A   That is what I aim to do.

Q   Okay.  I want to jump -- I don't know if this is jump back or jump ahead.  I don't think this issue has been addressed. Do you have, or are you familiar with, a shortwave radio or a Ham radio?

A   I own a Ham radio.

Q   And you own it for what purpose?

COMMITTEE SENSITIVE

A    Emergency communication in case of a storm, that sort of thing.  If the cell towers go out, uh-huh.

Q    How long have you had a Ham radio?

A    Well, I bought it shortly after I got my Ham license and I got -- yeah, I -- I -- I am guessing it is 2015, but I don't remember exactly.  It was -- you know, in 2014, I was underemployed, and I had some time, and I took a citizens emergency -- community emergency response team training.  And, you know, it was just something sponsored by the DHS and the local fire department, you know, taught these courses and then they said, hey, if you are going to be helping with community response in case of an emergency, why don't we have -- you know, some people take Ham radio lessons in case the communications towers go out.  And so I took the Ham radio class.  I passed the test.

Q    That is a difficult test, isn't it or --

A    Sixteen questions, something like that.  I squeaked past it.

Q    And are there different levels of licensure?

A    There are.  I was the lowest level.

Q    Do you have any desire to reach a higher level for your purposes?

A    No.

Q    So your obtaining of a radio, and your taking the class, and your sitting for the exam and ultimately passing and receiving the license, it had nothing to do with your employment at Fusion

GPS?

A    It was well before.

Q    Well before?

A    Yeah.

Q    And it was -- you had time on your hands, something to do -- was this something you were always interested in doing and this is an opportunity that you had to pursue it?

A    I saw an ad for the community emergency response training, and I thought, now is a good time for me to do it since I have a little bit of time.

Q    Have you ever communicated with anyone in Russia using your Ham radio?

A    No.

Mr. Somers.  Did you monitor any broadcasts from Russia using the Ham radio?

Ms. Ohr.  No.

    BY MR. BAKER:

Q    You indicated that most of your work for Fusion GPS was done from home?

A    Yes.

Q    Did you ever have occasion to visit a brick-and-mortar office where Glenn Simpson had facilities?

A    Yes.

Q    And how often would that be?

A    Once every several weeks, probably.

Q   What was the -- what kind of office was it?  Was it in a commercial building?  Is it in a residence?  Your description of the facilities where the official office was?

A   I mean, I guess they rented space in a building.  I am not sure if anyone lives there or not.

Q   So commercial or --

A   I guess.  I don't really know what you mean by commercial building.  It is not like a huge, you know, faceless commercial building.

Q   Was it a private residence --

A   No.

Q   -- where there was an office set up in?

A   No.  It was -- it was a building where people rented offices --

Q   Oh, okay.

A   -- as I understand it.  People -- yeah.

Q   And when you would go into this building or this particular office, was there anything in there that would make you think the general tone of the owners of the office, or the atmosphere of the people that worked at that facility, was anti-Trump or anti-anything, or was it neutral, or --

A   I mean, they have been involved in projects that have been partisan, and, so, you know, they may have been involved in projects that might tend to favor one or the other.  My impression was that they took on a variety of projects.

COMMITTEE SENSITIVE

Q   But nothing in the office that would give away a hint of a bias or a leaning to one side of an issue?  I mean, your -- your last answer indicates they would take on a variety of projects. You know, a client, whoever, could pay the fee or whatever; they wouldn't turn business away necessarily.  But was there anything that gave you the impression that they favored one type of research or one type of client over another?

A   Well, I really don't know the full scope of their projects.

Mr. Berman.  I think he is asking, the initial question, is there anything in the physical -- sort of the physical office space.  I don't know what is in his head.  It could be posters, it could be colors --

Mr. Baker.  Yes, that is exactly what --

Ms. Ohr.  Oh, sorry.

Mr. Baker.  Thank you, Counselor.

Ms. Ohr.  The physical office space, no.

BY MR. BAKER:

Q   Okay.

A   I wouldn't not say -- I would -- no.

Q   There is nothing when you walk in, there is not a poster of Trump that says "Down with Trump" --

A   No.

Q   -- or anything like that?  It is --

A   Yeah.

Q   -- kind of neutral, but you know, you have knowledge, that they take on a variety of clients for a variety of causes, for a variety of purposes?

A   That is my understanding.

Q   Okay.  Was there any -- was there any talk or any thought on your part, or anything you overheard that Mr. Simpson, himself, was uncomfortable, for whatever reason, in going directly to the FBI for any -- for any business he might have with the FBI?

A   I wouldn't know.

Q   Okay.

BY MR. SOMERS:

Q   So you discussed earlier three meetings, I believe over a course of years, with Christopher Steele.

A   Yes.

Q   What was your understanding in -- let's go back to the Mayflower meeting.  You know, walk into that meeting, you are going to meet with Christopher Steele.  What was your understanding of who Christopher Steele was?

A   A private investigator who knew a lot about Russia.

Q   Do you have any knowledge of his previous work for the British Government?

A   Not specifically, but in general.

Q   But you knew he worked for -- I believe he worked for MI6.  Is that correct?

A   I had a general understanding.  Something along those

lines.

Q   Do you have any knowledge of his reputation?

A   As I understood it, I mean, the fact that Bruce met with him made me think that he probably had something good to say -- you know, that he had -- he knew things.

Q   So he had -- I am just trying to see, did he have a solid reputation, is that your understanding?

A   That is my understanding.

Q   Did you have any knowledge of his reputation, or who he was, from Glenn Simpson?

A   No.

Q   Okay, after the meeting, did you have any impression of --

A   No additional talk about him besides what I mentioned earlier.

Q   All right.  So he was -- you assumed he had a good reputation because of your husband, but you -- would deal with him, but you didn't have an independent knowledge of his --

A   Correct.

Q   -- reputation?

And you may have known that he worked for MI6, but --

A   I knew something -- that he had some kind of intelligence background or something, yeah.

Q   Okay.  And then at that meeting, at the Mayflower Hotel, did Christopher Steele say at any point in time, I am going to

take this -- take information to the FBI?

    A   I don't remember him saying that he would take information to the FBI.

    Q   That he, Christopher Steele, would take information to the FBI?

    A   I don't recall him saying that in my presence.

    Q   It is our understanding that he was at that time, or shortly thereafter, taking information from the -- that ultimately became the dossier, to the FBI.  I just didn't know if that came up.

    A   I later learned that he had, himself, taken it to them. You know, way later.

    Q   And the intent of the meeting, I mean, was this a friendly get-together, or was Christopher Steele trying to convey, did you think, information to your husband at the meeting?

    A   By the end of the meeting, I understood that he was trying to convey to Bruce his concern.

    Q   And he was trying to convey it to him as an official at the Department of Justice?  This was to raise an official flag about this information?

    A   I think that can be -- yes, I would say that.

    Q   And switching -- switching subjects for a second.  Were you -- so you worked for Fusion GPS, I think you said for -- it was almost a year, I think was the period you described.  And you were out gathering information.  Were you ever asked to verify

information that someone brought to you?

A   No.

Q   Like someone from Fusion GPS gave you information, were you ever asked to verify the veracity of it?

A   I wouldn't say verify.

Q   Or did Glenn Simpson ever -- you obviously gave information to Fusion?

A   Yes.

Q   You researched information.  Did information ever come the other way, from Fusion to you?

A   Yes.

Q   What sort of information?

A   Well, they gave some material pages that talked about some of Manafort's travels.

Q   Any information related to Carter Page?

A   I don't think so.  I don't seem to recall that.

Q   You are -- I think you testified you are somewhat familiar with the Steele dossier.  Were you -- any information that you saw in the Steele dossier, had you seen any of that information before?

A   Not in the material that they gave me.

Q   Not in the material that Fusion had given you?

A   Right.

     BY MR. BREBBIA:

Q   If i could -- can I follow up, quick?

Similar to that point, did you communicate to anyone with Fusion GPS that your husband, Bruce Ohr, was going to provide any documents or information you had gathered to the FBI?

A    No.

Q    Did anyone at the FBI follow-up with you after they received those documents?

A    No.  I am not even sure they -- I have no direct knowledge of their having --

Q    What form was the -- what form did the information take that you -- that was provided to the FBI?  Was it a memo?  Was it a list of open sources?

Mr. Berman.  I think she just said she has no information that it was provided to the FBI.  I think it was the second part of her answer just now.  So you are presuming that there was information that went to the FBI.

BY MR. BREBBIA:

Q    Didn't you say you had no reason to doubt your husband's testimony that he took, I believe you called it a flash drive, from you, and provided it to the FBI?

A    I have no reason to doubt his testimony.

Q    So do you know the flash drive that we are talking about?

[Discussion off the record.]

Mr. Berman.  If this is a continuing way to ask her about communications with her husband --

Mr. Brebbia.  No, I am asking her -- did you --

Mr. Berman.  What was the question then?  Sorry.

Mr. Brebbia.  Did you compile information on Russia and put that onto a flash drive that you then gave your husband?

Mr. Berman.  Providing her husband, whether she did or didn't, that is a form of communication.  We have --

Mr. Brebbia.  The hand-to-hand interaction from her to her husband is covered by the marital privilege?

Mr. Berman.  To the extent that there was such a -- such a transmission, or a handing over, or a communication by physical act, yes.

Mr. Somers.  Did you ever put information on a flash drive to give to someone other than Fusion GPS?

Ms. Ohr.  Yes.

Mr. Brebbia.  Just so we are clear, the marital privilege covers non-testimony -- in your view,
non-testimony -- non-testimony but the actual transaction of handing a physical object to her husband, the physical object which was then handed off to a third party, the FBI?  So the contents, we agree whatever the contents are, are not privileged?

Mr. Berman.  I am simply suggesting that the act, the hypothetical act, of handing a flash drive, or something that you are suggesting, to her husband -- would be covered by the marital privilege.  What some other person, in your hypothetical, Mr. Ohr or someone else, does with it, it isn't covered by the privilege.

It is just what goes on between Ms. Ohr and Mr. Ohr --

    Mr. <u>Brebbia.</u>  Okay.

    Mr. <u>Berman.</u>  -- that is the privilege.  I have no problem with the after -- the before and the after.

    Mr. <u>Jordan.</u>  You said you -- there was a flash drive or maybe flash drives prepared that you gave to someone other than Fusion. Who did you give them to?

    Mr. <u>Berman.</u>  Again, to the extent that may implicate the marital privilege --

    Mr. <u>Brebbia.</u>  Other than Bruce --

    Mr. <u>Berman.</u>  -- she is instructed not to answer that question.

    Mr. <u>Brebbia.</u>  Other than your husband?

    Ms. <u>Ohr.</u>  No one.

    Mr. <u>Brebbia.</u>  Okay.

    Mr. <u>Jordan.</u>  Can I jump in?

    Mr. <u>Brebbia.</u>  Yeah.

    Mr. <u>Jordan.</u>  Just a few minutes.  Thank you.  And then I will let you guys come back.  Because I got to run.

    You said Fusion gave you information a little while ago. What information did they give you?

    Ms. <u>Ohr.</u>  A sheet with some flights that Mr. Manafort had taken.

    Mr. <u>Jordan.</u>  So a -- is that like a timesheet or a schedule or an agenda?  What would you call it?

Ms. Ohr.  A list.

Mr. Jordan.  A list of Manafort flights?

Ms. Ohr.  Yes.

Mr. Jordan.  Okay, did they give you any other information?

Ms. Ohr.  I don't recall.  I mean, that is -- that is the only substantive thing they gave me.

Mr. Jordan.  So in your working relationship there was information you were putting together on the two cases you talked about earlier this morning with me, that you were putting together to give to Mr. Berkowitz -- I think you said at Fusion was your direct contact -- but there was also information flowing from Fusion to you to help you do your work?

Ms. Ohr.  Okay, I am sorry.  I misunderstood the question.  Not in the term -- form of physical documents.  I thought you were talking about physical documents.  Yes, they gave me, you could say, leads and suggestions of names.

Mr. Jordan.  Things they wanted you to do; they were your employer?

Ms. Ohr.  Yes.

Mr. Jordan.  And who was that person giving you the information?  Who was -- who was saying, here is a lead, here is -- who gave you -- well, let's go back.

Who gave you the timesheet about Manafort's flights?

Ms. Ohr.  Most of my communication was with Jake Berkowitz.

Mr. Jordan.  Jake Berkowitz?

Ms. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Okay.  But that is not what I asked you.  Who gave you the timesheet?  Was it Jake Berkowitz?

Ms. <u>Ohr.</u>  I can't remember who physically gave it to me.  I was meeting with him and Glenn.

Mr. <u>Jordan.</u>  Were there occasions where Mr. Simpson passed information to you, and in particular, could Mr. Simpson have passed you the Manafort flight schedule or timesheet or whatever we are calling it?

Ms. <u>Ohr.</u>  It is possible.  I don't remember who physically handed it to me.  He was there, if I recall correctly.

Mr. <u>Jordan.</u>  Back when you started, did anyone at the Department of Justice or FBI encourage you to contact Mr. Simpson?

Ms. <u>Ohr.</u>  No.

Mr. <u>Jordan.</u>  It was all done -- did anyone encourage you to contact Mr. Simpson --

Ms. <u>Ohr.</u>  It was my initiative.

Mr. <u>Jordan.</u>  -- when you first started your employment?  It was all on your initiative?

Ms. <u>Ohr.</u>  Uh-huh.

Mr. <u>Jordan.</u>  Okay.  Do you have any knowledge that your experience as a contractor for various Federal agencies was marketed to Simpson ahead of your employment?

Ms. <u>Ohr.</u>  I gave them a resume.

Mr. <u>Jordan.</u>  So he knew about that.  But do you think

they -- any knowledge that he knew about even prior to you handing him or submitting your resume to him?

Ms. Ohr.  Well, he knew that -- we had been at a conference together, so -- and at the time of the conference, my name was listed as open -- as working for open-source work.

Mr. Jordan.  How often do you think in your typical week of work, or month of work, for Fusion, how often did you communicate with Glenn Simpson?

Ms. Ohr.  Relatively rarely.  Probably once every 6 to 8 weeks, I am guessing.  Roughly.

Mr. Jordan.  What were those communications typically like? Was he -- was he giving information to you, you passing on your work product to him?  Or was that just something that was done electronically on a regular basis?  How did it work?

Ms. Ohr.  He would sit in when I was having my regular check-in, you might say, with Jake, and he might, you know, add some additional information or leads or just listen.  I don't --

Mr. Jordan.  So when were those regular check-ins with Jake that he would sit in on?  How often were they?

Ms. Ohr.  Every few weeks, every -- say, approximately 3 weeks on average, I would say.

Mr. Jordan.  So every 3 weeks you were meeting with Mr. Simpson?

Mr. Berman.  I think she was answering often were the check-ins with Jake.

Mr. <u>Jordan.</u>  Okay.  Every 3 weeks.

Ms. <u>Ohr.</u>  Exactly, yes.  So -- so --

Mr. <u>Jordan.</u>  And Mr. Simpson would sit in on some of those or all of those or --

Ms. <u>Ohr.</u>  Occasional, yeah.  Occasionally.  Not -- not by far.  Not by far all of them.

Mr. <u>Jordan.</u>  And in all this time, you had -- you had -- so every 3 weeks, you are checking in with your direct contact at Fusion, Mr. Berkowitz, and on some of those occasions, Mr. Simpson is there.  You never once learned who, in fact, was paying them for the work you were doing, who they were contracting with?

Ms. <u>Ohr.</u>  I don't recall whether they explicitly named who was paying them.

Mr. <u>Jordan.</u>  Okay, okay.

I got to run guys, I am sorry.  Thank you.

Mr. <u>Breitenbach.</u>  Ms. Ohr, just following up on Mr. Jordan's question there, you don't --

Mr. <u>Jordan.</u>  Ms. Ohr, thank you, too.  I apologize, I do have to run, thank you.

BY MR. BREITENBACH:

Q   You don't explicitly recall who was paying for the research, but I think in the prior round you had indicated that you assumed that your research was going for the purposes of anti-Trump, or somebody that is engaged in anti-Trump or Trump opposition?

COMMITTEE SENSITIVE

A    I thought it was logical that that might be the case.

Q    Can you just talk a little bit more about why you were making that assumption?

A    I guess I figured that the premise of people looking for material about Trump's relationships with Russian organized crime were probably not people who supported his candidacy.

Q    So by that answer, I think it is by extension, you would agree.  I know Mr. Baker had initially asked about how you portrayed -- or how you felt that research was -- could be -- could be portrayed, and I think you said it was investigative-type research, but in the sense of research going to somebody who is opposing Trump, another term could be "opposition research"?

A    I am not sure how "opposition research" is defined.  It was research.

Q    But if it was going to oppose Trump -- and this was during the election, correct?

A    Yes.

Q    Can you talk about your feelings as to performing research that was then going to be used against the Trump candidacy?

A    I thought it was worthwhile to -- to, you know, look into.

Q    Why was it worthwhile, in your opinion?

A    Because, as I had mentioned earlier, when I first heard

many, many years ago, that he had had this transaction with

Mr. Rybolovlev, who had -- under suspicious circumstances, I had

already been curious about what -- what Mr. Trump might be

involved in.  And so when the opportunity came up, it was a way to

satisfy my curiosity.

Q   I cannot say that name you just said, so, in terms of

that gentleman, woman, I don't --

A   Yes.  It is a man.

Q   -- it is a man -- can you just explain a little bit more

about your prior understanding of that man and his

connections -- or alleged connections, I suppose, with President

Trump?

A   All I know is remembering reading in the press many

years ago that he had bought a mansion in Florida from Trump, and

it -- I mean any time -- you know, any time a Russian oligarch

just plops down a lot of money for a mansion from somebody, my

antennae go up.  And so I was curious --

Q   Based on -- this is based off of your prior research --

A   Well, I --

Q   -- you were made aware of this connection?

A   Well, it was just -- in the press.  It was in the press,

yeah, a long time ago.  And I don't remember the year.  So it was,

you know, I -- because I am -- I tried to stay on top of things of

that nature, it was something that caught my attention way back,

when it first happened.

Q   Okay.  So I suppose, would it be fair to characterize that you were not opposed to performing opposition research on then Candidate Trump?

A   That is fair.

Q   Would you have been opposed on performing research against Candidate Clinton?

A   I guess it depends on what research.

Q   Let's suppose if the research was directly within your -- your expertise on Russia, would that have been something that you would have been comfortable in doing, in performing opposition research?  Because I think when you are an opposition researcher, you fully understand what your opposition research is going towards.

So is it fair to characterize your understanding of where your opposition research was going, that you were comfortable with the idea that that research was going towards opposition of then Candidate Trump?

A   I would probably have been less comfortable doing opposition research that would have gone against Hillary Clinton.

Q   And why is that?

A   Because I favored Hillary Clinton as a Presidential candidate.

Q   Okay.  You said earlier, I believe, in so many words, in the minority's questioning, that you had no reason to believe that your research had ended up in the dossier.  Is that correct?

A    That is correct.

Q    Knowing what you know now, I think you also indicated that there may have been some of your research that did end up in the dossier.  Is that correct?

A    I am not sure what you are referring to.

Q    I am only referring to what I believed part of your prior explanation in a prior round may have indicated.

A    Uh-huh.  I may have said something that gave you a wrong impression.  So if you have a specific, I would like to hear --

Q    No, no, no, not at all.  I think -- my impression was that you had indicated that your research may have, in part --

A    Uh-huh.

Q    -- based off of your reading of the dossier, after learning of the dossier and after knowing about it, it was -- there were similarities of what was in the dossier based on --

A    Uh-huh.

Q    -- based off of what you had been performing as opposition research?

A    My recollection of what I said was that when I eventually read the dossier in January of 2017, I believe, I did not recognize any of my research in the dossier.  So your impression may come from my -- our July 30th meeting where we talked about some things that each of us had independently found.

Q    No, I appreciate that.  I think that clarifies things.

A   Uh-huh.

Q   Because I think prior testimony had indicated, at least to me, that you recognized some of what was in the dossier.

A   Yeah, no, I am -- I am sorry if there was any miscommunication.  I very clearly did not.  It was very distinct in my mind.

Q   Sure.  Well, let me just ask you generally, did you recognize, based off of your own independent research, any of the actual research that was located in the dossier?

A   Not the research.  I mean the -- some of the --

Q   Any of the facts?

A   -- were similar but totally independently derived.  Does that make sense?

Q   So when you say "facts" --

A   Yeah, okay, I would say --

Q   -- are you --

A   I am sorry, I am sorry.  Okay.

Q   Sure.  When you say "facts," are you referring to prior knowledge that you had concerning the substance of the dossier?

A   Let me correct myself first by -- I realize that the dossier is entirely allegations.  So can you rephrase your -- in other words, that is what is said in the dossier is allegations and not facts.  So can you -- can you restate your question?  I am sorry.

Q   Sure.  So based off of your prior research or just

COMMITTEE SENSITIVE

expertise on Russia, and knowing what you had known based off your prior research, was there anything in the dossier that seemed familiar to you?

A    I mean, some of the things looked believable, you could say, to the extent that they -- I could envision them happening within what I know about the system, but I won't -- I will not vouch for the veracity of anything that I did not independently research myself.

Q    Totally understand.  I am just wondering if there were any allegations in the dossier that you had independently come across in your prior research.

A    Partially.  Yeah.

Q    Now, I know the minority had put this in, I believe, as Exhibit No. 1 --

A    Yeah, yeah.

Q    -- can you point to anything directly in the exhibit that you are referring to, as having been -- as having been --

A    So that you are saying coincided with what I had independently found?

Q    Thank you.

A    Is that what you are asking about?

Q    That is exactly what I am asking.

A    Okay.  It would take me some time to --

Q    Offhand, do you recall after having read the dossier --

A    Uh-huh.

Q   -- is there anything that stands out to you as coinciding with research that you had previously performed?

A   The fact that Carter Page went to Moscow in July of 2016, I guess, is something that I independently found through my research.  However, many of the details about -- that are claimed in the dossier are not something that I found in my research.

BY MR. SOMERS:

Q   Can I just ask you a question about that.  Because you said something a moment ago that confused me a little bit.  You said there are things you recognize in the dossier, and you said there were other things -- I believe you said they were independently verified, there were things in there that --

A   Okay, I did not recognize my research, that is, the way that I, you know, the things that I found and the way that I expressed them.  So I did not -- I came to the conclusion after reading this, that it was a totally independent research endeavor.

Q   So it was another -- it was another source of information?

A   Yes, I think, if I understand you correctly, yes.

Q   I thought you said verify before.  So I just want -- you are saying that there are things that you researched, that appear in the dossier, but you don't believe they came directory from you?

A   Right.  That is -- right.

BY MR. BREITENBACH:

Q   So you mentioned Carter Page.  Why were you independently researching Carter Page?

A   I was asked to.

Q   By whom?

A   By Jake Berkowitz.

Q   Did he ever indicate to you the reason for researching Carter Page?

A   I think he said because Carter Page is an advisor to Trump.

Q   And can you explain some of the results from your research concerning Carter Page?

A   I found that -- well, he went to Moscow, he spoke at this university, and he talked about better relations between Russia and the United States, and he gave interviews where he advocated better relations between Russia and the United States.

Q   And this is based off of all open-source --

A   Yeah.

Q   -- research?

A   Uh-huh.

Q   Were you ever aware previously of the name Carter Page?

A   Not before he was announced as a Trump advisor.

Mr. Somers.  Was there any public source information on Carter Page that he had had a prior relationship with the FBI?

Ms. Ohr.  I am not aware of it until very recently.

BY MR. BREITENBACH:

Q   Are you aware of the Papadopoulos name that has been in the news?

A   I became aware of it as a result of press coverage in the recent months.

Q   Were you ever asked to perform research on Mr. Papadopoulos?

A   Not that I recall.

    BY MR. SOMERS:

Q   Michael Flynn?

A   Yes.

Q   What were you asked to research on Michael Flynn?

A   Just about any relationship he might have with Russia.

Q   Other countries -- other countries or just Russia?

A   Yeah, now I am trying to sort out what I -- what happened at the time, with what happened later.  I mean, at some point, it became evident that he had a relationship with Turkey as well.  I don't recall whether that was brought up at all.

Q   But that wasn't in the purview of your research?

A   Not that I recall.

Q   Paul Manafort, cover that a little bit?

A   Yeah.

Q   Were you asked to research him or --

A   Yes.

Q   Specifically?

A   Yes.

COMMITTEE SENSITIVE

Q   In regards to Russia or regards to --

A   Russia -- Ukraine, mostly.

    BY MR. BREITENBACH:

Q   Were you asked to research anybody else in Mr. Trump's family?

A   Certain -- I mean, you know, I was -- I was asked to research Trump's family broadly in connection with any -- any Russian connections.

Q   So broadly, but in terms of actually performing the research, did you begin to break out President Trump's family in terms of Melania Trump, all of his children?  Were you doing independent research based off of each family member?

A   I did some.

Q   On which family members, do you recall, or all of them?

A   As I recall, I did some research on all of them, but not in much depth.

    BY MR. SOMERS:

Q   How about Donald Junior, did you do more in-depth research on Donald Trump Junior than some of the others?

A   I am afraid it was relatively superficial.  It was --

Q   Nothing related to --

A   -- time pressure.

Q   Nothing related to travels or business dealings he may have had in Europe?

A   I looked into some of his travels and, you know, I am

not sure how much detail I remember, at this point.

Q    Ivanka Trump?

A    I looked into some of her travels.

     BY MR. BREITENBACH:

Q    And what were you trying to find with regard to each of these individuals?  What was the purpose of looking into the family members?

A    Yeah, to see whether they were involved in dealings and transactions with people who had suspicious pasts, or suspicious types of dealings.

Q    Was there indication from Mr. Berkowitz or Mr. Simpson that they had any inside information as to whether there were suspicious connections with any of President Trump's orbit of individuals including his family?

A    What do you mean by "inside information"?

Q    I would say any information that they specifically gave you, in terms of your employment with Fusion GPS, that would indicate that there were some level of connections with President Trump's family and Russia?

A    They would give me leads based on their open-source research and, you know, legal documents and other things.

Q    Did they ever indicate that any of their leads were based off of sources of theirs?

A    I don't remember get- -- regarding the Trump family, no.

Q    Regarding any of the research during this year, 10-,

11-month period, was any -- was any research based off of sources of theirs that you were aware of?

A    Yes.

Q    And who were the sources?

A    I recall a -- they were mentioning someone named Serhiy Leshchenko, a Ukrainian.

Q    And did they give you any indication as to Leshchenko's connections with them, how they got to know him?  Were they doing work for him?

A    With Fusion GPS?

Q    Correct.

A    I am not aware of how they --

Q    Were you aware of how they had a connection with him?

A    I am not aware.

Q    But you were aware that he was a source of information that was leading to information that they had, that they were then presenting to you as reasons for following up on opposition research or what research --

A    Yes.

Q    -- that is, on President Trump or his family?

A    My understanding is that some -- yes.  And -- yes, it was not necessarily on his family that Leshchenko's research was on.

Q    Are you aware of what his research, or what his source information included?

A   His source information, I am not aware.

Q   You are just aware that he was a source of --

A   Yes.

Q   -- Glenn Simpson?  Or was it a source of Mr. Berkowitz?
Or both?

A   I am not aware of a differentiation between them.  Just
a source for Fusion GPS.

Q   That is one source.  Were there any other sources that
you were aware of?

A   I don't think so.  I don't recall that there were.

Q   And were you aware of Mr. Leshchenko prior to him being
mentioned to you as a potential source of their information?

A   Yes.

Q   In what way?

A   He is very well-known, Ukrainian, anti-corruption
activist.  So I had read about him in the press.

Q   Had you studied him before?

A   What do you mean by "studied"?

Q   Performed independent research for any prior employer.

A   No.  I followed him in the -- you know, if I saw him
mentioned in the press, I read -- I read about it.

Q   And previous to this particular incoming knowledge from
Mr. Simpson or just from Fusion GPS, were you aware of any
connections between Mr. Leshchenko -- am I saying that name, by
the way?

A   Yes.

Q   -- Mr. Leshchenko and President Trump, or anyone in President Trump's familial orbit or even friendly orbit?

A   I was unaware of any connections before that.

Q   I think in the news, I am sure you have seen that there have been emails between your husband and Mr. Steele.  Is that correct?

A   In the news, emails?

Q   That you had seen.

A   I don't recall emails -- messages --

Q   Him being mentioned?

A   I remember communications being mentioned.  I don't remember emails, messages.

Q   So previously you said you had a shared email account.

A   With my husband.

Q   Are you aware whether -- because it is shared, a shared email account, when emails come in, are you then both reading emails that are arriving in the same email account?

A   We usually kind of can tell who it is intended for.  Whether it is from my friend, then it is probably for me.  So he is not likely to read it.  That sort of thing.

Q   Okay, so emails that were coming in from Mr. Steele, were you reading emails that were coming in from Mr. Steele to your husband?

A   I don't recall any emails coming into our joint email

account from Mr. Steele.

Q   You said, in the prior round of questioning, that you didn't hear the word "investigation" mentioned at the breakfast at the Mayflower.  Is that accurate?

A   To the best of my recollection.

Q   Was there any corollary to the word "investigation" that you may have heard during that discussion?  Meaning, let's say -- or synonym of "investigation"?

You were very specific, I noticed, in saying that you did not hear the actual word "investigation" at that discussion.

But did you ever hear any other terms?  I can just try to think of some, like "inquiry," or was there any indication that the research that was being discussed at that meeting concerning President Trump, was -- were you aware, based off of a word that was used, that that information was going somewhere for some type of, quote, investigation or other similar term?

A   My understanding was that Chris Steele was hoping that Bruce would put in a word with the FBI to follow-up on the information in some way.

        BY MR. SOMERS:

Q   When did you become aware that the FBI was investigating Trump and the Trump/Russia connections?

A   Much more recently.  When it came out in the press.

Q   Okay, so Glenn Simpson testified before the Senate Judiciary Committee that he became aware, or he was aware in the

October 2016 sort of timeframe.  You were not aware around that timeframe that the FBI was investigating Trump/Russia connections?

A    I was aware that it was a possibility, whatever was in the press, about, you know, oh, they might be investigating, that sort of thing.  But I never was explicitly aware.

Q    Any knowledge you had was from press reports?

A    As I recall.

     BY MR. BREITENBACH:

Q    Let me just go back to that breakfast meeting.  So you were aware that information, according to that discussion, was going to potentially be given to the Department of Justice or the FBI?  I know they are both part of DOJ, but what did you understand?

A    I guessed that it was going to the FBI.

Q    And when we say "it," can you say once again, what "it" is?

A    Yeah, that is a good question.  I didn't know the extent of his research, but I understood that whatever it was he was finding, that he was concerned about -- that he was hoping that this information would go to the FBI.

Q    He was hoping.  So did he formally ask, based off of your understanding of the conversation, for your husband to give Mr. Steele's research to the FBI?

     Or to the Department of Justice, or to any other Government agency?

A    Yeah.  My recollection of the specific words was -- is cloudy.  So the most -- what I can say is that my understanding was that he wanted to -- Bruce to put in a -- put in a word with the FBI and that may have involved information.  It is -- I don't have direct knowledge of what that involved.

Q    Okay.  And, again in the prior round, you answered in answer to a question that in so many words was, you didn't believe there was any discussion about opening an investigation on Donald Trump at that breakfast.  And you answered, quote, not by DOJ.  At least that is what I had written down.  So something to the effect of, you answered, not by DOJ.  It just raised in the question in my mind, by whom, if it wasn't by DOJ?

A    Yeah, and formally maybe I was mistaken because obviously FBI is part of the DOJ.  But my understanding was that it would be the FBI that might begin -- if there were an investigation, they would be the ones who would logically begin it.  It wasn't something the DOJ would initiate.

Q    Were you aware whether -- or do you recall any indication where Christopher Steele may have indicated that the research would also be beneficial to be passed on to any other government agency?

A    I am not aware of any --

Q    Other than the FBI?

A    -- discussion of that.  I don't recall any discussion of that.

Q   Okay, and then also going back to that breakfast meeting, you indicated that you may have seen a page of the dossier at the breakfast.  So can you just explain, this is based off of your subsequent understanding and viewing and reading the dossier that you mentioned had been first produced on your understanding by Buzzfeed, correct?

A   Oh, okay.  Are you asking multiple questions?

Q   Maybe.  The -- when you said in the prior round that you may have seen a page of the dossier, that is based off of your subsequent understanding of having read the dossier following the production by, first Buzzfeed, publicly?

A   I recognized the type of information when I saw the dossier.  Does that answer your question?

Q   I think so.  So can you, again, recall off of top of your mind -- off the top of your head, what exactly the portion of the dossier that you believe you saw at that breakfast meeting that eventually became the final product, so to speak?

A   I don't recall what I saw on the page, but it -- because of his talking about that point, about being very concerned about the Russian Government, for many years, having favored, or supported a Trump candidacy, my understanding was, it was along those lines.

Q   Along the lines of Russia supporting a Trump candidacy in the past?

A   Supporting a Trump candidacy at that time.  Or, yes, in

the past, and up until 2016.

Q   So it was -- so you do recall seeing something at that
meeting -- and again, I just want to try to -- I am trying to
figure out what part of the dossier that you --

A   Yeah.

Q    -- believe you may have seen.  First you have testified
that you believe it was part of the dossier, or at least a page of
the dossier.  Was there -- was it only one page, or how many pages
do you believe you saw?

A   I just seem to recall seeing sort of a -- you know,
probably a page.  And I don't recall specifically what I saw on
it.

Q   Okay.  And I am trying to understand, too, how did you
know -- or how do you know, reflecting back on that time, that it
was part of the dossier?

A   Good question.  I am guessing that -- I mean, just the
look of it, looked similar, the way the headers were and
everything else.  And the tenor of the type of arguments that were
made, looked similar.  But I don't have specific recollections of
what was on that particular page.

Q   So Director Comey has previously testified to the
salacious and unverified character of -- or the substance of the
dossier.  Did anything immediately stand out to you, when you saw
what you saw?  Even though you don't recall exactly the substance
of that page of the dossier, did anything stand out to you as

salacious?

A   No.

Q   What exactly, again -- and I know you have already explained in part, but what exactly again stood out to you based off of that one page of the dossier that you saw?

A   I am sorry, I don't recollect the specifics that were on that page.  It was along the same tenor of what he was saying verbally.

Q   And you understand that that was -- the page that you saw was the result of Christopher Steele's research?

A   That was my understanding at the time, yeah.

BY MR. SOMERS:

Q   Can I just ask you a couple and -- and I apologize before I ask these questions whether they were asked before because they are kind of basic questions.

Are you currently doing any research on Trump and Russia?

A   Why don't you --

Q   Paid research on Trump -- currently doing any paid research on Trump --

A   The reason I am hesitating is because it is hard to do anything without mentioning Trump, if you will excuse me.  I am doing -- I am doing cyber -- cyber threat intelligence research.  That is my current job.  And I will do things like, you know what is being said in the Russian press and by Russian officials about the latest round of sanctions, for example.  And so I will

summarize and analyze what I see as Russian responses.  And naturally it involves their understanding of how Trump will enforce the sanctions, their discussions of the midterm elections, and what effect that might have on the sanctions and things like that.

Q   But nothing specific to connections between Trump and Russia?

A   I don't -- I don't think so, no.

Q   And you testified before that I believe the dates were October 2015, roughly, September 2016, you did work for Fusion GPS on Trump/Russia connections.  Did you do any work after September 2016 for someone other than Fusion GPS on Trump and Russia?

A   I mean as part of my cyber threat intelligence research, I wrote about Russian information operations in connection with their -- their hacking of the DNC.

Q   But no direct research on Trump and Russia -- Russian connections between Trump and those in the Trump campaign, or Trump family and Russia?

A   I mean, I wrote about people who expressed support for Trump, Russians who expressed support but not Trump's direct dealings with them.  Does that distinction make sense?

Q   I think I understand what you are saying.

A   Uh-huh.

Q   Have you ever done any work for the Penn Quarter Group?

A   No.

Q   Daniel Jones?

A   No.

   BY MR. BREBBIA:

Q   Can I -- little bit related.

This might make you happy.  Leaving out the Fusion work of
2016 --

A   Okay.

Q   -- setting that aside, during the course of your career
working for private-sector entities, had there come a time when
you obtained information during your work that you thought I
should share this with the FBI?  Had that ever occurred?

A   I -- I mean, no.  I would say not.

Q   Leaving out the vehicle by which you would have
transmitted it, had you ever provided information to the FBI?

A   No.

Q   Okay.  But in the fall of 2016, there did come a time
when you decided the information you had obtained in the course of
your work with Fusion GPS, that that should go to the FBI?

A   Yes.

Q   Thank you.

Mr. Somers.  Again, I am going to apologize again if this was
already asked earlier.  Did you ever talk to any journalists about
the Trump/Russia research you were doing?

Ms. Ohr.  No.

   BY MR. BREITENBACH:

Q   Had you ever done, to your knowledge, any other opposition research on other Republican candidates?

A   No.

Q   Had you ever done any oppo research on Democrat candidates?

A   No.

Q   Going to the actual research product that you performed during that year, can we sort of narrow down and try to understand what exactly the results of your research product include.  So you had indicated that you -- you broadly reviewed family members of President Trump and President Trump, and those that we have mentioned, like General Flynn and Manafort, people within the Trump orbit.  What were the eventual results once you handed -- was there a final product that you handed over to Fusion GPS, once you completed your time employed by that company?

A   There were ongoing products.  So, small reports every few weeks, and ongoing chronologies.

Q   Are you aware whether it was ever compiled into one single report?

A   I am not aware of what happened to it after.

Q   Can you talk a little bit about the substance of what you found?

A   I did research on a lot of different people.  So I -- I, for example, did a report on Trump's various visits to the Soviet Union and Russia over the years and the deals that he tried to

undertake, and with whom and what the background of those people were, things about the Miss Universe Pageant and who was there.

Q   I suppose, was there anything in your research that -- beyond -- beyond open-source research that you found, was there anything in the research that raises a red flag for you?

A   What do you mean "beyond open-source research" that I found?

Q   Well, let me rephrase.

Based off of your research, was there anything that raised a red flag for you?

A   As I said, many of the transactions and business relationships appeared to have the kinds of hallmarks that, you know, others have said could be hallmarks of money laundering, and not that I am an expert on money laundering, but suspicious transactions, for example, the Rybolovlev thing which happened many years before.

If I recall correctly, Mr. Trump bought it for a -- a very small amount of money and relatively quickly resold it to Mr. Rybolovlev for a large amount of money, which seemed suspicious.

Q   Okay.  So you are getting -- you are giving, every 3 weeks or so, final, interim products, I would say, it sounds like.

A   Yeah, yes.

Q   Is that a good characterization?

A   Yeah.

Q   So based off the interim products, you were consistently getting more and more research performed.  In terms of a red flag, so to speak, your -- do you have a final impression, based off of all of those interim products?

A   A final impression --

Q   A final impression of your own research?

A   I came to the conclusion that -- that Mr. Trump's dealings with Russian business people were very concerning, that they seemed to show a disregard for -- disregard for staying within the law, I guess I could say.  I don't have any evidence to -- that would stand up in court.  I am not, you know, a legal person.  So by saying they are concerning, that is about as far as I could go with my open-source research.

Q   Okay, and was any of the -- were any of those concerns -- you indicated you are not aware whether those concerns -- you are not aware of the entity to whom those concerns were passed?  Meaning, somebody hiring Fusion GPS for that particular research performed by you?

A   I was -- I don't recall being told explicitly who was funding my research at any given time.

BY MR. BAKER:

Q   What would you do in your research if you found something that said, this happened, fact one, and then something that contradicted that, a fact two?  How would you reconcile or test each other against the other for purposes of your reporting?

A    Yeah, good question.  Yeah, I mean, that is obviously
something that happens all the time for anyone who does
investigations, right?  And I would look at the -- first of all,
try to trace any story or claim back to its source, and that often
takes a lot of time, evaluate the source, see if they seem to be
believable, if they had research to know what they were talking
about, had direct evidence, and in the end, you know, have to make
assessments about which is more believable.

Q    Would you assign a degree of confidence to a particular
reporting that you provided?

A    I know that there are these degrees of confidence that
are often applied.  I am not sure I ever explicitly said with
moderate confidence, or whatever, but I hope it was clear that,
you know, while this is -- I may not have used a word, confidence,
but I hope that I clarified the degree to which I had any
confidence in what I was finding.

Q    You indicated very early on that you had worked under
the general umbrella of U.S. Government jobs.  Have you ever
worked for a U.S. Government organization in a capacity other than
a research capacity, where you are looking at past events?  Did
you ever work for a government entity where you were
providing realtime information on things?

A    And you -- when you say "working for a government
entity," you were understanding that I was an independent
contractor, right?

Q   Yes.

A   Yes.  And my -- yes, my independent contractor work involved at times doing current research.

Q   In addition to the shared email account, did you have an email account that was uniquely yours?

A   I had a Gmail account but very rarely used it.

Q   How did you bill for your time?

A   I would add up -- I mean, I would just keep notes to myself of how many hours I spent, and then I turned in an invoice.

Q   And you said you got leads sent to you?

A   Mostly verbally when I was meeting with Jake or --

Q   Are there any email records that still exist that have particular leads on them that you were assigned, or records that indicate particular things you billed for?

A   Or records that indicate particular things I billed for? I mean, I have records of my research.  Is that what you mean?

Q   I would be interested in any records that exist, either particular assignments you got, or leads you got, via email and, therefore, created a record, or billing that you sent in for particular projects or time spent on a particular fact you were verifying.

A   Yeah, yeah.  I still have the emails where I sent in the invoices, and usually I would just say "latest report for Jake," you know, that sort of thing.

Q   And does Jake still work at Fusion GPS?

A    As far as I know.

Q    Okay.

    BY MR. PARMITER:

Q    Ms. Ohr, thank you for coming today.  Just one final question.  Do you know who Christopher Steele reported to at Fusion GPS?

A    No.

Q    Thank you.

Mr. <u>Breitenbach.</u>  I actually have one more final question.

[2:40 p.m.]

Mr. <u>Breitenbach.</u>  I actually have one more final question.

BY MR. BREITENBACH:

Q    Who owns the research that you performed for Fusion GPS?

A    I guess they own it.

Q    Fusion GPS or their client?

A    Oh, that's a good question.  I don't recall signing anything that explicitly said who owns it.

Q    Do you still possess the research that you performed?

A    Yes.

Q    Would you be willing to share that with the committee?

A    I guess so.

Mr. <u>Breitenbach.</u>  Thank you.  I think we're up on time.

(Recess.)

Ms. <u>Sachsman Grooms.</u>  All right.  Thank you.  Let's go back on the record.  The time is 2:50.

BY MS. SACHSMAN GROOMS:

Q    I just wanted to go back through something that I think you've touched on in a number of different rounds a little bit piecemeal, and it got a little confusing to me, and so I just wanted to walk through and clarify it.  It's about the Mayflower meeting.  So you went to the Mayflower meeting with your husband to meet up with Christopher Steele and his associate.  Is that right?

A    Yes.

Q   And it was a breakfast?

A   Yes.

Q   And you left the breakfast at some point so that Christopher Steele and your husband could speak privately.  Is that right?

A   Yes.

Q   And you were gone for some period of time.  Do you have an understanding of how long that was or --

A   I don't know, 15-20 minutes maybe, I don't know.  I don't know.

Q   Do you recall what you did at that point?

A   I went to the restroom and then I went out into the lobby and waited.

Q   Was it at the end or the beginning?

A   End.

Q   And during that meeting, it was my understanding, that Christopher Steele expressed to you -- Christopher Steele expressed to you that he had deep concerns about Donald Trump's relationship with Russia.  Is that accurate?

A   Yes.

Q   And that he wanted that to be communicated in some way to the FBI, I assume.  Is that right?

A   That was my understanding.

Q   Do you recall if he explicitly said that, or if that was just your understanding?

A    I don't recall what was explicitly said.

Q    I think at some point you explained that there was a page of a piece of paper that he showed to you.  Is that accurate?

A    Yeah, a page of a document.  And I don't remember if it was paper, or on a laptop.

Q    Do you recall why he was showing a page of a document?

A    My understanding, which I don't know if this is why his intention was just to show that he's been doing research, and that his research had led him to these concerns.

Q    Do you recall whether you stopped and read the document when he showed it to you or if he was sort of flashing you a piece of paper to show you that he was doing research?

A    I wouldn't make any guesses about his intentions.  My recollection is seeing very briefly something like one page.  I can't -- I don't remember exactly how many lines I saw, but yeah.

Q    Do you remember whether you read it at the time?

A    I recall looking at it, but as from my previous discussion, I don't currently recall what happened to be on that page.

Q    I understand, but do you recall whether at the time you actually read the document, or you just looked at it and sort of skimmed it over?

A    As I recall, it was more skimming than reading.

Q    And I think you explained that you had seen, essentially, the formatting of the document?

COMMITTEE SENSITIVE

A    Yeah.  Yes.

Q    And that the formatting of the document looked similar to the formatting of Christopher Steele's other work product that you later saw in the dossier.  Is that accurate?

A    If I recall correctly.  Yes.

Q    I think you've said that that page might have ended up in the dossier.  Is it also possible that that document that he showed you is just the way he formats his work product?

A    It's very possible, because I don't have any clear understanding of whether that particular page ended up as-is in the dossier, whether it was a first draft, it could have been.

Q    And did he give you the document to take?

A    I don't recall receiving anything.  I personally did not receive anything, and I don't recall Bruce receiving -- whether he received anything.

Q    Okay.  At that meeting?

A    At that meeting.

Q    Okay.  So he just showed you something, you skimmed it, and then you gave it back?

A    To the best of my recollection.

Q    And you don't recall whether he was showing you a piece of paper in a hard copy or a computer screen?

A    Right.

Ms. Sachsman Grooms.  Thank you.  That helps.  That's all I had.  Oh, I'm sorry, let me do one more.

COMMITTEE SENSITIVE

COMMITTEE SENSITIVE

BY MS. SACHSMAN GROOMS:

Q    You mentioned that, at some point, somebody from Fusion GPS told you that they were giving you a tip that was based off of a source that was a Ukrainian source, Serhiy Leshchenko.  Is that right?

A    Yes.  That they were -- that they were giving me some information that had originated with him in some way.

Q    Do you recall whether that information related to Mr. Manafort?

A    What I'll say is that at the time -- at the same meeting, if I recall correctly, that his name came up, this piece of paper that lists Mr. Manafort's flights was given to me, and I'm not -- I don't recall exactly right now whether they said this particular piece of paper comes from Mr. Leshchenko or not.

Q    Okay.  I think in the previous round, you said that you weren't reading emails from Mr. Steele that came to your husband through the joint email account, but obviously, you read this one email.  So I just wanted to clarify what you were talking about?

A    Yeah, there is a distinction here because from Mr. Steele, no messages came to our joint account, from Mr. Simpson occasionally messages came to our joint account.

Q    I apologize, that's my mistake between two different people.

A    Uh-huh.

Q    And I think in the last round, someone may have

described that you worked for Fusion GPS until December of 2016, and as part of a question, it was my understanding that you ended your work in September 2016.  Is that right?

A   And if someone did say that, and I didn't catch it, I apologize, I ended in September of 2016.

Q   Great.

Ms. Sachsman Grooms.  Thank you.  I think that's all we have.  Thank you.

Mr. Somers.  I think that's all we have.  Thank you for coming in and coming in voluntarily.  We appreciate your time today.

Ms. Ohr.  Thank you.

[Whereupon, at 3:00 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee


    I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.


_____

Witness Name


_____

Date

EXHIBIT 2

# Christopher Steele

# Vol. 1

**06/18/2018**

**Page 1**

```
 1                  Mr Christopher Steele
 2        CONFIDENTIAL - ATTORNEYS' EYES ONLY
         IN THE UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF FLORIDA
   ─────────────────────────────
 4                                   :
   ALEKSEJ GUBAREV, XBT HOLDING  : Case No:
 5 SA and WEBZILLA, INC          : 17-cv-60426-UU
 6            Plaintiffs         :
 7               -v-             :
 8 BUZZFEED, INC and BEN SMITH   :
 9            Defendants         :
   ─────────────────────────────:
10
11            Videotaped deposition
12                     of
13             Mr Christopher Steele
14
15        On Monday, June 18th 2018
16
17        Commencing at 9.35 am
18
19               Taken at:
20            15 Old Bailey
21               London
22              EC4M 7EF
23           United Kingdom
24
25   Reported by: Miss Pamela Henley
```

**Page 2**

```
 1                  Mr Christopher Steele
 2
 3            A P P E A R A N C E S
 4
 5   On behalf of the Plaintiffs:
 6         CIAMPA FRAY-WITZER, LLP
 7         20 Park Plaza
 8         Suite 505
 9         Boston, MA 02116
10         Telephone:  617 426 0000
11         Email: Evan@CRWLegal.Com
12             BY:  MR EVAN FRAY-WITZER
13
14     BOSTON LAW GROUP, PC
15     825 Beacon Street
16     Suite 20
17     Newton Centre, MA 02459
18     Telephone:  617 928 1800
19     Email: vgurvits@bostonlawgroup.com
20             BY:  MR VAL GURVITS
21
22
23
24
25
```

**Page 3**

```
 1                  Mr Christopher Steele
 2   W LEGAL LIMITED
 3   47 Red Lion Street
 4   London WC1R 4PF
 5   United Kingdom
 6   Telephone: 020 7220 9139
 7   Email: steven.loble@wlegal.co.uk
 8         BY:  MR STEVEN LOBLE
 9
10   W LEGAL LIMITED
11   47 Red Lion Street
12   London WC1R 4PF
13   United Kingdom
14   Telephone: 020 7220 9136
15   Email: sonalsachania@wlegal.co.uk
16         BY:  MS SONAL SACHANIA
17
18   ONE ESSEX COURT
19   Temple
20   London EC4Y 9AR
21   Telephone:  020 7583 2000
22   Email: hbrown@oeclaw.co.uk
23         BY:  MS HANNAH BROWN QC
24
25
```

**Page 4**

```
 1                  Mr Christopher Steele
 2   On behalf of the Defendants:
 3         DAVIS WRIGHT TREMAINE LLP
 4         1251 Avenue of the Americas
 5         New York, New York 10021
 6         Telephone:  212 402 4068
 7         Email: katebolger@dwt.com
 8             BY:  MS KATHERINE M BOLGER
 9
10     BLACK SREBNICK KORNSPAN STUMPF
11     201 S Biscayne Boulevard
12     Suite 1300
13     Miami, Florida 33131
14     Telephone:  305 371 6421
15     Email: rblack@royblack.com
16             BY:  MR ROY BLACK
17
18     MATRIX CHAMBERS
19     Griffin Building
20     Gray's Inn
21     London WC1R 5LN
22     United Kingdom
23     Telephone:  020 7404 3447
24             BY:  MR ALEX BAILIN QC
25
```

Page 37

1                    Mr Christopher Steele
2    the FCO submission means that this question should
3    not be asked.
4                    The witness can choose whether to
5    answer.
6         A.    I choose not to answer.
7    BY MR FRAY-WITZER:
8         Q.    Are you familiar with
9    Glenn Simpson?
10        A.    I am.
11        Q.    Can you tell us who Mr Simpson is?
12        A.    He is the co-owner and co-director
13   of Fusion GPS, an investigative firm based in
14   Washington DC.
15        Q.    When did you first meet Mr Simpson?
16        A.    I do not remember exactly when, but
17   I would say either late 2009, or early 2010.
18        Q.    Do you recall the circumstances of
19   meeting Mr Simpson?
20        A.    I do.
21        Q.    And can you tell us what those
22   were?
23        A.    I was introduced to him in London
24   by a British investigator who I already knew.
25        Q.    What was the purpose of the

Page 38

1                    Mr Christopher Steele
2    introduction?
3         A.    To get to know somebody else in the
4    sector and potentially to co-operate or do
5    business in the future.
6         Q.    Prior to working with Mr Simpson or
7    Fusion GPS on the matter that is the subject of
8    the present proceedings, did you work with
9    Mr Simpson or Fusion GPS on any other matters?
10        A.    Yes, a number of projects.
11        Q.    Are you able to tell us in general
12   terms what those projects were?
13        A.    I think only in very general terms.
14   So the classic due diligence, anti-money
15   laundering and strategic advice.
16        Q.    Can you tell us what you did to
17   prepare for your deposition today?
18        A.    I met twice with my British legal
19   team for about 2 to 3 hours each, and I had a half
20   an hour telephone conversation with my US attorney
21   yesterday.
22        Q.    Did you review any documents in
23   preparation for today?
24        A.    I did.
25        Q.    And what documents did you review?

Page 39

1                    Mr Christopher Steele
2         A.    I reviewed the documents that were
3    submitted to me by my legal team, which were a
4    range of different documents, but primarily our
5    own pleadings in the English proceedings, and the
6    two sealed, I believe, testimonies of Mr Kramer
7    and Mr Bensinger.
8                    And I reviewed the congressional
9    testimony, I think, to the judiciary committee of
10   Mr Simpson.  Those were the main documents that I
11   reviewed.  And, of course, the questions that have
12   been submitted. And the orders. Yes.
13        Q.    Did you discuss your deposition
14   with anyone prior to today?
15        A.    Only with the people that I have
16   indicated just now, so my English legal team and
17   my American attorney.
18        Q.    Did you discuss your deposition at
19   all with Mr Simpson?
20        A.    I did not.
21        Q.    Did you discuss your deposition at
22   all with anyone connected to BuzzFeed?
23        A.    I did not.
24        Q.    Did you discuss your deposition
25   with anyone from the Penn Quarter Group?

Page 40

1                    Mr Christopher Steele
2         A.    I did not.
3         (Exhibit 4 marked for identification)
4         Q.    Did you discuss your deposition
5    today with the FCO?
6         A.    I did not.
7         Q.    You are being shown what has been
8    marked as Exhibit Number 4 to your deposition, can
9    you tell me if you recognize this document.
10        A.    I do.
11        Q.    And can you tell us what this
12   document is?
13        A.    It is what it says it is, which is
14   an intelligence memorandum concerning Russia's
15   interference in the 2016 American presidential
16   election.
17        Q.    If I refer to this document as the
18   December memo, would that be acceptable?
19        A.    Yes.
20        Q.    When did you create this document?
21        A.    I believe it was created on the
22   given date, which is 13th December 2016.
23        Q.    I am sorry, I got ahead of myself,
24   let me just ask, did you create this document?
25        A.    I did create this document.

| | |
|---|---|
| **Page 41** | **Page 43** |

Page 41

Mr Christopher Steele

1
2       Q.    If you would turn to the second
3   page of the document, please, paragraph 3, it
4   begins first with a black bar that is a redaction,
5   and it has:
6               "[Redacted] reported that over the
7   period March to September 2016 a company called
8   XBT/Webzilla and its affiliates had been using
9   botnets and porn traffic to transmit viruses,
10  plant bugs, steal data and conduct 'altering
11  operations' against the Democratic Party
12  leadership.  Entities linked to one Aleksej
13  GUBAROV were involved and he and another hacking
14  expert, both recruited under duress by the FSB,
15  Seva KAPSUGOVICH, were significant players in this
16  operation.  In Prague, COHEN agreed [to]
17  contingency plans for various scenarios to protect
18  the operation, but in particular what was to be
19  done in the event that Hillary CLINTON won the
20  presidency.  It was important in this event that
21  all cash payments owed were made quickly and
22  discreetly and that cyber and other operators were
23  stood down/able to go effectively to ground to
24  cover their traces."
25               Did I read that correctly?

Page 42

Mr Christopher Steele

1
2       A.    I believe so, yes.
3   (Exhibit 5 marked for identification)
4       Q.    You are being shown what has been
5   marked as Exhibit Number 5, the witness statement
6   of Nicola Cain dated 1 December 2018 (sic).
7       A.    That cannot be right.
8       Q.    2017. Thank you. We have not
9   transported into the future! If you could look at
10  paragraph 18, please. It says:
11               "Paragraphs 18 to 21 of the Defence
12  explain that, having received the unsolicited
13  timed raw intelligence written up in the December
14  memorandum, Mr Steele and Orbis considered that it
15  had implications for national security of the US
16  and the UK and that it needed to be further
17  analyzed and verified."
18               First, did I read that correctly?
19      A.    You did.
20      Q.    Do you agree with that statement?
21      A.    I do.
22      Q.    Prior to receiving the unsolicited
23  raw information that was included in the December
24  memo had you ever heard of XBT Holdings?
25               MR MILLAR:  We object to that

Page 43

Mr Christopher Steele

1
2   question.
3               THE WITNESS:  Okay.
4               MR MILLAR:  There are 2 objections,
5   first, it would require the consent of the Foreign
6   & Commonwealth Office to answer that question in
7   relation to the period prior to 2009, to the
8   extent that his answer deals with the period prior
9   to 2009.
10               But, secondly, we are, as I
11  understand it, on topic 2 now, the operative words
12  in topic 2 are Mr Steele's efforts to verify the
13  allegations.  So one needs to look to see what the
14  allegations are in paragraph 3 of the December
15  memorandum that are the basis of the defamation
16  action in Florida.  They are very specific.  They
17  have been read to my client, and the topic which
18  we spent a lot of time discussing in the hearings
19  in the High Court has been formulated as
20  addressing his efforts to verify those
21  allegations.
22               What he may or may not have known
23  about a particular company or entity prior to that
24  has nothing to do with his efforts at
25  verification.

Page 44

Mr Christopher Steele

1
2               THE EXAMINER:  US plaintiffs.
3               MR FRAY-WITZER:  I would argue that
4   knowledge or lack of knowledge of the plaintiffs
5   in the US action would speak towards verification.
6   Whether or not he had any familiarity with these
7   entities is relevant to the question of what may
8   have been done or not done to verify the
9   allegations contained in the December memo.
10               THE EXAMINER:  US defendants.
11               MR BLACK:  We support the
12  relevance of the plaintiffs' question.
13               THE EXAMINER:  My opinion is it is
14  not within topic 2, which concerns efforts to
15  verify the allegations.  The witness may choose
16  whether to answer.
17      A.    I choose not to answer.
18  BY MR FRAY-WITZER:
19      Q.    And simply for the record then, I
20  will ask the next two questions, prior to
21  receiving the unsolicited raw information had you
22  ever heard of Webzilla?
23               MR MILLAR:  Same objection.
24      A.    Same answer.
25  BY MR FRAY-WITZER:

Page 45

```
1                    Mr Christopher Steele
2         Q.     And, again, just for the record,
3    prior to receiving this unsolicited raw
4    information had you ever heard of Aleksej Gubarev?
5              MR MILLAR:  Same objections.
6         A.     Same answer.
7    BY MR FRAY-WITZER:
8         Q.     You have stated that you have
9    considered that the unsolicited raw intelligence
10   needed to be further analyzed and verified, so
11   focussing your attention first on the time between
12   when you received this information and when you
13   included it in the December memo what steps did
14   you take to independently verify the allegations
15   concerning XBT?
16             MS EIKHOFF:  Object to form.
17        A.     Could you clarify what you mean by,
18   "independently verify"?
19             MR MILLAR:  I do not know what he
20   means.
21   BY MR FRAY-WITZER:
22        Q.     Did you take any steps to verify
23   the information concerning XBT?
24        A.     I did.
25        Q.     What steps were those?
```

Page 46

```
1                    Mr Christopher Steele
2         A.     I believe the only step I can
3    describe within the bounds of the order is what we
4    could call an open source search.
5         Q.     What is an open source search?
6         A.     It is where you go into the
7    Internet and you access material that is available
8    on the Internet that is of relevance or reference
9    to the issue at hand or the person under
10   consideration.
11        Q.     So if I understand your testimony
12   the extent of your attempts to verify information
13   about XBT is that you did some Internet searches
14   as to who or what XBT was, is that accurate?
15        A.     It is not accurate.
16        Q.     Please tell how that is not
17   accurate.
18        A.     It is not accurate because other
19   efforts to verify relate to sources or sources
20   and, therefore, are not allowed under the terms of
21   the order.
22        Q.     What can you tell us about any
23   efforts that you made to verify allegations
24   concerning Webzilla?
25        A.     The same.  So open source searches.
```

Page 47

```
1                    Mr Christopher Steele
2         Q.     And what efforts did you make to
3    verify the allegations concerning Mr Gubarev?
4         A.     The same.
5         Q.     What did you learn about XBT?
6         A.     From the open source search?
7         Q.     If that is what you are willing to
8    tell us about.
9         A.     We did not find anything of
10   relevance on XBT from the open source search.
11        Q.     Did you find anything of relevance
12   concerning Webzilla?
13        A.     We did.
14        Q.     And what was that?
15        A.     It is an article I have got here,
16   which is -- was posted on 28 July 2009, on
17   something called CNN iReport, which is -- I can
18   circulate it if you like.
19        Q.     What do you understand iReports to
20   be on CNN?
21        A.     I do not have any particular
22   knowledge of that.
23        Q.     Do you understand that they have no
24   connection to any CNN reporters?
25        A.     I do not.
```

Page 48

```
1                    Mr Christopher Steele
2         Q.     Do you understand that CNN iReports
3    are or were nothing more than any random
4    individuals' assertions on the Internet?
5              MS EIKHOFF:  Object to form.
6              MR MILLAR:  I do not -- it does not
7    have anything to do with his efforts to verify the
8    allegations.  He has explained what efforts he
9    made, which included open sourcing this article.
10             His understanding as to the status
11   of the media outlet concerned is not part of his
12   efforts to verify.
13             THE EXAMINER:  US plaintiffs.
14             MR FRAY-WITZER:  It could not be
15   more relevant to this topic or this question.  It
16   is probing the witness's understanding of the
17   search that he says that he himself did, and the
18   efforts that he himself says he made, and the
19   things that he has told us that he has discovered.
20             THE EXAMINER:  US defendants?
21             MR BLACK:  We support the
22   relevance of the question by the plaintiff.
23             THE EXAMINER:  My opinion is this
24   far it is within the topic.  The witness can
25   choose whether to answer or not.
```

**Page 49**

```
1                 Mr Christopher Steele
2          A.    What was the question again,
3   please?
4   BY MR FRAY-WITZER:
5          Q.    Do you understand that CNN iReports
6   are nothing more than any random person posting
7   things on the Internet?
8                MS EIKHOFF:  Objection.  Object to
9   form.
10         A.    So I have got to answer?
11               MR FRAY-WITZER:  You may.
12         A.    No, I, obviously, presume that if
13  it is on a CNN site that it has some kind of CNN
14  status. Albeit that it may be an independent
15  person posting on the site.
16         Q.    Did you learn any information about
17  Mr Gubarev?
18         A.    From this?
19         Q.    No, I am separately asking if you
20  learned anything --
21         A.    Not from my open source search.
22         Q.    -- without telling us what the
23  information was, did you learn any information
24  about Mr Gubarev from any other source?
25         A.    We are talking about the period
```

**Page 50**

```
1                 Mr Christopher Steele
2   between the receipt of the intelligence and the
3   issuing of the report, are we?
4          Q.    And the issuance of the December
5   memo, correct.
6          A.    Not in that period.
7          Q.    In that period, without telling us
8   what the information is, did you learn any other
9   information about XBT?
10         A.    No.
11         Q.    And, again, within that same
12  period, and other than the iReport article that
13  you have identified, did you learn any other
14  information about Webzilla and, again, just "yes"
15  or "no", not the content of any information?
16         A.    Not in that period.
17         Q.    Between the time that you received
18  the unsolicited information and the time that you
19  included it in the December memo did you make any
20  attempts to contact anyone at XBT?
21         A.    No.
22         Q.    Did make any attempts to contact
23  anyone at Webzilla?
24         A.    No.
25         Q.    Did you make any attempts to
```

**Page 51**

```
1                 Mr Christopher Steele
2   contact Aleksej Gubarev?
3          A.    No. And can I just add to that,
4   that that would not be standard practice in our
5   industry.
6          Q.    Why would it not be standard
7   practice?
8          A.    We are not journalists.  We are not
9   seeking to publish information.  We are doing
10  research, which is confidential for a client, in
11  general.
12         Q.    Would you want that information to
13  be as accurate as possible?
14         A.    Of course.
15         Q.    And so why would you not contact
16  the subjects of the information you have been
17  given?
18         A.    It is not standard practice in our
19  sector because of the exposure of sources,
20  potentially.  And, indeed, the confidentiality of
21  enquiries made by clients.
22               Unlike in journalism, for example,
23  where I do believe it is standard practice to put
24  allegations to a subject.
25         Q.    In the same time period we have
```

**Page 52**

```
1                 Mr Christopher Steele
2   been discussing did you conduct any research to
3   determine whether there had been attempts by
4   anyone to:
5                "...use botnets and porn traffic to
6   transit viruses, plant bugs, steal data and
7   conduct 'altering operations' against the
8   Democratic Party leadership."?
9                MR MILLAR:  I object to that on the
10  basis that it is not one of the allegations
11  against the US plaintiffs pleaded in the American
12  proceedings.
13               The -- we went through this with
14  the original order the US plaintiffs sought to
15  have made, which was included more generally, the
16  steps Mr Steele took to obtain information for the
17  dossier beyond the specific factual allegations
18  about the US plaintiffs.  That was item 4 in the
19  original list of 9th November. That was struck
20  out.
21               And the purpose of the confining of
22  topic A to the allegations in paragraph 3 was to
23  confine questioning about efforts to verify to the
24  specific allegations about these US plaintiffs
25  that were at issue in the proceedings there in
```

Page 141

```
1                    Mr Christopher Steele
2              MS EIKHOFF:  I would say that we
3    would need probably 14 to 30 days.
4              MR GURVITS:  Let us do 20 days.
5              THE WITNESS:  There is a difference
6    between 20 days and 20 working days.
7              MR LOBLE:  If we say 4 weeks, 28
8    days.
9              MS BOLGER:  We have a scheduling
10   order in the American we have to respect, so we
11   would need a final copy of it such that we can
12   write a summary judgment brief if we needed to, to
13   include it, right. So today, can we get it by the
14   end of June?  Sorry how about the end of the first
15   week in July. Which is the 6th July.
16             THE WITNESS:  That is pushing it a
17   bit. First week in July.
18             MS EIKHOFF:  What is the date that
19   you need it for your review?
20             MS BOLGER:  Well, how about July,
21   can we agree on July 13th?
22             MS EIKHOFF:  And that is assuming
23   that get our copy of the transcript within 7 days.
24             MS BOLGER:  Yes.  That is almost
25   the 30 days you asked.
```

Page 142

```
1                    Mr Christopher Steele
2              THE WITNESS:  That is fine.
3              MS EIKHOFF:  That is okay.
4              THE EXAMINER:  Thank you all very
5    much.  Mr Steele can be released and can discuss
6    his evidence with anyone he likes.
7              THE VIDEOGRAPHER:  This is the end
8    of the deposition of Christopher Steele.  Going
9    off the record at 1.49.
10             THE COURT REPORTER:  Could I get
11   the order on the record, I believe you would like
12   regular delivery?
13             MR FRAY-WITZER:  Yes, please.
14             THE COURT REPORTER:  And regular
15   delivery as well?
16             MS BOLGER:  Yes.
17             MR BLAKE:  Regular.
18             THE COURT REPORTER:   Thank you.
19
20
21
22
23
24
25
```

Page 143

```
1
2              CERTIFICATE OF WITNESS
3
4
5
6
7              I, Christopher Steele, am the
8    witness in the foregoing deposition. I have read
9    the foregoing deposition and, having made such
10   changes and corrections as I desired, I certify
11   that the transcript is a true and accurate record
12   of my responses to the questions put to me on
13   Monday, June 18th 2018.
14
15
16
17
18   Signed_____
19        Christopher Steele
20   Dated this _____ day of_____ 2018
21
22
23
24
25
```

Page 144

```
1
2              CERTIFICATE OF COURT REPORTER
3
4              I, Pamela E Henley, Court Reporter,
5    do hereby certify that I took the stenotype notes
6    of the foregoing deposition and that the
7    transcript thereof is a true and accurate record
8    transcribed to the best of my skill and ability
9              I further certify that I am neither
10   counsel for, related to, nor employed by any of
11   the parties to the action in which this deposition
12   was taken, and that I am not a relative or
13   employee of any attorney or counsel employed by
14   the parties hereto, nor financially or otherwise
15   interested in the outcome of the action.
16
17
18
19
20
21
22        _____
23             Pamela E Henley
24
25
```

Page 145

```
 1
 2
 3                          ERRATA
 4      (Please make any amendments or corrections on the
 5      errata sheet and not on the original deposition)
 6   CORRECTION                                    PAGE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   _____      _____
24
25   Signature                 Date
```

EXHIBIT 3

EXECUTIVE SESSION

COMMITTEE ON THE JUDICIARY,

JOINT WITH THE

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.


INTERVIEW OF:  BRUCE OHR


Tuesday, August 28, 2018


Washington, D.C.


The interview in the above matter was held in Room 2141,
Rayburn House Office Building, commencing at 9:05 a.m.

Mr. <u>Parmiter.</u>  Good morning.  This is a transcribed interview of Bruce Ohr.  Chairman Goodlatte and Chairman Gowdy requested this interview as part of a joint investigation by the House Committee on the Judiciary and the House Committee on Oversight and Government Reform regarding decisions made and not made in 2016 and 2017 by the Department of Justice and the Federal Bureau of Investigation regarding the 2016 Presidential election.

Would the witness please state his name and position at the Department of Justice for the record.

Mr. <u>Ohr.</u>  Good morning.  My name is Bruce Ohr.  I am a senior counsel in the Office of International Affairs in the Criminal Division of the Department of Justice.

Mr. <u>Parmiter.</u>  Thank you.  On behalf of the chairman, I want to thank you for appearing today, and we appreciate your willingness to appear voluntarily.  My name is Robert Parmiter, and I am the Majority Chief Counsel for Crime and Terrorism at the House Judiciary Committee.

I will now ask everyone else who is here in the room to introduce themselves for the record, starting to my right with Art Baker.

Mr. <u>Baker.</u>  Arthur Baker, Investigative Counsel, Majority Staff, House Judiciary.

Mr. <u>Gowdy.</u>  Trey Gowdy, South Carolina.

Mr. <u>Ratcliffe.</u>  Jim Ratcliffe, Texas

Mr. <u>Issa.</u>  Darrell Issa, California.

Mr. <u>Biggs.</u>  Andy Biggs, Ohio.

Mr. <u>Gaetz.</u>  Matt Gaetz, Florida.

Mr. <u>Lasseter.</u>  David Lasseter, Department of Justice.

Ms. <u>Hekman.</u>  Rebecca Hekman, Clifford Chance.

Mr. <u>Berman.</u>  Joshua Berman, Clifford Chance.

Mr. <u>Weinsheimer.</u>  Brad Weinsheimer, Department of Justice.

Ms. <u>Hariharan.</u>  Arya Hariharan, Judiciary minority.

Ms. <u>Shen.</u>  Valerie Shen, Oversight and Government Reform minority staff.

Mr. <u>Ventura.</u>  Christopher Ventura, legal clerk, majority.

Mr. <u>Castor.</u>  Steve Caster, Oversight staff, majority.

Mr. <u>Buddharaju.</u>  Anudeep Buddharaju, House Oversight majority.

Ms. <u>Green.</u>  Meghan Green, House Oversight, majority.

Mr. <u>Parmiter.</u>  The Federal Rules of Civil Procedure do not apply in this setting, but there are some guidelines that we will follow that I will go over.

Our questioning will proceed in rounds.  The majority will ask questions first for an hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.  We will go back and forth in this manner until there are no more questions and the interview is over.  Typically, we take a short break at the end of each hour of questioning, but if you would like to take a break apart from that, please let us know.  We will also take a break for lunch at the appropriate

point.

As I noted earlier, you are appearing today voluntarily. Accordingly, we anticipate that our questions will receive complete responses.  To the extent you decline to answer our questions or if counsel instructs you not to answer, we will consider whether a subpoena is necessary.  We also have the ability to go into classified setting, but it was represented to us that there is going to be very little that is classified today.

As you can see, there is an official reporter taking down everything we say to make a written record, so we ask that you give verbal responses to all questions.  Do you understand that?

Mr. Ohr.  Yes.

Mr. Parmiter.  So that the reporter can take down a clear record, it is important that we don't talk over one another or interrupt each other if we can help it.

Both committees encourage witnesses who appear for transcribed interviews to freely consult with counsel if they so choose, and you are appearing today with counsel.

Could counsel please state your name and current position for the record.

Mr. Weinsheimer.  My name is Brad Weinsheimer.  I'm an Associate Deputy Attorney General at the Department of Justice.

Mr. Berman.  My name is Josh Berman.  I am Mr. Ohr's personal counsel, and I am a partner of Clifford Chance.

Ms. Hekman.  My name is Rebecca Hekman.  I am Mr. Ohr's

personal counsel.  I'm an associate of Clifford Chance.

Mr. Parmiter.  We want you to answer our questions in the most complete and truthful manner possible, so we will take our time.  If you have any questions or if you do not understand one of our questions, please let us know.  If you honestly don't know the answer to a question or do not remember, it is best not to guess.  Please give us your best recollection, and it is okay to tell us if you learned of information from someone else.  If there are things you don't know or can't remember, just say so and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

Mr. Ohr, you should also understand that although this interview is not under oath, you are required by law to answer questions from Congress truthfully.  Do you understand that?

Mr. Ohr.  Yes.

Mr. Parmiter.  This also applies to questions posed by congressional staff in an interview.  Do you understand this?

Mr. Ohr.  Yes.

Mr. Parmiter.  Witnesses who knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements.  Do you understand this?

Mr. Ohr.  Yes.

Mr. Parmiter.  Is there any reason you are unable to provide truthful answers to today's questions?

Mr. Ohr.  No.

Mr. Parmiter.  Finally, I'd like to note that, as Chairman Goodlatte stated at the outset of our first transcribed interview in this investigation, the content of what we discuss here today is confidential.  Chairman Goodlatte and Gowdy ask that you not speak about what we discuss in this interview to anyone not present here today to preserve the integrity of our investigation. This confidentiality rule applies to everyone present in the room today.  That is the end of my preamble.

Do you have any questions before we begin?

Mr. Ohr.  No, I don't.  Thanks.

Mr. Parmiter.  The time is now 9:10 a.m. and we'll get started with the first round of questions, and Chairman Gowdy.

EXAMINATION

Mr. Gowdy.  Good morning, Mr. Ohr.  I'm one of a handful of members that will be asking you questions, and I'll kick it off. To the extent I ask you a question that is vague or you think it's a trick question, it's not.  I'm really trying to understand what role, if any, you played in the two major investigations in 2016, that being the investigation into what Russia did and with whom, if anyone, did they do it, and if you know anything or had any role in the Clinton Espionage Act investigation, we want to know that too.  So not trying to trick you, not trying to -- I just simply want to know.  I've read a lot, but here's our opportunity to ask you directly what role, if any, did you play in those two investigations, official or otherwise.

Did you ever provide information to Fusion GPS employees or contractors during 2016 or 2017?

Mr. Ohr.  I don't believe so, no.

Mr. Gowdy.  When you say you don't believe so, it makes me, as a recovering lawyer, wonder why you would use that phrase instead of yes or no.

Mr. Ohr.  I don't recall everything I said, but it's certainly not my practice, it's never been my practice to provide information to outsiders about any Department of Justice business.

Mr. Gowdy.  Did anyone employed at or by Fusion GPS -- and by that, I mean employees, contractors, anyone by any definition of employment you can think of -- provide information to you in 2016 or 2017 with respect to either the Russia investigation, the investigation into what the Trump campaign did, if anything, or the Clinton investigation?

Mr. Ohr.  Yes.

Mr. Gowdy.  Who?

Mr. Ohr.  Chris Steele, as I understand it, was hired by Fusion GPS to do research or gather information.  He provided information to me.  Glenn Simpson, who is, as I understand it, a principal of Fusion GPS, on a couple of occasions, he provided information to me.  And on one occasion my wife, who was a contractor with Fusion GPS, provided some information to me.

Mr. Gowdy.  Let's take those in reverse order.  You said on one occasion your wife.  And just for purposes of those who don't

know, your wife's name is Nellie Ohr.  Is that right?

Mr. <u>Ohr.</u>  That is correct.

Mr. <u>Gowdy.</u>  And she began working for Fusion GPS in what, March of 2016?

Mr. <u>Ohr.</u>  I believe it was late 2015.

Mr. <u>Gowdy.</u>  Late 2015?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  And what role did she have at Fusion GPS?

Mr. <u>Ohr.</u>  She was a Russia analyst, and she would research people and companies that Fusion GPS asked her to look into.  She would do her research on the internet, open sources; and she would report her findings to Fusion GPS, usually I think -- I don't remember exactly the names.

Mr. <u>Gowdy.</u>  Was she hired specifically to work on an investigation into then-candidate Trump, or was it a broader portfolio than that?

Mr. <u>Ohr.</u>  My understanding is that it was a broader portfolio.  She began, as I said, I believe in late 2015.

Mr. <u>Gowdy.</u>  What did she do before she began working for Fusion GPS?

Mr. <u>Ohr.</u>  She was a contractor with other companies that were doing Russia-related work.

Mr. <u>Gowdy.</u>  All right.  If I heard you correctly, there was one occasion where she provided information to you.

Mr. <u>Ohr.</u>  That is correct.

COMMITTEE SENSITIVE

Mr. <u>Gowdy.</u>  What was that one occasion?

Mr. <u>Ohr.</u>  So the -- what she -- at one point -- and I don't remember the exact date, I think it was in 2016 -- she provided me with a memory stick that included research she had done for Fusion GPS on various Russian figures.

And the reason she provided that information to me is, my understanding was, it related to some of the same -- it related to the FBI's Russia investigation.  And she gave me that stick to give to the FBI.

Mr. <u>Gowdy.</u>  Why would she not give it to the FBI?

Mr. <u>Ohr.</u>  She wasn't talking with the FBI.  She gave it to me, and I provided it to the FBI.

Mr. <u>Gowdy.</u>  Was Chris Steele talking to the FBI?

Mr. <u>Ohr.</u>  At various times, Chris Steele was talking with the FBI.

Mr. <u>Gowdy.</u>  He was talking to them a good bit until they discharged him as a source, wasn't he?

Mr. <u>Ohr.</u>  I don't know exactly when he spoke with them.

Mr. <u>Gowdy.</u>  Well, all marriages are different, so I'm trying to envision this cold start to a conversation with Here, honey, here's a thumb drive.  There were no conversations before that?

Mr. <u>Ohr.</u>  Well, Nellie was present with me in the end of July, when I first heard Russia information -- information relating to the Russia investigation from Chris Steele.  So she was present for some of that conversation.  So she was certainly

aware at that point that Chris Steele was giving me some information about Russia.

At some point, I don't remember when, I became aware that she was looking at some of the same figures as part of her work for Fusion GPS.  And so it came up -- again, I don't remember the exact date -- where basically she was concerned that maybe the FBI might want her information as well, and so provided the information to me.

Mr. <u>Gowdy.</u>  All right.  This is where I need you to help me, because you were working at the Department of Justice?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  Which means you, depending on what division you're working in, you have the ability, if appropriate, to charge people.

Mr. <u>Ohr.</u>  Well, at the time I was working as the director of OCDETF, so I did not have any line attorney responsibilities or command, chain of command responsibilities.  But yes, I was working for the Department of Justice.

Mr. <u>Gowdy.</u>  Right.  And the Department of Justice can file informations or seek indictments.  Fusion GPS cannot.  So when you say you were working on the same thing, it couldn't have necessarily been for the same reasons, because she wasn't investigating criminal conduct, was she?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  What was she investigating?

Mr. Ohr.  She was investigating names and companies that Fusion GPS asked her to look into.

Mr. Gowdy.  For what purpose?

Mr. Ohr.  To provide it to Fusion GPS.  My understanding is that Fusion GPS was, in turn, providing it to other people.

Mr. Gowdy.  Were they a contractor of the Department of Justice?  Were they launching criminal investigations?

Mr. Ohr.  No.

Mr. Gowdy.  I'm trying to figure out why Fusion GPS is investigating Russian oligarchs and potential criminality and how that might overlap with what you did at the Department.

Mr. Ohr.  My understanding is that Fusion GPS was hired by private individuals to look into possible contacts between the Russian Government and the Trump campaign.

Mr. Gowdy.  See.  That's what I thought.  I don't know why it took us three questions to get there.  Fusion GPS was hired by whom?

Mr. Ohr.  I did not know at the time.

Mr. Gowdy.  Do you know now?

Mr. Ohr.  I've seen it in the paper.  It sounds like, from the paper, that there were a couple of different people that were paying Fusion GPS to do this at different times.  My understanding is that some of these people were connected to the Clinton campaign in some way.  I don't know the -- I don't recall the names.

Mr. <u>Gowdy.</u>  So Fusion GPS were looking at potential Russian contacts with the Trump campaign.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  And that's what your wife was working on?

Mr. <u>Ohr.</u>  Yes.  At some point, I became aware that some of the people she was invest -- she was researching were some of the same people that I had heard about from Chris Steele and Glenn Simpson.

Mr. <u>Gowdy.</u>  And when did she provide, I call it a thumb drive, you called it something else.

Mr. <u>Ohr.</u>  I don't recall the exact date.

Mr. <u>Gowdy.</u>  Give me a month.

Mr. <u>Ohr.</u>  I don't recall the month either.  I think it was in late 2016, but I don't know for sure.

Mr. <u>Gowdy.</u>  After the Russia investigation began by the Bureau?

Mr. <u>Ohr.</u>  I --

Mr. <u>Gowdy.</u>  That would have been late July?

Mr. <u>Ohr.</u>  I would assume it would -- I'm pretty sure it was after that.

Mr. <u>Gowdy.</u>  After the election?

Mr. <u>Ohr.</u>  That I don't recall.

Mr. <u>Gowdy.</u>  Well, I need you to help me there.  The election is a pretty big pivot point.  Most people remember what they were doing before that and after that.  Do you remember getting

information from anyone at Fusion GPS before the election?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  From whom?

Mr. <u>Ohr.</u>  Glenn Simpson.

Mr. <u>Gowdy.</u>  We'll come back to Mrs. Ohr.  Tell me about Glenn Simpson providing you information.

Mr. <u>Ohr.</u>  As I recall, and this is after checking with my notes, Mr. Simpson and I spoke in August of 2016.  I met with him, and he provided some information on possible intermediaries between the Russian Government and the Trump campaign.

Mr. <u>Gowdy.</u>  I'm sure my colleagues are wondering this also.  Why would Glenn Simpson give you information about Russian oligarchs?

Mr. <u>Ohr.</u>  Well, my job, for a long time, included responsibility for the organized crime program at the Department of Justice.  And so for many years, I had been overseeing investigations and meeting with people, talking about organized crime.

In the course of this many years, I met with both -- I had become acquainted with both Chris Steele, Glenn Simpson, and other people.  And from time to time, these people would give me information about Russian oligarchs and other Russian organized crime figures, and then I would pass that to the FBI, or introduce people to the FBI so that they could continue.  And so what happened in August was I heard from Glenn Simpson that he had some

information.

Mr. Gowdy.  Well, you also strike me as being smart enough not to make yourself a fact witness if you didn't have to.  So why take the information?  Chris Steele already had a relationship with the Bureau.  Why not just connect Glenn Simpson with the Bureau?  Why put yourself in the middle of that?

Mr. Ohr.  My recollection is that I tried to get Glenn Simpson to speak with the Bureau, but I don't recall the exact conversation.  So he was willing to meet with me and give me some information.  So I took the information and passed it to the FBI.

Mr. Gowdy.  Who at the FBI did you pass it on to?

Mr. Ohr.  Well, at that point I had -- I believe I met with Peter Strzok, Lisa Page, and some people from the Department's -- Justice Department's Criminal Division, and I gave them the information that I had received.

Mr. Gowdy.  Was either Peter Strzok or Lisa Page, were they working on a Russian oligarch fraud investigation in addition to the Trump campaign, or was it just the Trump campaign investigation that you remember them working on at the time?

Mr. Ohr.  I think my recollection is that they were looking at different parts, not just one part.  I don't remember the exact details, but --

Mr. Gowdy.  Can you see how it might be troubling?  You just called the names of two people, neither of whom I think are with the Bureau, one who was mentioned unfavorably in an IG report,

both of whom had, at least from my standpoint, an unprecedented amount of animus or bias towards one of the candidates, and you are getting information from someone hired by the DNC and funneling it to the lead agent on the Russia investigation.  Can you possibly see how that might be troubling to people?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  All right.  And what would your response to that troublement be?

Mr. <u>Ohr.</u>  At the time, they were the people who could use, you know, or look at the information.  They were the ones that I was told to pass it to.  They also told me that they would arrange for me to be in contact with a line agent, a regular agent, and that in the future, my contacts would be with that agent rather than with higher officials at the FBI.

Mr. <u>Gowdy.</u>  Who was handling Chris Steele, who at the Bureau?

Mr. <u>Ohr.</u>  I don't know who was officially his handler.  I know one of the people he was talking with who may have been his handler was Special Agent Mike Gaeta.

Mr. <u>Gowdy.</u>  So why not tell Steele and Simpson to go talk to the Bureau directly?

Mr. <u>Ohr.</u>  I believe Steele was talking to the Bureau directly.  My recollection is that at least initially -- well, no. Let me cancel that.

I -- I don't think -- I think Glenn Simpson was willing to talk with me.  I'm not sure that -- my recollection is I'm not

sure he was willing to talk with the FBI, although that was
where obviously it would be better to --

Mr. Gowdy.  Why not?  Why talk to a prosecutor who does not
investigate crime?  Were you assigned to the Russia investigation?

Mr. Ohr.  I was not.

Mr. Gowdy.  Did you have any connection with the Russia
investigation at all?

Mr. Ohr.  Aside from passing this information, no.

Mr. Gowdy.  So why would Glenn Simpson go through you and not
go directly to the Bureau?

Mr. Ohr.  I don't know what was in his head.  I know he was
willing to talk --

Mr. Gowdy.  I'm sure you asked him.

Mr. Ohr.  I think I tried to get him to talk with the FBI,
but I don't recall the exact conversation.

Mr. Gowdy.  Well, Mr. Ohr, a couple of people around the
table have worked for the Department at various points.  You
really try hard, as an attorney, not to involve yourself in chains
or facts that could warrant you being pretty much exactly where
you are today, which is a fact witness.  Surely this is not the
first time you thought about that?

Mr. Ohr.  That's right.

Mr. Gowdy.  So why allow yourself to be a conduit?

Mr. Ohr.  I thought the -- I wanted to get the information,
whatever information they had.  I wanted to get it to the FBI, and

I wanted to try to create the situation for people like Glenn Simpson to talk to the FBI.

Mr. <u>Gowdy.</u>  Do you believe, as I do, that the FBI is the world's premier law enforcement agency?

Mr. <u>Ohr.</u>  If I say yes, I might make people at the DEA very unhappy, but yes, I am very -- I have a great admiration for the FBI.

Mr. <u>Gowdy.</u>  I don't think it's going to make them unhappy. They don't have as much jurisdiction as the Bureau has.  The Bureau has broad jurisdiction.  I mean, DEA can't look at Title 18 cases, can they?

Mr. <u>Ohr.</u>  That's right, except for money laundering, I believe, yes.

Mr. <u>Gowdy.</u>  All right.  So you've got what, with your caveat noted, you don't want to offend anyone else, you got the world's premier law enforcement agency investigating a fact pattern. Chris Steele already has a handler, already is in contact with the FBI; and you allow the person hired by the DNC to dig up dirt on a Presidential candidate to talk to you directly and use you as a conduit.  We're just trying to figure out why you let that happen?

Mr. <u>Ohr.</u>  I took the information.  I thought the information might be important, and I wanted to get it to the FBI.  It seemed the only way to do it.

Mr. <u>Gowdy.</u>  What information would Glenn Simpson have that the Bureau couldn't get or already have?

COMMITTEE SENSITIVE

Mr. Ohr.  I don't know exactly what the FBI had access to, and I know Glenn Simpson was also gathering information.  So more information is better.  The FBI is in a position to decide whether the information is useful or credible.  My job, as I saw it, was just to get the information over there and let them figure it out.

Mr. Gowdy.  So when Glenn Simpson gave you information, what information did he give you?

Mr. Ohr.  I don't recall the exact facts he gave me in August.  I believe I made some notes at the time, and I believe it had to do with possible intermediaries between the Russian Government and the Trump campaign.

Mr. Gowdy.  Such as?

Mr. Ohr.  I don't recall the exact names.

Mr. Gowdy.  That's a serious allegation, Mr. Ohr.

Mr. Ohr.  Yes.

Mr. Gowdy.  To allege that a hostile foreign government is in cahoots with members of a campaign is a pretty serious allegation.

Mr. Ohr.  Yes.

Mr. Gowdy.  And you don't remember who it was?

Mr. Ohr.  There were many names mentioned over a period of time.

Mr. Gowdy.  Tell me the ones you remember.

Mr. Ohr.  I don't know if it came up in the conversation with Glenn Simpson, but certainly one of them was Sergei Millian.

Mr. Gowdy.  How about on the Trump campaign side?

COMMITTEE SENSITIVE

Mr. <u>Ohr.</u>  Again, I don't recall if this was a name that Glenn Simpson mentioned, but I remember the name Michael Cohen coming up.

Mr. <u>Gowdy.</u>  Cohen?  Okay.  Who else?

Mr. <u>Ohr.</u>  I remember -- and, again, I don't think -- I don't remember if -- I think this name came from Chris Steele originally, was Carter Page.  And the name Paul Manafort was also mentioned, and I think that came from Chris Steele originally.

Mr. <u>Gowdy.</u>  And what precisely, as best you can recall, was the nature of this collaboration/conspiracy/coordination?

Mr. <u>Ohr.</u>  That there were communications back and forth between the Russian Government and the Trump campaign.

Mr. <u>Gowdy.</u>  Is there anything inherently criminal about that?

Mr. <u>Ohr.</u>  If the Russian Government was attempting to influence the Trump campaign in some way, I would think that would be a national security threat.

Mr. <u>Gowdy.</u>  What would that some way be?

Mr. <u>Ohr.</u>  Espousing certain positions, or if they had some kind of control or influence over members of the campaign that could affect U.S. policy in a way that would be favorable to Russia or Russian interests.

Mr. <u>Gowdy.</u>  And what did Mr. Simpson relay to you about that? What control or dominion or --

Mr. <u>Ohr.</u>  I think Mr. Simpson was -- what Glenn Simpson was giving me was more the means by which this communication was

being -- what he thought how the communication was happening.  I don't think he was talking as much about what exactly they were -- you know, what policies or whatever they were talking about.

Mr. <u>Gowdy.</u>  You've been a prosecutor for how long?

Mr. <u>Ohr.</u>  I began as a prosecutor in 1991.

Mr. <u>Gowdy.</u>  So from 2018 to 1991, you have essentially asked questions for a living?

Mr. <u>Ohr.</u>  Uh-huh.  Yes.

Mr. <u>Gowdy.</u>  What questions did you ask Glenn Simpson about the origin of his information?  And I'm still -- maybe it's just me.  I'm still struggling to figure out -- now, if it was a conspiracy to access the DNC server, I'm interested.  If it's a conspiracy to access John Podesta's email, I'm interested.  I'm actually interested if it's a conspiracy to disseminate what was taken even if they didn't take it.

But I doubt he met with a high-ranking DOJ official to say, someone in the Russian Government knows someone in the Trump campaign.

Mr. <u>Ohr.</u>  I believe one of the things -- again, I don't remember if it was Glenn Simpson or Chris Steele that mentioned this -- talked about -- I'm going to get the names wrong, but somebody associated with the Trump campaign having advance knowledge of when information about the Clinton campaign that had been stolen and hacked, when it was going to be leaked.

Mr. Gowdy.  What criminal code section would that violate?

Mr. Ohr.  I mean, I think, again, it's --

Mr. Gowdy.  Conspiracy to defraud the United States?

Mr. Ohr.  Right, conspiracy.  It could be --

Mr. Gowdy.  You don't see that statute used very often I don't think, do you, not that part of it?  Recently, we've seen it.

Mr. Ohr.  Sorry?

Mr. Gowdy.  Recently, we've seen it.  Is that what you were thinking, that it was a conspiracy to defraud the United States?

Mr. Ohr.  I think any attempt by a foreign power to gain influence over a Presidential campaign would be troubling.

Mr. Gowdy.  But that does not include Steele relying on Russians to provide dirt on Trump.

Mr. Ohr.  I'm sorry, I don't understand the question.

Mr. Gowdy.  That does not include Steele relying on Russians to provide dirt on Trump, question mark?

Mr. Ohr.  I think my understanding is that what Steele was finding out was investigating the links, the national security threat posed by Russian Government officials attempting to gain influence over the Trump campaign.  So I don't think that's criminal.  I think that's highlighting a national security threat.

Mr. Gowdy.  He was relying on foreign nationals for that information?

Mr. Ohr.  I don't know who he was getting it from.

Mr. <u>Gowdy.</u>  Who were Steele's sources?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Gowdy.</u>  How did you vet those -- how did he vet those sources?  How did Fusion GPS vet those sources?

Mr. <u>Ohr.</u>  I think -- I don't know the specifics.  The fact that my wife was looking at some of the same figures, like Sergei Millian, suggests that that was one way they were trying to vet the information.

So when I provided it to the FBI, I tried to be clear that this is source information.  I don't know how reliable it is.  You're going to have to check it out and be aware.  These guys were hired by somebody relating to -- who's related to the Clinton campaign, and be aware --

Mr. <u>Gowdy.</u>  Did you tell the Bureau that?

Mr. <u>Ohr.</u>  Oh, yes.

Mr. <u>Gowdy.</u>  Why did you tell the Bureau that?

Mr. <u>Ohr.</u>  I wanted them to be aware of any possible bias or, you know, as they evaluate the information, they need to know the circumstances.

Mr. <u>Gowdy.</u>  So you specifically told the Bureau that the information you were passing on came from someone who was employed by the DNC, albeit in a somewhat triangulated way?

Mr. <u>Ohr.</u>  I don't believe I used -- I didn't know they were employed by the DNC, but I certainly said, yes, that -- that they were working for -- you know, they were somehow working associated

with the Clinton campaign.  And I also told the FBI that my wife worked for Fusion GPS or was a contractor for GPS, Fusion GPS.

Mr. <u>Gowdy.</u>  And, again, you thought it was important to tell the Bureau that for bias --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  -- motive, interest in the outcome, all of the reasons that you have to produce --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  -- not complementary information?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  And so you think it should have also been included in a FISA application?

Mr. <u>Ohr.</u>  I have no -- I don't do FISA applications.  I don't know.  So I would think you should attempt to corroborate any source information you get before you --

Mr. <u>Gowdy.</u>  Would a jury be told about that?

Mr. <u>Ohr.</u>  I think certainly I would -- if I were calling a witness, I would provide that kind of information to the defense.

Mr. <u>Gowdy.</u>  Well, and your very competent counsel would spend hours making sure the jury knew of the connection between the source and a political opponent, don't you think?  Hours.

Mr. <u>Ohr.</u>  I'm sure it would be a topic of cross-examination.

Mr. <u>Gowdy.</u>  It wouldn't be a footnote.

Mr. <u>Ohr.</u>  I --

Mr. <u>Gowdy.</u>  It wouldn't be an oblique footnote buried

somewhere in an application.  They'd spend hours on it.

Mr. <u>Ohr.</u>  I'm sure if it were a trial setting, there would be cross-examination about it.

Mr. <u>Gowdy.</u>  All right.  So Simpson, you met with Simpson how many times?

Mr. <u>Ohr.</u>  I recall two times.

Mr. <u>Gowdy.</u>  Now, some of my colleagues don't believe in coincidences.  I have not made up my mind yet on whether or not that's possible, but you met with Simpson -- I mean, with Steele, if I remember correctly, in late July --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  -- at a breakfast with Mrs. Ohr?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  Do you know what else happened in late July?

Mr. <u>Ohr.</u>  I have seen in the papers that the FBI opened some kind of investigation in late July.  I was certainly not aware of that at the time.

Mr. <u>Gowdy.</u>  Who opened it?

Mr. <u>Ohr.</u>  I've just seen something in the papers.  I don't know.

Mr. <u>Gowdy.</u>  Oh, you can guess.  What FBI agent opened it?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Gowdy.</u>  I'll give you a hint.  You mentioned his name already.  Peter Strzok.  How many times did you talk to Peter Strzok before July of 2016?

Mr. Ohr.  None, I don't think.  I did not know Peter Strzok.

Mr. Gowdy.  How did you meet him?

Mr. Ohr.  At some point, I believe in the fall of 2016, I met with him and Lisa Page, as I told you before.

Mr. Gowdy.  Why?  Why did you meet with them?

Mr. Ohr.  To pass the latest information that I had received.

Mr. Gowdy.  How did you find out who to meet with?  Who did you call to find out?

Mr. Ohr.  So, prior to that meeting, I had -- okay.  After the July 30th meeting with Chris Steele, I wanted to provide the information he had given me to the FBI.  I reached out for Andrew McCabe, at that time, Deputy Director of the FBI and somebody who had previously led the organized crime, Russian organized crime squad in New York and who I had worked with in the past, and asked if he could meet with me.

I went to his office to provide the information, and Lisa Page was there.  So I provided the information to them.  And some point after that, I think, I was given Peter Strzok, or somehow put in contact with Peter Strzok.

Mr. Gowdy.  And that would have been when?

Mr. Ohr.  I don't recall the exact date.  I'm guessing it would have been in August since I met with Chris Steele at the end of July, and I'm pretty sure I would have reached out to Andrew McCabe soon afterwards.

Mr. Gowdy.  So you provided the information Glenn Simpson

gave to you to Peter Strzok?

Mr. <u>Ohr.</u>  No, no.  The information Chris Steele had given me -- oh, no.  Yes.  Yeah, I'm sorry.

So after Glenn Simpson gave me information, yes, I believe I provided that to Peter Strzok.

Mr. <u>Gowdy.</u>  So the Steele and Simpson information, you were the conduit to Peter Strzok?

Mr. <u>Ohr.</u>  Yes.  I -- they may have had other conduits certainly with respect to Mr. Steele, but yes, I did.

Mr. <u>Gowdy.</u>  In July of 2016, Chris Steele emailed you and made reference to, and I'll quote, "our favorite business tycoon."

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  Who was he referring to?

Mr. <u>Ohr.</u>  Oleg Deripaska.

Mr. <u>Gowdy.</u>  How did you know that that's who he was referring to?

Mr. <u>Ohr.</u>  We had had conversations prior to that time about Oleg Deripaska earlier that year.

Mr. <u>Gowdy.</u>  It couldn't have been Donald Trump?

Mr. <u>Ohr.</u>  No, I don't think so.

Mr. <u>Gowdy.</u>  Why not?

Mr. <u>Ohr.</u>  We never had conversations about Donald Trump before July 30th.  He talked with me about Russian organized crime matters.  We had talked in the past about Deripaska.  That was pretty much the only person in my mind that he could have been

referring to.

Mr. <u>Gowdy.</u>  Did you and Chris Steele ever discuss Donald Trump?

Mr. <u>Ohr.</u>  In the July 30th conversation, one of the items of information that Chris Steele gave to me was that he had information that a former head of the Russian Foreign Intelligence Service, the SVR, had stated to someone -- I didn't know who -- that they had Donald Trump over a barrel.

Mr. <u>Gowdy.</u>  Do you know Jon Winer?

Mr. <u>Ohr.</u>  Yes, I'm acquainted with Jonathan Winer.

Mr. <u>Gowdy.</u>  Did you ever discuss the Russian investigation or the 2016 Presidential race with Jon Winer?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  Did you ever pass information -- he was an employee of the State Department?

Mr. <u>Ohr.</u>  I think so.

Mr. <u>Gowdy.</u>  Did you ever pass information from him on to the Bureau or the Department?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  Other than Chris Steele and Glenn Simpson, did anyone else ever provide information to you that you then provided to the Department or the Bureau?

Mr. <u>Ohr.</u>  I mentioned my wife and the memory stick.

Mr. <u>Gowdy.</u>  Your wife?

Mr. <u>Ohr.</u>  So I don't think anyone else did, no.

Mr. <u>Gowdy.</u>  Did you look at that stick or thumb drive?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  You didn't even open it?

Mr. <u>Ohr.</u>  No.  I didn't want to plug it into my machine at work.  I just gave it to the FBI.

Mr. <u>Gowdy.</u>  Why didn't you want to plug it into your machine at work?

Mr. <u>Ohr.</u>  I don't plug any stick that anyone gives me, even my wife, into a work computer.

Mr. <u>Gowdy.</u>  What did she describe was on it?

Mr. <u>Ohr.</u>  My understanding was that it included her research on behalf of Fusion GPS.

Mr. <u>Gowdy.</u>  Was her job to find as much information as she could, good and bad, on Donald Trump, or was it opposition research?

Mr. <u>Ohr.</u>  I don't think -- my understanding was not that -- she was asked to look at specific individuals and companies, and I think they were all related to -- were Russia, because her expertise was researching Russian topics, reading Russian websites, that sort of thing.

So I think she was just gathering whatever information she could find on those persons, and then she would pass that to Fusion GPS.  So it wouldn't -- it wasn't limited to favorable or unfavorable.  It was just whatever she could find.

Mr. <u>Gowdy.</u>  The July 30th breakfast that Chris Steele and

your wife and you attended, what was discussed there?

Mr. Ohr.  So Chris Steele provided me with basically three items of information.  One of them I've described to you already, the comment that information supposedly stated and made by the head, former head of the Russian Foreign Intelligence Service.

He also mentioned that Carter Page had met with certain high-level Russian officials when he was in Moscow.  My recollection is at that time, the name Carter Page had already been in the press, and there had been some kind of statement about who he had met with when he went to Moscow.  And so the first item that I recall Chris Steele telling me was he had information that Carter Page met with higher-level Russian officials, not just whoever was mentioned in the press article.  So that was one item.

And then the third item he mentioned was that Paul Hauser, who was an attorney working for Oleg Deripaska, had information about Paul Manafort, that Paul Manafort had entered into some kind of business deal with Oleg Deripaska, had stolen a large amount of money from Oleg Deripaska, and that Paul Hauser was trying to gather information that would show that, you know, or give more detail about what Paul Manafort had done with respect to Deripaska.

Mr. Gowdy.  Did Mr. Steele ever express his opinion on candidate Trump to you?

Mr. Ohr.  At that time, I don't recall, but later on, prior to the election when I spoke with Chris Steele, I got the sense he

was very alarmed by this information, which I think he believed to be true.  And so I definitely got the impression he did not want Donald Trump to win the election.

Mr. Gowdy.  You got the impression or he told you that?

Mr. Ohr.  I don't remember specifically what he said, but it was a strong enough impression that I told the FBI that.

Mr. Gowdy.  Have you had a chance to review your 302s?

Mr. Ohr.  I looked at my 302s in preparation for my testimony with the Senate Intelligence Committee back in January of this year; and I did review them on one subsequent occasion, again, early this year.  So I have seen them, but I have not looked at them for at least 6 months.

Mr. Gowdy.  Do you recall whether it was you that Chris Steele said he was desperate that Donald Trump not win?

Mr. Ohr.  I think I said that to the FBI, yes.

Mr. Gowdy.  Was that your impression of him or is that something he said to you?

Mr. Ohr.  I -- I don't recall exactly what he said, but, as I said, whether he said it directly or not, I had the very strong impression.  I just don't want to say words that I don't remember right at this moment.

Mr. Gowdy.  What does the word "desperate" mean?

Mr. Ohr.  I think he was very anxious or very -- very concerned that Donald Trump not win.

Mr. Gowdy.  Well, "concerned" and "desperate" are two

separate words.  What does the word "desperate" mean?

Mr. <u>Ohr.</u>  I think very concerned.  And, again, I wanted to provide that to the FBI, because it was important that the FBI know what his mindset was.  You want to know when --

Mr. <u>Gowdy.</u>  If you're relying on a source that says they're desperate to prevent someone from winning, you would want to know that.

Mr. <u>Ohr.</u>  Yes, of course.

Mr. <u>Gowdy.</u>  How about willing to do anything to keep him from winning, do you remember seeing that in your 302, or words to that effect?

Mr. <u>Ohr.</u>  No, I don't recall that specifically, no.

Mr. <u>Gowdy.</u>  Well, what do you -- instead of me guessing what you recall, what do you recall Chris Steele telling you about Donald Trump and whether or not he wanted to see him prevail in November?

Mr. <u>Ohr.</u>  As I told you, I don't recall the exact words.  I definitely had a very strong impression that he did not want Donald Trump to win, because he believed his information he was giving me was accurate, and that he was, as I said, very concerned, or he was desperate, which is what I then told the FBI.

Mr. <u>Gowdy.</u>  If I remember right, you've been a prosecutor since 1991?

Mr. <u>Ohr.</u>  Yes, sir.

Mr. <u>Gowdy.</u>  Did you ever have a chance to cross-examine

anyone?

Mr. <u>Ohr.</u>  On occasion.  Not as often as a defense counsel, but yes.

Mr. <u>Gowdy.</u>  So tell me all of the questions, cross-examination-like questions that you asked Chris Steele about the source of his information.

Mr. <u>Ohr.</u>  I knew -- he would not give me the source of his information, so I couldn't get it.

Mr. <u>Gowdy.</u>  How much of what Chris Steele told you would have ever come out in a courtroom?

Mr. <u>Ohr.</u>  I'm not sure it would have.  I --

Mr. <u>Gowdy.</u>  Oh, I'm --

Mr. <u>Ohr.</u>  This was source information.

Mr. <u>Gowdy.</u>  I'm pretty sure it would not.

Mr. <u>Ohr.</u>  Right.

Mr. <u>Gowdy.</u>  Why not?

Mr. <u>Ohr.</u>  It was source information.  It was hearsay.  I --

Mr. <u>Gowdy.</u>  What's hearsay?

Mr. <u>Ohr.</u>  It's something that he did not -- it was something that he heard from someone else.

Mr. <u>Gowdy.</u>  What is hearsay for those not familiar with the definition?

Mr. <u>Ohr.</u>  A statement that was made outside of court.

Mr. <u>Gowdy.</u>  Offered to prove?

Mr. <u>Ohr.</u>  The truth of the matter asserted, yes.

Mr. <u>Gowdy.</u>  Yes.  There are exceptions, but we can't find one for what Chris Steele told you.  Was Chris Steele talking directly to the source?

Mr. <u>Ohr.</u>  I don't know exactly.  I assumed he was talking to a source.  I don't know what the source specifically knew.

Mr. <u>Gowdy.</u>  Did he have subsources?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Gowdy.</u>  I'm guessing you never talked to the sources or subsources.

Mr. <u>Ohr.</u>  That is correct.

Mr. <u>Gowdy.</u>  Well, Mr. Ohr, that information would never see the inside of a courtroom, because you can't cross-examine it.  You can't find out who, if anyone, really is the source of that.  Do you agree?

Mr. <u>Ohr.</u>  Yes.  But this is not evidence in a courtroom.  He is providing information from -- this is source information.  And most FBI investigations involve source information, at least in the early stages.

Mr. <u>Gowdy.</u>  All right.  I don't really want to do this, but we're going to have to do it anyway.  Why would that information not come in a courtroom?  Why is hearsay not allowed?

Mr. <u>Ohr.</u>  We don't -- the rules of evidence are try to ensure that we have, you know, first-person evidence for a courtroom.

Mr. <u>Gowdy.</u>  Why?  Why?

Mr. <u>Ohr.</u>  Because we consider that more reliable.

Mr. <u>Gowdy.</u>  Yes.  It's more reliable, more likely to be true, right?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  And the most powerful tool you have to eliminate the truth is what?  I'll give you a hint.  It's in the Sixth Amendment.

Mr. <u>Ohr.</u>  Cross-examination.

Mr. <u>Gowdy.</u>  You get to confront the people, right?  You get to cross them?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Gowdy.</u>  Not only were you not able to do it, you don't even know if Steele was able to do it.

Mr. <u>Ohr.</u>  Right.

Mr. <u>Gowdy.</u>  So best-case scenario, best-case scenario, it's double hearsay.  Worst-case scenario, we don't have any -- it could be quintuple hearsay, right?

Mr. <u>Ohr.</u>  I think -- I don't know.  It definitely is hearsay, and it was source information, which is what I was telling the FBI.

Mr. <u>Gowdy.</u>  I like the phrase "source information."  Source information is of no help if the source is not credible, agree?

Mr. <u>Ohr.</u>  The FBI -- I agree, but the point -- what the FBI has to do when it gets information is see if there's other information from other places that corroborate the information.  And this is the point of giving -- that's why the FBI collects

source information, not to present it in court, but to see if different sources corroborate each other, and whether a picture begins to emerge.

Mr. <u>Gowdy.</u>  I guess what alarms me about this fact pattern is all the way in December of 2016, a guy named Comey was referring to the information as unverified.  That's in December of 2016.  What happened in October of 2016?

Mr. <u>Ohr.</u>  I'm not sure what you're referring to.

Mr. <u>Gowdy.</u>  Was it used in a court filing?

Mr. <u>Ohr.</u>  I'm not aware of how it was used.

Mr. <u>Gowdy.</u>  Have you read the FISA application?

Mr. <u>Ohr.</u>  I am aware that there was -- I've read in the paper that some kind of a FISA application was used -- or that some of the information was used in a FISA application, but I was not aware of that at the time.

Mr. <u>Gowdy.</u>  Were you aware that Director Comey referred to the information as unverified all the way into December of 2016?

Mr. <u>Ohr.</u>  I don't recall that, you know, at the time, but I certainly considered it, as I said, source information.

Mr. <u>Gowdy.</u>  Do you know what steps Peter Strzok took to either corroborate or contradict the information?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  So you don't know Steele's source.

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Gowdy.</u>  You don't know if he had subsources.

Mr. Ohr.  Correct.

Mr. Gowdy.  You don't know if any of it was even attempted to be corroborated or contradicted?

Mr. Ohr.  My assumption is that the FBI tries to corroborate the information if they think it's something they want to pursue.

Mr. Gowdy.  How would you know better than Comey?  He said it was unverified.  They didn't even try to corroborate it until 2017.

Mr. Ohr.  I don't know what they had, what they were doing.

Mr. Gowdy.  Who at the Department knew that you were talking to Chris Steele and Glenn Simpson?

Mr. Ohr.  I spoke with some people in the Criminal Division, other career officials who dealt with some of these matters. So --

Mr. Gowdy.  Any of them have names?

Mr. Ohr.  Yes.  So I was about to tell you.  One of them was Bruce Swartz, who is the Counselor For International Affairs in the Criminal Division; a person who was working with him at the time, working on similar matters in the Criminal Division was Zainab Ahmad; and a third person who was working on some -- some of these matters I believe was Andrew Weissmann.

Mr. Gowdy.  Who is that last one?

Mr. Ohr.  Andrew Weissmann.  He was the head of the Fraud Section at the time.

Mr. Gowdy.  I've heard his name somewhere before, I think.

Changing the subject, have you talked to anyone on the special counsel's team?

Mr. <u>Ohr.</u>  I've had one social contact with a member of the special counsel team.  An FBI agent who I've worked with in the past named Bill McCausland was, at least for a while, assigned to the special counsel team from New York.  When he was working in Washington, we went out for lunch one time.  We -- obviously, we did not discuss the investigation.  Other than that, I am not aware of any contact with the special counsel team.

Mr. <u>Gowdy.</u>  Did you ever put Chris Steele in touch with anyone on special counsel team?

Mr. <u>Ohr.</u>  I don't know.  I know that the FBI, at one point in 2017, asked me to ask Chris if he would meet with the FBI, and I conveyed that message.  And I know at some point a meeting took place.  I don't know who from the FBI was present, so I don't know if they were from the special counsel team or not.

Mr. <u>Gowdy.</u>  I'm going to have to get you to go back through that again.  You lost me, which I'm sure is my fault, not yours.

Mr. <u>Ohr.</u>  No, no.  Sorry.  So -- I'm sorry, you're going to have to repeat the question so I get it right.

Mr. <u>Gowdy.</u>  Well, I think what I was wondering is whether or not Chris Steele either asked you or communicated to you that he wanted to talk to special counsel team and whether you made any efforts to connect him?

Mr. <u>Ohr.</u>  So the -- okay, that's a different question.  But I

know that Chris Steele referred to the FBI and the special counsel team in some of our conversations it seemed like interchangeably.

I do not know who Chris Steele spoke with when the FBI spoke with him in 2017, so I don't know if the FBI people who spoke with him were a part of the special counsel's team or not.  The person I was speaking with when I reported these conversations was not part of the special counsel team.

Mr. Gowdy.  Are you aware that Chris Steele's relationship with the Bureau soured and/or dissolved at some point in the fall of 2016?

Mr. Ohr.  At some point I became aware of that, yes.

Mr. Gowdy.  How did you learn that?

Mr. Ohr.  I am not sure where I first learned of it.  I certainly would have heard that from Chris Steele at some point, but I'm not sure where I learned it first.

Mr. Gowdy.  Why did it dissolve?

Mr. Ohr.  I don't know specifically.

Mr. Gowdy.  I'm sure Chris told you, didn't he, or did you not ask?

Mr. Ohr.  I mean, I guess I was making an assumption at the time that -- but it's just an assumption, that -- that the FBI would have stopped talking with him because he talked to a reporter.

Mr. Gowdy.  Why would that dissolve a relationship with the Bureau?

Mr. Ohr.  Normally, the FBI tells its sources not to talk to anybody else.

Mr. Gowdy.  That would be a good assumption.  So Chris Steele was working for Fusion GPS and the FBI at the same time?

Mr. Ohr.  Yes, I believe so.

Mr. Gowdy.  Was he being paid by both?

Mr. Ohr.  I believe so.

Mr. Gowdy.  Why was the Bureau paying him for information if you were going to pass it on from Fusion GPS to the Bureau?

Mr. Ohr.  I know the FBI had other contacts with Chris Steele besides my contact, besides what I was getting, but I don't know the specific nature of what they paid him for.

Mr. Gowdy.  Did you ever talk to the media?

Mr. Ohr.  No.

Mr. Gowdy.  Did DAG Yates know that you were talking to Steele or Simpson?

Mr. Ohr.  No.

Mr. Gowdy.  Did any of your supervisors at the Department know?  I think the others you described were more peers.

Mr. Ohr.  Right.

Mr. Gowdy.  Any of your supervisors?

Mr. Ohr.  No.

Mr. Gowdy.  Do you know if Mrs. Nellie Ohr ever talked to Peter Strzok?

Mr. Ohr.  I don't know of any conversation, no.

Mr. <u>Gowdy.</u>  If there were a text from Strzok to Page that said, quote, "remind me [redacted, name redacted] met with Bruce and got more stuff today," close quote, do you know who that Bruce would be?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  Could it be Bruce Ohr?

Mr. <u>Ohr.</u>  I guess it could be.

Mr. <u>Gowdy.</u>  Do you remember meeting with someone on or about December 20th and getting information from that person?

Mr. <u>Ohr.</u>  Not as I sit here.

Mr. <u>Gowdy.</u>  Would anything refresh your recollection?

Mr. <u>Ohr.</u>  Maybe an email or something.  I don't know.  I don't think in my notes it reflected anything like that.

Mr. <u>Gowdy.</u>  If I remember correctly, the only sources of information for you were Simpson, Steele, and Mrs. Ohr.

Mr. <u>Ohr.</u>  Yes.  Outside the government, yes.

Mr. <u>Gowdy.</u>  What was the last part?

Mr. <u>Ohr.</u>  Outside the government, yes.

Mr. <u>Gowdy.</u>  All right.  Other than Mrs. Ohr, were you talking to the other two in December of 2016?

Mr. <u>Ohr.</u>  I believe I met with Glenn Simpson in December 2016.

Mr. <u>Gowdy.</u>  About what?

Mr. <u>Ohr.</u>  He provided me with a memory stick, and he provided additional information regarding the contacts between the Russians

and the Trump campaign.

    Mr. Gowdy.  So now we're up to two memory sticks.

    Mr. Ohr.  Yes.

    Mr. Gowdy.  Both of whom could have gone to the Bureau but
didn't.

    Mr. Ohr.  Oh, I provided them to the Bureau.

    Mr. Gowdy.  I get that.  I get that, Mr. Ohr.  I'm still
wondering why they wanted to go through a DOJ attorney that was
not assigned to the investigation.

    Mr. Ohr.  Well, I've known Glenn Simpson, not very well, but
I've known him for several years.  So maybe he felt more
comfortable talking with me.  That's my -- that's my assumption,
but --

    Mr. Gowdy.  You've been with the Department since 1991?

    Mr. Ohr.  Yes, sir.

    Mr. Gowdy.  Are there other cases where you recall taking
information from fact witnesses and passing it on to the Bureau?

    Mr. Ohr.  Yes.  I don't recall specific instances, but
whenever I -- over the years, as I've talked with people who are,
you know, experts or have information one way or another on
transnational organized crime, including Russian organized crime,
I take their information, and if it looked like it -- if there's
anything there, I would pass it to the FBI.

    Mr. Gowdy.  I've been out of it for about 8 years, so you
help me if I'm wrong, but a stick, or thumb drive, would be

physical evidence --

Mr. Ohr.  Yes, sir.

Mr. Gowdy.  -- for which a chain would exist --

Mr. Ohr.  Yes.

Mr. Gowdy.  -- if it were ever needed in court?

Mr. Ohr.  Right.

Mr. Gowdy.  And you made yourself part of the chain?

Mr. Ohr.  Yes.

Mr. Gowdy.  Can you think of other instances in your career since 1991 where you made yourself part of a chain of custody?

Mr. Ohr.  Not -- I don't remember getting any other sticks or anything like that, so --

Mr. Gowdy.  How many cases would you say you handled in your career at the Department?

Mr. Ohr.  When I was an AUSA and actively prosecuting cases, I'm sure I did a few hundred.

Mr. Gowdy.  Then if tradition holds, you did a few less when you went to Main Justice than when you were out in the field?

Mr. Ohr.  Yes.

Mr. Gowdy.  So what, 250, is that conservative?

Mr. Ohr.  I wouldn't want to guess.

Mr. Gowdy.  I want to be conservative.  200?

Mr. Ohr.  As I said, I'm sure it was, you know, several hundred altogether.

Mr. Gowdy.  Several hundred would be more than 200, but we'll

COMMITTEE SENSITIVE

be really conservative and say 200.

    Mr. <u>Ohr.</u>  All right.

    Mr. <u>Gowdy.</u>  And you can't think of a single case where you
inserted yourself into a chain of custody other than this one?

    Mr. <u>Ohr.</u>  That's right.

    Mr. <u>Gowdy.</u>  I guess my colleagues are wondering why.  Why
this one?

    Mr. <u>Ohr.</u>  As I mentioned before, I met people over the years
who would have information that they wanted to tell somebody in
U.S. law enforcement.  I had been working in this area for many
years, so many people know me but might not know an FBI agent
who's working in this area.  They would tell me things; I would
pass it to the FBI.

    Mr. <u>Gowdy.</u>  You never gave information to your wife to then
give to Fusion GPS?

    Mr. <u>Ohr.</u>  No.  No.

    Mr. <u>Gowdy.</u>  Did you ever have any conversations with Peter
Strzok about Donald Trump?

    Mr. <u>Ohr.</u>  I don't believe so, no.

    Mr. <u>Gowdy.</u>  What causes you to not be certain?

    Mr. <u>Ohr.</u>  Well, I passed him the information I had received,
so that's -- you know, so that information mentions Donald Trump's
name, but outside of that, I don't think we had any other
conversations.

[10:05 a.m.]

Mr. Gowdy.  Did he ever express any animus or bias towards Trump to you in those conversations?

Mr. Ohr.  I don't think so, no.

Mr. Gowdy.  Did you ever meet with Lisa Page?

Mr. Ohr.  She was at the same meeting -- she was at the meeting with Peter Strzok, and she was at the initial meeting with Andrew McCabe.

Mr. Gowdy.  Where did the meeting take place, the one with you and Strzok and Page?

Mr. Ohr.  I belive that was in the Criminal Division at main Justice.

Mr. Gowdy.  Did either one of them express any concern that you were in a chain of physical evidence?

Mr. Ohr.  Well, at that point, I don't believe that any memory sticks had been passed.  So they understood that I had received information, and they said they would get me an agent to talk to who would write the stuff down and do whatever -- well, I don't know if write it down, but that they would give me an agent to speak with and provide the information.

Mr. Gowdy.  Is that why there are 302s of you in the file?

Mr. Ohr.  I believe so.

Mr. Gowdy.  That is the agent interviewing you?

Mr. Ohr.  Yes.

Mr. Gowdy.  Who did you give the sticks to?

Mr. <u>Ohr.</u>  The agent.  Yes.

Mr. <u>Gowdy.</u>  Which agent?

Mr. <u>Ohr.</u>  I believe at this point it was Joe Pientka.

Mr. <u>Gowdy.</u>  Did you get a receipt?

Mr. <u>Ohr.</u>  No.

Mr. <u>Gowdy.</u>  No chain of custody receipt?

Mr. <u>Ohr.</u>  I just -- this was, you know, unverified, as you say.  It was source information.  I just passed it to the FBI for whatever it was worth.

Mr. <u>Gowdy.</u>  Why did you meet with Chris Steele after the FBI had dissolved its relationship with him?

Mr. <u>Ohr.</u>  I don't believe I met with Chris Steele at any point after that.  Chris Steele would continue to call at various times, and I would listen to what he had to say, and I would pass it to the FBI.  The only time information went the other way -- it wasn't information -- was when the FBI asked me to convey to Chris would he be willing to meet with them again and I did that.

Mr. <u>Gowdy.</u>  Who at the FBI asked whether Steele would be willing to meet with them again?

Mr. <u>Ohr.</u>  It was the agent I was talking to.  At that point, I don't remember if it was Joe Pientka or another agent.  At various times, I was told to start talking to a new agent, and so I would provide the information to the new agent.

Mr. <u>Gowdy.</u>  So this is after the Bureau dissolved its relationship with Steele --

Mr. Ohr.  I believe so, yes.

Mr. Gowdy.  -- did not pay him the last installment of the money he thought was owed --

Mr. Ohr.  Yes, I believe so.

Mr. Gowdy.  -- for breaking the agreement that he had with them not to tell others that he was a Bureau source and/or talking to the media.

Mr. Ohr.  That is my assumption.  But, yes, I was not part of any decision at the FBI, so I don't know specifically.  But that is my understanding.

Mr. Gowdy.  And your testimony is someone at the Bureau was willing to reengage with Christopher Steele.

Mr. Ohr.  Yes.

Mr. Gowdy.  And tell me again who that was.

Mr. Ohr.  I don't know where the request came from.  It was given to me by the agent that I was reporting to, and then I conveyed that to Chris Steele.

Mr. Gowdy.  Did you ever wonder why the Bureau didn't convey that directly to Steele, why the Bureau was also using you as a conduit?

Mr. Ohr.  I don't remember if I wondered about that at the time.  I guess it didn't seem out of place, since I was telling them:  Hey, this is what he told me.  And they said:  Oh, well, the next time you talk with him, can you ask him this?  And so I did.

Mr. <u>Gowdy.</u>  I have only got a little bit of time left.  I see Mr. Ratcliffe writing furiously, so he can have the 1 minute and 30 seconds I have left.

Mr. <u>Ratcliffe.</u>  Mr. Ohr, I want to make sure I heard you right.  You met with Lisa Page on two occasions that you --

Mr. <u>Ohr.</u>  I remember two.  There might have been a third, but I remember two.

Mr. <u>Ratcliffe.</u>  And one of those was shortly after you met with Christopher Steele.  On July 30, you had a meeting with Andy McCabe and Lisa Page.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  You said that meeting was at main Justice?

Mr. <u>Ohr.</u>  No, that meeting was in Andrew McCabe's office.

Mr. <u>Ratcliffe.</u>  It was in Andrew McCabe's office.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  And it was sometime, you believe, in August, because it was shortly after the meeting with Christopher Steele?

Mr. <u>Ohr.</u>  Probably, yes.

Mr. <u>Ratcliffe.</u>  And that was because, at that point in time, you wanted the FBI to have that information and be aware of your contact with Christopher Steele?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  Did anyone prompt that call to Andy McCabe?

Mr. <u>Ohr.</u>  No, I don't think so.  I think that was me.  Just me.

Mr. Ratcliffe.  You, out of just an idea that that was the appropriate thing to do?

Mr. Ohr.  Yes.

Mr. Ratcliffe.  Okay.  But you also thought it was appropriate to be communicating with Christopher Steele.

Mr. Ohr.  Yes.

Mr. Ratcliffe.  Okay.  Even though you don't have any authority, apparently.

Mr. Ohr.  He is just calling me or meeting with me, as we had done on and off for many years.  So if he tells me something that is of interest or concern, I pass that to the FBI.

Mr. Ratcliffe.  And you said something about you thought that was your job.

Mr. Ohr.  Yes.  Part of my job, as I saw it, as having been for a long time responsible for organized crime at the Department, was to try to gather as much information or introduce the FBI to possible sources of information, whatever ways to further the program's goals.

Mr. Ratcliffe.  Okay.  But yet Sally Yates -- she was your boss, right?

Mr. Ohr.  Yes.

Mr. Ratcliffe.  You said she didn't know that you were talking to Steele or Simpson?

Mr. Ohr.  Correct.

Mr. Ratcliffe.  How do you know she didn't know?

Mr. <u>Ohr.</u>  Well, I didn't tell her.

Mr. <u>Ratcliffe.</u>  Okay.  So she may have known from some other source.

Mr. <u>Ohr.</u>  Possible.

Mr. <u>Ratcliffe.</u>  Well, you would think she would, because over at the FBI Andy McCabe knew that you were talking to Steele and Simpson as early as August of 2016.

Mr. <u>Ohr.</u>  Right.  But I don't know what, if anything, was conveyed to Sally Yates.

Mr. <u>Ratcliffe.</u>  Andy McCabe knew.  Did Jim Comey know in August of 2016 that you were talking to Christopher Steele and Glenn Simpson?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Ratcliffe.</u>  I think our first hour has expired.  So I will visit with you in a little bit.

Mr. <u>Ohr.</u>  Okay.

[Recess]

Ms. <u>Shen.</u>  We are back on the record.  The time is 10:25.

Sir, my name is Valerie Shen.  I am the chief national security counsel for Ranking Member Cummings on the House Oversight and Government Reform Committee.

Ms. <u>Hariharan.</u>  Arya Hariharan for Ranking Member Nadler.

Ms. <u>Shen.</u>  We will be leading the questioning on behalf of the minority side today.

Mr. <u>Ohr.</u>  Good morning.

Ms. <u>Shen.</u>  Good morning.

EXAMINATION

BY MS. SHEN:

Q   So I would like to ask you just some additional background questions about your career.  So we will end up covering, I think, some of the ground that we mentioned last round.  But what is your current title at the Department of Justice?

A   I am a senior counsel in the Office of International Affairs in the Criminal Division of the Justice Department.

Q   And how long have you held that position?

A   Since January of this year.

Q   And how would you describe your general roles and responsibilities in that position?

A   I advise the director and deputy directors of the Office of International Affairs in the operation of the office and the work of the office.

Q   Who is currently your direct supervisor?

A   The Director of Office of International Affairs is Vaugh Ary, A-r-y.

Q   And who does Vaughn Ary report to?

A   He reports to the Deputy Assistant Attorney General, Bruce Swartz, and to the Assistant Attorney General.

Q   And who does that Assistant Attorney General report to?

A   The Deputy Attorney General.

Q   Who reports to the Attorney General.

A   Correct.

Q   What previous positions have you held at DOJ?  What was your previous position before your current one?

A   My previous position was the Director of the Organized Crime Drug Enforcement Task Force, or OCDETF, OCDETF.

Q   What was your role and your responsibilities as part of that position?

A   I was the head of that component responsible for the operation of OCDETF and helping to coordinate drug and organized crime investigations within the Department.

Q   And how long did you hold that position for?

A   I had that position from late 2014 until January of 2018, the current year.

Q   And when you were in that position, who did you directly report to?

A   I reported to the Deputy Attorney General.

Q   What was your position at the Department of Justice prior to the Director of OCDETF?

A   From 2011 to 2014, I was counselor for transnational organized crime and international affairs in the Criminal Division.

Q   And what were your roles and responsibilities as part of that position?

A   I worked on organized crime policy matters and on

international policy and case matters as they came up.

Q   And who did you report to when you were in that position?

A   To Bruce Swartz and to the Assistant Attorney General.

Q   And what position did you hold at the Department of Justice before you were the counselor for transnational organized crime and international affairs?

A   From 1999 to 2011, I was the chief of the Organized Crime and Racketeering Section in the Criminal Division.

Q   And what were your roles and responsibilities in that position?

A   I oversaw the Department of Justice's organized crime program, primarily transnational organized crime.

Q   And who did you report to as part of that position?

A   I reported to one of the deputy assistant attorney generals in the Criminal Division.  For most of the time that I was the chief of that section, I reported to Deputy Assistant Attorney General John Keeney, K-e-e-n-e-y.

Q   And what was your position at the Department of Justice prior to that position?

A   From 1991 to 1999, I was an assistant U.S. attorney in the U.S. Attorney's Office for the Southern District of New York.

Q   And what types of cases did you prosecute when you were in the Southern District of New York?

A   Many different kinds of cases.  I served in the general

crimes unit, the narcotics unit, senior narcotics unit, securities unit, the gang unit, and in my last year in the office I was the chief of the violent gang unit.

Q   As part of the chief of the violent gang unit, are there any particular cases you found notable?  Or can you just elaborate a little bit more about your work as the chief of the violent gangs unit?

A   Our job was to prosecute the most violent gangs in New York City.  We did provide numerous prosecutions for murder, racketeering, drugs of violent gangs in various parts of New York City.

Q   Are you a counterintelligence expert?

A   No.

Q   Have you ever worked as a counterintelligence professional?

A   No.

Q   What would you say your professional areas of expertise are?

A   I have worked most of my career in organized crime and drug investigations.

Q   How many years of experience do you have in organized crime?

A   Certainly the time I was chief of the Organized Crime Section, 12 years.  I worked some organized crime cases when I was an AUSA.  And then as counselor -- well, I would say everything

COMMITTEE SENSITIVE

since then has involved organized crime.

Q   So it would be fair to say you have decades of
experience in organized crime.

A   Yes.

Q   Are there certain nations or regions of organized crime
that you have had a special focus on in your career?

A   Yes.  We are concerned with organized crime from many
different regions.  Russia and the former Soviet Union is one.
Eastern Europe and the Balkans is another.  Asian organized crime
and emerging organized crime groups from other parts of the world
as well.

Q   So would you call yourself an expert in Russian
organized crime?

A   Yes.

Q   And as part of your work in Russian organized crime,
have you worked on cases involving the Russian mafia or mob?  I am
not sure what the correct terminology is.

A   Yes, I have overseen those kind of investigation is.

Q   And in your investigations involving the Russian mafia
or mob, what types of investigations or crimes do those tend to
involve?

A   They often involve fraud, public corruption, extortion,
money laundering, other crimes.

Q   Do those criminal investigations sometimes involve
Russian oligarchs?

A   Yes.

Q   Have you ever prosecuted a Russian oligarch?

A   One of the cases that I had some supervisory responsibility as the chief of the Organized Crime Section was the prosecution of a former prime minister of Ukraine named Pavlo Lazarenko.  He was not only a former Prime Minister but he had a great deal of money, so I suppose you could call him an oligarch.

Q   What was Pavlo Lazarenko -- what kind of criminal activity was he engaged in?

A   I believe we charged him with money laundering and fraud.

Q   Can you describe in a little bit more detail what your specific role was in that prosecution of Pavlo Lazarenko?

A   The prosecution of Lazarenko was carried out by the San Francisco Strike Force, which was in the U.S. Attorney's Office for the Northern District of California.  As the chief of the Organized Crime Section in Washington, we had some supervisory responsibility for all Strike Force investigations.

Q   And why is his case specifically notable to you?

A   He was an extremely prominent figure both politically and having a lot of money in Ukraine.  The case involved corruption on a very large scale:  theft of Ukraine Government moneys.  He came to the United States.  So it was a very long and drawn-out prosecution.

Q   How long was the prosecution, do you recall?

COMMITTEE SENSITIVE

A   I don't remember exactly, but it was several years.

Q   As part of the prosecution of Pavlo Lazarenko, were there other individuals who were also prosecuted in related crimes?

A   Yes, there was another defendant in California.  I believe his name may have been Kerechenko, but I am not sure.

Q   Was that individual a U.S. citizen or a Russian national?

A   I don't recall.

Q   Do you recall playing a role in the 2003 indictment of the Russian crime boss Semion Mogilevich?

A   Yes.

Q   Okay.  And can you describe what your role was in that prosecution?

A   Again, as the chief of the Organized Crime Section, we had some supervisory responsibility for the work of the Philadelphia Strike Force that indicted Semion Mogilevich.  I don't recall now whether there was a RICCO charge -- I believe there was in that case -- and we had an independent responsibility to review and approve all RICCO indictments before they were filed.

Q   Do you recall generally what types of crimes Semion Mogilevich was involved in?

A   He was involved in stock manipulation, if I remember correctly.

COMMITTEE SENSITIVE

Q   Do you recall the revocation of Russian oligarch's Oleg Deripaska's visa around 2006?

A   Yes, although there -- yes.  There have been different incidents involving Mr. Deripaska over the years, so I may have trouble remembering specifically what happened in 2006.  But yes.

Q   I guess I will go to the beginning.  What is sort of your earliest recollection of your official involvement in prosecution or activity involving Oleg Deripaska?

A   I don't recall my first exposure to matters involving Mr. Deripaska, but I do recall that, at some point, it may have been in 2006, I worked with the FBI and with other U.S. Government agencies to try to limit Mr. Deripaska's access to the United States.

Q   And why did yourself and the FBI believe Mr. Deripaska's access to the United States should be limited at that time?

Mr. Weinsheimer.  He really can't get into other investigations and the basis for that investigation.

Ms. Shen.  Okay.

    BY MS. SHEN:

Q   Can you describe as a more general matter why Mr. Oleg Deripaska was on the United States Government radar?

A   I can say generally that Mr. Deripaska's activities have been of concern to the U.S. Government for some time.

Q   So, overall, would it be fair to say that you have significant experience in investigating and prosecuting Russian

organized crime, including Russian oligarchs with connection to
the Russian Government?

A    Yes.

Q    Mr. Ohr, why did you decide to join the Justice
Department?

A    I wanted to prosecute cases.  I believe strongly in the
mission of the Department of Justice, to protect our American
citizens by investigating and prosecuting crime.  That is what I
wanted to do.

Q    And in your nearly three decades at the Justice
Department, what would you call your proudest accomplishment?

A    It is hard to single out any particular accomplishment.
I think I feel very privileged to have been able to work at the
Department for this long.  I think when a prosecutor looks back on
their career, they remember things like their first trial, they
remember things like their longest trial.  Those tend to stick out
more than stuff that you do in a managerial capacity.  But it
would be hard for me to single out any one episode.

Q    Let me just step back for a moment, just because there
is certainly a lot of mention of Russian oligarchs in the news
these days.  Certainly, some of the individuals are part of our
investigation.  And with your experience, I was wondering if you
could elaborate at a higher level to, you know, if and why you
think it is important for us to understand what the national
security implications are of these individuals and the crimes they

commit.

I mean, a lot of these crimes we talk about are of a financial nature, money laundering.  But I don't think it really puts maybe the full context of perhaps the import, you know, to the country.

So I was just wondering if you could speak a little bit more in detail about, you know, the body of work that you have been engaged in and how you think people should really think about these cases in a larger sense, right, and why they should matter to them.

A    Okay.  I will try to answer that question.

You began with Russian oligarchs.  I think one thing that outsiders do not always understand is that Russia works differently from the United States and most Western countries, that Russia is a place where, unfortunately, crime and corruption are quite pervasive, and that the line between government, business, and organized crime is thin, gray, nonexistent, whatever you want to say.  So what people might look at as a business deal or a government action often may be linked to criminal activity.  And so we have to be very careful when we see Russian criminal, business, or government activity and be aware that they often flow into each other.

It is my experience that Russian criminals, businessmen, government officials often use the government for their own private ends, and, conversely, the Russian state often uses

oligarchs and criminals for government ends, to an extent which I think is not well understood by most people in the West.

Q    Okay.  So, if I am hearing right, it sounds like in Russia it is often indistinguishable, criminal networks from the official Russian Government network, and where those boundaries may lie.  Is that accurate to say?

A    Yes.

Q    Okay.  And so would it be fair to say that the activities of Russian oligarchs who may be involved in crimes is especially notable because they are also so heavily involved in the business of the official Russian state?  Is that a fair statement?

A    Yes.

Q    You know, we have also -- I have certainly heard many reports about particular acts of violence both within official Russian state officials but also these so-called Russian oligarchs.

So I was wondering if you could speak more -- is that something you have witnessed in your experience as well, in the course of your prosecutions, just certain threats that may not be as familiar to the tactics that we would expect of U.S. businessmen, certainly?

A    Yes.  Because the lines are so blurry in Russia, there is always the potential for violence.  At different times since the fall of the Soviet Union, the violence has been more or less

COMMITTEE SENSITIVE

explicit, but the threat of violence is always there.  And people who are doing things in Russia that involve a lot of money or government actions, I think, always are calculating whether some sort of violence could occur.

Q   Has a specific threat of violence ever come up either for you personally or a colleague of yours as they have been involving themselves in investigating or prosecuting a case related with Russia?

A   I don't believe I recall any times where I have personally felt threatened.  I think investigators working in this area are always cautious.  I can't remember any specific incidents, as I sit here.

Q   I imagine that yourself and other prosecutors, investigators who work in Russian organized crime would have contacts with certain sources or at least sources who are sources who are either Russian nationals or have ties to that world.  Do you feel like the threat of violence affects the type of sourcing that you tend to be involved in?

A   Sure.  I think people who are reporting or conveying information about Russian organized crime and corruption, I think they are very concerned about their safety.

Q   And so, in your experience, the sources related to your work, is it, in your mind, especially important to keep their identities confidential because of the potential risk to personal safety?

A   Yes.

Q   Okay.

Mr. Ohr, I would like to turn back now to really just kind of lay out the chronology of your relationship with Mr. Steele and some of the contacts that you have had over the years just so we can get a complete understanding of how that developed and where we are today.

So, as I am sure you might have gathered, one of the major reasons you have been asked to appear before this joint investigation is related to your relationship with Christopher Steele and your contacts with him.  So how did you first meet Mr. Steele?

A   I believe I met Chris Steele for the first time around 2007.  That was an official meeting.  At that time, he was still employed by the British Government.  I went to London to talk with British Government officials about Russian organized crime and what they were doing to look at the threat, and the FBI office at the U.S. Embassy in London set up a meeting.  That was with Chris Steele.  And there were other members of different British Government agencies there.  And we met and had a discussion.  And afterwards, I believe the agent and I spoke with Chris Steele further over lunch.

That was, I think, the first time I met him.

Q   And you said that Mr. Steele worked for the British Government at the time.  Was that at MI-6?

A   Yes.

Q   And you said in this meeting that he was one of several British Government employees at the meeting?

A   Yes.

Q   So, based on that introduction, is it fair to say that your contacts with Christopher Steele began as a, you know, shared professional specialization?

A   Yes.

Q   And that specialization would be Russian organized crime?

A   Yes.

Q   So, at the time that you were introduced to Mr. Steele, was he considered a specialist in Russian organized crime?

A   That was my understanding, yes.

Q   Subsequent to that first meeting, did you attend other related meetings or events with Mr. Steele?

A   Around the beginning of 2008, I recollect meeting Chris Steele -- I believe this was the next time I met him -- at some sort of a conference in England.  I forget the exact location, but it was talking about Russian organized crime.  And there were many participants there -- I don't remember exactly -- and Chris Steele was one of the people there.

Q   How did you run into him?  Was he a panelist?  Did you see him, recognize him?  How did that --

A   I think it was the latter, but I don't recall exactly.

Q    Okay.  So, at the time that you met Mr. Steele again, it was in the capacity as a previous or a professional contact or acquaintance.  Is that correct?

A    That is right.

Q    Okay.  Is it generally common to encounter either current or former law enforcement or intelligence officials at such conferences?

A    Yes.

Q    Okay.  Rough estimate, how often would you say you encountered, you know, such individuals, like, a second time at an event like that?

A    It is pretty common.  I can't give a percentage.

Q    But you wouldn't be surprised at all to see a familiar face from your professional network at a conference like that.

A    Exactly.

Q    Okay.

Can you sort of describe in general terms the community of law enforcement and intelligence officials who do specialize in Russian organized crime?  You know, would you call it an extremely large number of people or limited?  I am just trying to get a sense of the world and sort of how tight-knit it is versus who is likely to know each other where.

A    I couldn't give you an exact number, obviously, but I know the number of agents and prosecutors working on, say, Russian organized crime matters has historically been pretty small.  That

COMMITTEE SENSITIVE

goes both for the United States and for other nations as well. So, over the years, you tend to meet most of the people who are working in this area.

Q   Okay.  So, of the specialists who work in Russian organized crime, there are very few specialists that you wouldn't know, given the number of years you have been working in this area.  Is that fair to say?

A   I probable know most of them, yes.

Q   Okay.  And most of these other individuals probably also know each other and likely have professional contacts with each other over the years?

A   Yes.

Q   So I guess it would be fair to say that your association with Mr. Steele developed naturally because, again, there are just only so many expert in Russian organized crime.  Is that correct?

A   Yes.

Q   And so you did not develop a relationship with Mr. Steele for any improper or political purpose.

A   That is correct.

Q   Would you describe your relationship with Mr. Steele as a purely professional one?

A   Over the years, we would talk and have lunch together. So I would say, you know, we would talk a little bit about our families.  So, in that sense, it is professional, but it is a cordial relationship.

Q   Sure.  So you would talk about your families in a way that, say, work colleagues might talk about their families?

A   Yes.

Q   So, since meeting Mr. Steele and sort of the two specific meetings we just talked about, how often would you estimate you had contacts with him subsequently?

A   It is hard to say.  Maybe once a year.  It might be a couple of years between hearing from him, or I might hear from him twice in 1 year.  But not that frequently.

Q   What form did these contacts tend to take place?  Were they in person?  Calls?  Emails?

A   Some of both.  At some point, Chris Steele left the British Government and became involved with a firm called Orbis.  And, at that point, I know he -- sometime after that we were in contact, and we stayed in contact.  So sometimes it was by telephone, email.

Q   And, generally speaking, what were the purposes of your contacts with Mr. Steele?

A   Generally, Mr. Steele would be providing some information about Russian organized crime that he thought would be of interest to the U.S. Government.

Q   And so these contacts with Mr. Steele tended to be related to your work in Russian organized crime.

A   Yes.

Q   And throughout your contacts with him, did you consider

COMMITTEE SENSITIVE

Mr. Steele to be a trustworthy expert in his field?

A    Yes.  He was certainly very skilled, and, yes, I believe
he was pretty trustworthy.

Q    Did Mr. Steele ever have involvement in or make
contributions to any of your prosecutions at the Department of
Justice?

A    Chris Steele provided information that did help specific
cases, yes.

Q    And did you sometimes also consult with him on your
official matters, or was it more just receiving information?

A    I think it was more receiving information.

Q    And this information that you received from Mr. Steele
proved credible and actionable in some of your cases?

A    At least in some of the cases, I think it was
actionable, yes.

Q    Okay.

So now I would like to sort of switch to the 2016-2017
timeframe.  And since we are in unclassified setting, I will try
to keep all the information to that, but if at any point you think
the answer does involve classified information, please just let us
know, and we can address that.

Do you recall what your first contact was with Mr. Steele in
2016?

A    I believe we had some sort of email contact early in
2016.

COMMITTEE SENSITIVE

Q    And what did that contact consist of?

A    He was providing some information about Oleg Deripaska.

Q    And, again, we heard his name in the last round, but can you just briefly describe to us, like, who is Oleg Deripaska, like, what is his significance?

A    Oleg Deripaska is a Russian oligarch.  He, until very recently, was the head of a company called RUSAL, one of the biggest, if not the biggest, aluminum producers in the world.  He also has connections to organized crime and to the Russian Government.

Q    And why did Mr. Steele reach out to you about Oleg Deripaska?

A    I believe he was letting me know that Mr. Deripaska would be in the United States at some point.

Q    And why did you believe he thought that would be information significant to you?

A    I don't recall.  I mean, I don't know exactly what he was thinking.  He was just letting me know in case we wanted to do something, I suppose.

Q    What was your reaction to receiving that information?

A    I thanked him for the information.

Q    Did you respond to him in any way at the time?

A    I think my response was basically, "Thank you.  I'll keep an eye on it," or something like that.

Q    So it was just a piece of information that he thought

you might be interested in, but it wasn't part of an existing
conversation or it wasn't part of some larger conversation at the
time.

A   We had spoken about Deripaska over the years, so it is
just the latest bit of information.

Q   Okay.  Do you recall what your next contact was with Mr.
Steele after that regarding Deripaska?

A   Not specifically.  I know there were a couple of
contacts early in the year, but then I don't remember exactly what
the next contact was.

Q   Do you recall if Mr. Steele brought issues to you other
than regarding Mr. Deripaska in the early 2016
timeframe or later in the year?

A   As I sit here, I don't recall if there were any other
topics.

                    [Ohr Exhibit No. 1

                    Was marked for identification.]

          BY MS. SHEN:

Q   So I am going to introduce as exhibit 1 a July 1, 2016,
email from yourself to Chris Steele with the subject matter
"Availability for a Skype com with CDS?"

     Mr. Ohr, are you familiar with this email chain?

A   Yes.

Q   Okay.

I will also note that this email is Bates-stamped

COMMITTEE SENSITIVE

HPSCI-32318-DOJ-6, indicating that it was produced to the House Permanent Select Committee on Intelligence, and marked "law enforcement sensitive" in the header.  This document was, however, recently leaked to the press and posted online.

So, in the first message at the bottom of the page, Mr. Steele writes to you, quote:  "Dear Bruce, I hope all is well with you.  I am seeing" -- redacted -- "in London next week to discuss ongoing business, but there is something separate I want to discuss informally and separately.  It concerns our favorite business tycoon."

So, Mr. Ohr, I think you already answered this question, but can you describe what Mr. Steele wanted to discuss with you informally and separately about your favorite business tycoon?

A   I don't recall if this is the specific time he raised it, but I think he was letting me know that there might be an opportunity to interview Oleg Deripaska.

Q   So, again, "our favorite business tycoon" is a reference to Oleg Deripaska?

A   Yes.

Q   And the "favorite business tycoon" is not a reference to then-candidate Donald Trump?

A   No.

Q   Can you speak a little bit more to why during this timeframe Mr. Steele would reach out to you again involving Mr. Deripaska?

COMMITTEE SENSITIVE

A   Again, I am not 100 percent sure just from looking at this document, but I believe that at about this time Chris Steele was letting me know that there might be an opportunity for the U.S. Government to interview Oleg Deripaska.

                [Ohr Exhibit No. 2

                Was marked for identification.]

         BY MS. SHEN:

Q   So I am now going to introduce as exhibit 2 an email chain dated July 30, 2016, between yourself and Chris Steele with the subject "CDS in D.C."

It is also Bates-stamped with HPSCI-DOJ-8 and marked "law enforcement sensitive" in the header.  This document was also leaked to the press and posted publicly recently.

Mr. Ohr, are you familiar with this email chain?

A   Yes.

Q   So, at the top of the chain, Mr. Steele writes, quote: "Great to see you and Nellie this morning, Bruce.  Let's keep in touch on the substantive issues.  Glenn is happy to speak to you on this if it would help."

Mr. Ohr, who were all the attendees of this morning meeting referred to in the chain?

A   Chris Steele was there.  He had an associate at the meeting whose name I do not recall.  And my wife, Nellie, and I.

Q   Okay.  And what were the substantive issues that were raised during this meeting?

A   Chris Steele provided some information to us.
Specifically, he -- these are the things I mentioned before.  He
talked about the people that Carter Page had met with when he was
in Moscow sometime before this.  He told me that the former head
of -- or he had information that the former head of the Russian
foreign intelligence service had said that they had Trump over a
barrel.  And he told me that Paul Hauser, a lawyer who worked for
Oleg Deripaska, was collecting information about a large amount of
money that Oleg Deripaska had -- or that Paul Manafort had stolen
from Oleg Deripaska.

Q   So I believe in the last round you said that some of
these Carter Page meetings were with high-level Russian officials.
Is that accurate?

A   Yes.

Q   And did you recall any of the names of the high-level
Russian officials?

A   The trouble is that there are several high-level Russian
officials with similar names.  So I do not want to get the wrong
name here.

Q   Okay.  Was it notable to you that Carter Page had
in-person meetings with high-level Russian officials?

A   Yes.  In combination with the other item that Chris
Steele mentioned, it was very concerning, yes.

Q   Okay.  So it is not typical to hear about a U.S. citizen
who has meetings with high-level Russian officials.  Is that fair

to say?

A   Yes.  But, in particular, in this case, I think there had been a press story where Carter Page or some associate claimed he had met with different people.  So it was particularly concerning here because it sounded like he may be concealing that he had met with higher-level Russian officials.

Q   I see.  So Mr. Steele was bringing you information not just about what he believed were meetings that took place but meetings that were attempted to be concealed.  Is that correct?

A   Yes.

Q   Okay.

So, in that same email, the "Glenn," is that a reference to Mr. Glenn Simpson?

A   Yes.

Q   And why do you think Mr. Steele suggested that you might want to talk to Glenn about these issues -- Mr. Simpson?

A   Well, I don't know exactly what Chris Steele was thinking, of course, but I knew that Chris Steele was working for Glenn Simpson and that Glenn might have additional information that Chris either didn't have or was not authorized to prevent, give me, or whatever.

Q   Did you, in fact, talk to Mr. Simpson about these issues?

A   I believe I spoke with Mr. Simpson a few weeks later in August.

Q    And did Mr. Simpson provide you additional details about --

A    He did provide me some additional information.

Q    What were some of those additional details?

A    Again, I don't want to -- I met with him a couple times and I met with Chris Steele a couple times, so I don't want to get it wrong.  I don't know exactly what Glenn Simpson provided in August.

Q    Were there any other topics that were discussed during your July 30, 2016, meeting?

A    Yes, there were.  Based on my sketchy notes from the time, I think there was some information relating to the Russian doping scandal, but I don't recall the substance of that.  And based on my notes, it indicated that Chris Steele had provided some reports to the FBI, I think two, but that Glenn Simpson had more.

Q    Was this the Russian doping scandal related to the FIFA allegations?

A    I don't recall.

Q    Okay.

So your wife, Nellie, also attended this meeting.  What, if any, role did she participate in the substantive discussions?

A    I don't think she said anything.  And I don't know if she was present for all of the discussion, because Chris Steele and I, at least for part of the discussion, were standing away

from the table.  But she was there, and she certainly heard some of it.

Q   Okay.

And did any topic of this meeting relate to your ongoing substantive work at Department of Justice?

A   Yes.  It was relating to Russian organized crime and Russian Government actions.  To me, it seemed like, yes, it was part of the same topics I had been pursuing for many years.

Q   During this meeting, did you also talk about the Trump campaign and the fall election?

A   Yes.  The Carter Page information I think was significant because there was some sort of connection, at least in the press I think, between Carter Page and the Trump campaign. And, of course, the second item had to do with supposedly the Russian foreign intelligence service having some kind of compromising information about Donald Trump.

Q   Remind me, I think the term you had used was "had Trump over a barrel."  Is that accurate?

A   That is what my notes indicate.  I think that is what Chris said.

Q   Okay.  And how did you interpret "having Trump over a barrel" to mean?

A   My interpretation is that that meant that, if true, the Russian Government had some kind of compromising material on Donald Trump.

COMMITTEE SENSITIVE

Q   Okay.  So, in reporting this to you, do you believe
Mr. Steele believed it to be true that the Russian Government had
some sort of compromising material on then-candidate Donald Trump?

A   I think -- my impression is that Chris Steele believed
his sources.  What I should say in addition, though, is that
whenever you are dealing with information from Russia, you have to
be careful, because it is a very complicated place.  And so even
information from a good source has to be looked at carefully.

Q   Okay.

In the last round, I think someone noted that shortly after
this July 30 meeting the FBI's investigation into potential
coordination between the Trump campaign and Russia was initiated
by the FBI, although you weren't aware of that at the time.  Is
that correct?

A   That is right.

Q   Okay.  So, just to be clear, your July 30, 2016, meeting
didn't have anything to do with the decision to initiate the
investigation into links between Russia and the Trump campaign?

A   None that I know of.

Q   Okay.

So, moving back to, I guess, August 2016, do you recall if
Mr. Steele maintained contact with you into the summer and the
fall of 2016?

COMMITTEE SENSITIVE

[11:12 a.m.]

        Mr. <u>Ohr.</u>  Yes.  But I don't know -- the next time I'm aware
of meeting with Chris Steele is in September.  So, yes.

              BY MS. SHEN:

    Q    And what took place at that September meeting with Chris
Steele?

    A    Chris Steele was in Washington, D.C., again, and he
reached out to me, and, again, we met for breakfast, and he
provided some additional information.

    Q    And can you describe what that additional information
was he provided?

    A    Again, I would have to look at my notes because I don't
want to mix up the different meetings.

    Q    Okay.  Is it fair to say was it a follow-on conversation
from the July 30, 2016?  Was it similar topics?

    A    Yes.

    Q    Okay.  Did you have any other meetings in 2016 after
that September 2016 meeting with Christopher Steele?

    A    I don't believe so.

    Q    Okay.  Did you continue to speak or exchange
communications with Chris Steele after that --

    A    Yes.

    Q    -- September 2016 meeting?

    A    Sorry.  Yes.

    Q    And were those communications on the same set of topics

COMMITTEE SENSITIVE

that were brought up previously in the July 30, 2016, meeting?

A   Yes.

Q   Okay.  Were there any communications you had with Chris Steele in the rest of 2016 that were separate topics entirely, unrelated to what was discussed previously?

A   At some point Chris Steele provided me with some information about an unrelated matter.  I don't recall if it was 2016 or 2017.

Q   But would it be accurate to say that the rest of your contacts, communications with Mr. Steele in 2016 once again related to the substantive information he provided during that July 30, 2016, meeting?

A   Yes.  We were following along on -- he was providing more information along the same lines.

Q   So some of these communications, did they relate to the Russian Government's intent to interfere with the 2016 Presidential election?

A   That is how I read it, yes.

Q   Okay.  And did Mr. Steele provide you specific information related to the Russian Government's attempt to interfere with the Presidential election?

A   I believe so, yes.

Q   And I think I know the answer to this, but so a number of Mr. Steele's communications were related to members of the Trump campaign and allegations of colluding with Russia.  Is that

correct?

    A   I believe so, yes.

    Q   The information that Mr. Steele relayed to you in 2016, did you share this information with Federal law enforcement officials?

    A   Yes, I did.

    Q   Okay.  And who exactly did you share the information with?

    A   As I mentioned earlier, my first move was to reach out for Andrew McCarthy.

    Q   Or Andrew McCabe is what you meant?

    A   McCabe, yes.  Not McCarthy.  I'm sorry.  Andrew McCarthy will be angry.  I know him, too.

But Andy McCabe, yes, and met with him and Lisa Page and provided information to him.  I subsequently met with Lisa Page, Peter Strzok, and eventually Joe Pientka at the FBI.  And I also provided this information to people in the criminal division, specifically Bruce Swartz, Zainab Ahmad, and Andrew Weissman.

    Q   Okay.  So I believe you described a meeting you attended with Lisa Page and Peter Strzok and officials in the criminal division.  Is that correct?

    A   Yes.

    Q   And I believe you said earlier that you did not know Peter Strzok prior to that meeting.  Is that correct?

    A   I believe that is correct.

Q   Did you know Lisa Page prior to that meeting?

A   Yes.

Q   Okay.  How did you know Lisa Page?

A   Lisa Page had previously been a trial attorney in the organized crime and racketeering section, so she was one of my employees.

Q   Oh, okay.  The other criminal division officials at that meeting, did you know them prior to that meeting?

A   Yes.  I worked with Mr. Swartz for many years, and I had worked with Ms. Ahmad for a lesser period of time when she was on detail to Washington.  And I don't recall for sure whether Andrew Weissman was present at this particular meeting, but I know him for -- I've known him for some years as well.

Q   And, again, what exactly was the purpose of that meeting?  Was that for you to relay specific information to those individuals?

A   That was part of the purpose of the meeting.  I think the criminal division officials also wanted to make sure that the criminal and national security parts of the FBI were talking or communicating.

Q   So in other words, there was a desire to have the people with the right portfolios in the room on the same page, to have the same information.  Is that --

A   I believe that's -- yes.

Q   What was your understanding of why Lisa Page was a part

of that meeting?  Was it as a -- how do I say -- as someone representing Mr. McCabe and reporting back to him, or was it a different capacity?

A   Well, she had been introduced into this with my first meeting with Andrew McCabe.  So, yes, in that sense.  But I don't know what she was reporting or exactly what her responsibilities were as part of this subsequent meeting.

Q   Sure.  I'll just ask it more generally.  What was your understanding of why Lisa Page was participating in that meeting?

A   I think she was working on the investigation.

Q   Okay.  And what was your understanding of why Peter Strzok specifically was in that meeting?

A   I believe he was working on the investigation as well.

Q   Again, I mean, this was discussed last round. Obviously, these two names have been in the news for lots of different reasons.  I guess I just want to be able to dispel any notion that there's anything more perhaps than two officials performing their jobs at the time.

So trying to form the question.  Do you have any reason to believe that Lisa Page and Peter Stzrok's attendance at this meeting should indicate any nefarious purpose or concern or implication of bias on the Russian investigation or law enforcement community at large?

A   The answer is no.  I saw their participation as appropriate since I had originally conveyed my information to

Mr. McCabe, and he in turn had put Lisa Page and then Peter Strzok in contact with me.  So it seemed like the natural progression.

And in addition, Peter Strzok and Lisa Page were -- said they would put me in contact with a line-level FBI agent who would be my contact.  And so that also seemed appropriate.

Q   Okay.  So subsequent to that meeting, Lisa Page and Peter Strzok were not your main points of contact at the FBI.  Is that correct?

A   That's correct.

Q   So at the time you decided to share the information you received from Mr. Steele with Federal law enforcement, were you directed to share this information by someone or was this a proactive decision on your part?

A   It was my decision.

Q   And why did you think it was important to share this information with the FBI?

A   I was very concerned when I got the information.  It seemed to have very serious national security implications.  I wanted to get it to the officials, the career officials, who would be able to take the information and evaluate it and decide whether further action was appropriate.

Q   Okay.  And I think you mentioned earlier that this is something you had done before, which is to pass on fact information to the FBI.  Is that correct?

A   That's correct.

Q   And in the past, did you do so for similar reasons because you had a national security concern or something of that nature?

A   Whenever I received information that had an organized crime or a national security nexus, I would convey that information to the FBI.

Q   Okay.  So even if an issue wasn't part of your current official duties, you thought it was an appropriate practice or a desired practice perhaps to pass information to the FBI.  Is that correct?

A   Any time a citizen gets information about a crime or a national security threat it's appropriate to convey it to the FBI.

Q   Okay.  Thank you.

                    [Ohr Exhibit No. 3

                    Was marked for identification.]

          BY MS. SHEN:

Q   Okay.  I'd like to introduce as exhibit 3 a letter dated July 6, 2018, from Senate Judiciary Committee Chairman Chuck Grassley to Deputy Director Rosenstein and FBI Director Wray that in its first paragraph is, quote:  Formally requesting the declassification of the FD-302 interview summaries in which Bruce Ohr relayed his contacts with Christopher Steele and to request that you produce the declassified versions directly to the Senate Judiciary Committee.

Mr. Ohr, are you familiar at all with this letter?

A    No.

Q    Okay.  I'll give you some time to review if you would like.

A    Okay.

Q    Okay.  So on page 2 of the letter it lists 12 separate dates and 302s where the FBI interviewed you indicating the first interview took place on November 22, 2016, and the last one on May 15, 2017.  Is this list of interviews and dates generally consistent with your recollection?

A    Yes.

[Discussion off the record.]

Mr. Ohr.  Right.  Right.  I can't recall specific dates.

BY MS. SHEN:

Q    But nothing strikes you as being inaccurate looking at it?  I mean, understanding that there's -- you're not going to be able to actually remember each date for the interview, but this is a rough timeframe that you recall being interviewed in?

A    Yes.  The caveat I would say is, I continued to have some conversations with Christopher Steele after May 15, 2017. I've reported all of those to the FBI, but I do not see any 302s relating to those conversations.

Q    Okay.  Generally, how soon after communications with Mr. Steele would you notify the FBI?

A    As quickly as possible, same day or the next day, whenever possible.

COMMITTEE SENSITIVE

Q   Okay.  And after you notified the FBI, how soon after that would the FBI be able to interview you about those communications?

A   Usually within a day.

Q   Did you provide any documents or evidence to the FBI as part of these interviews?

A   We mentioned two memory sticks, so I provided those to the FBI.

Q   Okay.  Did you provide any other documents or evidence other than two memory sticks?

A   On a couple of occasions I had written up my notes.  And I don't recall whether I gave them copies or showed them, but I may have given them copies.

Q   Okay.  And these notes, were they contemporaneous with your meetings or calls with Mr. Steele?

A   I didn't generally write note -- well, yes.  But when I met with Chris Steele or Glenn Simpson I did not take notes during the meeting, so I would have written something after.

Ms. Shen.  Okay.  All right.  Thank you.  And I think we're out of time for this round, so we'll take a short break.  Thank you.

[Recess.]

Mr. Parmiter.  Let's go back on the record.

Mr. Meadows.

Mr. Meadows.  Mr. Ohr, thank you for your testimony.  I guess

I'm going to just try to ask some clarifying questions because my good friend, Mr. Gowdy, is a prosecutor and an attorney, and I guess some of this stuff I'm just scratching my head to figure out why it would have happened this way.

So for the record, you said Sally Yates did not know, to your knowledge, that you were involved in coordinating with the FBI?

Mr. <u>Ohr.</u>  That's right, to my knowledge.

Mr. <u>Meadows.</u>  Are there other types of investigations that you've been involved with where you didn't inform those that you reported to?

Mr. <u>Ohr.</u>  When I'm working on -- when I was working on cases, of course, I would inform my superiors on the cases.

Mr. <u>Meadows.</u>  Right.  But she was your superior, so why would you have not informed her of you working, it seemed like, multiple times on this particular investigative matter with the FBI?

Mr. <u>Ohr.</u>  Well, I wasn't serving as an investigator or prosecutor on that case.  I was simply getting source lead information.

Mr. <u>Meadows.</u>  So did you get any of that information -- were you paid on official DOJ time while you got the information?

Mr. <u>Ohr.</u>  Yes.  I think it's overall part of my job, but it wasn't a case, so --

Mr. <u>Meadows.</u>  So you're saying it was part of your job to do it, but it was not part of your job to inform your supervisors?

Mr. <u>Ohr.</u>  I thought the information --

Mr. <u>Meadows.</u>  Because I have a hard time with that.  I think most of the American people would have a hard time.  Why would Bruce Ohr independently engage 60-plus times with Christopher Steele, through text messages or phone calls or personal meetings, and not inform anybody at DOJ?

Mr. <u>Ohr.</u>  Well, first of all, I did inform some people at DOJ --

Mr. <u>Meadows.</u>  So who did you inform?

Mr. <u>Ohr.</u>  -- in the criminal division.  But what I would --

Mr. <u>Meadows.</u>  So who did you inform?  Who did you inform at DOJ?

Mr. <u>Ohr.</u>  The people I mentioned, some people in the criminal division, Bruce Swartz, Zainab Ahmad, Andrew Weissman.

Mr. <u>Meadows.</u>  So why would you have informed Bruce Swartz and not Sally Yates?

Mr. <u>Ohr.</u>  My -- at the time my lead was this is source information, lead information.  It's nothing that they can do anything with.  It should be passed to the FBI for them to use it or not as they feel appropriate.

And it was obviously, you know, scary, inflammatory, however you want to characterize it, and I did not want -- I wanted to keep it in the career channels where agents would do whatever was appropriate with it and not make it part of a larger policy discussion.

Mr. <u>Meadows.</u>  Well, so how do you reconcile that, wanting to

COMMITTEE SENSITIVE

keep it in the proper channels, that you use this improper or
unconventional channel to actually get this information to the
FBI?  Why would you be so concerned about protocol in one area and
yet do something that, according to your previous testimony,
you've never done since you were employed at DOJ since 1991,
you've never acted in this way before, why would you have been so
concerned about protocol in one area and not protocol in the other
area?

Mr. Ohr.  Well, I think as I said before, I have received
information from different people about organized crime over the
years, and in each case I've provided it to the FBI.  Frankly, I
don't think most of that got to the level where my superiors, you
know, would have had any use for that information or had any, you
know, anything they could do with the information.

So this wasn't the first time I had spoken directly to the
FBI.  That was a regular practice of mine to let the FBI know
whatever I heard.

Mr. Meadows.  Was it a regular practice in those previous
examples that you're thinking of to let the people that you
reported to know that you had received information?

Mr. Ohr.  It's hard to characterize generally, but, you
know --

Mr. Meadows.  Well, you were remembering other instances that
you were just sharing.  So is it your typical habit to let your
supervisor or those you report to know your professional activity?

COMMITTEE SENSITIVE

Mr. <u>Ohr.</u>  In general, yes.

Mr. <u>Meadows.</u>  And so in this particular case, you believed because the information was that salacious or inflammatory, I guess, is what you were saying, and not necessarily, I guess, could not be used, I guess is your word, is that correct, could not be used?  That's what you just said?

Mr. <u>Ohr.</u>  I don't recall exactly what I just said, but yeah, what -- I think maybe I misspoke.  What I said is that I didn't think my superiors in the Deputy Attorney General's Office would be able to act on that information because they're not --

Mr. <u>Meadows.</u>  But you could?

Mr. <u>Ohr.</u>  I could pass it to the FBI --

Mr. <u>Meadows.</u>  You could act on it, but they couldn't?

Mr. <u>Ohr.</u>  I could pass it to the FBI.  All they could do is pass it to the FBI.

Mr. <u>Meadows.</u>  All right.  So let me go a little bit further.  So obviously this relationship that you had with the FBI matured as it got closer to the 2016 election and beyond.  There were more contacts, wouldn't you --

Mr. <u>Ohr.</u>  There were more contacts.

Mr. <u>Meadows.</u>  So earlier in your testimony you talked about the fact that you had a personal relationship with Glenn Simpson that dated back, I think, several years, is what you said.

Mr. <u>Ohr.</u>  I wouldn't necessarily call it personal, but, yes, I had met him several times over the years.

Mr. <u>Meadows.</u>  All right.  And so when, at what point did you reach out to Mr. Simpson as it relates to your wife's contract work?

Mr. <u>Ohr.</u>  I don't believe I ever reached out to Glenn Simpson about my wife's work.

Mr. <u>Meadows.</u>  So how did she get a contract with Glenn Simpson?

Mr. <u>Ohr.</u>  I don't know.  I know there was some sort of contact, but it wasn't by me.

Mr. <u>Meadows.</u>  So you know about all of her helping write the dossier and do -- and give you this information, but you don't know how she got a contract?  You mean a husband and wife -- she's getting paid -- how much did she get paid?

Mr. <u>Ohr.</u>  I don't remember exactly.

Mr. <u>Meadows.</u>  Approximately?

Mr. <u>Ohr.</u>  I don't even know.  Any guess I would make would be wrong.

Mr. <u>Meadows.</u>  So you can recall with specificity some of this other stuff, but you can't recall how much your wife got paid and how she got the job?

Mr. <u>Ohr.</u>  Well, my wife was a Russia --

Mr. <u>Meadows.</u>  I find that curious as a prosecutor how you would not remember those things.

Mr. <u>Ohr.</u>  My wife is a Russia analyst.  She's worked in the field for several years as well.

Mr. Meadows.  I didn't ask about her credentials.

Mr. Ohr.  Right.

Mr. Meadows.  How did she get a contract job with Glenn Simpson?

Mr. Ohr.  I don't remember who made the contact, whether she spoke with Glenn Simpson directly or whether there was another party or someone else involved.  I just know it wasn't me.

Mr. Meadows.  So when she came home and said, "Honey, I got a job with Glenn Simpson," what did you say?

Mr. Ohr.  Oh, I'm sure we had a conversation at the time.  I just can't remember now.

Mr. Meadows.  Did you say there may be a conflict of interest if she's being -- if Glenn Simpson is being paid by the DNC or Hillary Clinton and I'm working for the Department of Justice?  Could there potentially be a conflict?  Did you say anything like that?

Mr. Ohr.  Well, my wife started working for Glenn Simpson, doing -- a contractor for Fusion GPS in late 2015, and I don't believe it had anything to do with the campaign at that point.

Mr. Meadows.  So she never talked about the campaign with you?

Mr. Ohr.  Well, at some point I became aware that the topics she was researching had to do with the possible --

Mr. Meadows.  When did you become aware?

Mr. Ohr.  I don't recall exactly.

Mr. <u>Meadows.</u>  So when you became aware what was your conversation?  Did you tell her that it created a problem for you because you were with the Department of Justice?

Mr. <u>Ohr.</u>  I think she can work for the firm that has dealings with the DNC.  I don't think that's --

Mr. <u>Meadows.</u>  And you can investigate it -- while she's working for the firm that is hired by the DNC and you can be the source that leads information from that same group to the FBI?  Do you not see a problem with that, Mr. Ohr?

Mr. <u>Ohr.</u>  I can't --

Mr. <u>Meadows.</u>  I mean, would you do it the same way if you had it to do over again, Mr. Ohr?

Mr. <u>Ohr.</u>  That's hard to say.  I was not part of the investigation.  I did not have any kind of investigative --

Mr. <u>Meadows.</u>  But you were part of the investigation.  You coordinated with the FBI.  You're part of the investigation.

Mr. <u>Ohr.</u>  I -- as I saw it --

Mr. <u>Meadows.</u>  Multiple times, according to your own testimony.

Mr. <u>Ohr.</u>  As I saw it, I was receiving information that I passed to people who were working on the investigation, and they decided what to do with it.  I don't know what they did with it.  I don't know whether -- I don't know what investigations specifically were existing at the time.  I didn't have any input or work on those investigations.  I'm just providing

information --

Mr. <u>Meadows.</u>  Well, hold on.  I want to give you a chance to correct.  You had no input into the investigation.  Is that your sworn testimony here today?

Mr. <u>Ohr.</u>  I don't believe I did.  I was providing information that I knew to --

Mr. <u>Meadows.</u>  So you gave no commentary on the validity of what the source told you or what you thought?  You gave no commentary?

Mr. <u>Ohr.</u>  I --

Mr. <u>Meadows.</u>  Your 302s don't suggest that.

Mr. <u>Ohr.</u>  No.  I warned them that my wife work for Fusion GPS.

Mr. <u>Meadows.</u>  When did you do that?

Mr. <u>Ohr.</u>  When I first spoke with Mr. McCabe.

Mr. <u>Meadows.</u>  In August of 2016?

Mr. <u>Ohr.</u>  Yes, uh-huh.

Mr. <u>Meadows.</u>  So in August of 2016 you tell Andy McCabe that you're concerned because your wife works for Fusion GPS and that's where you're getting the information?

Mr. <u>Ohr.</u>  Yes.  I wanted Mr. McCabe to know that there was a possible, you know -- that the --

Mr. <u>Meadows.</u>  Conflict of interest --

Mr. <u>Ohr.</u>  -- of interest or appearance thereof, yeah.

Mr. <u>Meadows.</u>  So there's a possible conflict of interest in

August of 2016 before a FISA warrant is actually initiated?

    Mr. <u>Ohr.</u>  Well, first of all, let me --

    Mr. <u>Meadows.</u>  Is that correct?

    Mr. <u>Ohr.</u>  No, because what -- I think I did not mean to say conflict of interest.  What I would say is that in evaluating any information that I transmitted to the FBI, I wanted the FBI to be aware of any possible bias --

    Mr. <u>Meadows.</u>  So you believe there was the possibility of bias?

    Mr. <u>Ohr.</u>  Yes.

    Mr. <u>Meadows.</u>  Okay.  So there's a possibility of bias, and that would affect the credibility of this confidential human source or the information you got from them?

    Mr. <u>Ohr.</u>  Yes.

    Mr. <u>Meadows.</u>  All right.  So when your conversations -- and so I assume that you had a conversation with Glenn Simpson sometime between July 30, when you met with Christopher Steele, and this August meeting?

    Mr. <u>Ohr.</u>  We must have reached out somehow to arrange the August meeting, but I don't think there was any substantive conversation.

    Mr. <u>Meadows.</u>  So text messages, maybe a phone call here or there to try to arrange it?

    Mr. <u>Ohr.</u>  Something to arrange the meeting, yes.

    Mr. <u>Meadows.</u>  All right.  So you're the coordinating person

COMMITTEE SENSITIVE

to bring an opposition research group together with the FBI.  Why did it take Bruce Ohr?  Why did it not take -- you know, why was it not Peter Strzok?  Why was it not someone else?  Why would it take someone with the Department of Justice to do that?

Mr. <u>Ohr.</u>  Well, I know -- I don't know why Peter Strzok or someone else --

Mr. <u>Meadows.</u>  Could it be because your wife worked with Fusion GPS?

Mr. <u>Ohr.</u>  No.

Mr. <u>Meadows.</u>  Oh, you're saying that had nothing to do with it?

Mr. <u>Ohr.</u>  No.  I know Glenn Simpson separately.  And Chris Steele had mentioned in July, I believe, that Glenn Simpson might be willing to talk to me, so yes.

Mr. <u>Meadows.</u>  So why was Christopher Steele so interested in the 2016 Presidential election?  From what I read he's from England.  Why would he be so concerned and so against Donald Trump, the candidate, that he would want you to talk to Glenn Simpson?

Mr. <u>Ohr.</u>  Chris Steele has, for a long time, been very concerned about Russian crime and corruption and what he sees as Russian malign acts around the world, in the U.S., U.K., and elsewhere.  And if he had information that he believed showed that the Russian Government was acting in a hostile way to the United States, he wanted to get that information to me.

COMMITTEE SENSITIVE

Mr. <u>Meadows.</u>  So if he's real concerned about Russian intervention, why would you and Mr. Steele be talking about trying to make sure that Mr. Deripaska could get into the United States when the State Department didn't want him here?  But you and Mr. Steele wanted to make sure that Mr. Deripaska got here.  If he was concerned about Russian interference, why would you be doing that?

Mr. <u>Ohr.</u>  First of all, I did not want Mr. Deripaska to come to the United States.

Mr. <u>Meadows.</u>  Well, the emails exchanged suggest something very different.

Mr. <u>Ohr.</u>  I respectfully disagree.  I know Chris Steele --

Mr. <u>Meadows.</u>  So why would Chris Steele then?

Mr. <u>Ohr.</u>  I think Chris Steele --

Mr. <u>Meadows.</u>  I mean, what did he convey to you?

Mr. <u>Ohr.</u>  He conveyed, I believe, if I remember correctly, that there might be an opportunity to interview Mr. Deripaska.

Mr. <u>Meadows.</u>  About what?

Mr. <u>Ohr.</u>  About --

Mr. <u>Meadows.</u>  Russia?

Mr. <u>Ohr.</u>  -- all kinds of things.

Mr. <u>Meadows.</u>  Trump?

Mr. <u>Ohr.</u>  Yes.  I don't know about Trump, but certainly about Russia.

Mr. <u>Meadows.</u>  Well, you had multiple conversations about your

favorite business tycoon, which you say was Deripaska.  It could have been Mr. Trump.  But let's assume that you're correct on your assumption since you didn't really know.  Is that correct?  He didn't say I'm talking about my favorite business tycoon Deripaska?

Mr. Ohr.  No.  But we had conversations over the years about Mr. Deripaska.

Mr. Meadows.  Well, not a whole lot, because I went back to look at the number of conversations.  Your interactions with Mr. Steele on Mr. Deripaska had been limited prior to 2015.  Isn't that correct?

Mr. Ohr.  But it's been --

Mr. Meadows.  No, for the record, is that correct?

Mr. Ohr.  It is correct, but it's been brought up every time pretty much when he talk with me.

Mr. Meadows.  So on the three times that you talked to him prior to 2015 about Deripaska he brought up -- he brought it up each time?

Mr. Ohr.  Pretty much, yeah.

Mr. Meadows.  All right.  So the three times he brings up -- so every time he brings up Deripaska, in what context did he bring up Deripaska as it relates to Mr. Trump with you?

Mr. Ohr.  Usually he was telling me that -- whether Deripaska had received some kind of an official visa, which could not be blocked by the State Department, and he would be coming to the

United States.

Mr. <u>Meadows.</u>  Is it your understanding -- I have credible evidence that would suggest that your understanding is the FBI actually helped Mr. Deripaska figure out how to get here officially?  Are you aware of any of those conversations where he would come as a business delegation with the U.N.?

Mr. <u>Ohr.</u>  The -- I know the -- well--

Mr. <u>Weinsheimer.</u>  Can we have a second?

[Discussion off the record.]

Mr. <u>Ohr.</u>  So I'm aware that the FBI spoke with Mr. Deripaska on other occasions, but I don't know the specific topics they discussed.

Mr. <u>Meadows.</u>  All right.  Are you aware that the FBI spoke to Mr. Deripaska in September of 2016?

Mr. <u>Ohr.</u>  I don't recall specifically for 2016.

Mr. <u>Meadows.</u>  Are you aware that based on some of your conversations -- go ahead.

Mr. <u>Ohr.</u>  My apologies.  2016 I was not aware of that.

Mr. <u>Meadows.</u>  All right.  So you're not aware that there were any FBI involvement with Mr. Deripaska in September 2016?

Mr. <u>Ohr.</u>  I don't.  That's news to me.

Mr. <u>Meadows.</u>  All right.  So let me go on a little bit further because I guess I want to go back to where Mr. Gowdy was talking about in this December 20 conversation -- or text message where it says:  Bruce has more information for us.  Actually, I

think the redacted name under there is Joe for Joe Pientka.

So was Joe Pientka your go-between in December when you got additional information from either Christopher Steele or Glenn Simpson in getting it to the FBI?

Mr. <u>Ohr.</u>  Joe Pientka, I believe, was my contact at that time, yeah.

Mr. <u>Meadows.</u>  So he was your contact at that time?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Meadows.</u>  You have a meeting.  You get information.  You immediately go to Joe Pientka, who immediately goes to Peter Strzok.  Are you aware of that?

Mr. <u>Ohr.</u>  No.

Mr. <u>Meadows.</u>  All right.  Where did you assume that Joe Pientka would go with the information that you gave him?

Mr. <u>Ohr.</u>  I didn't know.

Mr. <u>Meadows.</u>  Still to this day, you do not know?

Mr. <u>Ohr.</u>  Well, now from what you're telling me, it sounds like --

Mr. <u>Meadows.</u>  No.  No.  Not based on me.  Based on other things.  You are unaware that there was a coordination between Joe Pientka and Peter Strzok or Lisa Page?

Mr. <u>Ohr.</u>  I was --

Mr. <u>Meadows.</u>  You're unaware of that?

Mr. <u>Ohr.</u>  I was not aware of the specific roles that they were playing.

Mr. Meadows.  Okay.  Specifically, did Joe Pientka ever say that he was giving it to the people that he reported to, that he would take your information and get it to someone else?

Mr. Ohr.  No.  I think they just say thank you for the information, and then it disappears into the FBI.

Mr. Meadows.  So if it just disappears in the FBI and you're not sure where it's going, why did you continue to be so aggressive after November 1 or thereabouts when Christopher Steele had been terminated by the FBI, in and around that particular time?

Why would you have continued on your conversations and intelligence gathering with Christopher Steele knowing that he had been terminated by the FBI and you were just getting information from that same source back to the FBI?

Mr. Ohr.  When I got a call from Chris Steele and he provided information, if it seemed like it was significant, I would provide it to the FBI.

Mr. Meadows.  But he had been terminated by the FBI.  In your previous testimony said you were aware of that?

Mr. Ohr.  At some point I became aware he had been terminated.  But nevertheless, when I receive information from Chris Steele I'm not going to sit on it.  I've got to give it to the FBI.

Mr. Meadows.  So why didn't you say, "Listen, Chris, you've been terminated.  I'm at the Department of Justice.  Why don't you

take this back to the FBI?"  Why was that not happening?  Was
there an unofficial coordination that the FBI terminated and now
they're recognizing you're this backdoor conduit to get them the
information?

Mr. Ohr.  I don't know what they were thinking.

Mr. Meadows.  I didn't ask you what they were thinking.  What
I am asking you, was there an unofficial back channel that was
acknowledged by the FBI that they knew that you were the
unofficial handler for Chris Steele after that termination?

Mr. Ohr.  I don't know if you can characterize it that way.
All I can say is, I would get calls from Chris Steele and I would
pass it to the FBI.

Mr. Meadows.  All right.  So let me ask you a different
question then.  Did the FBI ever encourage you to reach out to try
to get additional information from Chris Steele?

Mr. Ohr.  Yes, there was one occasion.

Mr. Meadows.  All right.  So there was a coordination?

Mr. Ohr.  On that --

Mr. Meadows.  I mean, for you to say that you didn't
know -- I mean, if they're reaching out to you then there is
obviously this channel that has been at least unofficially
acknowledged.  If they're reaching out and they're saying, can you
get Christopher Steele to do what?

Mr. Ohr.  On one of the occasions when I talked to the FBI to
tell them I got a call from Chris Steele, they said, oh, next time

you talk with him, can you ask him if he's willing to meet with us? And I conveyed that back to Chris Steele.

Mr. <u>Meadows.</u> After he had been terminated --

Mr. <u>Ohr.</u> Correct.

Mr. <u>Meadows.</u> -- you got a -- the same FBI that terminated, that have told the American people that, oh, when we found out there was a credibility problem we terminated him, after that time you basically got a call from the FBI that said can you engage Mr. Steele again?

Mr. <u>Ohr.</u> Well, it wasn't a call. It was when I told them what I had heard.

Mr. <u>Meadows.</u> So it was in-person contact.

Mr. <u>Ohr.</u> They said, by the way, can you ask him if he'd be willing to talk with us, yes.

Mr. <u>Meadows.</u> All right. Were you aware or did your wife characterize or Glenn Simpson characterize anything that was on the two thumb drives that you were given? Did they give you kind of a contextual: What was in there?

Mr. <u>Ohr.</u> Well, I knew that the thumb drive my wife gave me contained her research for Fusion GPS. The thumb drive that Glenn Simpson gave me I immediately turned over to the FBI, but I think at the time I suspected it was the dossier and I --

Mr. <u>Meadows.</u> Did he characterize it? That's my question.

Mr. <u>Ohr.</u> No.

Mr. <u>Meadows.</u> So he didn't say there's juicy stuff in here,

there's dirt in here, or this is important, you need to get it there, he just said, this is a thumb drive, give it to the FBI?

Mr. <u>Ohr.</u>  Yeah.  He said that and then --

Mr. <u>Meadows.</u>  Mr. Ohr.  Mr. Ohr.  Mr. Ohr.

Mr. <u>Berman.</u>  Mr. Meadows, can he finish his answer?

Mr. <u>Meadows.</u>  He can finish the answer, but at the same time I want to make sure that we're shooting straight here.

You're saying that Glenn Simpson gave you a thumb drive and didn't suggest what was on it or anything else and said give it to the FBI, and your curiosity was not piqued?

Mr. <u>Ohr.</u>  I think I assumed it was the dossier, but he did not say that.

Mr. <u>Meadows.</u>  Why did you assume it was the dossier?

Mr. <u>Ohr.</u>  This was in December.  The rest of the conversation had to do with additional information that he had gathered about the possible connections between the Russian Government and the Trump campaign, and he gives me a thumb drive.  I think the natural assumption at that point -- I had not seen the dossier.  I had heard there was such a thing as a dossier, but I hadn't seen it.  So he gives me a thumb drive.  I assumed this was the dossier.

Mr. <u>Meadows.</u>  So he gives you the dossier or what you believed to be the dossier.  How did you first become aware of the dossier?

Mr. <u>Ohr.</u>  I don't recall.  It might have been in the press or

I don't remember.

Mr. <u>Meadows.</u>  Well, so what you're saying is, is he gave you something that was already -- how could it be in the press, because I don't think it was printed until later, was it?

Mr. <u>Ohr.</u>  It wasn't printed, but I think people were aware there was such a thing as a dossier.  It just hadn't been printed. I don't recall, you know, specifically, but yeah.

Mr. <u>Meadows.</u>  All right.  So let me go back because your conversations -- I think Glenn Simpson has given sworn testimony that he never talked to you.  And what you're saying under sworn testimony today is that indeed you've talked to Glenn Simpson?

Mr. <u>Ohr.</u>  I have talked to Glenn Simpson.

Mr. <u>Meadows.</u>  And actually, is it true that Glenn Simpson called you on Inauguration Day, according to your notes, January 20 of 2017, says, I needed to talk to you.  Did you talk to him on Inauguration Day?  You take good notes, by the way.

Mr. <u>Ohr.</u>  Yes.  Yes.

Mr. <u>Meadows.</u>  I can't read your handwriting.

Mr. <u>Ohr.</u>  Many defense counsel complained about my handwriting as well.

Yes, Glenn Simpson contacted me on or about January 20, yes.

Mr. <u>Meadows.</u>  And what was that about?

Mr. <u>Ohr.</u>  He was concerned that one of the sources, Chris Steele's sources, was going to be supposed and that would put the source in personal danger.

Mr. <u>Meadows.</u>  And why was he concerned about that source being exposed?

Mr. <u>Ohr.</u>  I think he was aware of some kind of article that was likely to come out in the next, you know, few days or something.

Mr. <u>Meadows.</u>  So how would Glenn Simpson know that and the intel community and the Department of Justice and FBI not know that?  I mean, what made Glenn Simpson so uniquely qualified to call you on Inauguration Day about a concern about a source being outed?

Mr. <u>Ohr.</u>  I don't know what his sources are.

Mr. <u>Meadows.</u>  So you mean he must have talked to media.  Did he share with you that he had talked to the media, that he was concerned about that?  I mean, help me understand that conversation from January 20.

Mr. <u>Ohr.</u>  He says something along the lines of, I -- there's going to be some reporting in the next few days that's going to -- could expose the source, and the source could be in personal danger.

Mr. <u>Meadows.</u>  And so when he's talking about there's going to be some reporting, there was a lot of reporting that was going on. Did you find it just normal protocol that the Department of Justice and the FBI would still engage when there was a number of facts or at least allegations that continue to be shared in the press?  Did you find that concerning?  Where were you having these

one-on-one conversations and then reading about it in the press, did you find that concerning?

Mr. Ohr.  Well, what I don't -- what I recall at the time is being very concerned, if someone's life was in danger, that we had to be able to respond to that.

Mr. Meadows.  All right.  So did you talk to Lisa Page, Peter Strzok, the deputy attorney general -- I mean deputy attorney director -- or assistant director -- and Joe Pientka about the FISA application?

Mr. Ohr.  No.

Mr. Meadows.  So your notes from November 21, where you got all of their names and you talk about FISA, what's that in reference to?

Mr. Ohr.  I don't think I said FISA.  I think I asked him if they had a prosecutor, and they said no, and that they might look at Manafort again.  And I don't recall the other thing, but, yes.  But I don't think there was any discussion of FISA.

Mr. Meadows.  And so there was no discussion of FISA because Carter Page was really not the subject of your investigation?

Mr. Ohr.  I don't know what -- I mean, I wasn't part of any FISA investigation, so I don't know.

Mr. Meadows.  All right.  So help me reconcile two things.  Earlier you said that all you did was got information, you passed it on.  Just now you talked about that you actually had conversations between you and some of the other people as it

relates to, you know, how you prosecute or what you were going to do or who was going to be involved.  So how extensive were those conversations?

Mr. Ohr.  I believe this was the only time, and I did ask is there a prosecutor, yeah.

Mr. Meadows.  Yeah.  So if this was the only time, then why would your notes suggest on March 15 of 2017, why would your notes suggest that you had discussions about a special prosecutor?

Mr. Ohr.  I would like to see the notes to be sure, but my recollection --

Mr. Meadows.  Well, I can refresh your memory.

Mr. Ohr.  Yes.  But my recollection is that Chris Steele was concerned about queries from Congress or from special counsel or whoever that might expose his source's identity, and so he asked about that.

Mr. Meadows.  Well, there was different notes about that, so let me refresh your memory.

You were concerned about a special counsel being able to ask questions in the U.K.  that was your notes.  That was your own individual notes.

Mr. Ohr.  Right, that Chris Steele had asked something along the lines of can a special prosecutor ask questions --

Mr. Meadows.  So why were you having discussions with Christopher Steele about a special prosecutor before one was ever appointed?

Mr. <u>Ohr.</u>  It's just something --

Mr. <u>Meadows.</u>  Because one wasn't appointed for another
2 months.

Mr. <u>Ohr.</u>  Right.

Mr. <u>Meadows.</u>  So why were you having questions about
prosecution with a special prosecutor with a source that you said
all you were doing was taking the information and get it to the
FBI?

Mr. <u>Ohr.</u>  I wrote down what Chris Steele asked about.  I
often could not answer his questions, and this was one of those
times.  He'd said, can a special prosecutor ask questions in the
U.K., and I'm sure I've said something like I don't know but --

Mr. <u>Meadows.</u>  Did you ever get back to him with that answer?

Mr. <u>Ohr.</u>  No.

Mr. <u>Meadows.</u>  And so you just let him ask the question and
you never responded?

Mr. <u>Ohr.</u>  I couldn't answer many of his questions.

Mr. <u>Meadows.</u>  All right.  So let me finish with this and I'll
yield to my good friend, the gentleman from Texas.

Your testimony earlier indicated you handled this differently
than anything you've done in your career at the Department of
Justice.  I mean, it was like nails on a chalkboard to me.  I
heard it.  I mean, you said that this was a unique circumstance.

And yet, it appears that there was, according to your
testimony, there was either an implied or a confirmed relationship

between the FBI and you to get information from Chris Steele to them after he was terminated.  Is that correct?

Mr. Ohr.  The FBI -- it's correct to the extent that the FBI knew I was continuing to get contacted by Chris Steele and they had given me an agent to contact to provide -- to, you know, to forward the information, so --

Mr. Meadows.  Yeah.  But you're changing that a little bit because you did admit that they reached out to you.  So there was this coordination that was happening.  Obviously, you had conversations with Lisa Page and McCabe and some of them about prosecuting and how you would go about it.  So there's actually more of a relationship there than perhaps I'm getting information because I happen to have a personal relationship with Christopher Steele.

Mr. Ohr.  Yes.  As we discussed earlier, as I said earlier, there was the one occasion where I did ask Lisa Page and Peter Strzok, do you have a prosecutor?  And that's what they told me. I did not pass that information to anybody.

And on the one occasion in 2017, the FBI, when I reported to them, one of my conversations with Chris Steele, they said, can you ask him if he'd be willing to meet with us?  So on those two occasions there was more conversation.

Mr. Meadows.  Did Andy McCabe or Peter Strzok or Lisa Page ever talk to you about getting a special prosecutor involved after the election of 2016?

Mr. <u>Ohr.</u>  I don't think so, no.  I don't have any recollection of that.

Mr. <u>Meadows.</u>  So did they suggest that to Christopher Steele?

Mr. <u>Ohr.</u>  Not that I know of.

Mr. <u>Meadows.</u>  I guess, why did it come up?  I mean, why would Christopher Steele ask that question when it is a fairly infrequent use in terms of the way that we prosecute things?  Why did it have come up if it wasn't being discussed?

Mr. <u>Weinsheimer.</u>  Just a second.

[Discussion off the record.]

Mr. <u>Ohr.</u>  Right.  That's what I was going to say.  So basically, I don't know what -- what I can say is that at various times it's clear to me that Chris Steele is not an expert in the U.S. judicial system.  So he would sometimes ask things that didn't quite, you know -- weren't obvious.  But beyond -- or, you know, where it didn't quite make sense about the U.S. judicial system.  But in this case, I don't know what -- I don't know why he asked that question.

Mr. <u>Meadows.</u>  Did Chris Steele get paid by the Department of Justice?

Mr. <u>Ohr.</u>  My understanding is that for a time he was a source for the FBI, a paid source.

Mr. <u>Meadows.</u>  I'll yield to my good friend, Mr. Ratcliffe.

Mr. <u>Ratcliffe.</u>  Mr. Ohr, I want to follow up on the issue of the authority or permission that you had to be engaging with

Christopher Steele.  I know you have been asked about this by Mr. Gowdy and Mr. Meadows, but I have to cover this again because I'm really trying to establish what the Department of Justice knew and what the FBI knew as it relates to the FISA process.

I know that you weren't involved in the actual FISA applications, but what the FBI and the Department of Justice knew through you is important.

And so you've been asked a couple of questions about this engagement and you've several times said that you thought it was part of your job to get and pass along source information.  And I think you're relating that, is it fair to say, that you didn't really think you needed authority or permission, that it was just part of your job that allowed you to do that?

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Ratcliffe.</u>  Okay.  And you said you had done it a number of other times in other cases?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  Okay.  Had you ever done it in any other cases where your wife was involved?

Mr. <u>Ohr.</u>  I don't recall my wife being involved in any of these other cases.

Mr. <u>Ratcliffe.</u>  Okay.  But isn't that what makes this case different, is that you're passing along information where you know that your wife is involved and you know that your wife is being compensated for her involvement, correct?

Mr. Ohr.  So that is -- yes.  And that is why I began, when I first spoke to the FBI about this, to emphasize my wife is working for Fusion GPS.

Mr. Ratcliffe.  Okay.  And I get that, and I'm going to get to that in terms of how you explained that.  But there are a number of us who used to work at the Department of Justice.  I'm trying to understand your mindset for the Sally Yates issue and what she knew and when she knew it.

You know that there are rules against being involved in cases where you get a financial benefit.

Mr. Ohr.  Yes.

Mr. Ratcliffe.  And there are requirements and obligations that prosecutors have if those circumstances arise.

Mr. Ohr.  Yes.

Mr. Ratcliffe.  And what are those obligations?

Mr. Ohr.  If you're -- if I was working on the case, I would probably have to get off the case.

Mr. Ratcliffe.  And as it relates to getting a financial benefit?

Mr. Ohr.  Well, I mean, my wife can work for whoever she works for, but I can't work on a case where she's getting a financial benefit.

Mr. Ratcliffe.  Right.  And so in this case she was getting a financial benefit?

Mr. Ohr.  Right.  But I wasn't working on the case.

Mr. <u>Ratcliffe.</u>  Other than to be part of the chain of custody of evidence, is your testimony.

Mr. <u>Ohr.</u>  I passed along the information I got.

Mr. <u>Ratcliffe.</u>  All right.  Well, we don't -- you know, the facts will speak for themselves with respect to this.

Mr. <u>Ohr.</u>  Sure.

Mr. <u>Ratcliffe.</u>  But you were asked a question about how much your wife was paid.  You said you weren't sure.  This $44,000, does that sound approximately correct?

Mr. <u>Ohr.</u>  That could be, but I don't know as I sit here.

Mr. <u>Ratcliffe.</u>  Okay.  If money that your wife was paid for her work on this case, would ultimately you benefit from that financially?  In other words, do you have shared accounts?

Mr. <u>Ohr.</u>  Yes, we do.

Mr. <u>Ratcliffe.</u>  Okay.  Did you ever file financial disclosures reflecting that you received financial benefits as it pertained to your wife Nellie Ohr on a matter before the Department of Justice?

Mr. <u>Ohr.</u>  Not that I received.  I filed the public financial disclosure reports regularly.  I did not report that I was receiving money in connection with a matter I was working on because, in my mind, I'm not.

Mr. <u>Ratcliffe.</u>  Do others think that that was an incorrect assumption on your part?

Mr. <u>Weinsheimer.</u>  I don't think he's able to answer what

others --

Mr. Ratcliffe.  Well, are there actions that have been taken by the Department of Justice or any of its investigating arms with respect to the disclosures, the financial disclosures, as it pertains to Nellie Ohr's work?

Mr. Weinsheimer.  Hang on 1 second.

Mr. Ohr.  As far as I know, no.

Mr. Ratcliffe.  And I'm not -- I'm trying to understand this. I'm not trying to embarrass you.  But it's been publicly reported that you've been demoted from different positions.  Is that an accurate public reporting?

Mr. Ohr.  I've been moved twice since December, yes.

Mr. Ratcliffe.  Okay.  Just briefly give me the circumstances and the timing of the moves.  Because at the relevant time period here, again, I think you've been clear, you were the ADAG or the associate deputy attorney general, correct?

Mr. Ohr.  I was an ADAG, yes.

Mr. Ratcliffe.  Yeah.  And so you have had two position changes since then.

Mr. Ohr.  Yes.  So in December of 2017 I was told that there were going to be articles relating to my conversations with Chris Steele in the press, and they were going to move me out of the Office of Deputy Attorney General but retain me as the director of the -- of OCDETF.

They gave two reasons.  One was they said I had not given

them timely notice of my conversations with Chris Steele; and the other one they said was that they were planning to change the structure of the Department anyway because I was a component head and -- as far as the only component head who was sitting in the Office of Deputy Attorney General.  So as part of the broader reorganization of the department, they had planned to move me out of the Deputy Attorney General's Office.

Mr. Ratcliffe.  All right.  That's the first one.

Mr. Ohr.  Yes.  And then in January or at end of December, I don't remember the exact date, but right around there, I was informed that the Attorney General and the deputy attorney general did not want me in a position where I would be having contact with the White House as part of my general -- as part of my work.  And because OCDETF did have contact with the White House, and particularly the National Security Council, on organized crime policy, they were going to move me into the criminal division.

Mr. Ratcliffe.  Okay.  So with respect to the first move in December of 2017, you said they said you weren't giving timely notice of your communications with Christopher Steele.  Who was "they"?

Mr. Ohr.  I was informed by Scott Schools and Jim Crowell in the Deputy Attorney General's Office.

Mr. Ratcliffe.  All right.  And then in January of 2018 when you were told that the AG and the deputy AG did not want you in that position, which at that point, depending on at what point

the -- just for the record, who was the AG and who was the deputy AG at that point?

Mr. Ohr.  Oh, that was Attorney General Sessions and Deputy Attorney General Rod Rosenstein.

Mr. Ratcliffe.  So getting back to the issue that I mentioned regarding what the Department of Justice knew and what the FBI knew, you're not sure what Sally Yates knows -- knew about your involvement.  You just said you hadn't told her anything about that.

Mr. Ohr.  Correct.

Mr. Ratcliffe.  Okay.  But you've identified at the Department of Justice folks as early as August of 2016 or folks at the Department of Justice and the FBI being aware of your involvement.  At the Department of Justice, Mr. Swartz, Mr. Weissman, and the third name I didn't get.  Zainab?

Mr. Ohr.  Ahmad, Ms. Ahmad.

Mr. Ratcliffe.  Ahmad.  Can you spell that for me?

Mr. Ohr.  I think it's A-h-m-a-d, but I'm not sure.

Mr. Ratcliffe.  Okay.  And the first name was Zainab, did you say?

Mr. Ohr.  Zainab.  I believe that's Z-a-i-n-a-b.

Mr. Ratcliffe.  All right.  And over at the FBI, the folks that you have identified, obviously you met with Andy McCabe, Lisa Page, Peter Strzok?

Mr. Ohr.  Yes.

Mr. <u>Ratcliffe.</u>  Who else?

Mr. <u>Ohr.</u>  Joe Pientka.

Mr. <u>Ratcliffe.</u>  Joe Pientka.  So, again, so the record is clear with respect to what the Department of Justice and the FBI knew about your involvement, those are the folks that were aware as of August of 2016 that you had an involvement with Christopher Steele?

Mr. <u>Weinsheimer.</u>  Hang on a second.

[Discussion off the record.]

Mr. <u>Ohr.</u>  Those are the people that I knew that I had told. I had told them, of course, at different times, as I mentioned before.  I had met with Mr. McCabe and Lisa Page very early on, and then later I had met with the larger group of people that you named.  And, in fact, Mr. Pientka I don't think I met with until November.

Mr. <u>Ratcliffe.</u>  Okay.  Well, so -- and I'm not holding you to a specific date, but you said shortly after your meeting with Christopher Steele you called Andy McCabe, is what you said?

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Ratcliffe.</u>  And you believe within a few weeks or some short period of time, you estimated probably in August, that you met with Mr. McCabe, Ms. Page --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  -- and Peter Strzok?

Mr. <u>Ohr.</u>  I don't believe Peter was there.  I don't recall.

I don't think so.

Mr. <u>Ratcliffe.</u>  Okay.  And when you say there, that was at -- was it at --

Mr. <u>Ohr.</u>  Mr. McCabe's office.

Mr. <u>Ratcliffe.</u>  Mr. McCabe's office, okay.  All right.

And so with respect to the Department of Justice, what is your best recollection of when Mr. Swartz, Mr. Weissman, and Ms. Ahmad --

Mr. <u>Ohr.</u>  Ahmad, yeah.  I don't recall exactly.  I don't recall exactly.  I --

Mr. <u>Ratcliffe.</u>  Do you know if it was around the same timeframe as Mr. McCabe and Ms. Page?

Mr. <u>Ohr.</u>  It may not all have been at the same time.

Mr. <u>Ratcliffe.</u>  Is it fair to say it would have been at least in the summer or early fall of 2016?

Mr. <u>Ohr.</u>  Yes.  Yes, I think so.  Yes.  Uh-huh.

Mr. <u>Ratcliffe.</u>  Okay.  And what were your contacts with Mr. Swartz, Mr. Weissman, and Ms. Ahmad?

Mr. <u>Ohr.</u>  I remember mentioning this to Bruce Swartz.  And because Ms. Ahmad worked closely with him she may have been present.  And then at some point I had a conversation with the two of them and with Mr. Weissman.  And I don't remember if that's the same meeting that Peter Strzok and Lisa Page were at.  It could have been, but I don't recall specifically.

Mr. <u>Ratcliffe.</u>  Okay.  And would those meetings have taken

place at Main Justice?

Mr. Ohr.  Yes.

Mr. Ratcliffe.  All right.  There's reference into your notes about a meeting in September of 2016 at Perkins Coie?

Mr. Ohr.  That doesn't ring a bell.  I'm sorry.

Mr. Ratcliffe.  Are you aware of a meeting with -- was there a meeting with Glenn Simpson, Fusion GPS, Mr. Steele, and others that you were involved with?

Mr. Ohr.  I met once with Chris Steele in September when he came to town, but it was just him and me, just two of us, yeah.  I don't believe I had any meetings with any of these other folks.

Mr. Ratcliffe.  All right.  Well, the reason I'm trying to -- again, and you're aware of this even though you weren't involved in the FISA -- the process, you know that ultimately that FBI and the Department of Justice, as has been publicly reported, filed verified applications to get a warrant to surveil an American citizen, Carter Page.  You're aware of that?

Mr. Ohr.  From the press, yes.

Mr. Ratcliffe.  From the press.  And you're aware that occurred the first time on October 21 of 2016?  I'll let the -- you may not be aware of the date.

Mr. Ohr.  Not aware of the date.

Mr. Ratcliffe.  I'll represent to you that that was the date.  But you know as a prosecutor that when you make those verifications and the folks on behalf of the FBI and the

Department of Justice that do so, they have to verify that the information in a FISA application has been thoroughly vetted and confirmed.  We've talked a little bit about that.  You had no role with respect to that.  I think there are real questions whether or not that was done.

       But the other obligation that we know that we had or you continue to have as a Federal prosecutors is to make a full disclosure of material facts, correct?

[12:19 p.m.]

Mr. Ohr.  As part of the FISA application?

Mr. Ratcliffe.  As a part of any -- as a part of any application to a Federal court.

Mr. Ohr.  Yes.  You're supposed to tell the court material facts.

Mr. Ratcliffe.  Material facts.  Okay.  And that's really what I'm trying to get at, is to establish the material facts that we can agree the FBI and the Department of Justice knew as of October the 21st of 2016.  Again, I know you weren't involved in the process other than to give them some of this information.

Mr. Ohr.  Right.

Mr. Ratcliffe.  So at that point, and through the folks that we've mentioned at the FBI and the Department of Justice, they were aware that -- they were aware of the relationship between you and Christopher Steele and Glenn Simpson, correct?

Mr. Ohr.  Yes.  The people we've discussed.

Mr. Ratcliffe.  The people we discussed.  They were also aware of the relationship between Nellie Ohr and Christopher Steele and Glenn Simpson?

Mr. Weinsheimer.  One second.

Mr. Ratcliffe.  Uh-huh.

[Discussion off the record.]

Mr. Ohr.  I believe that I told the people that we've discussed about my wife's work, yes.

Mr. Ratcliffe.  And if you did, then they would have known that your wife was being compensated in part for contributions to what we've referred to as the Steele dossier?

Mr. Ohr.  Well, just to be careful about that, my wife was researching various entities who are some of the same people mentioned in the dossier.

My understanding of the dossier, and I didn't look at it that carefully, but it seems to be reports from Chris Steele to Fusion GPS.

So I don't think my wife's information, as far as I knew, was reported in those specific reports.  It was certainly provided to Fusion, which had both Chris Steele's reports and my wife's research.

Mr. Ratcliffe.  Do you recall telling the FBI during any of your interviews as reflected in 302s that your wife was working on the Steele dossier and providing information?

Mr. Ohr.  I don't recall specifically what I said, but --

Mr. Ratcliffe.  Do you think she was?

Mr. Ohr.  I don't think so.  I think she was working on the same topic, so you could say in a broader sense maybe.  But the dossier itself, as far as I know, and I could be wrong, but those appear to be Chris Steele's reports, not Fusion GPS.

Mr. Ratcliffe.  To be clear, your wife was compensated for information that she was providing to Fusion GPS and Christopher Steele.

Mr. Ohr.  I don't know what information from my wife was given to Christopher Steele.  I know she was giving it to Fusion GPS, obviously.

Mr. Ratcliffe.  Right.  Was the FBI and the Department of Justice also aware of media contacts between Christopher Steele and Glenn Simpson?

Mr. Weinsheimer.  One second.

[Discussion off the record.]

Mr. Ohr.  I mean, I don't have specific information on that, no.

Mr. Ratcliffe.  Okay.

So, again, going back to the Sally Yates issue, is it your testimony that at some point in time as you were sitting down with the FBI for the purpose of talking to them about information that you were helping to coordinate from Christopher Steele that you shouldn't have advised or didn't advise Sally Yates about the fact that you were being interviewed for that purpose?

Mr. Ohr.  I did not inform Sally Yates that I was talking to the FBI and that I was receiving information from Chris Steele. That's correct.

Mr. Ratcliffe.  My question is, did you have the thought that it might be a good idea to let my boss know that I'm being interviewed by the FBI?

Mr. Ohr.  It was -- my thought at the time was I should get this to the career people who would work on it, but that was my

thought.

Mr. Ratcliffe.  Okay.  Do you know whether Sally Yates actually -- are you aware of the fact that Sally Yates actually signed off on two different verified applications in the FISA process as it relates to Carter Page?

Mr. Ohr.  I've seen that in the press.

Mr. Ratcliffe.  We've talked about the relevant facts that the FBI and the Department of Justice was aware of.  Were they also -- one that I didn't ask you about -- they were also aware of Mr. Steele's bias against Donald Trump, were they not?

Mr. Ohr.  I provided information to the FBI when I thought Christopher Steele was, as I said, desperate that Trump not be elected.  So, yes, of course, I provided that to the FBI.

Mr. Ratcliffe.  Yes.  And so were the Department of Justice and THE FBI also aware of Glenn Simpson's bias against Donald Trump?

Mr. Ohr.  I certainly told the FBI that Fusion GPS was working with -- doing opposition research on Donald Trump.

Mr. Ratcliffe.  Okay.  So, again, so the record is clear, what the Department of Justice and the FBI was aware of prior to the first FISA application was your relationship with Christopher Steele and Glenn Simpson, your wife's relationship with Christopher Steele and Glenn Simpson, Mr. Steele's bias against Donald Trump, Mr. Simpson's bias against Donald Trump, your wife's compensation for work for Glenn Simpson and Fusion GPS, correct?

Mr. Weinsheimer.  Can I have a second?

[Discussion off the record.]

Mr. Ohr.  Right.  So just, again, to reiterate, when I spoke with the FBI, I told them my wife was working for Fusion GPS.  I told them Fusion GPS was doing research on Donald Trump.  You know, I don't know if I used the term opposition research, but certainly that was my -- what I tried to convey to them.

I told them this is the information I had gotten from Chris Steele.  At some point, and I don't remember exactly when, I don't think it was the first conversation, I told them that Chris Steele was desperate that Donald Trump not get elected.

So those are all facts that I provided to the FBI.

Mr. Ratcliffe.  And you provided -- you said because you wanted to make sure -- first you said you thought there might be a conflict of interest and then you changed that and said, well, I didn't mean conflict of interest, I just wanted to make sure that they were aware of the possibility of bias as it related to those facts, correct?

Mr. Ohr.  In case there is any concern that there might be any kind of bias or anything like that.

Mr. Ratcliffe.  So that the FBI and the Department of Justice had the opportunity, if they were going to file a FISA application, to say, the central piece of evidence that we're submitting, this dossier, just so you know, the associate deputy attorney general was involved in this respect and his wife was

COMMITTEE SENSITIVE

involved in this respect, so they would have the opportunity to decide what material facts related to that information and provide it to a court.

Mr. Ohr.  Right.  Again, I can't answer what they were putting into the FISA.  I was providing it to them for whatever purpose.

Mr. Ratcliffe.  Right.  But we've agreed that those are material facts that you provided and they could have provided. You don't know whether or not they provided that information to the FISA court or not.

Mr. Ohr.  Correct.

Mr. Ratcliffe.  But they should have.

Mr. Weinsheimer.  I don't think he can answer that.

Mr. Ohr.  I can't answer that.

Mr. Ratcliffe.  Well, I want to make -- part of the reason I'm also trying to make this record real clear is there's someone that's been appointed to look at potential FISA abuse, United States Attorney John Huber.  Have you talked to Mr. Huber?

Mr. Ohr.  I have not.  I mean, I have spoken with Mr. Huber in the past when he was a U.S. attorney, but I have not spoken with him as part of this.

Mr. Meadows.  One little cleanup.  You had mentioned that your interaction with Joe Pientka did not start until November of 2016, earlier in the questioning from Mr. Ratcliffe.  Is that correct?

COMMITTEE SENSITIVE

Mr. Ohr.  I think that's right.  I think I was introduced to him in November.

Mr. Meadows.  So you would have been introduced to him after he was terminated -- Christopher Steele's relationship with the FBI was terminated?

Mr. Ohr.  I don't remember exactly when Christopher Steele's relationship with the FBI was terminated?

Mr. Meadows.  Well, I'm representing that Christopher Steele's relationship was terminated on or about the 1st of November, so you would have been introduced to Mr. Pientka after that time.

Mr. Ohr.  I believe I was introduced to Mr. Pientka around November 21.

Mr. Meadows.  Okay.  Thank you.  Yield back.

Let me ask you one other question, because in some of your notes you referred to some inquiries as it related to Christopher Steele with a Cleta Mitchell as it related to the NRA.  What did he represent that Ms. Mitchell was involved with?

Mr. Ohr.  I may be wrong, but I think my recollection is that Glenn Simpson mentioned Cleta Mitchell, not Chris Steele, but I may be wrong about that.

Mr. Meadows.  And it could be.  In what context?  Because she hadn't been on the board for the NRA for a number of years, so it would have been very old news at that point.

Mr. Ohr.  I didn't know who Cleta Mitchell was.  What I

COMMITTEE SENSITIVE

was -- I believe what -- and I think it was Glenn Simpson
mentioned to me was that Cleta Mitchell became aware of money
moving through the NRA or something like that from Russia.  And I
don't remember the exact circumstances.  And that she was upset
about it, but the election was over.  I seem to remember that from
my notes.

Mr. Meadows.  So in your conversations with Mr. Simpson did
you verify the veracity of that allegation?

Mr. Ohr.  I was just taking the information.  I wasn't -- you
know, so I don't remember asking followup questions on that.

Mr. Meadows.  And he said he knew that how?

Mr. Ohr.  I don't --

Mr. Meadows.  How did he find out about Cleta Mitchell?

Mr. Ohr.  I don't think he said.

Mr. Ratcliffe.  Mr. Ohr, the reason I hesitated before is I
don't want to start, my time is about to expire and I want to
start a new topic.  I'll leave it for the next hour.  But it
relates to your interviews with the FBI.

And just so that I'm clear and can be thinking about this,
it's my understanding -- I have seen that you sat down with the
FBI on 12 different occasions, or I have seen 302s that relate to
12 different interviews that you gave between November 22 of 2016
and May 15 of 2017.

My only question for you right now is, did you have
interviews with the FBI regarding these matters after May 15 of

COMMITTEE SENSITIVE

2017.

Mr. Ohr.  I believe I did.

Mr. Ratcliffe.  Were those with the FBI or were they part of the special counsel investigation?

Mr. Ohr.  The agent I talked with was not part of the special counsel team.

Mr. Ratcliffe.  Okay.  Okay.  Any reason -- well, you're not the one that produced those.  I'll save that question for the folks that can answer why I haven't seen those 302s.

I think our time has expired.

[Recess.]

BY MS. SHEN:

Q   The time is 12:44 p.m.

So I'd like to just turn back to the roles you may or may not have played in the investigations we're talking about, just to be absolutely clear.

So, first of all, because our joint investigation is presumably about the FBI's investigation into Secretary Clinton's private emails and potential disparate treatment with the FBI's handling of the Trump-Russia collusion investigation, I will ask, did you have any involvement in the Clinton email investigation?

A   No.

Q   And to what extent were you ever involved in the Trump-Russia collusion investigation?

A   I was not involved.  I simply provided the information

as I've discussed.

Q   And were you ever involved in the broader investigation of Russian attempts to interfere with the U.S. election?

A   No.

Q   Did your portfolio at the Department of Justice have any purview over any of these investigations that I've mentioned?

A   No.

Q   And were there other individuals at DOJ who did in fact have portfolios of purview over these investigations?

A   Yeah.

Q   Were there other Department of Justice officials whose portfolios did in fact have purview over these investigations?

A   Yes.

Q   So last round I think I got a little confused because, I think, as you just said, you did not have any involvement with the Trump-Russia collusion investigation.  However, I think there's some dispute about that.  You did talk about how you gave information and then provided input that ultimately became part of the work of the investigation.

Can you just like help us understand, clarify exactly what the difference is?  Because there's, I imagine, that in the FBI and the Department of Justice there's a core investigative team, that people are considered members on the team, people who are considered, quote, you know, involved, and then there are many other current officials in government who nonetheless have

conversations with members of that team.  I'm sure some were
substantive and I'm sure some have to do with, you know, the
nature of the underlying investigation or even specific evidence
and facts as part of that investigation.

But can you just sort of outline the boundaries of what
constitutes being involved on the team versus not involved, but
may have, you know, had a conversation or played a role or been
meeting-related?

A    So, I mean, I think I've tried to explain what I did in
connection with this investigation.  I was not investigating the
case.  I wasn't responsible for the investigation.  I was not
working as a prosecutor on the case.  I didn't make any kind of
decisions or prepare any pleadings or anything like that.  I
provided the information that I've discussed.

Q    Okay.  So did the FBI provide updates to you or keep you
apprised of the progress of the Trump-Russia collusion
investigation?

A    No.

Q    So you had no substantive role or oversight
responsibilities in the Trump-Russia collusion investigation?

A    That's correct.  And to be clear, though, the one time I
did I ask them, is there a prosecutor assigned to the case, and
they told me no.

Q    Were you involved in any way in the decision to initiate
the counterintelligence operation relating to Russian contacts

with individuals in the Trump campaign?

    A   No.

    Q   Were you aware of the FBI's decision to initiate the Trump-Russia collusion investigation at the time?

    A   No, I don't think so.

    Q   And overall you were not involved in the Trump-Russia collusion investigation?

    A   Correct.

    Q   And have you ever been a decisionmaker for matters pertaining to the FBI's Trump-Russia collusion investigation?

    A   No.

    Q   Again, we discussed this a little bit, I guess, a few rounds ago now, but I believe there was a November 26 meeting in which you attended with Peter Strzok, Lisa Page, and some DOJ criminal -- does that sound right -- or a late 2016 meeting?

    A   There was a meeting on November 21, I believe my notes reflect, with Peter Strzok, Lisa Page, and Joe Pientka.

    Q   Okay.  And was that meeting the first time that you had met Peter Strzok?

    A   I think I may have met Peter Strzok on one earlier occasion when we had the meeting with the criminal division officials.

    Q   Okay.  And can you just remind me when was that?

    A   I don't recall exactly.

Q   Was that the meeting in McCabe's office?

A   No.  I had the first meeting with McCabe in August, and the meeting with the criminal division officials and Peter Strzok and Lisa Page, I think that was in -- I think it was -- it may have been, I don't know, it was in the fall some time, I think, but prior to November 21.

Q   But this other meeting, this prior meeting where you first met Peter Strzok, that was also in 2016?

A   Yes.

Q   So, again, I think you've already answered this question a couple times in broad strokes, but just to be clear, were you involved in the October 2016 FISA application for surveillance on Carter Page?

A   No.

Q   Did you have any role in drafting or reviewing the Carter Page FISA application?

A   No.

Q   Were you part of the decisionmaking chain of command for the Page FISA application?

A   No.

Q   Were you part of the approval process for the Page FISA application?

A   No.

Q   Were you aware of the Page FISA application at the time?

A   No.

Q   Were you involved in any of the subsequent renewals of the Page FISA application?

A   No.

Q   Were you involved in any of the FISA applications -- were you involved in any of the other FISA applications related to the Trump-Russia collusion investigation?

A   No.

Q   And were you ever involved with Special Counsel Mueller's investigation?

A   No.

Q   And to reiterate, you were never part of the FBI's Trump-Russia collusion counterintelligence investigation?

A   Correct.

Ms. Shen.  Okay.  Thank you.

BY MS. HARIHARAN:

Q   So I just want to help clarify some of the discussion about your contacts with the FBI, because as it's been presented in the previous hour and in certain media outlets, it's been presented as improper or nefarious.

So just to start generally, do you believe your communications with Mr. Steele were somehow improper?

A   No.

Q   Can you explain why?

A   I received information from Chris Steele which I thought could be important and I passed that to the FBI.  I think that

COMMITTEE SENSITIVE

anybody could do that, and I don't think that's improper.

Q    Do you believe you were acting appropriately in deciding to report Mr. Steele's -- communications with Mr. Steele to the FBI?

A    Yes, I do.

Q    And you had said it earlier, because of national security concerns, right?

A    That's right.

Q    Do you believe it was improper or inappropriate for the FBI to accept this information?

A    No, I think it was proper for them to accept it.

Q    Are you familiar with any Department of Justice protocol that requires DOJ employees -- any protocol related to DOJ employees sharing information with law enforcement officials outside of the scope of their official duties?  Is there any protocol in place?

A    I'm not aware of anything like that.

Q    Are you aware of any protocols for when Department employees observe or receive criminal or counterintelligence tips?

A    No.

Q    So is there like a -- you know, with ordinary citizens, right, there's a hotline where you can call to report suspected criminal activity or terrorism or suspected terrorism activity to the FBI.  Does such a process exist for DOJ employees or do you essentially act like an ordinary citizen in that case?

A    I think we basically act like an ordinary citizen in that case.

Q    So, in effect, you're expected to report that information in a manner similar to how non-DOJ employees who want to report tips to law enforcement, specifically FBI, as far as you can understand?

A    As far as I can understand, yeah.

Q    Would you characterize this information Mr. Steele was sharing with you as something similar to a tip or was it a fully formed report?

A    These were leads.

Q    Leads?

A    Yeah.

Q    Okay.  And did the information, as far as you could understand it from what he described to you, was it more counterintelligence related or more criminal?

A    That's part of the problem, is it's both.

Q    Okay.  And, again, to reiterate, you are not a counterintelligence official?

A    Correct.

Q    So counterintelligence information, even if it's mixed up in a criminal matter, would be outside the scope of your official duties?

A    Correct.

Q    So given that you're not a counterintelligence official

and you don't act in that capacity in an official sense, it made -- do you believe it made sense to report that information through your normal chain of command or the FBI?

A   I believed it was proper to report it to the FBI.

Q   Is it -- and I think you've said this now a couple of times -- but is it fair to say that any communication you had with Mr. Steele that involved substantive counterintelligence matters you immediately shared with the FBI?

A   I shared -- when I received information from Chris Steele in the end of July, I reported it to the FBI, I don't know exactly how often, how quickly, but within a couple weeks, I think.  When I received more information in September, again, I think I reported it to the FBI, I don't remember if it was immediately but within a couple weeks.  Once I had a regular contact at the FBI, I think I reported those either the same or the next day after that.

Q   So just to make sure, you're not aware of any policy or protocol at the Department that you were violating when having these -- at the time when you had these conversations with the FBI?

A   That's correct.

Q   All right.  So it was brought up in the previous hour, and you testified to this, to some extent to this fact, how you provided information to the FBI but not necessarily to certain Department of Justice officials.  And I want to clarify the

difference between your supervisors who were in the political track versus the career track.

Are you aware of -- so to be clear, when you said you did not report it to your supervisors, did you mean the politicals, as in Deputy Attorney General Yates, or did you mean within the career track?

A    Deputy Attorney General Yates.

Q    So that would be on the political track?

A    Yes.  I believe, just to be clear, I think at that point as a component head my superiors were all on the political side, so yes.

Q    Gotcha.

Are you aware of any Department of Justice rule that requires its employees to inform DOJ political leadership when you provide information to law enforcement that's outside the scope of your duties, official duties?

A    I'm not aware of any such policy.

Q    So arguably this would include any leads or tips that apply to counterintelligence or criminal matters?

A    I'm not aware of any policy along those lines.

Q    Are you aware of any Department of Justice policy that would have required you to inform anyone at the Department, political or career, about your interviews with the FBI?

A    No, not that I'm aware of, no.

Q    Are you aware -- actually, I may have asked this

already -- but are you aware of any Department of Justice rules
that require you to inform anyone at the Department, political or
career, of your communications with Mr. Steele?

A    No.

Q    So, again, so it's fair to say that you were not aware
that were you violating any Department of Justice policy --

A    Correct.

Q    -- at the time?

You stated that Deputy Attorney General Yates was not aware
of your communications with Mr. Steele or your interviews.  Was
any other Obama DOJ political appointee aware of your
communications with Mr. Steele?

A    I am not aware of any political official knowing of my
communications.

Q    Or your interviews with the FBI?

A    Right.

Q    Do you believe it would have been appropriate to share
what is in effect a counterintelligence criminal tip related to an
FBI investigation with a political appointee?

A    No.  I mean, I think all I can say is I made the
decision at the time to inform career people and that's what I
did.

Q    And before I jump into the next subject, there has been
some focus on, you know, why when Mr. Steele shared this
information, like, why you didn't cross-examine him or why you

didn't follow through.

Is it safe to -- is it fair to characterize that it's the FBI's job to investigate and verify the credibility of a source or leads information and not necessarily you as a private citizen providing that?  Like that is why they are there?

A    That's part of their job certainly, yes.

BY MS. SHEN:

Q    So, again, at the time you did in fact inform some DOJ criminal division career employees about your communication with Mr. Steele and your communications with the FBI.  Is that correct?

A    Yes.

Q    However, at the same time you did not inform any of your superiors who all happened to be political appointees or any other political appointees.  Is that correct?

A    Yes.

Q    Can you explain why you made the decision to inform certain career Department employees but not any political Department employees?

A    I wanted the information to be given to the career employees who would be able to evaluate the information and do any necessary followup, because it was still source leads information.

Q    But aren't there certain Department political employees who also have substantive portfolios in that area?  In the same vein, wouldn't you think they would be interested to know that information, too?

A    They might have been interested.  I really can't speculate.

Q    But you -- I mean, it appears to me, I don't know if it's a coincidence, but you drew a line at career employees versus political, or is that a mischaracterization?

A    Right.  But I think more -- what I was trying to do was get it to the officials who were working on this kind of information.

Q    Uh-huh.

A    So I didn't just call any career person, I called people who understood and dealt with these kinds of Russian matters, Russian organized crime matters.

Q    But, again, like the most senior career employee that was informed, at some level above them was a political appointee. Did you have any specific thoughts as to why it was important to inform the career level but not that one political level above it?

A    Beyond saying I wanted to keep it in career channels and not make it political or not have it treated in a political way, that's all I can say.

Q    So was it important to you to keep it in career channels?

A    I thought it was appropriate that career officials would be the ones dealing with the information.

Q    What would be your concern if it did end up in political channels?

A    You know, all I can say is that the information was, you know, leads, source information, it's not the kind of information that higher-ups used to determine policy or make decisions.  It's a very raw end of the case.

And so just like the FBI probably would not report up to the top of the Department all the leads they were getting from people out in the outside.  I felt this should go to the people who were going to be looking at it.

Ms. Shen.  Okay.  Thank you.

BY MS. HARIHARAN:

Q    Before I turn it back over to Val, I want to kind of go through the timeline of events that has occurred since this news broke of your communications with Mr. Steele and the impact that it's had at your position at DOJ.  I know it was touched upon a little bit, but I couldn't write my notes fast enough, so I wanted to make sure I have the exact date, times, names, correct.

When were you removed -- when were you reassigned from the position of associate deputy attorney general?

A    I believe it was early December of 2017.

Q    And at that time you were still the head of the Organized Crime Drug Enforcement Task Force?

A    That's correct.

Q    When were you reassigned from that position?

A    End of December, beginning of January of this year.  January of this year.

Q   2018?

A   Yes.

Q   And you mentioned that the Department provided a couple
of explanations as to why those reassignments occurred.  So for
the -- from the early December 2017 reassignment, the reasons they
gave were?

A   December 2017, yeah, so end of 2017.

Q   Right.  I'm sorry.

A   Yes.

Q   The reasons they gave for that reassignment, the first?

A   Two reasons.  One was they said I had not given them
sufficiently and timely notice of my conversations with Chris
Steele.  And, secondly, that they were planning a reorganization
of the Department where none of the component heads would be
sitting within the Deputy Attorney General's Office.

Q   And who are the names of the two individuals who gave
you that explanation.

A   Scott Schools and Jim Crowell.

Q   How do you spell that?

A   C-r-o-w-e-l-l.

Q   Was that a meeting?  Was that in writing?  Was that --

A   That was a meeting.

Q   Did they provide you anything in writing?

A   I think there's a thing you sign acknowledging the
transfer, something like that.  But the reasons were not written

down.

Q   Did they cite any DOJ policy with regards to the timely notice requirement or regulation?

A   As I said, I think there's some sort of thing that you sign whether you accept the transfer immediately or whether you want 2 weeks or something like that.  So there's some kind of form.  But that's what I remember.  I don't remember if it's called a timely --

Q   No, no, I mean with regard to their explanation.

A   No, they didn't cite anything specific.

Q   So they didn't give -- so they weren't able to identify specific violations of policy or misconduct?  They weren't able to refer back to a specific DOJ policy?

A   Right.  Right.

Q   I'm sorry.  Let me --

A   They did not cite any reg to me or anything like that.

Q   Okay.  So that was for the December 2017?

A   Right.

Q   Now, for January 2018?

A   Yes.

Q   Who were the individuals involved?

A   It was Scott Schools, and I don't remember if someone else was in the room.  There may have been another member of ODAG, but I'm not sure.  And I was told at this time that the Attorney General or the deputy attorney general did not want me in a

position where I would be having contact with the White House.

Q   Was this a meeting or was this in writing?

A   It was a meeting.

Q   And was it again a form where you sign acknowledging the transfer or did they provide anything else?

A   Just a form acknowledging the transfer.

Q   Did they offer an explanation as why you couldn't have contact with the White House, why they didn't want you in that type of position?  Did they offer details?

A   They did not provide any additional details.

Q   Did the DAGs at any point speak with you directly?

A   No.

Q   Prior to this are you -- sorry.

Ms. Shen.  Oh, just in either of these two meetings with Scott Schools and the other individuals, were there subsequent communications on this topic after these two meetings?

Mr. Ohr.  Nothing substantive.  There may have been paperwork kind of -- I don't remember if there was any other forms to sign or anything like that, but, no, I don't think so.

BY MS. HARIHARAN:

Q   Are you aware of any other -- prior to this instance -- any complaints about your substantive performance or the quality of your work prior to December 2017?

A   No.

Q   Are you aware of the decision either in December 2017 or

January 2018 based on a report by the Office of Professional Responsibility?

A    No.

Q    Are you aware of any OPR complaint filed against you?

A    No.

Q    Are you aware of any -- again, referencing both December 2017 and January 2018 -- are you aware if the decision was based upon an opinion provided by the Department's ethics office?

A    No.

Q    Are you aware of any appeals process for when someone is reassigned or demoted, however you would like to refer to it?

A    I am not aware of any -- I don't know what the yes or no on that, but I did not seek to appeal any of those decisions.

Q    Did they advise you at the time?  Did they say, like, "Oh, you have this option, do you acknowledge it"?

A    They might have.  I don't recall.

Q    Have you at any point been approached by the Department's Inspector General'S Office regarding your contacts with Mr. Steele?

A    Yes.

Q    If you can, share approximately when that occurred?  I won't pry into the details of it.

A    I think it was in July --

Q    Of this year?

A    -- of this year.

Q    And have you fully cooperated with his request?

A    Yes.

Q    To the best of your --

A    Yes.

BY MS. SHEN:

Q   So just going back to your first meeting with Mr. Schools and Mr. Crowell, I believe, you said one of the bases or the two bases was not providing a timely -- sufficiently timely notice of your communications with Mr. Steele.  Is that accurate?

A   Yes.

Q   And did they provide an explanation of what would have been a sufficiently timely notice?

A   No.

Q   Did you ask about the basis or what that meant for them directly at the time?

A   I don't believe so.

Ms. Hariharan.  Did they offer an example?

Mr. Ohr.  No.

BY MS. SHEN:

Q   So sitting here today do you know what they meant, I mean what could you have done differently to avoid not having -- to avoid having provided the insufficiently timely notice, given that there's no rule or regulation that they cited?

A   Right.  I don't have a specific understanding, but I assume if I had told them months before that might have been different.

Q   Are you familiar with any other cases where career civil servant Department employees have been reassigned on the basis of not providing timely notice for a communication that is not

contained in a Department policy or regulation?

A   I don't, as I sit here, I don't -- I can't think of any particular examples.

Q   So such a basis is not some kind of common administrative action that you're familiar with?

A   I really couldn't say.

Mr. Hariharan.   Are you aware of any prior case where a Department career civil servant has been reassigned without a written justification?

Mr. Ohr.   Again, I don't know.

BY MS. SHEN:

Q   During each of these meetings were -- how were those meetings set up?  How did you know to go to these meetings?  Did someone call you to reach out to set up the meeting?

A   Yes.

Q   Who was that person?

A   In the first meeting it was one of the administrative people in the Office of Deputy Attorney General, I don't remember who.  And the second time it may have been -- I don't recall exactly.  I got some kind of a call asking me to come down.  I don't remember who made the call.

Q   And what was the timeframe between the reaching out to set up the meeting and the actual meeting taking place in both instances?

A   In the first case it was only a few minutes.  The second

case, I was no longer sitting in the Main Justice building.  I
don't recall exactly how long it was, but it wouldn't have been
very long.

    Q   So within the day?

    A   Probably, yes.

    Q   And so prior to that reaching out and asking you to come
down -- I'm talking about the first meeting now and asking you to
come down in a few minutes to have the meeting with the ODAG
officials, did you have any prior communication on the topic of
your reassignment?

    A   No, not on the topic of my reassignment.  No.

    Q   So when you received this communication, did you -- did
the communication from the -- I'm sorry -- the administrative
official indicate what the purpose of the meeting was?

    A   No.

    Q   What about in the second meeting when you had a call,
did that call indicate what the purpose of that meeting was?

    A   I don't recall.

    Q   So is it fair to say that when you were told that you
were going to be reassigned to this meeting, that it came as a bit
of a surprise to you?

    A   Yes.

    Q   Do you recall anything that you said in response during
that meeting -- those meetings?

    A   Not at the first meeting.  At the second meeting I think

I said, okay, but I would need a little time to let the folks at OCDETF know.  So I said, I don't want to do it today.

And one of the options was 2 weeks or something like that. So I think I said I wanted -- whatever the time period was, a few days or a couple weeks, I asked for that and they said fine.

Q   And so in terms of asking for a few days or a couple weeks, does that mean asking for time before it becomes effective. Is that correct?

A   Right.

Q   So in the first instance then -- I'm sorry, I'm jumping back and forth -- in the December 2017 meeting about the associate deputy attorney general title, what was the timeframe between the meeting and when that reassignment became effective?

A   I think that was immediate.

Q   Immediate.  Okay.

A   I didn't ask for any time there.

Q   Because there was not as much of a practical day-to-day difference?

A   Correct.

Q   Okay.  But in your capacity as the director of OCDETF, what work were you engaged in at the time?  Was there a specific project or --

A   Well, mainly, I just wanted to make sure I had a chance to say goodbye to the folks at OCDETF and the network of prosecutors and agents around the country.

Q   When your reassignment from director of OCDETF took place, who took over your duties at that point?

A   I don't know.

Q   So you're not aware of someone that the Department had talked to to ensure a smooth transition of your duties?

A   Well, okay, let me just -- the first time I don't know. For the second meeting when I left OCDETF, my deputy took over as the acting director.  So at that time there was -- I knew who was doing it.

Q   Were you the one that informed your OCDETF team of your reassignment or were --

A   Yes.

Q   Was there any kind of larger Department notice or email sent out announcing your reassignment?

A   I sent an email out to the OCDETF community.

Q   But there wasn't a separate email from, like, an HR Department or the ODAG's office sending out a notice regarding your reassignment?

A   I don't recall anything like that.

Q   So, Mr. Ohr, I don't want to put you in -- I'm not trying to put you in an awkward position.  At the same time, I personally think it's very concerning -- what you've told me concerns me personally a lot.  The way that this was handled, it doesn't sound typical to me.  You know, I work on a committee that has jurisdiction over Federal civil service employees, Title 5

employees.  We have an understanding of what due process
protections, and we take those very seriously.

You know, I'm not actually a subject matter expert on all of
these procedures or the Department's procedures.  You know, that
being said, I feel like I have to ask you, do you feel like that
your process with your reassignments was handled in accordance
with all the due process you think --

Mr. Weinsheimer.  I'm not sure that this is relevant to your
investigation.  I let this go on for a long time.  It's a long day
and you've spent a lot of time having very specific questions, and
we're now really getting into specific personnel matters, and I
don't think it's appropriate for him to answer that question.

Ms. Shen.  Well, in all fairness, the specific personnel
matters that we're discussing, I think the facts establish, have a
direct causal relationship to the very core of the larger
investigation and many other questions that have been asked and
will be continued to be asked.  I don't think I'll be the only one
to discuss this issue.  In fact, I was not even the first one to
raise it, it was folks in the other round who did.

So I think this is a pretty natural -- and I can promise you,
since this is going to be the last question, I think it's a pretty
natural ending to the overarching discussion that both I and
people across the aisle have been having.

Mr. Weinsheimer.  But you've asked him about his reaction to
a personnel matter.  You've gotten all the facts you need in terms

COMMITTEE SENSITIVE

of whatever is the relevance of the personnel matter.  What his opinion of that personnel matter I don't think is relevant.

And he may have certain rights or he may have certain options in terms of what he wants to do.  I don't think his reaction to what's happened so far is relevant to your investigation.

Ms. Shen.  Okay.  Well, then can I be permitted to ask a few factual questions that's related to this topic?

Mr. Weinsheimer.  I've allowed to you ask all sorts of factual questions.

Ms. Shen.  Okay.  Well, then I will ask -- then I'll ask a couple more.

So, Mr. Ohr, in light of what you've told us, do you have any plans to pursue a personnel action in relation to the Department's handling of your position?

Mr. Weinsheimer.  Can I just interrupt for a second?

COMMITTEE SENSITIVE

[1:19 p.m.]

Mr. Ohr.  So I understand what you're asking, but I think all I can really say, to be honest, is I'm a Department of Justice employee.  I did not seek to appeal any of these actions.  I don't know, I can't say what I'm going to do in the future.  But I didn't seek any kind of appeal.

Ms. Hariharan.  Okay.  So earlier this month, a columnist for The Hill reported that you were discussing with Christopher Steele the possibility of reengaging him with both the FBI and the Special Counsel's Office, and I know it was brought up in the previous hour.  So we will introduce the article as exhibit 4. I'll give you a second to quickly review it.

[Ohr Exhibit No. 4

Was marked for identification.]

Mr. Berman.  Pages 4 through 7 are not the article, just so you know.

Ms. Hariharan.  Yes.  They're attachments within the article.

Mr. Ohr.  Okay.

BY MS. HARIHARAN:

Q   Can you describe how soon after, again, to the best of your knowledge, with regards to when Mr. Steele was officially terminated as a paid confidential human source for the FBI, how soon after that he was attempting to reengage with the FBI or the Special Counsel's Office in an official capacity?

A   Well, the conversations or the texts that are reported

on in this article all follow the FBI asking me to ask Chris if he would be willing to meet with them again.

I conveyed that to Chris Steele.  He conveyed back to me that he was interested.

Then there is a period of time, which I think is reflected in these texts, where the reengagement had not happened and Chris is asking:  What's happening, what's going on?  And so I said, I'll convey this, but that's all I could say.

Q   Does it speak to Mr. Steele's credibility as a source or as a point of access to various source networks for accurate and potentially credible information that the FBI would consider reengaging with him as a --

A   It's kind of speculation, I think, on my part.  I mean, clearly the FBI was the one that asked to reengage.

Q   And, again, we're just trying to clarify sort of why that may have been the case.

Is it consistent with your understanding that Mr. Steele's sources were still providing him information relevant to the question of Russian interference or Russian collusion or just broader Russian activities in the United States?

A   I think --

Q   That's part of the reason he was reaching out to you, part of the reason perhaps the FBI would want to reach out to him?

A   At some point, as reflected in some of these texts, Chris Steele is indicating he has additional information.  It's

COMMITTEE SENSITIVE

not clear to me whether that had to do with the, quote, special counsel's investigation or what, you know, but -- and so I didn't know specifically, you know, where it would fit in, if anywhere.

He does reference the special counsel, but, again, I don't know if that has, you know -- if that's right or what, whether he just conflated the FBI and the special counsel.  I don't know.

[Ohr Exhibit No. 5

Was marked for identification.]

BY MS. HARIHARAN:

Q   So since you've mentioned it a few times and it's also linked in within the article itself, we'd like to introduce as exhibit No. 5 the text messages that are labeled HPSCI 3-23-18-DOJ-27 through DOJ-30, which are law enforcement sensitive documents that were leaked to the press at a previous date.

These text messages, they're from March 30, 2017, through November 27, 2017, between you and Mr. Steele.  And if you could turn to page 2, Mr. Steele, writes, quote, "we are frustrated with how long this reengagement with the Bureau and Mueller is taking. There are some new perishable operational opportunities we do not want to miss out on," end quote.

Then again on the third page, for November 18, 2017, he wrote, quote, "I am presuming you've heard nothing back from your SC colleagues on the issue you kindly put to them for me.  We have heard nothing from them either.  To say this is disappointing would be an understatement," end quote.

COMMITTEE SENSITIVE

Would it be fair to say that Mr. Steele was having a difficult time communicating with both the FBI and the Special Counsel's Office outside of his communications with you, in your understanding, in your recollection from these messages?

A    He is expressing frustration that he is not in contact with the FBI and the Special Counsel's Office.

Q    Now, I'm not sure how familiar you are with some of the what I would characterize as conspiracy theories that have floated around, based on these text messages, and not only your communications with Mr. Steele but his attempted communications with the Special Counsel Office or the FBI.

In your opinion, is Mr. Steele's attempt to reengage with the special counsel or the FBI evidence of a secret conspiracy between those parties?

A    I think the communications speak for themselves.  He's trying to reestablish contact and it's not happening.

Q    Do you know if he ended up being successful in reengaging with the FBI or the Special Counsel's Office?

A    At some point during 2017 Chris Steele did speak with somebody from the FBI, but I don't know who.

Q    You wouldn't happen to remember when?

A    Not as I sit here, no.

Q    And would you even be in a position to know that information, since you're not involved in the investigation?

A    The only reason why I say this is that at some point

Chris Steele told me that he had met with somebody from the FBI.

Q    Do you know why he was -- Mr. Steele was so eager to reengage with the FBI or the special counsel?

A    I only know from the information he gave here that he thought there were some additional opportunities.  We did have a conversation at some point during this time period where he provided some information about what kind of opportunity, and I passed that along to the FBI.

         BY MS. SHEN:

Q    So just to go back to -- I think from these text messages, you know, it appears that he's trying to engage or through you maybe try to contact the FBI again.  Is that accurate?  As in this was not his first attempted outreach, but that there had been some level of back-and-forth with the FBI and him already.

A    Well, it's tough to say, because these text messages cover a period of several months.  And at some point during this time, the FBI did speak with Chris Steele, according to what Chris Steele reported.  And he had obviously had contact with the FBI back in 2016.  So, in that sense, yes, he's trying to get back in touch with the FBI.

Q    So in late 2016, I believe someone represented it to be around the November timeframe, Mr. Steele's formal status as an FBI confidential human source was terminated.  Subsequently, 6 months later, he's attempting to reengage with the FBI.

Why do you think the FBI would be -- I'm sorry, let me rephrase.  Do you have any insight as to why Mr. Steele believed that the FBI would nonetheless be receptive?

A    Well, as these notes reflect -- well, maybe they're not explicit, but as I had mentioned before, at some point, and it looks like from these notes around May of 2017, the FBI had asked me to ask Chris if he would meet with them again.

Q    When the FBI asked you to ask Mr. Steele to reengage, did they provide any commentary as to why they were asking you to do so?

A    No.

Q    So when the FBI had asked you to engage with Chris Steele, were they specific as to whether they wanted to establish, again, a formal relationship as a confidential human source versus just have some level of contact again?

A    I think they said they wanted to talk with him.  That's, I think, all they said.

BY MS. HARIHARAN:

Q    There has been a lot of conversation not only in this interview today but in our previous interviews as part of this joint investigation with relation to confidential human sources.

Are you familiar with the Department of Justice policy against revealing information from confidential human sources during an ongoing criminal investigation?

A    I know that the Department attempts to keep confidential

human source information confidential.

Q   And why does that policy exist?

A   If we reveal this information, it will make people not want to tell us in the future, and because in an investigation we may be acting on confidential human source information and revealing that information prematurely could, you know, damage our investigative efforts.

Q   So could disclosing the identity of a confidential human source then create a risk to that person or their source networks?

A   Yes, of course.

Q   And would that in any way -- in your experience, how would -- how could disclosing the identity of a confidential human source compromise our national security, the national security investigations or criminal investigations?

A   When a source's name is outed, that could put the source at risk.  It could prevent future attempts by the source to gather information on behalf of U.S. law enforcement.

There are a lot of ways that could damage ongoing cases, as well as the broader policy of trying to recruit sources to give information to law enforcement.

Q   If you could turn back to exhibit 5, which was the text messages.  And I'd like to turn your attention to page 3, where on October 26, 2017, Mr. Steele wrote to you, quote, "Can we have a word tomorrow, please?  Just seen a story in the media about the Bureau handing over docs to Congress about my work and

COMMITTEE SENSITIVE

relationship with them.  Very concerned about this.  People's lives may be endangered," end quote.

So in my understanding of this, Mr. Steele appears to be concerned that the production of documents to Congress could potentially endanger the lives of active sources or source networks.  Is that consistent with your understanding?

A   Yes.

Q   How did you react to Mr. Steele's concerns at that time?

A   I think we had a conversation.

Q   Did you agree in his assessment that lives could potentially be at risk, source lives?

A   I wanted to hear what he had to say, but, as I've said before, if sources are identified in public, then there could -- people's lives could be in danger.

Q   In your experience as an organized crime, transnational crime prosecutor, would you be concerned if Congress began requesting personal identifying information related to confidential human sources, their methods, their networks?  Would that be of a concern to you?

A   Speaking in general, yes.

Q   Do you believe that the Department has legitimate concerns that providing that information to Congress would, in turn, place those sources at risk?

Mr. Weinsheimer.  Just to be clear, Mr. Ohr can speak on behalf of himself.

Ms. Hariharan.  Yes, I'm sorry.

In your opinion.

Mr. Ohr.  In my opinion, yes.

Ms. Hariharan.  Okay.

BY MS. SHEN:

Q   So given the nature of protecting confidential human sources or protecting any kind of classified or sensitive information, you know, I think there's sort of -- in my mind, there's obviously just straight-up saying details, names, descriptions, and like that, but there's also, you know, contextual information that could potentially help someone else identify a source.  And it's often much more difficult to know what to protect in that example.  Would you agree?

A   If I understand your question correctly, the identity of the source could be put at risk in ways other than the straight revealing of their name or other identifying information, yes.

Q   Right.  So I think often, you know, there are people who don't necessarily understand that the information that they're seeking or might be talking about could be placing or could be an identifying piece of information, because it may not be obvious on its face.

But certain things, like dates of meetings or, you know, number of sources at given points of time, or locations of meetings, you know, in your experience, is that the kind of thing that is also protected because, you know, contextually it could

lead to someone piecing together a puzzle and identifying a source?

A   Yes.  Almost -- a lot of information relating to contacts with a source is sensitive, because it could be used to help identify a source.

Q   And so when in an open setting someone is asking for information about, say, the number of contacts a law enforcement official has with a source or how many meetings they had with a source or when they first met the source, would those be examples of types of information that, in your opinion, should be protected?

A   I think, from the law enforcement point of view, we would want to be careful about any information about sources being made public.

Ms. Shen.  Okay.  Thank you.

      BY MS. HARIHARAN:

Q   Going back to your time as a line prosecutor, did you utilize information or confidential human sources in your cases, understanding that you are not on the investigative side, you're on the prosecution side?

A   Yes.

Q   Now, was that information from these sources consistently accurate or did it vary from source to source?

A   Not only from source to source, but different information from the same source might be more or less credible,

COMMITTEE SENSITIVE

depending on the circumstance.

Q   As part of the process, the investigative side would have gone through and corroborated, if they could, any of the information provided by the sources before you even dreamed of using it?

A   Part of the job of an agent is to try to flesh out source information and corroborate it and use that information as lead information to generate other information and evidence that could be useful in an investigation and prosecution.

Q   And that happens in almost -- in every case that may or may not use a confidential source or material provided by them, correct?

A   It's pretty common.

Q   So, understanding that, the information provided by Mr. Steele, at one time an official confidential human source and then as a lead or conduit for that kind of information, the investigative side of the shop, i.e., the FBI, would have taken the time to go through and verify or corroborate what they could of the information that he -- that you provided via him?

A   This is our standard procedure.  What they did with it I don't know.

Q   But, generally speaking, that is the standard procedure for dealing with those types of leads and that type of information?

A   Yes.

Q   How -- you may have described this a little bit -- but how valuable -- again, going back to your time as a line prosecutor -- how valuable were these sources to your ability to successfully prosecute all manner of organized crime individuals?

A   Source information is very important to Federal law enforcement, particularly in the organized crime and drug areas.

Ms. Hariharan.  In that case, I think we're done for our hour.

Mr. Ohr.  Thank you.

Ms. Hariharan.  We should take a lunch break.  We are off the record at 1:39.  We'll break for lunch.

[Recess.]

[2:21 p.m.]

Mr. <u>Parmiter.</u>  Let's go back on the record.  The time is 2:21.

Mr. Jordan.

Mr. <u>Jordan.</u>  Thank you.

Mr. Ohr, why did they pick you?  That's what I'm trying to figure out.  Why did Fusion and Mr. Steele -- let's just focus on Mr. Steele.  Why did he come to you?  If he's, as you said, if he's already being paid by the FBI, going directly to the FBI, meeting with the FBI, why did he need to talk to you?

Mr. <u>Ohr.</u>  I don't know specifically why he reached out to me.

Mr. <u>Jordan.</u>  Tell me when you first met Christopher Steele.

Mr. <u>Ohr.</u>  I met him in 2007.

Mr. <u>Jordan.</u>  Where at?

Mr. <u>Ohr.</u>  At a meeting.  At that time he was still working for the British Government, their intelligence service.  And I was in London for meetings on Russian organized crime.

The FBI office in our Embassy in London set up a meeting with our British Government counterparts on Russian organized crime.  It took place at Christopher Steele's building, and he was there and there were other members of different British Government agencies there.

Mr. <u>Jordan.</u>  So our government and their government set up a meeting, and you both were at that meeting and you met there.

Mr. <u>Ohr.</u>  Yes.

Mr. Jordan.  Okay.  Between '07 and '16 -- so when was your first meeting with Christopher Steele relative to our subject today?  When was that, '16?

Mr. Ohr.  That was July 30 of 2016.

Mr. Jordan.  The meeting that's been talked about already?

Mr. Ohr.  Yes.

Mr. Jordan.  Okay.  So July 30, 2016.  Between 2007, when you first met Mr. Steele in Great Britain, and July 30, 2016, did you meet with Mr. Steele any time between those dates?

Mr. Ohr.  I did on occasion.  I don't remember exactly how many times, but a few times.

Mr. Jordan.  A few times.  Under 10, more than 10?

Mr. Ohr.  Probably under 10.

Mr. Jordan.  Under 10?  Was it also in like a conference-type setting, or was it some individual meetings?

Mr. Ohr.  Some of both.  There was at least one time I saw him in a conference-like setting, and then there were some meetings where either I or I and an FBI agent met with him.

Mr. Jordan.  Okay.  The July 30 meeting with Mr. Steele, prior to that what was your most recent meeting with Mr. Steele on a different subject prior to the July 30, 2016, meeting?

Mr. Ohr.  We had some -- we did not meet earlier that year that I recall.  We had met either the year or 2 before that.

Mr. Jordan.  So then 1 or 2 years prior --

Mr. Ohr.  Yes.

Mr. Jordan.  -- was your most recent meeting before the subject matter which we're discussing today?

Mr. Ohr.  I believe that is correct.

Mr. Jordan.  Okay.  Were you curious why all of a sudden you hadn't talked to him in, say, 2 years, why he wanted to get together with you now on this subject matter?

Mr. Ohr.  Well, he didn't explain the subject matter ahead of time.  It was -- over our -- over the years he had occasionally called when he was coming into town.  So we agreed to meet for breakfast.

And when he -- when we met then he provided the information that I've described earlier.  So I think I was in a little bit of shock at that point.

Mr. Jordan.  Okay.  When you meet on July 30, was your -- refresh my memory, we may have went over this -- was your wife at that meeting as well?

Mr. Ohr.  Yes, she was.

Mr. Jordan.  She was at that meeting.  And did Mr. Steele know that your wife was working for Fusion?

Mr. Ohr.  I'm not sure.  Probably, but I don't recall right now.

Mr. Jordan.  And he gives you this information.

What did he give you, actually?  Did you just talk?

Mr. Ohr.  We just talked.

Mr. Jordan.  So no documents were exchanged there, no memory

stick, nothing, no substantive other than just a conversation?

Mr. Ohr.  That is correct.

Mr. Jordan.  Okay.  And was it just the three of you, Mr. Steele, your wife, and you?

Mr. Ohr.  There was an associate of Mr. Steele's there as well, another gentleman, younger fellow.  I didn't catch his name.

Mr. Jordan.  Okay.  So that's the first time I knew that. Okay.  So there was a fourth individual there, but he also -- he worked for Mr. Steele?

Mr. Ohr.  I believe so, yes.

Mr. Jordan.  All right.

Who contacted you first?  Well, let me back up.

Tell me when you first met Glenn Simpson.

Mr. Ohr.  I met Glenn Simpson several years ago.  I don't recall the exact date.

Mr. Jordan.  Several years ago meaning?  Can you give me -- 2007, like Mr. Steele, or more recent than that?

Mr. Ohr.  It might -- it's several -- I mean, probably -- I don't know.  Definitely more than 5 years before, but I don't recall.

Mr. Jordan.  Five years earlier.

Mr. Ohr.  Yes, at least that, maybe 10 years earlier.

Mr. Jordan.  I think you said earlier today, sometime this morning, that you met with Glenn Simpson twice in person.  You had some conversations with him on the phone, it looks like some email

exchanges.  But you met twice in person in 2016.  Is that right?

Mr. Ohr.  That is my recollection.

Mr. Jordan.  Once was August and once was December?

Mr. Ohr.  Yes.

Mr. Jordan.  So August 2016.  What was your most recent meeting prior to that August 2016 meeting with Glenn Simpson -- before this subject matter on August 2016, what was your most recent meeting prior to that?

Mr. Ohr.  You know, I don't recall.  It probably was at least a few years before.

Mr. Jordan.  Just like Mr. Steele, at least a couple years earlier?

Mr. Ohr.  Right.

Mr. Jordan.  Okay.  And tell me about this first meeting with Mr. Simpson again.

Mr. Ohr.  This happened around August 22.  I believe, if I remember from looking at my notes -- I don't have a specific recollection of the date -- when I had spoken with Chris Steele, I think he indicated that Glenn might be available to meet.  Or maybe that was in an email.  And I don't recall how the August 22 meeting was set up, whether I reached out for Glenn Simpson or whether he reached out for me.

Mr. Jordan.  Okay.  And what did you discuss exactly, again, at this meeting?

Mr. Ohr.  He provided some additional information.  And the

only reason I'm hesitating is I don't know exactly what he said as opposed to what Steele said.

Mr. Jordan.  Just give me 1 second.  I apologize.  Additional information.  So was the meeting on August 22 -- so you have the meeting on July 30 with Christopher Steele --

Mr. Ohr.  Correct.

Mr. Jordan.  -- and your wife.  That's the first time you had met with him in a couple years.

Mr. Ohr.  Yes.

Mr. Jordan.  Twenty-two days later, you're meeting with Glenn Simpson.

Mr. Ohr.  Yes.

Mr. Jordan.  Was your wife at that meeting?

Mr. Ohr.  No.

Mr. Jordan.  Was anyone else at that meeting?

Mr. Ohr.  I don't believe so.

Mr. Jordan.  So the two of you.  And you said additional information.  So was the 22nd, August 22 meeting with Glenn Simpson building on information you learned from the July 30 meeting with Christopher Steele?

Mr. Ohr.  That was my understanding.

Mr. Jordan.  That was your understanding.  Were there any meetings with either Steele or Simpson -- obviously not Simpson, because you said this was your first one -- any meetings with Steele or anyone else between the 30th and the 22nd about this

subject?

Mr. Ohr.  Not that I recall.

Mr. Jordan.  Okay.  So those are the first two meetings on
what we've been talking about --

Mr. Ohr.  I believe so.

Mr. Jordan.  -- with the two principal -- well, with Mr.
Steele and Mr. Simpson.  All right.

Go back to the 30th meeting now.  I know we're jumping back
and forth.  Go back to Steele.  What exactly did he convey at the
July 30 meeting?

Mr. Ohr.  As I mentioned before, there were three primary
items of information.

Mr. Jordan.  Let me just go find those in my notes, because I
remember you saying that.  I want to make sure I have it.

You talked about Mr. Page.  You talked about the statement he
had made, Donald Trump over a barrel, and a gentleman named
Hauser.  Is that right?

Mr. Ohr.  That's right.

Mr. Jordan.  Those three pieces of information.

Mr. Ohr.  Yes.

Mr. Jordan.  And you -- we'll get to the next meeting in
August when you go, because there was a meeting in between those
when you went to meet Mr. McCabe and Mr. Strzok and Ms. Page,
right?

Mr. Ohr.  Well, I believe what happened after that first

July -- well, first of all, can I step back for a moment, because I think you may not have been in the room.

In the July 30 meeting, Chris Steele also mentioned something about the doping -- you know, one of the doping scandals.  And he also mentioned, I believe -- and, again, this is based on my review of my notes -- that he had provided Mr. Gaeta with two reports, but that Glenn had all reports.  So, okay, so there's that.  Then --

Mr. <u>Jordan.</u>  I'm just trying to get the chronology.  There's a July 30 meeting.  There's an August 22 meeting.  July 30 is with Mr. Steele and your wife and some associate of Mr. Steele.  The August 22 meeting is just you and Mr. Simpson.

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Jordan.</u>  In between those two meetings --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  -- I thought you said you met with Mr. McCabe --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  -- Ms. Page, and Mr. Strzok.

Mr. <u>Ohr.</u>  No.  What I met with -- what I did after the July 30 meeting is I reached out for Andy McCabe and asked to meet with him.

Mr. <u>Jordan.</u>  Right.

Mr. <u>Ohr.</u>  He said -- you know, there was a certain time we set up.  I went over there to talk with him and Lisa Page was there.  I did not know she was going to be there.  I do not

believe that Peter Strzok was there at that meeting.

Mr. <u>Jordan.</u>  But Page and McCabe were.  And that meeting took place sometime between the 30th of July of 2016 and the 22nd of August 2016.

Mr. <u>Ohr.</u>  To the best of my recollection.  I don't have a date for that meeting.

Mr. <u>Jordan.</u>  And when did you learn, in these three meetings in those 22 days, when did you learn that Mr. Steele was being paid, as you said earlier, paid by the FBI and actually providing information to them directly?

Mr. <u>Ohr.</u>  I had known years prior to that that Chris Steele had an informant relationship, was a paid informant with the FBI.

Mr. <u>Jordan.</u>  So you knew it at the time.  When you first met him on the 30th, you knew he was already --

Mr. <u>Ohr.</u>  He already had a relationship.

Mr. <u>Jordan.</u>  You knew that?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Okay.  Did he talk about that at all?  Did he talk about what he was giving to the FBI?  Did he talk about his meetings with the FBI in your July 30 meeting?

Mr. <u>Ohr.</u>  The only thing I recall him mentioning is that he had provided two of his reports to Special Agent Gaeta.

Mr. <u>Jordan.</u>  So the same information he gave you, did he tell you he had given that directly to the FBI?

Mr. <u>Ohr.</u>  I don't know what he told the FBI.

Mr. Jordan.  Okay.  After he gave you this information, did you -- I'm just curious how you're thinking -- did you step back and say, well, why does he want to talk to me if he's a paid informant and he can give it directly?  Why the go-between?  Why not just like go say, if he told you three sentences and then two other pieces of information about the doping scandal, whatever, three other sentences, why didn't he just tell it directly to the FBI?

Mr. Ohr.  He may well have.  I don't know what -- you know, he had a relationship with the FBI at that time.  He may well have provided that information to the FBI.  I didn't know.

Mr. Jordan.  Why did he need to say it twice, is what I'm asking.

Mr. Ohr.  He and I had spoken from time to time over the years and --

Mr. Jordan.  What I'm trying to figure out is why did they need you.

Mr. Ohr.  I don't -- I don't know what --

Mr. Jordan.  I don't see how they -- I mean, if Christopher Steele is a paid informant of the FBI and he's this source who's credible, he's been working with the FBI, as you said, for a long time, you knew he was a paid informant, why did he need to talk to you --

Mr. Ohr.  I don't know.

Mr. Jordan.  -- to give the same darn information?

Mr. Ohr.  I don't know.

Mr. Jordan.  Okay.  All right.  So the timeline is, again, the 30th you meet with Steele.  Sometime between the 30th and the 22nd of August you meet with McCabe and Page.  And then we're to the meeting on the 22nd with Glenn Simpson.

Tell me -- again, go back.  How did you first meet Glenn Simpson?  How did you guys first meet?  You said you met Steele at an organized crime event or some forum in Great Britain.  How did you first meet Simpson, again?

Mr. Ohr.  I don't recall specifically.  It may have been at some kind of conference or something, but I don't recall specifically.  I knew he was interested in Russian organized crime, that was the nature of our prior contacts, but I don't recall the specifics.

Mr. Jordan.  When did your wife first meet Glenn Simpson?  And when did your wife first -- when was her employment -- when did her employment start with Fusion?

Mr. Ohr.  I believe she knew Glenn Simpson for several years as well, because he was interested in Russian organized crime.  My wife was a Russia analyst.  And so I think they met.

I recall at least one conference or meeting, I believe it was at the Department of Justice, not Main Justice but one of our offices, where different speakers were there to talk about some aspect of Russian organized crime.  And I believe Glenn Simpson was there and my wife was there.  And I don't know if they knew

each other before then or not.  So that's what I remember about them meeting, was certainly some time ago.

She started, had signed on as an independent contractor with Fusion GPS I believe in late 2015.

Mr. <u>Jordan.</u>  And, again, and I think you've talked about this earlier, why was she hired?

Mr. <u>Ohr.</u>  To do research on Russian -- Russian or Russia-connected individuals and companies.

Mr. <u>Jordan.</u>  And build on that.  Research.  I mean, that's pretty broad.  Do research on Russia, I mean, that's, you know -- was she hired specifically for the dossier as well, or was that one and the same when you say research on Russia?

Mr. <u>Ohr.</u>  I believe her initial assignments had nothing to do with Chris Steele or with the Trump campaign or anything.  I think she was just given other assignments.

Mr. <u>Jordan.</u>  When you met with Mr. Steele on July 30, did he know your wife was working for Fusion?

Mr. <u>Ohr.</u>  Again, I'm not sure.  I'm guessing -- well, I shouldn't guess.  I'm not sure.  He may have.

Mr. <u>Jordan.</u>  Did Mr. Steele know that you knew Mr. Simpson, and did Mr. Simpson know that you knew Mr. Steele?

Mr. <u>Ohr.</u>  I believe so, yes.

Mr. <u>Jordan.</u>  How about this memory stick on December 12 that you got from Glenn Simpson?

Mr. <u>Ohr.</u>  Sorry, what's the question about that?

Mr. Jordan.  The memory stick you got on December 10 of 2016, what can you tell me about that?  Do you know anything that was -- you got a memory stick on the 10th of December.

Mr. Ohr.  Yes.  Yes.  So, as I think I may have mentioned earlier, Glenn Simpson wanted to meet in early December, whatever date that was in December.

At that meeting, he provided me with a memory stick and provided some additional details on information about possible connections between the Russian Government and the Trump campaign. And he did not at that time explain specifically what was on the memory stick, but my guess at the time was that this was the dossier.

Mr. Jordan.  You did handwritten notes.  There was a long --

Mr. Ohr.  Yes.

Mr. Jordan.  There's a long one that has a similar date.

Mr. Ohr.  Yes.

Mr. Jordan.  It's the same date.

Mr. Ohr.  I believe so, yes.

Mr. Jordan.  Is that -- and the very first thing is, Glenn gave me a memory stick.

Mr. Ohr.  Yes.

Mr. Jordan.  All right.  Are you familiar with what I'm talking about?

Mr. Ohr.  Yes, I am.

Mr. Jordan.  It looks like three or four pages, maybe five.

COMMITTEE SENSITIVE

Was that a recap of what you thought was on the memory stick?

Mr. Ohr.  No.  It was a recap of our conversation.

Mr. Jordan.  Is your conversation, though, what you assumed was on the memory stick or what you were told was on the memory stick?

Mr. Ohr.  Well, I don't think he explicitly told me it was the dossier, but I think I assumed that.  And the additional information he gave, he didn't indicate whether it was in the dossier or not.

Mr. Jordan.  All right.  When you -- did you ever give information -- or did you ever give anything to -- information or any document or any memory stick or any type of -- anything tangible to Mr. Steele or Mr. Simpson in your meetings with them?

Mr. Ohr.  No.

Mr. Jordan.  How about when you met with Mr. McCabe and Ms. Page between these two meetings, did you give them notes that you had taken?  Was there anything in writing you gave to Andy McCabe and Lisa Page?

Mr. Ohr.  I don't believe so, no.

Mr. Jordan.  Okay.  Let's move to --

Mr. Issa.  Before you go on, he said he thought at the time it was the dossier.  How did he know there was a dossier?  When did he learn of the existence of a dossier?

Mr. Ohr.  I don't recall exactly when I learned of the existence of the dossier.  I think prior to this meeting I was

COMMITTEE SENSITIVE

aware there was such a thing.  I had not seen it.  And I don't know if I even knew the word "dossier" at the time or just Chris Steele reports or something.  I don't recall whether I, you know, knew that term.

And I don't recall exactly why, whether -- I don't recall exactly why I assumed that that was the dossier, but either prior -- one of the conversations with Chris Steele prior to that time, I might have, you know, been -- made me expect that Glenn might give me the dossier.  I don't recall exactly.

But at that time, being aware that there was something like that in existence and then being given a memory stick by Glenn Simpson, I think that's what I assumed was on there.

Mr. <u>Jordan.</u>  You met with Glenn Simpson in person twice.  How many times did you meet with Christopher Steele in person?

Mr. <u>Ohr.</u>  I believe just the two times, the July 30 and then sometime in September.

Mr. <u>Jordan.</u>  And each of them gave you -- I think you said earlier each of them gave you a memory stick?

Mr. <u>Ohr.</u>  No.  Glenn Simpson gave me a memory stick in December.  The other memory stick we have discussed before this was at some point, and it may have been in the fall of 2016, my wife gave me a second memory stick or a first memory stick.

Mr. <u>Jordan.</u>  And what did you do with that?

Mr. <u>Ohr.</u>  I gave that --

Mr. <u>Jordan.</u>  Both you gave to the FBI?

COMMITTEE SENSITIVE

Mr. Ohr.  Yes.

Mr. Jordan.  The memory stick your wife gave you, when was that and what was on it?

Mr. Ohr.  I don't recall exactly when I got that from her, but my understanding at the time was that that represented her research into particular Russian figures on behalf of Fusion GPS.

Mr. Jordan.  Was it before the election or after the election?

Mr. Ohr.  You know, I'm afraid I can't recall.

Mr. Jordan.  Who did you give it to, Mr. Pientka?

Mr. Ohr.  I'm sorry?

Mr. Jordan.  Did you give it to the guy, your handler, your agent, Mr. Pientka?

Mr. Ohr.  Yeah.  I believe I would have given it to Mr. Pientka, yes.

Mr. Jordan.  Okay.  And you think -- but it was before the one -- do you think it was different than the memory stick Mr. Simpson gave you, the contents of it?

Mr. Ohr.  Yes.

Mr. Jordan.  You know that?

Mr. Ohr.  No.

Mr. Jordan.  But you think so?

Mr. Ohr.  I think so, because I believe the memory stick that Mr. Simpson gave me was the reports from Chris Steele that are referred to as the dossier.  And the memory stick that my wife

gave me was her research, through open sources, into the work that she had done for Fusion GPS.

Mr. Jordan.  Okay.  But you definitely got the memory stick from your wife prior to the one that you received in December from Mr. Simpson.

Mr. Ohr.  I'm not sure.  I think I said first a moment ago, but I'm not sure.

Mr. Jordan.  Did you have discussions with your wife about this whole subject area?

Mr. Ohr.  We had some conversations, sure.

Mr. Jordan.  And can you tell me about some of the things that she may have related to you about this?

Mr. Ohr.  Well --

Mr. Berman.  Congressman, with the staff earlier we discussed the fact that Mr. Ohr wants to fully cooperate and answer fully every question that he can.  We're trying to get him to answer all your questions, at the same time not testify directly to conversations he had with his wife, which are generally protected by privilege, although I recognize Congress takes a different view of privilege.  He does want to answer your question.

Mr. Ohr.  Okay.  What I can tell you, I think, is that my understanding was when we met with Chris Steele on July 30 that that was -- the specific information he gave me was not known to my wife at the time.

After that, I can say that I think I certainly tried to keep

separate what I was getting from Chris Steele and from Glenn
Simpson from any conversations with my wife.

She was specifically researching particular people.  At some
point, I became aware that she was looking at, among other people,
Sergei Millian, which was one of the names that either Chris
Steele or Glenn Simpson had given to me.  I know she was
researching these things.

In September of 2016, she ended her -- she stopped being a
contractor with Fusion GPS and she went to work at VeriSign as a
Russia cyber analyst.  And at some point, I don't remember when
specifically, she wanted to know or she was, you know, afraid that
the --  was curious whether the FBI would want her -- results of
her research.  And she did -- and she provided that to me in the
form -- and I said yes, and then she provided it in a memory
stick.

Mr. Jordan.  Shortly after she left the employment of Fusion,
you said?

Mr. Ohr.  I don't recall when it was.

Mr. Jordan.  But you said she left employment at Fusion in
September of 2016.

Mr. Ohr.  That I remember.  I don't recall when she gave me
the memory stick.

Mr. Jordan.  Did you ever give her any information that you
had learned from Mr. Steele or Mr. Simpson?

Mr. Ohr.  I certainly tried not to.  I can't remember every

conversation we had, but I don't remember giving her any
information.

Mr. <u>Jordan.</u>  Was your wife aware of the conversations, the
Skype meetings and the text messages and conversations you were
having with Mr. Steele and Mr. Simpson?

Mr. <u>Ohr.</u>  I think she knew that I was having some contact
with them, but aside from that one meeting that she was at on July
30, she wasn't --

Mr. <u>Jordan.</u>  There is one note in here that says, I think
Glenn sent this to the wrong person, he sent it to me, and she
forwards it to you.

Mr. <u>Ohr.</u>  Yes, uh-huh.  So that's the -- I mean, yes.  So
that time -- so she was aware that Glenn Simpson was reaching out
for me.  We have the same email address.  So when there's a
message from Glenn Simpson saying, you know, can you bring or
whatever it was, she says, I think this is meant for you, not for
me, or she sends a text to that effect.

Mr. <u>Jordan.</u>  Were you aware of the money trail, the fact that
the DNC and the Clinton campaign had paid Perkins Coie, the law
firm who then had paid Fusion, who were then paying Christopher
Steele, were you aware of that?

Mr. <u>Ohr.</u>  I don't believe I was aware of that at the time.  I
knew they were --

Mr. <u>Jordan.</u>  When did you learn about that?

Mr. <u>Ohr.</u>  I think in the press.

Mr. <u>Jordan.</u>  Do you know when your wife knew that, that trail?

Mr. <u>Ohr.</u>  She may also have learned it from the press.  I'm not entirely sure.  I don't think she -- she was not -- you know, she didn't go to their office, I think, most days.  I think she was basically researching topics on the internet and providing the information.  So I don't think she had a lot of conversations, from what I can tell, on the specifics.

Mr. <u>Jordan.</u>  Let me go back a second.

Your wife first met Glenn Simpson when?

Mr. <u>Ohr.</u>  Several years ago.  I don't remember --

Mr. <u>Jordan.</u>  The same meeting you were at or different?

Mr. <u>Ohr.</u>  Probably -- I don't know.  I mean, I've seen Glenn Simpson at various -- on various occasions over the years, and I believe my wife has as well.

The one time I remember the three of us being in a room was this one conference that DOJ had.  I think it was NIJ that had -- you know, or National Institute of Justice maybe.

Mr. <u>Jordan.</u>  Several years ago?

Mr. <u>Ohr.</u>  Yeah, several years ago.  And I don't --

Mr. <u>Jordan.</u>  Do you recall -- your wife began working in late 2015-early 2016 timeframe for Fusion.  When was the most recent meeting prior to when she began employment at Fusion that your wife had with Glenn Simpson?  Do you know?

Mr. <u>Ohr.</u>  I don't know.

Mr. Jordan.  Years, months, days before that?  What would it
be?

Mr. Ohr.  Well, I assume there was some kind of --

Mr. Jordan.  Prior to just the initial contact for
employment.

Mr. Ohr.  Okay.  So my guess is years, but -- well, I
shouldn't guess, so I don't know.  But I don't think it was one
close -- close in time.

Mr. Jordan.  Similar to what we discussed earlier with you.

Mr. Ohr.  Yes.

Mr. Jordan.  It had been 2 years prior before you -- since
you had most recently talked to Chris Steele before he wants to
meet you on July 30, a couple years prior before Glenn Simpson
wants to meet you on August 22.  Same pattern with your wife?

Mr. Ohr.  I can't -- because I don't know the years.  I'm
guessing it's -- again, I shouldn't guess, but I know it was not
close in time, in terms of weeks or months.

Mr. Jordan.  Why do you think they picked your wife?  There's
probably lots of Russian experts in the Washington, D.C., area.

Mr. Ohr.  You know, I think -- first of all, I don't think
that there are that many people that do Russia research that are
available to do these kinds of contracts.  So I think, you know,
they have talked over the years from time to time.

So I don't know why he picked her, but they were certainly
acquainted and knew of each other, you know, knew of each other's

work at least in general.

Mr. Jordan.  Let me go to Peter Strzok.  Let me do this, then I'll go to you, Darrell, then I know John wants to get back in here too.

Tell me about your relationship with Peter Strzok, how many interactions you had with him.

Mr. Ohr.  I believe I only saw him maybe twice.  I don't know specifically.  I did not know him before I was introduced to him.

Mr. Jordan.  When was that date?

Mr. Ohr.  Well, I don't recall exactly, but I think this was the -- reconstructing it, I think the first time I may have met him is with the meeting I had with Lisa Page, Peter Strzok, and some of the criminal division people.  So that would have been in the fall at some point.

Mr. Jordan.  And, again, he was not at the August meeting. So you're saying the fall of 2016.

Mr. Ohr.  I'm pretty sure he was not at the August meeting, yeah, or the meeting around that time.

Mr. Jordan.  Mr. Ohr testified a few weeks back, about 5 weeks ago, that -- Mr. Strzok testified, excuse me, I'm sorry, that Mr. Ohr gave FBI documents which included material that I believe originated from Mr. Steele.  That's Peter Strzok's testimony when I was questioning him 5 weeks ago.

What were those documents?

Mr. Ohr.  I had -- well -- so what I recall is before I

met -- certainly in November, when I met with Peter Strzok, Lisa Page, and Joe Pientka, prior to that meeting, and then prior to my meeting, I believe, with Joe Pientka on November 22, I had tried to write up some of my notes of the prior conversations, the ones in July, August, September.

Mr. Jordan.  Okay, so back up.  November 22 you meet with Pientka.  Prior to that, you met with Strzok, Page, and McCabe and Pientka.

Mr. Ohr.  No, I'm sorry.  I met with Mr. McCabe and Lisa Page in July.  I don't believe I gave them any notes at that time.

Mr. Jordan.  I know, you said that earlier.  Go to this November timeframe.

Mr. Ohr.  Oh, you mean August.  Yeah, I'm saying August.  I'm getting mixed up here.

Then in the fall sometime, it could have been September, but I don't recall precisely, I met with Lisa Page, Peter Strzok, and the three people I previously mentioned from the criminal division.  I don't believe I gave them any documents at that time either.

I remember, though -- and my notes reflect this -- that in November, before I sat down with Joe Pientka, I had prepared -- and I had prepared some summaries of the conversations I had had with Mr. Steele and with Mr. Simpson up to that time, you know, prior to November.  And I had also prepared a -- what I think I had labeled a partial chronology of my meetings with those

guys.

So those, I don't recall specifically whether I gave them, the documents, to Mr. Strzok and Ms. Page and Mr. Pientka on the 21st or to Mr. Pientka on the 22nd, but I may well have.  I certainly prepared the documents with the intention of sharing that information and offering them the documents if they wanted it.

Mr. <u>Jordan.</u>  I'm sorry, go ahead.

Mr. <u>Ratcliffe.</u>  Yes, just to clear up one thing.  With respect to those contacts with folks at the Department of Justice, like Andrew Weissmann and Bruce Swartz and Ms. Ahmad, and contacts with Mr. McCabe and Ms. Page in that timeframe, are there, other than what we've seen in these documents, are there emails or text messages that would document those contacts?  And, if so, how would I request those?

Mr. <u>Ohr.</u>  I don't know.  I don't think -- I don't think I had -- beyond the notes that you have from me, those I think are my only -- the only records I'm aware of, of those meetings.

And part of the reason for introducing me to Joe Pientka, what I was told was so that they would -- you know, I would have a regular contact and they would kind of take -- keep track of things.

Mr. <u>Jordan.</u>  John makes a good point.

So the documents you handed to Page, Strzok, or Pientka or whoever around the November 21-22 time period --

Mr. Ohr.  Yes.

Mr. Jordan.  -- are they different than what we were given?

Mr. Ohr.  Those are the notes.  That's what you have.

Mr. Jordan.  This is what you gave?

Mr. Ohr.  Yes.  Yeah.  I believe -- I don't physically remember, you know, I don't remember physically handing it to them, but I believe I did give it to them.

Mr. Jordan.  These handwritten notes?

Mr. Ohr.  Yes.

Mr. Jordan.  Okay.  And so this is different.  The documents that Mr. Strzok testified to, he was testifying to that versus the -- well, you wouldn't --

Mr. Ohr.  I don't know.

Mr. Jordan.  I get you.  I get you.  But you handed him documents, and then you also handed him the memory stick.

Mr. Ohr.  At some point -- whenever I got the memory stick from my wife and whenever I got the memory stick from Glenn Simpson, I turned that over to the FBI, probably to Joe Pientka directly.

Mr. Jordan.  How many times did you give documents to the FBI?

Mr. Ohr.  So the two memory sticks and then these documents.  I think those are the only things I remember giving to them physically.

Mr. Jordan.  The handwritten notes that we have --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  -- and the two memory sticks.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  All right.  And it was Mr. Pientka who took receipt of them and/or Page and Strzok?

Mr. <u>Ohr.</u>  It probably would have been Mr. Pientka, but I don't recall for sure.  And, again, I don't specifically recall giving him the documents.

Mr. <u>Jordan.</u>  These notes of yours and the memory sticks, did you give them to anyone else?

Mr. <u>Ohr.</u>  No.

Mr. <u>Jordan.</u>  No one at the Justice Department?

Mr. <u>Ohr.</u>  No.

Mr. <u>Jordan.</u>  Any of the people, your peers that you talked about, I think Ms. Ahmad, Mr. Weissmann, no one else?

Mr. <u>Ohr.</u>  I don't believe I gave them any documents, no.

Mr. <u>Jordan.</u>  Okay.  Did you talk to any of those folks about this material, your notes you put together?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Your peers, did you talk to them?  Did you go to Mr. Weissmann and say, "You know what, I just want to run some things by you, I got to go meet with the FBI, here's my notes"?  Did you do that kind of stuff?

Mr. <u>Ohr.</u>  No.  No, nothing like what you're saying.  I think I conveyed some of the substance of the same conversations to

Mr. Swartz, Ms. Zainab, and at least on one occasion Mr. Weissmann would have been present, but I don't recall specifically.

Mr. <u>Jordan.</u>  Okay.  When did you know that the FBI had an active counterintelligence investigation into the Trump campaign and Russia?

Mr. <u>Ohr.</u>  I don't recall when I -- exactly when I learned that.  It was sometime later.

Mr. <u>Jordan.</u>  "Sometime later" is pretty vague, Mr. Ohr.  Give me an idea.

Mr. <u>Ohr.</u>  I can't -- I don't know.  At some point obviously --

Mr. <u>Jordan.</u>  2016?

Mr. <u>Ohr.</u>  I don't recall.  It may have been 2017, but I'm not sure.  And I think I saw it in the press.  I'm not sure if that's the first time.  It may have been the first time I heard of it.  I'm not sure.

Mr. <u>Jordan.</u>  When did you know -- I think this may have been asked earlier, but just for my -- when did you know that the research Mr. Steele was doing that you were passing on to the FBI was used as part of a FISA application?

Mr. <u>Ohr.</u>  I think I read that in the press.  So whenever it was reported in the press.

Mr. <u>Jordan.</u>  Did you know the FBI had different versions of the dossier?

Mr. <u>Ohr.</u>  That rings a bell, but I don't recall specifically

what I heard about that.

Mr. Jordan.  It rings a bell.  Can you elaborate?

Mr. Ohr.  I can't specifically.  I mean, I don't recall the specifics.

Mr. Jordan.  Okay.  I want to go through some of the documents and work through those, but I know that the gentleman from California has some questions.  So if that's all right, we'll go there and then we'll come back and work through these documents.

Mr. Issa.  Thank you.  And mine will be brief.

Your wife earned purportedly $44,000 working for Fusion GPS for about a year.  Is that right?

Mr. Ohr.  Again, I don't recall the number, but --

Mr. Issa.  During that period of time, who else did she work for?

Mr. Ohr.  She had an ongoing contract with something called Plusis (ph) that does training for law enforcement on, among other things, cybersecurity.  I don't recall if she earned money from them during the -- late 2015 to September 2016.

Mr. Issa.  Do you file a joint return?

Mr. Ohr.  Yes.  Whatever it would be would be reflected on our tax return.

Mr. Issa.  Do you recall?  You make about 212,000, 220,000, somewhere in that range.  Do you recall how much your tax return was so you'd know how much she made?

COMMITTEE SENSITIVE

Mr. Ohr.  I don't remember the specifics, no.

Mr. Issa.  But there was other income besides the 44,000, to your recollection?  Most people do think about how much they earn per year.

Mr. Ohr.  I certainly was paying attention to what I was earning, but I don't recall --

Mr. Issa.  Okay.

Mr. Ohr.  I'm sorry, go ahead.

Mr. Issa.  I mean, we don't have to dwell on this, but you filed a joint return.  You have no idea how much she made in '15 or '16 from any or all income?

Mr. Ohr.  I don't recall as I sit here.  I know her income fluctuated when she was an independent contractor.

Mr. Issa.  Okay.  You said she had a contract.  How do you know it was a contract?  Is that routine?  Does she have her own contracts she presents to people?

Mr. Ohr.  No.  I think it was Fusion's contract.

Mr. Issa.  Okay.  Now, normally in a contract like Fusion GPS, one of the first things they have is that the work product they pay for is their work product and cannot be shared.

Would you be familiar in any way of whether or not she signed a contract that would have limited her ability to hand you information, the fruit of their paid-for research?

Mr. Ohr.  I don't specifically know what was in her contract.

Mr. Issa.  So would it be fair to say that -- let's assume

that it was in the contract, as it almost always would be with any company -- that, in fact, she had to gain their permission or even their request to turn that information over to you?

Mr. Ohr.  Yeah, I don't know.  I mean, you're making an assumption that I just don't know.

Mr. Issa.  Well, since you know that Glenn Simpson, Christopher Steele, and others really disliked the President and were motivated to stop him, I'm just asking if this was proprietary information that belonged to Fusion GPS and it was being given to you by your wife, but effectively it was being given to you through your wife by Fusion GPS.  That's what it appeared to be.  I just want to see if you knew that or reasonably would believe that.

Mr. Ohr.  I don't think that was the case.

Mr. Issa.  So you think she did that on a rogue basis, that she didn't go to Fusion GPS for permission?

Mr. Ohr.  I think it was her giving it to me, not -- without -- you know, without any sanction or whatever from -- as far as I know, yes.

[3:02 p.m.]

Mr. Issa.  Okay.  And I will conclude, like I said, and it will be very brief.  We have already had a vast amount of publicly reported information about Peter Strzok and Lisa Page's dislike of the President -- well-stated dislike.  You worked with them.  You presented information to them.

Tell me, did you have any indication that they or anybody else at the FBI had any dislike for the President -- jokes, comments, anything that would have you believe anything but the greatest respect for the President of the United States-elect.

Mr. Ohr.  There were no jokes or comments or anything like that in my presence, that I can recall.  They obviously took the information I gave them seriously, which was certainly not flattering to the President.  But I never heard anything that was indicating --

Mr. Issa.  So, no evidence of glee or Wow, this is great?

Mr. Ohr.  No, no.

Mr. Issa.  The last question, which closes the loop on everybody.  In your interactions at all times during 2016, 2017, were you in contact with people at the Department of Justice or FBI who showed any notable like or dislike for the President and said so to you in a way in which you recognized that they had a preference?  I know that is broad.

Mr. Ohr.  That is pretty broad.

Mr. Issa.  How about if we just limit it to people who were,

in any way, tangentially involved with this investigation and this activity?

Mr. Ohr.  Even that covers a long period of time.  I am not recalling anything like that from the people who I was dealing with on this matter.

Mr. Issa.  So, at this point you never ran into anybody you saw that had stated preference, one way or the other, or articulated in any way?

Mr. Ohr.  Right.  I can't recall anything like that at the moment as I sit here.

Mr. Issa.  Thank you very much.

Mr. Jordan.  Earlier you said that you told the FBI that Mr. Steele, when you were conveying to them where you were getting this information, Mr. Steele was desperate to stop Trump from winning.  When did you convey that to the FBI?

Mr. Ohr.  I don't think it was after the July 30 meeting, although I am not entirely sure.  It may have been after the September meeting.

Mr. Jordan.  So it was either the August meeting or September meeting, one of those?

Mr. Ohr.  I think that is probably right.  I don't recall exactly.

Mr. Jordan.  My colleague wanted me to ask -- Mr. Biggs -- was your wife fluent in Russian?  Can she speak the language?

A    She can certainly read it well.  I think she would say her speaking is a little rusty.

Mr. Jordan.  Okay.  Another colleague.

When did you first learn your wife was working for Fusion?  When did you know she was working for fusion?

Mr. Ohr.  When she began.

Mr. Jordan.  When she began?

Mr. Ohr.  Yeah.

Mr. Jordan.  2015.  When did you first become aware that Rod Rosenstein knew of your wife's work for Fusion?

Mr. Ohr.  I am sorry?

Mr. Jordan.  Do you know when Mr. Rosenstein knew of your wife's work for Fusion, and her work on the dossier?

Mr. Ohr.  I believe that was in October of 2017.

Mr. Jordan.  Okay.  And how about the special counsel, when do you think he knew about you and your wife's work for -- your wife's work for Fusion and her work on the dossier?  Any idea?

Mr. Ohr.  First of all, let me just say I don't know what the special counsel knew at any time.  I have not had any conversation with the special counsel or his staff.  What I had said, I think, to Mr. Rosenstein in October of 2017, was that my wife was working for Fusion GPS.  I am not sure if you were in the room earlier when I said that the dossier, as I understand it, is the collection of reports that Chris Steele had prepared for Fusion GPS.  My wife had separately done research on certain Russian

people and companies or whatever that she had provided to Fusion GPS.  But I don't believe her information is reflected in the Chris Steele reports.  They were two different chunks of information heading into Fusion GPS.

Mr. <u>Jordan.</u>  So your wife didn't work on the dossier?

Mr. <u>Ohr.</u>  Not specifically, from what I can tell.  She worked on some of the same people.  So, for example, I think I mentioned earlier, she had worked on Sergie -- done some research on Sergie Millian.  And I think Sergie Millian is mentioned in the dossier, but I don't think it is her work that made it into the dossier.

Mr. <u>Ratcliffe.</u>  If that testimony that you just gave regarding whether or not your wife worked on the dossier conflicts with testimony that you previously gave and recorded in the 302 with the FBI, which testimony was given in more recent time?  Which would you think would be more accurate and more closely aligned to the facts?

Mr. <u>Ohr.</u>  I provided information to the FBI.  How they documented it, I didn't know.  But I am telling you now is my understanding of what happened, which is that dossier consisted of reports prepared by Chris Steele, which is separate from --

Mr. <u>Ratcliffe.</u>  Have you reviewed the dossier?

Mr. <u>Ohr.</u>  I have taken a look at the dossier, yes.

Mr. <u>Ratcliffe.</u>  You testified before that you didn't look at the information that your wife gave you to the FBI?

Mr. <u>Ohr.</u>  Correct; I did not look.

Mr. Ratcliffe.  So how do you know, as you are testifying under oath here, that the information that your wife gave to the FBI was not part of the dossier?

Mr. Ohr.  What I saw of the dossier was in the form of the kinds of reports that Chris Steele and Orbis prepared.  So I believe from what I can tell -- and I haven't studied it closely -- that these reports reflected information that Orbis has collected and then provided to Fusion GPS.

Mr. Ratcliffe.  That is your belief.

Mr. Ohr.  Yes.

Mr. Ratcliffe.  But, again, to be clear, you never reviewed the information that your wife gave to the FBI.

Mr. Ohr.  Right.

Mr. Ratcliffe.  Did you review the information that your wife gave to Christopher Steele or Fusion GPS?

Mr. Ohr.  Well, your first question was:  I didn't review the information that my wife gave to me and the stick that I gave to Fusion GPS.  I am not aware that my wife ever gave any information to Chris Steele.

Mr. Ratcliffe.  Directly?

Mr. Ohr.  Right.

Mr. Ratcliffe.  Because she gave information to Fusion GPS?

Mr. Ohr.  Correct.

Mr. Ratcliffe.  You don't have any knowledge about whether or not Glenn Simpson was giving information to Christopher Steele or

how they were --

Mr. <u>Ohr.</u>  I don't have any specific information, but it is all going to Glenn Simpson.

Mr. <u>Ratcliffe.</u>  One more thing I want to clarify.  You said that you had not provided any information to the special counsel or the special counsel staff.

Mr. <u>Ohr.</u>  I, you mean?

Mr. <u>Ratcliffe.</u>  Yes.

Mr. <u>Ohr.</u>  That is correct.

Mr. <u>Ratcliffe.</u>  Was the Andrew Weissman that you mentioned dealing with earlier in the criminal division the same Andrew Weissman that is part of the special counsel's investigative team?

Mr. <u>Ohr.</u>  I believe he is.

Mr. <u>Ratcliffe.</u>  Earlier today, you told us that you had a meeting with him and gave him information.  He was one of the folks that you were communicating with at the Department of Justice in the fall of 2016.  Is that accurate?

Mr. <u>Ohr.</u>  That is accurate.  I provided some of the information I learned from Chris Steele and Glenn Simpson to, among other people, Andrew Weissman.

Mr. <u>Ratcliffe.</u>  To that same Andrew Weissman?

Mr. <u>Ohr.</u>  Right.  At the time -- I am sorry.

Mr. <u>Ratcliffe.</u>  The information you gave him regarding Christopher Steele, regarding Glenn Simpson, regarding the Steele dossier, regarding Nellie Ohr, all of that information that you

related in August you believe 2016, that is knowledge that the special counsel would have through part of the special counsel's investigative team, Andrew Weissman, correct?

Mr. Ohr.  Right.  I mean -- no, just to be clear, the information -- I don't recall exactly what information Andrew Weissman got from me.

Mr. Ratcliffe.  But you gave him information.

Mr. Ohr.  But I gave him some information.

Mr. Ratcliffe.  And whatever that information is --

Mr. Ohr.  He received it at that time in his capacity as head of the chief of the fraud section.

Mr. Ratcliffe.  Any reason to believe he wouldn't continue to contain that information when he became part of the special counsel's team?

Mr. Ohr.  I don't know.  I assume the special counsel has access to what information the FBI collected, which would probably include everything.  But I shouldn't be assuming that.  I don't know.

Mr. Jordan.  Has the special counsel talked to you?

Mr. Ohr.  No.

Mr. Jordan.  Have they talked to your wife?

Mr. Ohr.  No.

Mr. Jordan.  Let's go to -- I think this document was introduced last round that we got from you, whatever application this is, these text messages like.  Let's go on the first page.  I

am just curious.  About halfway down, "1-31-17.  Doubtless sad and crazy day for you and" -- I assume SY is Sally Yates.  "Just wanted to check on the situation, along with Bureau colleagues with our guy."

Can you tell me who "our guy" is?

Mr. Ohr.  I am sorry, where?

Mr. Jordan.  The first page.

Mr. Ohr.  Are you looking at this document?

Mr. Jordan.  Yes.

Mr. Ohr.  Okay.

Mr. Jordan.  This is what we were given.  I want the one January 31, 2017.

Mr. Ohr.  I don't believe that is in this document.

Mr. Jordan.  This is different than what you were presented. We are going to have to make some copies of this.

Can I read this to you or should we go do copies?

Mr. Ohr.  Whatever you like, sir.

Mr. Jordan.  Can we hold the time while we make copies?  Is that how this work?

Mine starts with 1-25-17 at the top.

Mr. Weinsheimer.  I have got that.

Mr. Jordan.  So go halfway down, the first.  Approximately halfway down.  It looks like, "Bruce, doubtless sad and crazy day for you regarding" -- and this is the same day that Sally Yates was fired.  Before that it talks about "our guy."  Who is our guy?

Mr. Ohr.  I believe our guy in this case refers to the source that Chris Steele was worried was going to be outed and might need -- and whose life may be in danger.

Mr. Jordan.  The next one below:  "You have sympathy and support.  If you end up out, though, I really need another contact point's number."  What does he mean "if you end up out"?  What is he talking about here?

Mr. Ohr.  My interpretation of this is that if I were to be forced out, or leave the Department, he would need another possible -- he says Bureau, so FBI "contact point who could help make arrangements for the safety of the source."  So that is why I responded:  "Understood.  I can certainly give you an FBI contact if that becomes necessary."

Mr. Jordan.  I guess I am confused, because it is not that he is saying if you end up out -- I am not sure what that all means -- but if you end up out, I don't need someone at DOJ, I need someone at the Bureau.

Mr. Ohr.  He is worried about the safety of his source.  So when I had learned earlier --

Mr. Jordan.  But if you are the key to the safety of the source and you are at the Department of Justice, why doesn't he want someone else at the Department of Justice?  Why doesn't he want someone at the FBI?

Mr. Ohr.  Obviously, if we are worrying if we are somehow securing the safety of the source, I think that is something that

the FBI would do.

Mr. Jordan.  Sort of underscores the point, why were you in in the first place?  If it is the FBI's responsibility, why has it been, up to this point, Bruce Ohr's responsibility and the Department of Justice?  But now if you end up out, we want to get someone in the Bureau to guard the safety of this source.

Mr. Ohr.  When Chris Steele had previously told me -- and I don't remember the exact date, but a few days before this, I think -- that his source might be outed and in danger, I reported that to the FBI and basically asked:  If something develops quickly, should I call you?  And he said, Yes.

I don't remember exactly what I said to Chris Steele about that, but our concern at that time was there could be a threat to the safety of the source.

Mr. Jordan.  I get that.  I don't understand why it has to jump from the Department of Justice to FBI.  Seems to me if you are the key and you are in the Department of Justice, you would continue to work with someone in the Department of Justice, or shouldn't he have been working with someone in the Department of Justice in the first place?

Mr. Ohr.  I think -- I don't know exactly what was in his mind, but I do know that if we were going to try to protect a source, it was going to have to eventually be an FBI agent that takes those steps.

Mr. Jordan.  "I can give you an FBI contact if and when it

becomes necessary."  Was it necessary, and if so, who did you give him?

Mr. Ohr.  It did not.

Mr. Jordan.  Let's go to the next page.  I am looking at the entries on 3-18-2017.  "Just wondering if you had any news. Obviously, we are a bit apprehensive, given Comey's scheduled appearance at Congress on Monday.  Hoping that important firewalls will hold.  Many thanks."

And then you respond:  "I believe my earlier information is still accurate."

So tell me what the firewalls mean, and then what your earlier information was.

Mr. Ohr.  My understanding of firewalls, again, had to do with information that the FBI might have that might identify, or somehow help to identify Chris Steele's source.  And I had --

Mr. Jordan.  So we are talking about the same guy that you were talking about 2 months earlier.

Mr. Ohr.  That is my recollection, as I look at this now. And I had told him earlier that the FBI is very careful about producing information that could identify a source and lead to the source being harmed, and that that is still accurate.  Because I had no --

Mr. Jordan.  And was it accurate?  Was that source revealed?

Mr. Ohr.  I am not aware that the source was revealed.

Mr. Jordan.  Okay.  So let's go 2 months then.  The next

page, 2 months forward, 5-15, three-quarters of the way down.
"Having now consulted my wife and business partner about the question we discussed on Saturday, I am pleased to say yes, we should go ahead with it.  Best, Chris."

Go ahead with what?

Mr. <u>Ohr.</u>  The FBI had asked me a few days before, when I reported to them my latest conversation with Chris Steele, they had had would he -- next time you talk with him, could you ask him if he would be willing to meet again.

Mr. <u>Jordan.</u>  So this is the re-engagement?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Okay.  So then the messages just a few days later get into that subject.  They are actually not a few days later; a month later.

Mr. <u>Ohr.</u>  A month later?  I am sorry, I don't understand?

Mr. <u>Jordan.</u>  Well, hang with it.  We are going to read what you guys wrote back and forth.  "Having now consulted with me wife and business partner about the question we discussed on Saturday, I am pleased to say yes, we should go ahead with it."

So you have asked him will he re-engage with the FBI?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  And he says:  "Talked with my wife; I'm in." You say:  "Thanks.  We'll let them know and we will follow up."

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  "Thanks again.  I chatted with my colleagues and

can give you an update when you have a minute."  What was the
update about?  Was it about that subject?

Mr. Ohr.  Yes.

Mr. Jordan.  So that all happens on May 15?

Mr. Ohr.  Yes.

Mr. Jordan.  June 22, "Hi, Bruce.  Is there any news on the
re-engagement yet?  Anything we can do to help from this end?
Grateful for an update."

Mr. Ohr.  Right.

Mr. Jordan.  How did those re-engagement talks go?

Mr. Ohr.  Based on these additional text messages back and
forth, it took some time.  I remember that Chris Steele was
anxious why it was taking so long.  But at some point, Chris
Steele informed me that they had -- he had, in fact, met with
somebody from the FBI.

Mr. Jordan.  Okay.  So move forward.

"Still frustrated" -- "Bruce, still frustrated.  We are
frustrated with how long this re-engagement with Mueller and the
investigation is taking."  Talk to me about that last clause,
"Mueller is taking."

Mr. Ohr.  I don't know.  I know the FBI had asked if Chris
Steele was interested in re-engaging.  I don't know what role if
any the special counsel team played in that.  I think -- so, Chris
Steele was referring to that, but I have no knowledge of whether
there was a re-engagement with Mueller as opposed to --

Mr. Jordan.  Did you pass that along to the FBI, that Mr. Steele has also mentioned re-engaging or engaging with the special counsel?

Mr. Ohr.  I don't recall.  I am pretty sure I met with the FBI to tell them that this is my latest communication with Chris Steele, because that was my practice.  But I don't recall whether I said Bureau and Mueller or just re-engagement.

Mr. Jordan.  Okay.

Mr. Ratcliffe.  I want to follow up, Mr. Ohr.  On the end of the last hour that I was here, I asked you about these 302s -- I have seen 12 of them -- interview dates from November 22, 2016 to May 15, 2017.  I asked you whether there were any sit-down interviews and corresponding 302s after that date.  And I thought I heard you say yes.

Mr. Ohr.  I believe I did, yes.

Mr. Ratcliffe.  Do you know how many?

Mr. Ohr.  I don't know specifically, but each of these communications that are reflected in the text messages back and forth, whenever we had a call or anything substantive, I would have reached out to the FBI and given them the information.  I didn't know what they were writing down or not writing down.

Mr. Ratcliffe.  Do you know anything different about those interviews or about those 302s as to why they wouldn't have been produced in response to a request by Members of Congress?

Mr. Ohr.  I don't know if they did 302s later on.  A lot of

these conversations seemed less substantive, but I don't know.  I
didn't know about the original 302s either.

     Mr. <u>Jordan.</u>  Did you continue to meet with the FBI to discuss
your conversations with Mr. Steele all the way up through late
November of 2017?

     Mr. <u>Ohr.</u>  Correct.

     Mr. <u>Jordan.</u>  Was Chris Steele working?  Was he being paid by
Oleg Deripaska?  Was he like a lobbyist or a consultant being paid
by Oleg Deripaska?

     Mr. <u>Ohr.</u>  I don't know.

     Mr. <u>Jordan.</u>  The September 22 meeting.

     Mr. <u>Ohr.</u>  You are now jumping back to --

     Mr. <u>Jordan.</u>  Jump back to 2016.

     Mr. <u>Ohr.</u>  Very good.

     Mr. <u>Jordan.</u>  In your communications from -- Mr. Steele wrote
you an email.  He talks about "I am going to be in town in
Washington again on business of mutual interest."  Is that
anything different than you told me earlier, or what does that
mean?

     Mr. <u>Ohr.</u>  No.  I think it is more of the same.

     Mr. <u>Jordan.</u>  Okay.  October 18, you get a text, or excuse me,
an email from Mr. Steele:  "I have something quite urgent I would
like to discuss with you."  October 18, 2016.  What was the urgent
matter?

     Mr. <u>Ohr.</u>  I don't have an independent recollection of this,

but based on the notes, I think it was conveying some more
information about Oleg Derapaska.

Mr. <u>Jordan.</u>  Can you tell me what that was?

Mr. <u>Ohr.</u>  I think there is an email maybe dated the 19th or
18th that has an attachment, or a little paragraph or something
attached that talks about a dispute between Oleg Derapaska and the
Ukrainian Government.  I think that is what he was contacting me
about.  But I don't recall beyond that what we discussed.

Mr. <u>Jordan.</u>  If a phone call -- with email talking about a
phone call first sent to your wife, but she thinks it is for you
from Mr. Simpson on December 12.  Was this a
follow-up call from your December 10 meeting and what did you
discuss on this call?

Mr. <u>Ohr.</u>  I don't recall.  I think he was providing some
additional information on the same topics as our -- when we met.
I am not sure exactly what the dates were, so I don't know if it
was preparatory to the same meeting or a follow-up or what.

Mr. <u>Jordan.</u>  I want to ask you one other thing.  In one of
these handwritten notes you talk about so much -- it is difficult
to read -- but it says "HRC," looks like "second dossier."

Mr. <u>Berman.</u>  Is there a date on that?

Mr. <u>Jordan.</u>  It looks like 11-8-2017.

It looks like number three.

Mr. <u>Ohr.</u>  Yes.  My recollection is that Chris Steele was
telling me that he had read a report or heard somewhere that

people were talking about a second dossier -- I don't know if it was about Hillary Rodham Clinton -- or by Hillary, or whatever, that a second dossier existed, and he was saying there is no second dossier.

Mr. <u>Jordan.</u>  So this is your notes.  Can you just read it for me?  "Story in --

Mr. <u>Ohr.</u>  Happy to read it.

Mr. <u>Jordan.</u>  The one that is highlighted in yellow there.

Mr. <u>Ohr.</u>  So I am looking at this piece of paper, 11-8-17, "Story in news today about Hillary" -- HRC, I assume that is Hillary Rodham Clinton -- "and second dossier totally" -- I can't even read my own writing -- "totally" -- think -- "may be unfounded."  I remember him saying that is just not accurate.

Mr. <u>Jordan.</u>  A second dossier about Clinton or a second dossier about Trump-Russia?

Mr. <u>Ohr.</u>  I don't know?  But since it is second dossier -- I don't know.

Mr. <u>Jordan.</u>  Cathleen Cavilick.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Why is she included in this stuff?

Mr. <u>Ohr.</u>  She is an official at the State Department and she had also, I believe, spoken with Chris Steele at some point.  And whatever I had from her, I gave to the Department as well, because I thought it related to the same subject matter.

Mr. <u>Jordan.</u>  Were there notes about this?  Did you take notes

about Cathleen Cavilick that we don't have that you gave to the FBI?

Mr. <u>Ohr.</u>  I don't think so.  I would have reported that conversation to the FBI as well, but I don't believe I have any separate notes on that.

Mr. <u>Jordan.</u>  Anyone else at the State Department that you talked to about these matters?

Mr. <u>Ohr.</u>  No, not that I can recall.

Mr. <u>Jordan.</u>  All right.  I think we are out of time. Thank you, Mr. Ohr.

Mr. <u>Ohr.</u>  Thank you.

[Recess.]

Ms. <u>Shen.</u>  We are back on the record.  It is 3:35 p.m. for the minority round.

EXAMINATION

BY MS. SHEN:

Q   Mr. Ohr, last week, The New York Times reported that you met Mr. Steele in 2007 when he was still with MI6, with the approval of both the U.S. and U.K. Governments.  Is that accurate?

A   Yes, I believe so.

Q   I am actually going to change tack a little bit here and just address an issue that has come up in the last round, and maybe even earlier, which is that we have been reading from -- we have been referencing and reading certain documents, some of which have been made public to the press, they are marked Bates stamped

HPSCI, we mentioned -- but as part of the same production there
have also documents that have not been made public.  I believe
some of them were the handwritten notes you were looking at
earlier and talked to.

Our understanding is this a document production produced to a
congressional committee that is not the Oversight or Judiciary
Committee from which is doing this investigation has not been
cleared for release to the public.  So there is a question of:
How did it come into possession of our Members?  It is our
understanding that there is in fact a committee rule that may
prohibit the sharing of a committee document production like that.

In addition to that, we have concerns to state for the record
that such information could, in fact, contain sensitive
information, I think on its face, discussion of confidential human
sources.  We are not really in a position to know kind of per
earlier conversation the full implications of just putting this
kind of information out in an unclassified setting in an open
record.

So I want to state for the record that this is something that
we oppose.  We do not think it is responsible to be continuing to
reference such information for the variety of reasons that I have
outlined, and we hope that the practice does not continue in this
interview or any subsequent interviews as part of this joint
investigation.

Ms. Hariharan.  Also to be clear, HPSCI rules require a full

committee vote before they release documents.  They have certain arrangements with specific committees to produce documents.  House Judiciary is not one of them.

So the documents that we introduced were pulled from public sourcing that were already leaked to reporters or whomever, not by us.  We do not have access to these materials, except for what we found online.

Ms. Shen.  Thank you.

BY MS. SHEN:

Q   So I will just reiterate the question real quick from previously.

So last week, the New York Times reported that you met with Mr. Steele in 2007, where he was still with MI6, with the approval of the U.S. and U.K. Governments, is that corrects.

A   I believe so.

Q   In 2007, Mr. Steele was the head of the Russia desk at MI6, is that accurate?

A   I don't know his specifically title.

Q   In your experience, is the United Kingdom considered a close intelligence partner to the United States?

A   I can only speak to what I have seen in the press, and the answer is yes.

Q   So it is your understanding that MI6 would closely partner with U.S. intelligence agencies?

A   Again, I only speak to what I have seen publicly.  Yes.

Q   In your opinion, do U.S. intelligence community agencies tend to value the intelligence from MI6?

A   I can't really say that.  I don't know.

Q   Okay.  Generally speaking, does -- do your counterparts in the United Kingdom, are they considered reliable and accurate sources of information regarding Russia?

A   Again, I can't speak generally.  I can only say that information was provided to me and to the FBI by Chris Steele when he was with the British Government was considered good information.

Q   So, The New Yorker has reported that information from Mr. Steele had once helped expose the Kremlin that had rigged the vote to host the World Cup in 2018 with bribes and swapped votes.

Is that something you have been aware of?

Mr. Weinsheimer.  He can't really talk about other investigations.

         BY MS. SHEN:

Q   To your knowledge, or just based on public reporting, are you aware that Mr. Steele played a role or had contacts that played a role in the Justice Department's investigation of bribes and kickbacks in the FISA investigation?

Mr. Weinsheimer.  He can't talk about other investigations and the role of sources.  I know that you prefaced that question with public reporting.  But to the extent it is public reporting, it speaks for itself.  Given the work that he does, I think it is

COMMITTEE SENSITIVE

too difficult to ask him to parse what he might know relating to other investigations and sources and methods that relate to other investigations what might be in the public sphere.  So I would object to that question.

      BY MS. SHEN:

Q   Okay.  Given your personal experiences and interactions with Mr. Steele, does it surprise you that the FBI would decide to use him as a confidential human source?

A   No.

Q   And do you believe that Mr. Steele is capable and would continue to provide credible, actionable information to the U.S. law enforcement?

A   Yes.

Q   So, it has also been widely publicly reported that Christopher Steele was not a fan of Donald Trump.  You, at one point, noted that Mr. Steele was "desperate that Donald Trump not get elected and was passionate about him not being President."  Is that accurate?

A   Yes.  Words to that effect.  I don't recall the exact words.

Q   Just based on public reporting as well.

Did Mr. Steele ever explain to you why he held this view?

A   I think he was very alarmed by the information that he had provided to me about contacts between the Russian Government and the Donald Trump campaign.

Q    And why do you think he was so alarmed by this particular piece of information?

A    Well, he described the information to me as -- well, I think it speaks for itself.  I don't know how to characterize it.  It was information I found alarming.

Q    So, given Mr. Steele's, what seems very apparent opposition to Donald Trump, did you ever suspect that Mr. Steele was simply making up or fabricating his report related to Trump, his campaign or any Trump associate?

A    I did not suspect that.

Q    And why is that?

A    I had a good track record with Mr. Steele, and his information has generally been pretty good.

Q    And so do you believe that despite -- I think it is fair to call it a bias of Mr. Steele -- potential bias of Mr. Steele against Trump -- that Mr. Steele's reports nonetheless could be taken seriously by U.S. Federal law enforcement officials?

A    I mean, I think my read is that his bias, as I reported to the FBI, was as a result of his reporting, the facts that he had reported to me.

Q    Are you aware of any instances where Mr. Steele fabricated evidence in his reports or intentionally provided misleading information?

A    No.

Q    And we have already spoken somewhat about this, but

overall how would you describe the credibility of Mr. Steele's information and its potential value to U.S. national security?

A    I think I have stated before, his information was generally pretty good, but we have to be careful about all information relating to Russia.  And so with that caveat.

[Ohr Exhibit No. 6

Was marked for identification.]

BY MS. SHEN:

Q    So I would like to introduce as exhibit 6 an August 7, 2018, article from The Hill entitled "Opinion:  How a senior DOJ official helped then-researchers on Trump-Russia case."  This article makes reference to your notes, emails, and text messages that were, again, turned over to Congress but also apparently given to this reporter.

Are you familiar with this article?

A    I have not read this article.  I was aware that it came out.

Q    Would you like some time to read it now?

A    I will take a quick look.

Okay.

Q    So, if you could go down to the article, to the sentence I think it is the third paragraph from the bottom of the first page, and it reads, "Steele's FBI relationship had been terminated about 3 months earlier.  The Bureau concluded on November 1, 2016, that he leaked information to the news media and was 'not suitable

for use' as a confidential source, memos show.

"The FBI specifically instructed Steele that he could no longer 'operate to obtain any intelligence whatsoever on behalf of the FBI,' those memos show."

So, in this article it also includes attachments, including -- well, four documents.  One of them is referenced, this termination memo in that the quotes that I just read to you. So I am going to introduce the termination memo now as exhibit 7.

[Ohr Exhibit No. 7

Was marked for identification.]

BY MS. SHEN:

Q    So if you can go to the part of the termination memo, which actually appears to be undated, or at least I can't find it, but it is entitled, "Federal Bureau of Investigation, Source Closing Communication" and under the note it reads, "The following are possible reasons which may justify closing for cause: unauthorized criminal activity, serious control problems, unreliable and violated instructions."  Right underneath that, it states that the general reason for closing in this case was "confidentiality revealed."

So this memo appears to list unreliable as a possible reason for closing.  And yet, the reason for closing did not identify as one of the bases.  Is that also your reading of this document?

A    I just say I haven't seen this document before.  I see the general reason for closing "confidentiality revealed."

Q    Is it a fair interpretation, just based on the face of this documentation that, at least in the confines of this document, the FBI's reason for closing was confidentiality revealed, but not unreliable?

A    It would be speculating.

Q    Has the FBI ever expressed to you that they believed Mr. Steele was an unreliable source of information?

COMMITTEE SENSITIVE

A   Not that I recall.

Q   If you could turn back to the article now and right where I left off at the very bottom of the page, it reads:  "Yet Steele asked Ohr in the January 31st text exchange if he could continue to help feed information to the FBI.  'Just wanted to check you are okay.  Still in the situ and able to help locally as discussed, along with your Bureau colleagues.

"I am still here and able to help as discussed or texted back.  I will let you know if that changes.  Steele replied, 'If you end up out though, I really need another Bureau contact point number who is briefed.  We can't allow our guy to be forced to go back home.  It would be disastrous.'  Investigators are trying to determine who Steele was referring to."

[Ohr Exhibit No. 8

Was marked for identification.]

BY MS. SHEN:

Q   Now I am going to introduce as exhibit 8 -- again, this was accompanied in the article posted online -- but the January 31 text exchange referenced there.  I would like to point out that although in the article the quote ends at "it would be disastrous," in the text message at 11:12-09 a.m., the text actually continues.  So I will read the entire text, which is: "Thanks.  You have my sympathy and support.  If you end up out, though, I really need another Bureau contact/point number who is briefed.  We can't allow our guy to be forced to go back home.  It

would be disastrous all around.  The position right now looks stable.  A million thanks."

Mr. Ohr, I do believe we already addressed this, but just to be absolutely clear, your text exchanges with Mr. Steele on January 31, what were they about?

A   My interpretation is these related to the safety of the source.

Q   So these text exchanges did not have anything to do with the Trump-Russia collusion investigation at the time?

A   No, not directly.  Just the safety of the source.

Q   So if I could ask you to go back to the article again. A few paragraphs down on the second page it reads:  "There is something separate I want to discuss with you informally and separately.  It concerns our favorite business tycoon" -- an apparent reference to Trump.  Again, we have covered this, but is the article accurate in saying that the reference was to Trump?

A   No.

Q   The next sentence, the article reads:  "The overture came just four days before Steele walked into the FBI office in Rome with still unproven allegations that Trump had an am improper relationship with Russia, including possible efforts to hijack the Presidential election."

Mr. Ohr, did your conversation with Mr. Steele have anything to do with any meetings or communications he may have had in an FBI office in Rome a few days later?

A    I don't believe so, no.

Q    Okay.  Jumping down a little bit.  On the same page the article reads -- again, quoting from these text messages -- I am sorry, it quotes from the July 30, 2016, email, which we had previously introduced as exhibit 2, and it reads:  "Great to see you and Nellie this morning, Bruce, Steele wrote shortly after the breakfast meeting.  'Let's keep in touch on the substantive issues.  Glenn is happy to speak to you on this if it would help.'

"That meeting occurred exactly 1 day before FBI counterintelligence official Peter Strzok formally opened the investigation, dubbed Crossfire Hurricane, into whether the Trump campaign was colluding with Moscow to steal the election."

Once again, to be absolutely clear, was your meeting with Christopher Steele and your wife Nellie on July 30, 2016, related in any way to FBI counterintelligence official Peter Strzok formally opening an investigation named Crossfire Hurricane?

A    I don't believe so.

Q    The next paragraph reads:  "At the time, the case was based mostly on an Australian diplomat's tip that Trump campaign advisor, George Papadopoulos, appeared to know in advance that the Russians possessed information involving Hillary Clinton before hacked documents were released on WikiLeaks."

Mr. Ohr, were you involved in any way in an Australian diplomat's tip that the Trump campaign advisor George Papadopoulos

appeared to have advance knowledge of Hillary Clinton's hacked emails?

    A   No.

    Q   If you turn to the last page of the article, at the very top it reads:  "By early November 2016, Steele was terminated for unauthorized media contacts and the FBI was turning to Ohr as a back channel to Steele."

    Mr. Ohr, would you agree with the characterization that the FBI was turning to you as a "back channel" to Mr. Steele?

    A   I don't know what the FBI's thinking was specifically. They just told me that if I received information, that there would be an agent that I could talk with.

    Q   Okay.  But at no point did the FBI indicate to you that they were turning to you as an illicit way of obtaining information from Mr. Steele?

    A   They never said anything like that.

    Q   It is 3:56, and I think we will actually just end our round now.

    [Recess.]

    Mr. Parmiter.  Let's go back on the record.  The time is 4:02 p.m.

    Mr. Ratcliffe.  Mr. Ohr, I just have a couple of things I want to follow up with you.  Earlier today, we established that Christopher Steele had been terminated as a confidential human source for violating the FBI's rules about communicating with the

press.  Do you remember that?

Mr. <u>Ohr.</u>  We talked about Chris Steele's termination, yes.

Mr. <u>Ratcliffe.</u>  I will represent to you that there is an FBI document that is not classified, or has been declassified that relates to that occurring on or about November 1, 2016.

Before that, there is some indication in the record that Glenn Simpson was a person who was urging Christopher Steele to share the dossier contents with members of the media.  Are you aware of that?

Mr. <u>Ohr.</u>  I don't know specifically who he was sharing the document with, but, yes, I understand that Glenn Simpson was providing information to whoever would employ him.

Mr. <u>Ratcliffe.</u>  So my question is, there is also some indication that perhaps Glenn Simpson made you aware of the fact that he was urging Christopher Steele to contact the media about the dossier contents?

Mr. <u>Ohr.</u>  My notes from our December conversation, the conversation I had from Glenn Simpson, I believe I mentioned that, yes.

Mr. <u>Ratcliffe.</u>  So you made the FBI aware of that.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Ratcliffe.</u>  When did you make them aware of that?

Mr. <u>Ohr.</u>  I think it was when I heard it.  As soon as I heard it.

Mr. <u>Ratcliffe.</u>  And do you know when that was?

I am sorry, go ahead.

Mr. Ohr.  Sorry; within a day or two of my receiving the information.

Mr. Ratcliffe.  Okay.  Well, if the news -- Christopher Steele's efforts to communicate that information to the media resulted in news stories in October of 2016, would it have been in that timeframe?

Mr. Ohr.  I don't believe I spoke with Glenn Simpson in that time frame.

Mr. Ratcliffe.  Okay.

Mr. Ohr.  I recall meeting Mr. Simpson in December, and I think --

Mr. Ratcliffe.  And in August?

Mr. Ohr.  And in August, right.  So I remember this coming up in December and I reflected it in my notes, which I informed the FBI.

Mr. Ratcliffe.  Okay.  Well, that is all I am really trying to determine.  We know that the FBI knew no later than November 1, because that is when they essentially fired Christopher Steele.  I am wondering before that they knew, and if you can narrow that down for me.

Mr. Ohr.  Don't have information on that.

Mr. Ratcliffe.  I want to make sure that I have -- that I understand completely your touch points or involvement in this Trump-Russia investigation as you have related them to us today.

So as it pertains to folks outside of the Department of Justice and the FBI, your involvement included passing evidence from Nellie Ohr and Glenn Simpson to the FBI, correct?

Mr. Ohr.  I mean, as I have said before, I received a memory stick from Glenn Simpson that I provided to the FBI, and at some point I also received a memory stick from my wife that I provided to the FBI.

Mr. Ratcliffe.  Right.  How is that different from what I said?

Mr. Ohr.  I don't know if that is evidence.

Mr. Ratcliffe.  Okay.  Provided information to the FBI from Glenn Simpson --

Mr. Ohr.  Yes.

Mr. Ratcliffe.  -- and Nellie Ohr?

Mr. Ohr.  Yes.

Mr. Ratcliffe.  You also provided information to the FBI regarding Christopher Steele as documented in at least 12 sit-downs from November 2016 to May 2017.

Mr. Ohr.  Yes.

Mr. Ratcliffe.  You also communicated with members of the FBI beginning with a phone call to Andy McCabe, but included Andy McCabe, Lisa Page, FBI Agents Strzok and Pientka as early as August of 2016.

Mr. Ohr.  We have discussed a series of meetings or conversations I had with the FBI that included various

combinations of those people, yes, over a period of time.

Mr. Ratcliffe.  And with respect to the Department of
Justice, your sharing information there included folks at the
criminal division, to include Swartz, Weissman, and Ahmed.

Mr. Ohr.  Yes.

Mr. Ratcliffe.  Anyone else?

[4:09 p.m.]

Mr. Ohr.  I don't think I gave any of the information to other people.

Mr. Ratcliffe.  All right.  So all of those things document your involvement in the -- what I've called the Trump-Russia investigation.

Earlier today you told me that you didn't think that you actually had a role in the investigation.  You meant other than those things that I just related?

Mr. Ohr.  I don't see those as playing a role in the investigation.  I provided information and the other things we've discussed today.  I neither investigated nor --

Mr. Ratcliffe.  Okay.  Well, I think we'll have to agree to disagree on that, about whether or not that plays a role on the investigation.  But thanks for confirming what your involvement was.  And I appreciate your courtesies to me in terms of answering questions for the record.

Before I leave, I've asked you a lot of questions today, have I been fair and courteous to you?

Mr. Ohr.  You've certainly been courteous.  I don't know, it's hard for me to make a judgment about fairness.  You have been courteous.  Thank you.

Mr. Ratcliffe.  Well, thank you.  The reason I say that is, believe it or not, sometimes things get misrepresented to the media about how our approach was.  I have been civil and courteous

and --

Mr. <u>Ohr.</u>  Yes, you are.

Mr. <u>Ratcliffe.</u>  -- given you time.  Have I given you every
opportunity to answer the questions that I've asked you?

Mr. <u>Ohr.</u>  Yes, you have.

Mr. <u>Ratcliffe.</u>  Is there anything that I haven't given you an
opportunity to say in response to my questions?

Mr. <u>Ohr.</u>  I don't have anything to add at this time.

Mr. <u>Ratcliffe.</u>  So you have had a chance to fully and
completely and truthfully answer the questions that I've related
to the best of your ability?

Mr. <u>Ohr.</u>  To the best of my ability.

Mr. <u>Ratcliffe.</u>  All right.  Thank you.  I appreciate your
time.

Mr. <u>Jordan.</u>  Thank you, John.

Mr. Ohr, so Mr. Ratcliffe had earlier talked about the number
of times you've sat down with the FBI to sort of brief them on
your meetings with Mr. Steele, Mr. Simpson.  And then there has
been -- I've not seen these, but there has been some 302 made of
those meetings.

And Mr. Ratcliffe indicated that there were four times in
2016, I believe eight times in 2017, and then you said there have
been additional of those type of meetings after -- the last date I
have is May 15 of 2017.

Mr. <u>Ohr.</u>  That is my recollection, yes.

Mr. Jordan.  How many of those additional meetings, could you hazard a guess at how many of those, and when was the last one?

Mr. Ohr.  I don't remember how many there were.  The last one, I think, was in November of 2017.

Mr. Jordan.  So all the way through November of 2017.  And do you know how many between the time the special counsel was named in November 2017?  Three?  Four?  Five?  Six?

Mr. Ohr.  I don't know.  I don't know.

Mr. Jordan.  More than one?

Mr. Ohr.  More than one, yes.  Beyond that, I don't know.

Mr. Jordan.  Okay.  And the first meeting was 11 -- so roughly a year, 11/22/2016.  So November 22, 2016, through November of 2017?

Mr. Ohr.  Yes.

Mr. Jordan.  More than 12, more than 13, you said, because there's the 12 we know about, the ones you're telling us about?

Mr. Ohr.  Yes.

Mr. Jordan.  So more than 13 times you sat down with the FBI.  What prompted each meeting?

Mr. Ohr.  I would call the FBI to let them know I had spoken with Chris Steele and did they want to hear about it, and then they would say come over, and I would go over and talk to some agents.

Mr. Jordan.  What was the catalyst?  Was it you telling the FBI?  Was this part of this reengagement?  What was the catalyst?

Mr. <u>Ohr.</u>  As near as I can recall, in each case it was me calling the FBI agent to say, I've had a conversation with Chris Steele.

Mr. <u>Jordan.</u>  Why did it start in November?  Why not sooner?

Mr. <u>Ohr.</u>  I don't know.  That's when they provided or hooked me up with Joe Pientka.

Mr. <u>Jordan.</u>  November of 2016 --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  -- they said to you, hey, we're going to put you together with Mr. Pientka, an FBI agent, and we want you to come give us a briefing after every encounter, whether a phone call or meeting or any type of exchange, text message, you have with Mr. Steele?  Is that how it was done?

Mr. <u>Ohr.</u>  I don't recall the exact words, and I don't think it was said quite that way, but --

Mr. <u>Jordan.</u>  I'm still struggling with who did what.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Did the FBI tell you, "We want you to let us know every single time you communicate with Mr. Steele so that we can sit down with you, and we're going to make Mr. Pientka the guy who sits down with you to get a briefing on that"?

Mr. <u>Ohr.</u>  I don't recall them saying we want you to call us every time you have contact with Mr. Steele.  I think they provided Mr. Pientka to me as a point of contact, and it was up to me to call him.  From my point of view, I called him, I think,

every time I had a conversation with Chris Steele.

Mr. <u>Jordan.</u>  Did the FBI ask you to call him?

Mr. <u>Ohr.</u>  No.  I think that one time, that one time.

Mr. <u>Jordan.</u>  How did this happen?  How did this arrangement happen?  You just decided out of the goodness of your heart, "Every time I talk to Steele I'm going to call the FBI"?

Mr. <u>Ohr.</u>  I thought it was important to just be as complete as possible in providing the information I had.

Mr. <u>Jordan.</u>  So you initiated this?

Mr. <u>Ohr.</u>  Well, they had provided Joe Pientka to me initially as a point of contact.

Mr. <u>Jordan.</u>  Based on the meeting clear back in August?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Why didn't these regular meetings then start until November?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Jordan.</u>  What may have been the catalyst for that?

Mr. <u>Ohr.</u>  I don't -- that would be speculating.  Once they provided Joe Pientka's name to me I made it a practice to contact him every time I had contact.

Mr. <u>Jordan.</u>  They first provided Joe Pientka's name to you in November?

Mr. <u>Ohr.</u>  I think that's right.

Mr. <u>Jordan.</u>  So up until then, who was your contact at the FBI?  Andy McCabe?

Mr. Ohr.  As I think I mentioned, I met with Peter Strzok and Lisa Page on, you know, at least one occasion probably in the fall and then on November 21.

Mr. Jordan.  Okay.  When is the last time you visited with -- last contact you've had with Mr. Steele?

Mr. Ohr.  I believe it's the one in November of 2017.

Mr. Jordan.  November of 2017?

Mr. Ohr.  Yes.

Mr. Jordan.  All right.  How about Mr. Simpson?

Mr. Ohr.  The last contact was probably the contact we had on January 20 when he was calling to express concern about the safety of the source.

Mr. Jordan.  January 20, 2017?

Mr. Ohr.  Correct.

Mr. Jordan.  Why did you switch from communicating with Mr. Steele -- well, let me back up.  The arrangement you had with the FBI starting on November 22, 2016, where you would contact Mr. Pientka after you've touched base with Mr. Steele, after you've had a conversation with Mr. Steele, did that same arrangement exist for Mr. Simpson?  Did they want the same thing from Mr. Simpson?

Mr. Ohr.  Yeah.  It wasn't -- again, it wasn't really an arrangement.  Anytime I got information from Mr. Steele or from Mr. Simpson, I think I called the FBI, at least that's my recollection.

Mr. <u>Jordan.</u>  Okay.  What about Mr. Simpson?

Mr. <u>Ohr.</u>  I said Mr. Steele or Mr. Simpson.

Mr. <u>Jordan.</u>  Either one you would then let the FBI know about a conversation or discussion you've had?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Any type of contact?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Why did you switch your communication from emails to the text messages with --

Mr. <u>Ohr.</u>  I don't recall.  I just think I was responding in whatever medium Mr. Steele had contacted me on.

Mr. <u>Jordan.</u>  Okay.  Do you know when you switched?

Mr. <u>Ohr.</u>  Well, it looks like the first WhatsApp text, looks like it's in January of 2017.

Mr. <u>Jordan.</u>  Do you remember the last email you sent in 2016, what the timeframe was?

Mr. <u>Ohr.</u>  No.

Mr. <u>Jordan.</u>  Okay.  Is there any type of disciplinary action that you're under at the Department of Justice?

Mr. <u>Ohr.</u>  I have been contacted by the Office of Inspector General and I will be talking with them.  But aside from that, no. And that's not -- yeah, I guess that's not really disciplinary action.  So that's the closest thing I have.

Mr. <u>Jordan.</u>  That was my next question, though, was has the IG in any way reached out to you?

Mr. Ohr.  Yes.

Mr. Jordan.  And is that an investigation specifically about you, or is it part of a broader investigation into some other matter?

Mr. Ohr.  I'm not sure.

Mr. Jordan.  How about the Office of Professional Responsibility, have you had any interaction with them?

Mr. Ohr.  No.

Mr. Jordan.  No.  Walk me back through -- because you have had different titles and I want to make sure I understand this.

So you initially were associate deputy attorney general, and you also were head of the Organized Crime Drug Enforcement Task Force.  Is that right?

Mr. Ohr.  Correct.

Mr. Jordan.  Both titles?

Mr. Ohr.  As of 2014, yes.

Mr. Jordan.  And you had both titles through what date?  When did that change?

Mr. Ohr.  December of -- early December of 2017.

Mr. Jordan.  So early December of 2017 it went from associate -- or ADAG and organized crime drug enforcement, it went to what?

Mr. Ohr.  Director of Organized Crime Drug Enforcement Task Force.

Mr. Jordan.  So you just dropped the first title but kept the

second?

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Jordan.</u>  Okay.  So that one gets dropped early December.
And then so you go from Organized Crime Drug Enforcement Task
Force director to a different title, and when does that happen?

Mr. <u>Ohr.</u>  Early January.

Mr. <u>Jordan.</u>  So January of '18?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  It goes to that.  So a month later you change
again.  And what's your title now?

Mr. <u>Ohr.</u>  Senior counsel, Office of International Affairs.

Mr. <u>Jordan.</u>  Okay.  So three titles all happen within a
month?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Tell me why those things took place.  Why did
you go first from associate deputy attorney general to just the
organized crime?

Mr. <u>Ohr.</u>  As I mentioned earlier, in early December I was
told by other members of ODAG -- I was called to a meeting and
told that they were going to make me just the director and take
away the ADAG title.

They gave me two reasons.  One was they said I hadn't told
them sufficiently early enough about my contacts with Chris
Steele.  And then they said they were, in any event, planning a
reorganization where none of the heads of Department of Justice

components would sit within the Deputy Attorney General's Office.

Mr. <u>Jordan.</u>  Hadn't told them sufficiently early enough?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Who?

Mr. <u>Ohr.</u>  Told, I guess, the deputy attorney general or higher -- other officials in the Office of Deputy Attorney General.

Mr. <u>Jordan.</u>  You hadn't told Sally Yates?

Mr. <u>Ohr.</u>  I had not.

Mr. <u>Jordan.</u>  Okay.  And if you had told Sally Yates, sounds like you would have kept that title.

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Jordan.</u>  But, I mean, that's what they said.  They said the reason you're not going to be ADAG any longer is because you didn't tell Sally Yates on August 1, after your July 30 meeting with Christopher Steele, about your relationship with Christopher Steele.

Mr. <u>Ohr.</u>  Yeah.  I mean, they gave me the two reasons.  And so I don't know specifically what would have been early enough.  I mean, they said I didn't tell them sufficiently early.  They didn't further explain that.

And then, as they said, they were in any event planning to reorganize so that nobody who was a component head sat within the Deputy Attorney General's Office.

Mr. <u>Jordan.</u>  Is there anyone else you could have told that

would have satisfied them?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Jordan.</u>  Matt Axelrod?  Did you talk to him about this at all?

Mr. <u>Ohr.</u>  I did not.

Mr. <u>Jordan.</u>  Never talked to him at all?

Mr. <u>Ohr.</u>  No, not about this, nothing relating to this.

Mr. <u>Jordan.</u>  Okay.  All right.

So you lose the ADAG title because you had not told your superiors about your relationship with Mr. Steele and the information you were getting from him in early December 2017. Then why in early January -- or in January 2018, why did you lose the -- why did you go to the other title?

Mr. <u>Ohr.</u>  I was told at the time that the Attorney General and the deputy attorney general didn't want me in a position where I would be interacting directly with the White House.  And the director of OCDETF does deal with various members of the National Security Council on organized crime matters, organized crime policy.

Mr. <u>Jordan.</u>  Okay.  And no one from OPR has talked to you throughout any of this process?

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Jordan.</u>  But the inspector general has?

Mr. <u>Ohr.</u>  They have asked to interview me, and I will talk with them.

Mr. <u>Jordan.</u>  But you have not done that interview yet?

Mr. <u>Ohr.</u>  Correct.

Mr. <u>Jordan.</u>  And you don't know if that specifically, just to be clear in my mind, if that's specifically about your situation and your interactions with Mr. Steele and the fact that you did tell your superiors about that interaction or if it's part of a broader investigation?

Mr. <u>Ohr.</u>  I don't know.

Mr. <u>Jordan.</u>  You don't know?

Mr. <u>Ohr.</u>  Right.

Mr. <u>Jordan.</u>  Okay.  I want to go back one last time, make sure I fully get this.

You made it a point starting in November of '16 to -- any interaction you had with Mr. Steele or Mr. Simpson to then follow up with a meeting with folks at the FBI?

Mr. <u>Ohr.</u>  Yeah.  As much as I can remember, I would do that, yes.

Mr. <u>Jordan.</u>  And that continued until you no longer met with anyone, until you had stopped meeting with Steele or Simpson --

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  -- in November of 2017?

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  So for 1 full year you're meeting with them.

When was the -- do you recall, Mr. Ohr, when you were talking about reengaging with -- where's my notes -- we just talked about

that the last hour.  Here we go.  Reengaging with -- helping

Mr. Steele reengage with the FBI.

Mr. <u>Ohr.</u>  Yes.

Mr. <u>Jordan.</u>  Tell me the timeframe again.

Mr. <u>Ohr.</u>  I --

Mr. <u>Jordan.</u>  May of '17?

Mr. <u>Ohr.</u>  Yes, I believe that that sounds right.

Mr. <u>Jordan.</u>  So why do you have to reengage -- why does the

FBI have to reengage if they're getting -- if they've already had,

looks like, 12 meetings with you and you're having conversations

with Mr. Steele?  Seems like they've already engaged.  There's no

reengagement.  It's continued engagement.

Mr. <u>Ohr.</u>  What they asked me in May was to ask Chris Steele

if he would be willing to meet with them.  So that was the message

I passed on.

Mr. <u>Jordan.</u>  Okay.  Thank you, Mr. Ohr.  I appreciate your

time.

Mr. <u>Ohr.</u>  Thank you.

BY MR. PARMITER:

Q   Sir, can I follow up briefly on that?

A   Absolutely.

Q   In the text that Mr. Jordan is referring to, I believe

it's exhibit 5, in several places Mr. Steele refers to -- in this

discussion about reengagement he refers to -- I'm looking

specifically at the, for example, at August 6, 2017.

A   Yes.

Q   Should be the second page of that.

A   I've got it.

Q   And he expresses his frustration.

First of all, he says, "we are frustrated."  Do you know who he's referring to what he says "we"?

A   I'm not sure.

Q   Okay.  "With how long this reengagement with the Bureau and Mueller is taking."

And then in a couple of places he says -- he uses the word, and I think you talked about this in the last hour, "SC"?

A   Yes.

Q   Do you know what he's referring to by SC?

A   My interpretation is special counsel.

Q   Okay.  So he's -- his -- was your interpretation also then that he wanted to engage with the special counsel?

A   Yes, but I'm not sure whether -- I don't know.  I mean, clearly that's what he's asking, but when I passed the question from the FBI to Chris Steele it was simply whether he would meet with the FBI.  He did not say special counsel.

Q   Okay.  And when you said things like -- this is the text immediately preceding the one, "the Bureau and Mueller," July 16, you said, "I will pass this along to my colleagues."

A   Yes.

Q   "I will pass this along to my colleagues," in a couple

other places, things like that.  Who are you referring to there?

A    The FBI agent that I was in contact with.

Q    Okay.

BY MR. BAKER:

Q    It's been a long day and I want to thank you for your patience.  Our process sometimes out of necessity results in duplicity, so I appreciate you asking -- or answering some of the questions more than one time.

I have a couple of random questions, and some of these may fall into the category of having already been asked, but I just want to make sure they're on the record.

When you -- rewinding back to 9 o'clock this morning -- when you refer to OCDETF, you're talking about the Organized Crime Drug Enforcement Task Force?

A    That is correct.

Q    Okay.  And in your association with OCDETF and you traveling on behalf of OCDETF and doing things that I believe I understand OCDETF does, it would not be unusual for you to interact with other law enforcement officials either around the country or around the world?

A    Correct.

Q    And in that capacity, would it be fair to say you -- for those people in attendance at conferences like that, you would be the face of the Department of Justice?

A    Yes.

Q   And in that capacity it would not be unusual for you to be identified as a conduit for people to reach out to for resource information or to pass information to?

A   Yes.

Q   And that is, as I understand what you've said today, that's initially how you became associated with Mr. Steele?

A   Yes.

Q   And did you have occasion to become associated with other acquaintances like Mr. Steele through your capacity as a liaison with OCDETF?

A   Yes.

Q   Did --

A   Well, not just OCDETF but throughout my different --

Q   Throughout your different capacities --

A   Capacities, yes.

Q   -- with the Department of Justice.

A   Yes.

Q   So did other people reach out to you, separate and apart from Mr. Steele, separate and apart from Russian organized crime, did others reach out to you with information?

A   Yes.  Yes.  And mostly on Russian organized crime, but, yes.

Q   And you, would it be fair to say, when they reached out to you, some of the things they would reach out to you for wouldn't necessarily be things that you in and of yourself could

instantly resolve or dispose of.  You farm that information out to appropriate people?

A    Yes.

Q    And would that also have included the FBI?

A    Yes.

Q    Okay.  You indicated that you -- I think you indicated you reached out to Mr. McCabe initially, but you had an association with him prior to him being the deputy director?

A    Correct.

Q    So he was at Washington field office and you knew him?  Or how did you know him?

A    I knew him at Washington field office, and I also dealt with him when he was in the New York division of the FBI.

Q    Okay.  So you reached out to him and then he provided Lisa Page and Peter Strzok?

A    Yes.

Q    Okay.  How did he come to know that the types of violations, for lack of a better word, that Mr. Strzok would work, how did he know that they would be the appropriate people for your needs?  You gave him an indication of the information that you were getting and then he produced them as opposed to maybe somebody from the criminal division?  How did he come up with Strzok and Page?

A    I don't know how he came up with them.  I met with him, I believe, in August of 2016, and I provided the information to

him that I had received from Chris Steele.

Q    So he took the information and decided that it would be Page and Strzok that would be the appropriate --

A    Well, Lisa Page -- he had Lisa Page present at that initial meeting.

Q    Okay.

A    And then later on, it's my understanding that he had -- it got to Peter Strzok.

Q    Okay.

A    I met subsequently with Peter Strzok.

Q    Okay.  You had mentioned earlier you had two different, I believe, special agents or supervisory special agents that were handlers of Mr. Steele, I think a Special Agent Gaeta and I think a Pientka?

A    No.  I know that Chris Steele had conversations with Mike Gaeta, and then separately I was given Joe Pientka as a point of contact for me to provide information to starting in November 2016.

Q    Okay.  When you would just receive information from Mr. Steele and notify the FBI, it sounds like from testimony you've given your transmitting that information to the Bureau was pretty contemporaneous with you receiving the information.  Is that correct?

A    As close as I could make it.  Certainly, once I started talking with Joe Pientka it was usually the same day or next day.

Q    Who did you deal with before Joe Pientka?

A    I dealt with, as I think I've mentioned, Andrew McCabe,
and then Peter Strzok and Lisa Page.

Q    So one of those people would be who you -- what was the
mode of communication?  Did you pick up the phone?  You'd email?
Would there be personal meetings?

A    I recall at least one meeting that Peter Strzok and Lisa
Page were present at, along with criminal division officials.  I
don't recall other, you know, the other ways.

Q    When you started dealing with Mr. Pientka --

A    Yes.

Q    -- where is he assigned?  Where was he assigned during
this time?

A    I would meet with him at the FBI headquarters.

Q    So you met with him at FBI headquarters?

A    Correct.

Q    Was he ever assigned to New York, are you aware of?

A    I don't know.

Q    Okay.  Somewhere along the line I was under the
impression that one of the handlers for Mr. Steele was a New York
assigned agent.  Are you aware of that at all?

A    Mike Gaeta was -- and, again, I don't know his official
status, his handler or not, but Mike Gaeta was from the New York
office.

[4:31 p.m.]

       BY MR. BAKER:

Q   Okay.  Was he also ever assigned overseas?

A   Yes.

Q   And where was he assigned?

A   He was assigned to the FBI's legal attache in Rome.

Q   And the legal attache is the sort of liaison in the embassy where agents are assigned?

A   Yes.

Q   And they coordinate law enforcement efforts on behalf of the Bureau and others from that post?

A   Yes.

Q   Okay.  Are you familiar with a Daniel Jones, a former Senate Select Committee on Intelligence staffer?

A   I believe that -- but I -- no independent recollection as I sit here, but I have seen that name in my notes, and it looks like Chris Steele had mentioned that name to me.

Q   Okay.  Are you aware that he works for, or is the founder of a group called Penn Quarter Group?

A   No.

Q   Okay.

A   I did not know the name.

Q   So not -- were you aware that he's raised approximately $50 million from Democratic donors to continue the Fusion GPS investigation?

A   No.

Q   Separate and apart from Mr. Steele, are you aware or have you ever dealt with the FBI on any other informant issues, confidential human source issues?

A   I've dealt with the FBI on numerous informant issues.

Q   Would it be unusual for a source, a CHS, whatever they call them, would it be unusual for a source to be discontinued for some reason and then be opened again?

A   It can happen.

Q   Are you aware of it happening in any instance?

A   I think so, but I don't recall specifics, yes.

Q   Okay.  So it wouldn't be usual if someone's discontinued for any reason if they resurfaced with information that was of interest to the FBI.  They could be reopened under certain circumstances -- I don't know what those circumstances are -- but it's possible?

A   Yes, I believe so.

Q   Do you know, when you first met Mr. Steele, I think earlier your testimony was this went way back to maybe 2007?

A   That's correct.

Q   Do you have any reason to believe he was an FBI source then?

A   I don't believe so.

Q   Okay.  Do you have any idea when he was opened approximately as an FBI source?

A   I don't recall the specific year, but I think it followed a meeting or -- I don't recall a specific year.  I know that I was at a -- present at a meeting with Chris Steele and with Mike Gaeta at some point some years ago.

Q   Okay.  So he might have been opened as a source prior to you relaying any information to the FBI that you're getting from Mr. Steele?

A   It's possible.  I don't know.

Q   Okay.  It was widely reported in the media that you were the number four official at the Department of Justice.  I think by your reaction, I know where this will go, but I want to put it on the record.  You occupied the title, associate deputy assistant -- or associate deputy attorney general?

A   That's right.  I was one of the associate deputy attorneys general.

Q   And how many of them are there?

A   There are more than five, somewhere between five and 10, I believe.

Q   Is there any slots succession plan or continuity of operation plans, that if the attorney general and certain numbers of people below him are unable to do their jobs, that you would be the fourth person to take over the Department of Justice?

A   No.

Q   Okay.  So there were multiple ADAGs and you were one of the multiple ADAGs, but you were never the fourth in charge at the

Department of Justice?

    A   That is correct.

    Q   Okay.  You're a member of the Senior Executive Service?

    A   Yes, I am.

    Q   Is it true as a member of the Senior Executive Service, you can be moved within your organization for any reason or for no reason at all, based on where you're needed?

    A   I don't know the specifics, but certainly my attitude has always been that if the Department wants me in a -- to do a particular job, I will do that job.

    Q   Your, what's become known as the Ohr 302s, were they all done at FBI headquarters, or were any done --

    A   I did not participate in the creation of the 302s so I don't know how they wrote them up or how they did it.

    Q   But when you were present for the information that they documented in the 302s, was that FBI headquarters as far as you know or --

    A   Some of them were at FBI headquarters, and later on, it was at the Washington field office of the FBI.

    Q   And who at the Washington field office conducted an interview?

    A   I cannot remember the names.

    Q   But it wasn't Pientka?

    A   Right.

    Q   So it was somebody, another agent, or agents, at the

COMMITTEE SENSITIVE

FBI's Washington field office?

    A    My recollection is at least on two occasions I was
handed onto a new agent.

    Q    Okay.

        BY MR. PARMITER:

    Q    Sir, again, just to reiterate, we really appreciate, you
know, the time that you've spent here today, and hopefully we just
have a few more questions before our colleagues take the chair.

    So just very briefly, to follow up on my colleague's
questions about the ADAGs in ODAG.

    A    Yes.

    Q    So which at the time during your communications with
Mr. Steele in 2016 and 2017 -- well, first, let me ask you this:
I believe you said earlier that, you know, when you were ADAG you
supervised -- you kind of wore two hats being the head of OCDETF.
What other components of the Department did you directly
supervise?

    A    That was the only one I directly supervised.

    Q    Okay.  Who was directly supervising NSD or the FBI at
that time?

    A    Well, the ADAGs don't directly supervise the components.
There were other ADAGs whose responsibilities included talking to
NSD, criminal division, and so forth.

    Q    So how does it break -- is it broken down by component,
or is it broken down by the particular subject matter like

counterintelligence?

A    It varies, I guess, would be the best way to say.  And it can change also.  So --

Q    Okay.  So when you were talking to Mr. Steele in 2016 and 2017, that sort of -- that period, who was the person, the ADAG who was in charge of the counterintelligence portion of the Department?

A    Well, Tash Gauhar, in the Office of Deputy Attorney General, worked on national security matters, but I don't know if she was specifically in charge of counterintelligence or anything like that.

Q    Did you ever speak to her about any of this --

A    I did not.

Q    -- material?

Okay.  Why didn't you do that?

A    I wanted to keep it at the lowest level and, you know, give the information to FBI and whoever I was going to be able to evaluate it, decide what to do with it.

Q    Okay.  So it would be fair to say you just wanted to keep yourself as sort of a conduit rather than, you know --

A    Correct.

Q    -- create something within ODAG about this?

A    That's right.

Q    Regarding Fusion GPS --

A    Yes.

Q   -- I think you said earlier that you became aware, or
Mrs. Ohr became aware that her research was intended to be about
Russia and, you know, about the potential ties between the
campaign and Russia.  Is that correct?

A   Yes.  At some point, yes.

Q   Okay.  Are you aware of any efforts by Fusion GPS to
conduct sort of research about other politicians?

A   No.

Q   I'm --

A   I mean, I know Fusion GPS did research on different
topics, so I don't specifically know of research on other
politicians.

Q   Okay.  For example, anyone who may have been in this
room today --

A   No.

Q   -- or -- okay.

A   Not aware of anything like that.

Q   Senator Grassley?

A   No, not --

Q   Devin Nunes?

A   No, not that I'm aware of, no.

Q   Okay.  Bob Goodlatte?

A   No.  Again, not aware of any Fusion GPS research on
other Senators, Congressmen, other officials.

Q   Okay.  Just briefly because we touched on this, you've

mentioned Lisa Page a few times today.  You met with her and Peter Strzok --

A    Yes.

Q    -- and Andy McCabe?

A    Yes.

Q    And I believe you said you'd known Lisa Page from when she was a trial attorney in OCRS.  Is that correct?

A    That is correct.

Q    Okay.  Did she work directly for you?

A    Yes.  I was the chief of OCRS, so she was one of my employees.  We had deputy chiefs in OCRS, and she would have reported directly to one of the deputy chiefs.

Q    Okay.  And through that deputy chief to you?

A    Yes.

Q    Okay.  How long did she work for you?  Do you recall?

A    I don't recall.

Q    Okay.  After she left did you -- did you maintain communications with her after she left?

A    No.

Q    Did Mrs. Ohr know Ms. Page?

A    She will -- -- my recollection is she would have met Ms. Page at some point, because once a year, when I was chief of OCRS I would have a -- invite the whole section over to our house. So I recall, on one occasion, Lisa Page being there, and so they would have -- I don't know if they spoke or whatever, but they

would have been in the same room.

Q   Okay.  Apart from the meeting that you had at the FBI, I believe it was at the FBI, with Deputy Director McCabe and Ms. Page and Mr. Strzok, did you have any other conversations with Lisa Page about anything the FBI was looking into related to Russia?

A   No.  But just, again, as I had mentioned earlier in my initial meeting was with Mr. McCabe and with Lisa Page.  I don't believe Peter Strzok was there.  And later when I met with Mr. Strzok and Lisa Page, I don't believe Andy McCabe was there.  So, no, I can't -- I don't remember conversations on any other topics.

Q   Did you ever discuss Mr. Steele with Ms. Page?

A   I assume so, since I was telling them about what I was hearing from Chris Steele.

Q   Apart from that meeting, I mean?

A   We might have.  I don't recall.

Q   Okay.  Do you recall her reaction specifically to the -- to what was conveyed in the meeting?

A   I don't recall specifically.  I think everybody was alarmed and took it seriously, but I don't recall any specific things she said or reaction.

Mr. Jordan.  Bobby, can I ask something?

Mr. Parmiter.  Yes, sir.

Mr. Jordan.  Mr. Ohr, I'm sorry I'm back in here.  When did you learn that Mr. Steele had been -- his relationship with the

FBI had been stopped, he'd been fired by the FBI?

Mr. <u>Ohr.</u>  I don't recall specifically.

Mr. <u>Jordan.</u>  Give me an approximate?

Mr. <u>Ohr.</u>  I mean, you've told me that they terminated him in the beginning of November.  But beyond that, I don't recall.

Mr. <u>Jordan.</u>  Did -- how did you learn that?  Did you learn -- did someone from the FBI tell you -- I mean, you're meeting with the FBI at least 13 times over a year's timeframe, and because they've asked you to meet with Mr. Pientka after every time you touch base with Steele and/or Simpson.

In one of those meetings -- did you learn in one of those meetings that he had been terminated?  And it seems to me that's something you're going to -- by the way, the guy you're talking to and giving us information on at least once a month -- looks like a lot more often than that frankly, because you met 12 times in about 6 months -- oh, by the way, we fired him.

Mr. <u>Ohr.</u>  I don't recall how I learned that he was terminated as a source, so that's the thing.  But, again, and the FBI provided Joe Pientka to me as a point of contact.  If I recall correctly, they did not instruct me to call him every time I had a contact from Chris Steele.

Mr. <u>Jordan.</u>  But you did that?

Mr. <u>Ohr.</u>  That was my -- that was me, yes.

Mr. <u>Jordan.</u>  So it's fair to say what -- every time you met with -- that corresponds to some meeting just prior to that with

Christopher Steele?

Mr. Ohr.  Yes.

Mr. Jordan.  The dates we have from the FBI when you've sat down with them correspond to at or about that time you had had a meeting with Christopher Steele and/or Simpson?

Mr. Ohr.  And from November onward, all the contacts with Chris Steele were by telephone, so I didn't have meetings.

Mr. Jordan.  Right.

Mr. Ohr.  And I had one meeting with Glenn Simpson in December that we've discussed.  And I recall one call with Glenn Simpson in January.

Mr. Jordan.  Okay.  All right.  Thanks.

        BY MR. BAKER:

Q    Just briefly.  This issue of being told untimely notice of conversations with Chris Steele, is that -- as you understand it, was that relating back to the very first time you started talking to Steele, or was this in relation -- the untimely part, is this in relation to public reporting now starting to happen?

A    So what I was also told was that reports, press reports were about to run talking about my relationship with Chris Steele. So that's my -- but when they say untimely reporting, I think it's basically these press reports are about to run.  We didn't have all the information.

Mr. Baker.  Okay.  Thank you.

        BY MR. PARMITER:

COMMITTEE SENSITIVE

Q   One last question, sir.

A   Just for you.

Q   Can you tell me what sort of -- email servers is the wrong word -- email -- like, apps and email services you used to communicate with Mr. Steele and Mr. Simpson?

A   I used WhatsApp, which is I think what that reflects. We had some Skype calls.  I don't remember if there were any Skype texts or anything like that.  I couldn't -- I don't think I could find anything.  And then we had some telephone calls.

Q   Okay.  And regarding email, I mean did you email Mr. Simpson or Mr. Steele using --

A   Yeah.  There were some emails that I produced relating to my work email, and there was at least that one communication from Glenn Simpson on our home email.

Q   Okay.  And what was the -- why use Skype?

A   I think there was -- I remember Chris Steele saying sometime earlier, maybe years earlier, that he liked using Skype.

Q   Okay.  But that list right there you think you could confidently say you used to communicate with both of them?

A   No.  With Chris Steele, Skype, WhatsApp, some emails. With Glenn Simpson, I don't think there was ever any Skype or WhatsApp, just some emails, and then, of course, meeting in person.

Q   Okay.  And forgive me if you've already answered this, did you first meet Mr. Simpson before or after the election, if

you recall?

A    I've known -- met Mr. Simpson on various occasions over the years, you know, so --

Mr. Parmiter.  Okay.  I think that's all we have.

Mr. Ohr.  All right.

Mr. Parmiter.  Thank you.

Ms. Hariharan.  All right.  We are back on the record for the minority.  It is 4:50 p.m., and hopefully we can do this really quickly.

BY MS. HARIHARAN:

Q    So there has been a significant amount of attention placed on not just you and your professional contacts, and your wife and her professional contacts, but your family in general.  There has been a significant number of attacks in the public, and I cannot imagine what that is like, and I'm very sorry you have to deal with that.  So if you will bear with us, we're going to go through some of the allegations that have been made in these public attacks just to get them out of the way.

So President Trump has been quoted as saying, quote:  They should be looking at Bruce Ohr and his wife Nellie for dealing with -- by the way, indirectly -- Russians," end quote.  For the record, have you or Mrs. Ohr engaged in a conspiracy to interfere in the U.S. election process with Russian individuals or entities?

A    No.

Q    Do you know what the President is getting at when he

accuses you and your wife of, quote, "dealing with -- by the way, indirectly -- Russians," end quote?

A   No.

Q   I know you have previously discussed your wife's background and the type of work she was doing for Fusion GPS, and I'm not going to force you to repeat that.  The understanding is she was doing open source research translating Russian language materials because of her background.

To the best of your knowledge, was she reviewing any type of classified or highly sensitive materials or was --

A   No.

Q   Okay.  So in general, if Mrs. Ohr was working on a sensitive project, would she -- for one of her clients.  As I understand, she had multiple clients, correct --

A   She was --

Q   -- over a period of --

A   She was working for Fusion GPS during part of the period we have been discussing.

Q   Right.  When she works on sensitive projects, does she discuss those details with you?

A   Generally, no.

Q   And on the flip side, have you discussed details of your cases with her?

A   No.

Q   At any time prior to the 2016 election, did she ask you

COMMITTEE SENSITIVE

to provide your professional opinion about any research concerning Donald Trump?

A    I don't recall anything like that, no.

Q    Or the Russian entities -- or, excuse me, Russian individuals or companies she was researching?

A    She didn't ask me for my professional opinion.

Q    Okay.  Do you have any reason to believe that prior to the 2016 election, your wife had any knowledge of the FBI's broader Russian investigation, or the FBI's Russian collusion investigation?

A    No.

Q    Do you have any reason to believe that Mrs. Ohr sought or reviewed any FISA applications related to the Russian investigation?

A    No, she did not.

Q    And to your knowledge, beyond the open source research that she was conducting, was Mrs. Ohr involved in meeting with sources to gather information?

A    She was not.

    BY MS. SHEN:

Q    So, Mr. Ohr, within the past few weeks, President Trump has put you in name -- has named you in his Tweets about nine times to my count, and I will have the fortunate pleasure of reading you a couple of those now and asking you some questions.

    So on August 17, 2018, Donald Trump tweeted, quote:  "FOX

News has learned that Bruce Ohr wrote Christopher Steele following the firing of James Comey stating that he was afraid the anti-Trump Russia probe will be exposed, Charles Payne on FOX Business.  How much more does Mueller have to see?  They have blinders on.  Rigged."

So, Mr. Ohr, did you write Christopher Steele following the firing of James Comey because you were, quote, "afraid the anti-Trump Russia probe will be exposed"?

A   No.

Q   Okay.  So your writing to Christopher Steele following the firing of James Comey had nothing to do with the Trump/Russia probe.  Is that accurate?  To the Steele -- I'm sorry.

So your communications with Christopher Steele after the firing of James Comey was not due to any concern that either you or Mr. Steele would be exposed as some -- as part of some kind of conspiracy.  Is that correct?

A   I don't think so, if I understand your question.

Q   Okay.

BY MS. HARIHARAN:

Q   Do you recall if that conversation was a discussion about sources and concerns for their safety?

A   I think -- I don't know if that's -- that's what I was trying to remember, but our conversations were about the concern for the source's safety.

BY MS. SHEN:

Q   Okay.  Also in August 17, 2018, President Trump tweeted, quote:  Bruce Ohr of DOJ is in legal jeopardy.  It's astonishing that he's still employed.  Bruce and Nellie Ohr's bank account is getting fatter and fatter because of dossier that they are both peddling.  He doesn't disclose it under Fed regs.  Using your Federal office for personal, dot, dot, dot, dot, dot.

It continues to a second tweet on the same day:  Using your Federal office for personal financial gain is a Federal gratuity statute violation, bribery statute violation, honest services violation, all major crimes, dot, dot, dot, because the DOJ is run by blank Jeff Sessions.  So when does Mueller do what must be done?  Probably never, @FOXNews.

Okay.  Mr. Ohr, are you in some kind of legal jeopardy that you're aware of?

A   Not that I'm aware of.

Q   Okay.  And is it true that your, or your wife's bank account is getting fatter and fatter because of the Trump dossier?

A   I don't believe so.

Q   Okay.  So did you or your wife make any money as a result of the Trump dossier?

A   I don't believe so.

Q   Okay.  So -- well, in reference to Trump dossier, when it says he didn't disclose under Federal regs, you and your wife didn't actually make any money off the Trump dossier, therefore, there would be no reason to disclose such a thing under Federal

regs, if that's --

A   Yes, correct.

Q   So you were also being accused of, quote, using your office for personal financial gain.  Mr. Ohr, have you used your Federal office for any personal financial gain?

A   No.

Q   Okay.  And have you committed any major crimes?

A   No.

Q   Okay.  Thank you.

Ms. Hariharan.  So I think we'll just end with, we are very grateful that you've taken the time to be here with us.  We cannot possibly imagine what this experience must have -- what the past year must have been like.  And for that, we are very sorry.

And if there is anything you would like to share with us, because most folks don't get the opportunity to address, especially these kind of -- the public attacks that have occurred via social media and other outlets, if there's anything you would like to say, the floor is yours.

Mr. Ohr.  I don't think I have anything to add.  As I said before, I'm happy, privileged to work for the Department of Justice, and I continue to pursue that mission.

Mr. Berman.  All right.  Then I believe we are done and under 10 minutes.  We're off the record at 4:57.  Thank you so much.

[Whereupon, at 4:57 p.m., the interview was concluded.]

COMMITTEE SENSITIVE

Certificate of Deponent/Interviewee

I have read the foregoing ____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

_____

Witness Name

_____

Date

COMMITTEE SENSITIVE

EXHIBIT 4

**RUSSIA INVESTIGATION**

**Published** March 25, 2019

# Trump allies await results of two internal probes that could expose Russia investigation backstory

By **Gregg Re I Fox News**

Following the revelation that Special Counsel Robert Mueller unearthed no evidence that President Trump or his campaign colluded with Russia to sway the 2016 election, Trump allies are now awaiting the results of two long-running internal probes that could expose the backstory behind the Russia probe's beginnings -- and provide more detail on already-documented misconduct among top FBI and DOJ officials.

DOJ Inspector General (IG) Michael Horowitz confirmed at a panel discussion last week that his office is continuing to review potential surveillance abuses by the FBI, a review that began last March and that Fox News is told is nearing completion. Horowitz has previously found that senior FBI officials routinely leaked information without authorization to the media, and also received "improper gifts" from reporters, including meals and sporting event tickets. Most notably, Horowitz found that FBI officials' anti-Trump communications raised doubts as to the integrity of their work.

Republicans, meanwhile, are increasingly looking for answers from U.S. Attorney for Utah John Huber, who was appointed a year ago by former Attorney General Jeff Sessions to review not only surveillance abuses by the FBI and DOJ, but also authorities' handling of the probe into the Clinton Foundation. Huber, Republicans have cautioned, has apparently made little progress, and spoken to few key witnesses and whistleblowers.

But in January, then-Acting Attorney General Matthew Whitaker reportedly indicated at a private meeting that Huber's work was continuing apace.

Among the primary looming questions that the IG has said he will address, and that Huber is expected to review: Did the FBI follow all applicable "legal requirements" when FBI lawyer Lisa Page and then-Deputy Director Andrew McCabe obtained a Foreign Intelligence Surveillance Act (FISA) warrant to surveil Trump aide Carter Page -- weeks before the 2016 presidential election -- by relying heavily on a dossier created by a firm working for the Hillary Clinton campaign and the Democratic National Committee (DNC)?

Internal text messages exclusively published last week by Fox News showed that a senior DOJ official apparently battled with the FBI over the political bias of the author of the dossier, British ex-spy Christopher Steele. The unverified dossier was eventually published by BuzzFeed News, fueling months of speculation about the Trump team's alleged ties to Russia -- even though key

assertions in the dossier have since been contradicted or proven entirely unsubstantiated.



**Michael Horowitz, inspector general of the Justice Department, testifies before a Senate Judiciary Committee in Hart Building titled "Oversight of the Foreign Agents Registration Act and Attempts to Influence U.S. Elections: Lessons Learned from Current and Prior Administrations," on July 26, 2017. (Photo By Tom Williams/CQ Roll Call) (CQ Roll Call via AP Images) (2017 CQ-Roll Call, Inc.)**

The texts also showed FBI brass circulating a Mother Jones article, among others, that racheted up media attention on Carter Page's supposed links to Russian officials and ominously warned of a "Russian Operation to Cultivate Donald Trump." One anti-Trump blog post circulated by Lisa Page, which she said had "surely" been read by then-FBI Director James Comey, called Trump a "useful idiot" for Russian President Vladimir Putin. Another, which Lisa Page called a "must read," characterized Trump as a national security threat.

Carter Page, who is not related to Lisa Page, has not been

charged with any wrongdoing despite more than a year of federal surveillance, and he is now suing multiple actors, including the Democratic National Committee, for defamation.

In its FISA application, the FBI incorrectly assured the FISA court that a Yahoo News article provided an independent basis to surveil Page, even though Steele was the source of the Yahoo News article. The FISA application also did not make clear that the Steele application had been funded by Fusion GPS, a firm retained by the Clinton team -- it instead only stated that Steele's work was done in connection with a campaign.

The text messages also revealed that, just days after Trump said during an October 2016 presidential debate that a special prosecutor should investigate the tens of thousands of emails deleted from Hillary Clinton's private email server, Lisa Page pushed for the FISA warrant to monitor the Trump aide.

"We have a FISA-related review that people might have heard about that the deputy attorney general asked us to take a look at," Horowitz told attendees at a Washington, D.C. event organized by the Atlantic Council. He took no further questions on the topic. Although only the government presents a case at FISA warrant hearings, defendants retain their constitutional rights against unlawful searches, and DOJ guidelines preclude the FBI from omitting exculpatory evidence, or misrepresenting sources, in FISA applications.

Separately, federal investigators are also continuing their review of systemic leaks at all levels of the FBI. Former FBI Acting Director McCabe was fired from the bureau in March 2018 after it was determined he lied to FBI investigators and Comey about a leak four times, including under oath, and a grand jury has been impaneled to investigate the matter.

McCabe, officials say, authorized a leak to a newspaper reporter about the contents of a telephone call on August 2016 in order cast himself in a positive light in the upcoming story about an investigation involving Hillary Clinton. While McCabe had the authority to authorize such a disclosure, the IG determined that the authorization was aimed at advancing his own rather than the bureau's interests.



**Newly obtained texts between Andrew McCabe and Lisa Page reveal that they mocked President Trump**

Fox News obtained texts between former Deputy FBI Director Andrew McCabe and former FBI lawyer Lisa Page revealing that the two shared derogatory blogs about Trump and mocked former Congressman Trey Gowdy; Catherine Herridge reports.

DOJ investigators have also uncovered a slew of unauthorized contacts between FBI agents and reporters. Remarkably, at least two unauthorized phone calls to reporters came from an "unattributed FBI HQ phone number," the IG said last year -- suggesting that some employees at the bureau were brazenly leaking information from phones in the agency's headquarters in Washington, D.C.

Huber's mysterious investigation, meanwhile, has been dogged by allegations that he has not interviewed witnesses who could shed light on those topics. In a January letter to Mr. Huber, Ohio GOP Rep. Jim Jordan and Georgia GOP Rep. Doug Collins said they interviewed dozens of witnesses while his probe was simultaneously running.

"During the course of our extensive investigation we have interviewed more than a dozen current and former DOJ and FBI personnel, and were surprised to hear none of these potentially informative witnesses testified to speaking with you," Jordan, the ranking member of the House Judiciary Committee, and Collins, the ranking member of the House Oversight and Government Reform Committee, wrote to Huber.

In an interview with The Washington Times last October, Jordan emphasized his bafflement: "I would just like to

know what he's doing. I'll take anything. All I know is that we haven't heard a single thing about what he's doing."



**Republicans have charged that John Huber, the U.S. Attorney assigned to probe the FBI's handling of Clinton and FISA matters, has not done his job. (Official government photo.)**

In a deep dive published late last year, RealClearInvestigations reported that Huber's appointment was internally seen as little more than a political effort to placate Republicans.

"At the time, people wanted a special counsel, but Jeff Sessions announced he brought in Huber and people said, 'OK, we got Huber on it,'" former Justice Department prosecutor Victoria Toensing told the outlet. "But it was a head fake."

Toensing added: "It's a farce. It's an embarrassment how this has been handled." (Weeks later, Whitaker reportedly told former Attorney General Ed Meese over breakfast, in a meeting first reported by the Associated Press, that

Huber's work was ongoing.)

Carter Page told The Washington Times late last year that he had not spoken to Mr. Huber, but was eager to do so.

Justice Department official Bruce Ohr also told Congress in August that he had not spoken with Huber. Ohr effectively served as a back channel between Steele and the FBI, after the FBI dropped Steele as a source for leaking to the media.

New details, nevertheless, have emerged about the FBI's handling of its investigation into the Clinton Foundation -- ostensibly an area of focus for Huber. Among the key new information: The Justice Department "negotiated" an agreement with Clinton's legal team in 2016 that ensured the FBI did not have access to emails on her private servers relating to the Clinton Foundation.

Former FBI special agent Peter Strzok, who was fired for breaking FBI protocol by sending numerous anti-Trump text messages on his government-issued phone while working as the No. 2 official on the Clinton and Trump investigations, first acknowledged the arrangement during a secretive closed-door appearance before the House Judiciary Committee last summer.

 

**Senior Justice Department official Bruce Ohr, left, continued to communicate with former British spy Christopher Steele, right, even after the FBI cut ties with him. (AP)**

Republicans late last year renewed their efforts to probe the Clinton Foundation, after tax documents showed a plunge in its incoming donations after Clinton's 2016 presidential election loss. The numbers fueled longstanding allegations of possible "pay-to-play" transactions at the organization, amid a Justice Department probe covering foundation issues.

Even aside from the probes by Huber and the IG, Republicans on Monday called for new inquiries, including a special counsel to probe "the other side of the story." Mueller's probe, conservatives noted, produced multiple indictments for "process crimes" -- including lying to federal authorities -- but no evidence of collusion by any American with Russia. Some individuals who admitted to lying to investigators about the full extent of their communications with Russians, including former National

Security Adviser Michael Flynn, had also lied to Trump administration officials about the same topic.

"I'd like to find somebody, like a Mr. Mueller, that can look into what happened with the FISA warrants, the counterintelligence investigation," Senate Judiciary Committee Chairman Lindsey Graham, R-S.C., said Monday. "Am I right to be concerned? It seems pretty bad on its face—but there are some people that are never going to accept the Mueller report, but by any reasonable standard, Mueller thoroughly investigated the Trump campaign. You cannot say that about the other side of the story."

Graham added: "I hope Mr. Barr will appoint somebody outside the current system to look into these allegations, somebody we all trust, and let them do what Mueller did," he continued, adding that he has been calling for the appointment of a second special counsel since 2017 to investigate "whether or not a counterintelligence investigation was opened as a back door to spy on the Trump campaign."

"A counterintelligence investigation is designed to protect the entity being targeted by a foreign power…I still am at a loss as to why nobody went to President Trump to tell him," Graham told reporters.

Fox News' Catherine Herridge, Brooke Singman, and The Associated Press contributed to this report.

EXHIBIT 5



# The Russian collusion hoax meets unbelievable end

by <u>Rep. Devin Nunes</u>
April 05, 2019 12:00 AM

As the Russia collusion hoax hurtles toward its demise, it's important to consider how this destructive information operation rampaged through vital American institutions for more than two years, and what can be done to stop such a damaging episode from recurring.

While the hoax was fueled by a wide array of false accusations, misleading leaks of ostensibly classified information, and bad-faith investigative actions by government officials, one vital element was indispensable to the overall operation: the Steele dossier.

Funded by the Hillary Clinton campaign and the Democrat National Committee, which hid their payments from disclosure by funneling them through the law firm Perkins Coie, the dossier was a collection of false and often absurd accusations of collusion between Trump associates and Russian officials. These allegations, which relied heavily on Russian sources cultivated by Christopher Steele, were spoon-fed to Trump opponents in the U.S. government, including officials in law enforcement and intelligence.

The efforts to feed the dossier's allegations into top levels of the U.S. government, particularly intelligence agencies, were championed by Steele, Fusion GPS co-founder Glenn Simpson, and various intermediaries. These allegations were given directly to the FBI and Justice Department, while similar allegations were fed into the State Department by long-time Clinton aide Sidney Blumenthal.

Their efforts were remarkably effective. Officials within the FBI and DOJ, whether knowingly or unintentionally, provided essential support to the hoax conspirators,

bypassing normal procedures and steering the information away from those who would view it critically. The dossier soon metastasized within the government, was cloaked in secrecy, and evaded serious scrutiny.

High-ranking officials such as then-FBI general counsel James Baker and then-Associate Deputy Attorney General Bruce Ohr were among those whose actions advanced the hoax. Ohr, one of the most senior officials within the DOJ, took the unprecedented step of providing to Steele a back door into the FBI investigation. This enabled the former British spy to continue to feed information to investigators, even though he had been terminated by the FBI for leaking to the press and was no longer a valid source. Even worse, Ohr directly briefed Andrew Weissmann and Zainab Ahmad, two DOJ officials who were later assigned to special counsel Robert Mueller's investigation. In short, the investigation was marked by glaring irregularities that would normally be deemed intolerable.

According to Ohr's congressional testimony, he told top-level FBI officials as early as August or September 2016 that Steele was biased against Trump, that Steele's work was connected to the Clinton campaign, and that Steele's material was of questionable reliability. Steele himself confirmed that last point in a British court case in which he acknowledged his allegations included unverified information. Yet even after this revelation, intelligence leaders continued to cite the Steele dossier in applications to renew the Foreign Intelligence Surveillance Act warrant on former Trump campaign adviser Carter Page.

It is astonishing that intelligence leaders did not immediately recognize they were being manipulated in an information operation or understand the danger that the dossier could contain deliberate disinformation from Steele's Russian sources. In fact, it is impossible to believe in light of everything we now know about the FBI's conduct of this investigation, including the astounding level of anti-Trump animus shown by high-level FBI figures like Peter Strzok and Lisa Page, as well as the inspector general's discovery of a shocking number of leaks by FBI officials.

It's now clear that top intelligence officials were perfectly well aware of the dubiousness of the dossier, but they embraced it anyway because it justified actions they wanted to take — turning the full force of our intelligence agencies first against a political candidate and then against a sitting president.

The hoax itself was a gift to our nation's adversaries, most notably Russia. The abuse of intelligence for political purposes is insidious in any democracy. It undermines trust in democratic institutions, and it damages the reputation of the

brave men and women who are working to keep us safe. This unethical conduct has had major repercussions on America's body politic, creating a yearslong political crisis whose full effects remain to be seen.

Having extensively investigated this abuse, House Intelligence Committee Republicans will soon be submitting criminal referrals on numerous individuals involved in these matters. These people must be held to account to prevent similar abuses from occurring in the future. The men and women of our intelligence community perform an essential service defending American national security, and their ability to carry out their mission cannot be compromised by biased actors who seek to transform the intelligence agencies into weapons of political warfare.

*Rep. Devin Nunes, a Republican, represents California's 22nd Congressional District. He is ranking member of the House Intelligence Committee.*

EXHIBIT 6

LINDSEY O. GRAHAM, SOUTH CAROLINA, CHAIRMAN

CHARLES E. GRASSLEY, IOWA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JOSHUA D. HAWLEY, MISSOURI
THOM TILLIS, NORTH CAROLINA
JONI ERNST, IOWA
MIKE CRAPO, IDAHO
JOHN KENNEDY, LOUISIANA
MARSHA BLACKBURN, TENNESSEE

DIANNE FEINSTEIN, CALIFORNIA
PATRICK J. LEAHY, VERMONT
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
KAMALA D. HARRIS, CALIFORNIA

# United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

March 7, 2019

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

Dear Attorney General Barr:

Through the Foreign Intelligence Surveillance Act (FISA), Congress granted the Executive the ability to seek classified warrants to conduct surveillance on Americans from a special, secret court that meets behind closed doors. Given the nature of these warrants and the court that grants them, the public's confidence in the FISA process is based on assurances, such as those set forth in the 2001 Woods procedures, that FISA applications will undergo rigorous review before being submitted to the Foreign Intelligence Surveillance Court (FISC). Only through strict adherence to procedures like those set forth in the Woods memo and production by the government to the FISC of all material and relevant facts, can the public continue to have confidence in FISA.

To that end, the Committee is concerned that the Woods procedures and a full presentment of material and relevant facts may not have occurred with regard to the applications for FISA warrants for (and the opening of the underlying investigations on) Carter Page and other individuals associated with the presidential campaign of Donald Trump. Accordingly, the Committee will continue to examine this Congress, as this Committee and several other congressional committees did last Congress, potential abuse of the FISA and investigation initiation processes with regard to Carter Page and others associated with the Trump campaign.

In order to aid the Committee's examination of these matters, I request that the Department provide the Committee with the following documents by no later than March 21, 2019:

1. All documents and communications originally shared with the Gang of Eight in May 2018 related to the investigation into Russian interference in the 2016 election.

2. The "Woods file" related to the application for (and subsequent renewals of) a FISA order authorizing surveillance on Carter Page. The term "Woods file" includes, but is not limited to, any document concerning or relating to any attempt to verify the accuracy of any alleged facts stated in the FISA applications for Mr. Page.

Attorney General Barr
March 7, 2019
Page 2 of 2

3. All documents and communications referring or relating to efforts to verify the contents of the "Steele dossier." The term "Steele dossier" includes, but is not limited to, a series of intelligence reports prepared by Christopher Steele that were transmitted to, among others, the Department.

4. All documents and communications referring or relating to the role or extent to which the Steele Dossier factored into the Carter Page FISA application.

5. All documents and communications referring or relating to Christopher Steele's contacts with members of the media and the reliability of the information provided, directly or indirectly, by Christopher Steele.

6. All documents and communications that govern the procedures, standards, rules, regulations, or policies that the Department, including the Federal Bureau of Investigation, must follow in seeking a FISA warrant from the FISC.

7. All documents and communications with the FISC referring or relating to any FISA applications associated with Carter Page or other individuals on or associated with Donald Trump's 2016 presidential campaign.

8. All FD-302s for Bruce Ohr and any other individual at the Department, the FBI, or elsewhere in the federal government who received information from individuals outside the Department or the FBI that was used in the Carter Page FISA applications.

9. All documents and communications referring or relating to defensive briefings provided (or that were under consideration to be provided) to the presidential campaigns of Hillary Clinton, Donald Trump, or any other 2016 presidential candidate.

If you have any questions about these requests, please have your staff contact Zachary Somers with majority staff on the Committee. Thank you for your prompt attention to this matter.

Sincerely,

Lindsey O. Graham
Chairman

cc:   The Honorable Dianne Feinstein
      The Honorable Christopher Wray